UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

**FILED**

SEP 1 7 2002

U.S. BANKRUPTCY COURT
BY_____DEPUTY

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| MOLL INDUSTRIES, INC. | ) | Case No. 02-54341-RBK |
|  | ) |  |
| Debtor. | ) |  |
|  | ) |  |

## DEBTOR'S MOTION FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTOR TO (A) OBTAIN POSTPETITION FINANCING, (B) GRANT SECURITY INTEREST AND PRIORITY, AND (C) PROVIDE ADEQUATE PROTECTION TO PREPETITION SECURED LENDERS AND (II) SCHEDULING FINAL HEARING PURSUANT TO BANKRUPTCY RULE 4001

### THE DEBTOR REQUESTS THAT THIS MATTER BE CONSIDERED AT THE DEBTOR'S FIRST DAY HEARINGS

Moll Industries, Inc., the debtor and debtor in possession in this Chapter 11 case (the "Debtor" or "Moll") files this motion (the "Motion") for interim and final orders (i) authorizing the debtor to (a) obtain postpetition financing, (b) grant a security interest and priority, and (c) provide adequate protection to prepetition secured lenders and (ii) scheduling a final hearing pursuant to Rule 4001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

### Jurisdiction

1.      The Court has jurisdiction over this Motion under 28 U.S.C. § 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. §157(b)(2)(A) and (O).

2.      Venue of the Debtor's Chapter 11 case and this Motion in this District is proper pursuant to 28 U.S.C. §§1408 and 1409.

3. The statutory bases for the relief requested herein are §§ 105 and 361 through 364 of the Bankruptcy Code and Bankruptcy Rules 4001 and 9014.

4. On September 6, 2002 (the "Petition Date"), affiliates of Highland Capital Management, L.P. ("Highland") who hold a majority of the Debtor's 10½% Series B Senior Subordinated Notes due in 2008 (the "Subordinated Notes") filed an involuntary Chapter 11 bankruptcy petition against the Debtor.

5. During the "gap" period, the Debtor continued to operate in the ordinary course of its business, while negotiating the debtor in possession financing facility with its proposed post-petition lenders and preparing various first day motions. Additionally, at the request of the Debtor's lenders, the Debtor engaged Nightingale & Associates, LLC on September17, 2002 to serve as its Chief Restructuring Officer and financial advisors.

6. On September 17, 2002, Moll filed an assent to convert the involuntary case to a voluntary case under Chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). The Debtor continues to operate its business and manage its property as a debtor and debtor in possession, pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

## The Debtor's Business[1]

### *Moll is a leading manufacturer and designer of custom molded and assembled plastic components*

7. The Debtor is a leading full service manufacturer and designer of custom molded and assembled plastic components for a broad variety of customers and end markets throughout North America and in Europe and Brazil. The Debtor was formed through the merger in 1998 (the "Merger") of two leading plastics injection molders, Moll PlastiCrafters Limited Partnership

---

[1] The facts set forth herein are supported by the affidavit of William W. Teeple filed contemporaneously herewith.

("Moll L.P.") and Anchor Advanced Products, Inc. ("Anchor Advanced"), which were each controlled by Mr. George T. Votis. Immediately prior to the Merger, Moll L.P. and Anchor Advanced were independently operated entities. Anchor Advanced survived the Merger and changed its name to "Moll Industries, Inc."

8. The Debtor operates domestic manufacturing, design, or related facilities located in San Antonio, TX; Austin, TX; El Paso, TX; Morristown, TN; Lavergne, TN; Ft. Smith, AR; Newberg, OR; Seagrove, NC; Fairport, NY; Evansville, IN; and Duluth, GA. The Debtor constitutes a significant presence in its host communities and employs approximately 1,096 employees. Its workers are an asset, key to its reputation as a leader in the custom molded plastics industry.

*The Debtor's Corporate Structure*

9. Non-debtor AMM Holdings, LLC is a Delaware limited liability company whose only assets are the stock of AMM Holdings, Inc. AMM Holdings, Inc., a Delaware corporation and a non-debtor, is a holding company whose only assets are the outstanding capital stock of Anchor Holdings, Inc. ("Anchor"), which is also a Delaware corporation and a non-debtor. Anchor is a holding company whose only assets are the outstanding capital stock of Moll, a Delaware corporation.

10. The Debtor is the primary operating entity and parent to Moll Industries, LLC and Moll Brazil Holding, LLC, both Delaware limited liability companies and non-debtors. The Debtor owns 99.9% and Moll Brazil Holding, LLC owns 0.1% of Moll do Brazil LTDA, a Brazilian limited liability company. Moll Industries, LLC is the parent to Moll Plastics, LLC, also a Delaware limited liability company.

11.     The Debtor, together with non-debtor affiliates Moll Industries, LLC; Moll

Plastics, LLC; and Moll Brazil Holding, LLC, owns a 100% interest in the following foreign

subsidiaries, which are not debtors in proceedings before this Court:

        A.     Compression, Inc., an Ontario corporation;

        B.     Moll Industries UK, Limited, a United Kingdom private limited company;

        C.     Moll Industries, Limited, a United Kingdom private limited company;

        D.     Moll France SARL, a Société à Responsabilité Limitée (limited liability

company) formed under the laws of the Republic of France;

        E.     Moll do Brasil Ltda., a Brazilian limited liability company; and

        F.     Anchor Advanced Products Foreign Sales Corporation, a Barbados foreign

sales corporation.

### The Foreign Operations

12.     The Debtor derived approximately 36% of its 2001 net sales from its operations in

Europe.  The Debtor's international operations are subject to risks inherent in international

business activities, including, in particular, compliance with a variety of foreign laws and

regulations, unexpected changes in regulatory requirements, overlap of different tax structures,

foreign currency exchange rate fluctuations and general economic conditions.  The Debtor has

had financial difficulties relating to certain of its European facilities and continues to have such

difficulties.

13.     In light of the operational losses suffered in the UK and significant market

changes in the hand-held telecom sector which adversely affected demand for molded products,

the Debtor restructured its UK operations in an attempt to retain a viable manufacturing capacity

in the UK.  This restructure included (1) the disposal in January 2002 by Moll Industries Limited

of the non-core business of its wholly-owned subsidiary, Moll Engineering UK Limited and (2)

4

the formalization in March 2002 of a plan to consolidate the operations of the Debtor's Gloucester UK facility (previously owned and operated by Moll Industries UK Limited) into the facility of Moll Industries Limited located in Morecambe. The Debtor continues to monitor the UK situation in its attempt to retain a viable manufacturing capacity in the UK.

14.     Due to deteriorating financial performance, the Debtor decided in June 2002 to close its Villefranche, France facility. Moreover, the Debtor's French subsidiaries have been put on an "alert" status by their statutory auditors. In connection therewith, an overseer for the Debtor's French subsidiaries has been appointed by a French tribunal, the governmental body in France overseeing these matters. There can be no assurances that the situation will improve in France without an additional infusion of capital. The Debtor has no source for an infusion of capital into its French subsidiaries. Without this additional money, the French subsidiaries could be forced into a bankruptcy filing in France. Given the current situation in France, there are no assurances that the Debtor's French subsidiaries will have any continuing value to the Debtor. Rather, they pose a drain on an already extended management team in the United States and a risk of claims or litigation against the Debtor as the equity holder of its French subsidiaries.

15.     The Debtor's prices its products and incurs operating expenses in Europe in the currency of the country in which the product is manufactured and sold and, in the United States, in United States dollars. To the extent that costs and prices are in the currency of the country in which the products are manufactured and sold, the costs and prices of such products in dollars will vary as the value of the dollar fluctuates against such currencies. There can be no assurance that there will not be increases in the value of the dollar against such currencies that will reduce the dollar return to the Debtor on the sale of its products in such countries.

***Events Leading to Chapter 11***

16.     The Debtor's operating results have been lower than expected since the Merger. The disappointing results are primarily attributable to worse than expected performance in the Debtor's Brush, Display, Medical, and Compression divisions in North America and all of the European divisions, along with costs incurred to sell or close unnecessary facilities. Management of the Debtor has and continues to evaluate all of the Debtor's operations. These evaluations to date have resulted in:

A.     the sale of the metal fabrication business in March, 1999 to a supplier;

B.     the sale of a non-essential tool building division in March, 1999;

C.     the closing of the Round Rock, Texas molding facility, moving production from such facility to existing capacity in other of the Debtor's facilities;

D.     the sale of the Germany division, which had incurred significant losses due to declines in volume, in December, 1999;

E.     the sale of the Chalon, France tooling operation in June 2000;

F.     the discontinuance of the Display division in November, 2000;

G.     the sale of the Cosmetics division in November, 2000;

H.     the sale of the California location of the Compression division in December, 2000;

I.     the downsizing of the Morristown, Tennessee Brush facility in December, 2000;

J.     the consolidation of the operations of the Crissey, France facility into the Rouvray, France facility in May, 2001;

K.     the consolidation of the operations of the Morristown, Tennessee facility into other existing facilities in September, 2001;

L. the consolidation of the operations of the Rochester, New York facility into other existing facilities in September, 2001;

M. the closure of the tooling operation in Mansfield, UK;

N. the consolidation of the operations in Gloucester, UK into the Morecambe, UK facility in March, 2002;

O. the decision in June, 2002 to close the Villefranche, France facility, and

P. significant overhead reduction commencing in December, 2001 and continuing into 2002.

17. Management continues to evaluate other divisions as to their future strategic fit within the organization and their projected results of operations. Subject to this Court's approval, additional locations or divisions may be sold or closed as management continues the evaluation.

18. Prior to the Petition Date, the Debtor took the following measures to reduce its debt structure:

A. In August 2000, the Debtor reduced its leverage by $7.5 million when it purchased through a tender offer $50.0 million of its previously issued 11¾% Series B Senior Notes due 2004 (the "Senior Notes") at a 15% discount, utilizing proceeds from the term loan and revolving loan of that certain Amended and Restated Credit Agreement dated as of August 9, 2000, among the lenders named therein, Bank of America, N.A., as agent, and Moll Industries, Inc., as amended, supplemented and otherwise modified (the "Senior Credit Facility"). This transaction resulted in a gain of $4.9 million that was recorded in 2000.

B. In November 2000, the Debtor used the proceeds of the sale of the Cosmetics division to purchase $41.4 million of the Senior Notes at a 15% discount, resulting in

a gain of $5.0 million that was recognized in 2000. The Debtor used remaining proceeds from the sale of the Cosmetics division to retire $11.4 million under the Senior Credit Facility.

        C.      In January 2001, the Debtor reduced its debt structure by an additional $8.6 million as it used availability under the revolving loan component of the Senior Credit Facility to repurchase through a tender offer $13.5 million of its outstanding Subordinated Notes at a 63.5% discount. This transaction resulted in a gain of $7.7 million that was recognized in 2001.

        D.      In December 2001, the Debtor further reduced its outstanding debt by $22.8 million by purchasing $28.8 million of the Subordinated Notes for $6.0 million. This reduction was financed through that certain Term Loan Credit Agreement dated as of December 21, 2001, among the lenders named therein, Bank of America, N.A. and any successor thereto, as agent, and Moll Industries, Inc., as amended, supplemented and otherwise modified (the "Mezzanine Facility"). The transaction resulted in a gain of $20.1 million that was recognized in 2001.

        E.      In January 2002, the Debtor utilized additional borrowings under the Mezzanine Facility to purchase $14.2 million of the Subordinated Notes for $6.4 million, resulting in a gain of $7.1 million and reduced leverage of $7.8 million.

      19.     As of the Petition Date, approximately $8.6 million remains outstanding under the Senior Notes and $73.5 million remains outstanding under the Subordinated Notes.

      20.     As of the Petition Date, the Debtor is a party to the Senior Credit Facility and the Mezzanine Facility. The Senior Credit Facility consists of a $30 million revolving credit facility of which $20.7 million is outstanding and a $10 million term loan facility, of which $9.3 million is outstanding. The Senior Credit Facility expires June 30, 2004.

21.    Pursuant to that certain Restructuring Agreement dated June 10, 2002, by and among AMM Holdings, Inc., Anchor Holdings, Inc., Moll, George T. Votis, Highland and Foothill Capital Corporation ("Foothill") (the "Restructuring Agreement"), Highland agreed to purchase all existing commitments and loans (other than those owned by Foothill) under the Debtor's Senior Credit Facility. Contemporaneously with the Restructuring Agreement, Bank of America and other lenders thereto sold all existing commitments and loans (other than those owned by Foothill) under the Senior Credit Facility to various investment funds collaterally managed by Highland. Shortly thereafter, Bank of America assigned to Foothill its position as agent under the Debtor's Senior Credit Facility. Subsequent to this transaction, investment funds collaterally managed by Highland own 81.25% and Foothill owns 18.75% of the commitments and loans under the Debtor's Senior Credit Facility.

22.    Under the Mezzanine Facility, $33.8 million is outstanding and various investment funds collaterally managed by Highland own 100% of the outstanding loans. The Mezzanine Facility expires December 31, 2004.

23.    The Debtor continued to experience significant financial liquidity problems following the implementation of the foregoing measures, as it attempted to improve its operating results. The Debtor failed to make a scheduled payment of interest on the Subordinated Notes in the amount of approximately $3.9 million due on July 1, 2002 and failed to cure such non-payment of interest within the 30-day period provided in that certain Indenture dated as of June 26, 1998, as supplemented by a First Supplemental Indenture dated as of December 28, 2001, by and between State Street Bank and Trust Company, as Trustee, and the Debtor (as so supplemented and amended, the "Indenture"). The Debtor was therefore in default, as of the Petition Date, under the terms of the Indenture. On July 19, 2002, the Debtor was informed by

the current agent for the Senior Credit Facility that "Events of Default" (as such term is defined in the Senior Credit Facility) were existing under the Senior Credit Facility. Some or all of these "Events of Default" are also events of default under the Mezzanine Facility.

24.     For more than a year prior to the execution of the Restructuring Agreement, the Debtor diligently pursued options to refinance the Senior Credit Facility, including:

A.     attempting a real estate refinancing which failed because the proposed structure violated the terms of the Debtor's indentures;

B.     attempting a refinancing with a new lender which failed due to environmental underwriting concerns;

C.     engaging an advisor to locate possible lenders and the unsuccessful pursuit of a refinancing with such lenders; and

D.     most recently, attempting a refinancing with other lenders which ultimately failed due to the Debtor's inability to find a lender which would lend appropriate amounts against the Debtor's real estate collateral.

All such attempts at refinancing the Senior Credit Facility were unsuccessful.

25.     In June, 2002, the Debtor faced a liquidity crisis related to the scheduled interest payment on the Subordinated Notes, at which time the only viable financing option, which would provide the Debtor with the immediate liquidity it needed that could be effected in time to prevent an emergency bankruptcy filing was entering into the Restructuring Agreement with Highland. Although this transaction with Highland did not solve the Debtor's long term liquidity problems, at that time it was the only proposal put forth by any lending institution that would provide the Debtor with sufficient current liquidity and therefore presented the best and only alternative for strengthening the Debtor's financial situation and preserving and maximizing value for all its constituencies, including its creditors.

26.     Following the acquisition of a majority position in the Senior Credit Facility by Highland and pursuant to the terms of the Restructuring Agreement, the Debtor used its best efforts to effect a capital and debt restructuring outside of court, as the Debtor believed such to be in the best interests of all its constituencies.  On September 6, 2002, the involuntary petition was filed by the Highland managed bondholders as described above.

### Relief Requested

27.     By this Motion, the Debtor seeks entry of an interim Order:

A.     seeking the Court's authorization, pursuant to Sections 105 and 361 through 364 of title 11 of the United States Code (11 U.S.C. § 101 et seq., as amended, the "Bankruptcy Code") and Rules 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for the Debtor to obtain from Foothill Capital Corporation as Agent (the "Agent") for itself and certain Lenders (the "Lenders")[2], direct borrowings (the "Loans") and a subfacility for letters of credit, pursuant to that certain $50,000,000 SENIOR SECURED, SUPER-PRIORITY DEBTOR-IN-POSSESSION LOAN AND SECURITY AGREEMENT, to be dated as of the Closing Date (the "DIP Loan Agreement")[3] by and between the Debtor and the Lenders, to (i) finance the capital expenditure needs of the Debtor, (ii) fund ongoing working capital needs of the Debtor, (iii) permit the Debtor on the basis described below, and as may be provided in a Final Order, to pay the Prepetition Revolving Loans, Prepetition Term Loan and other prepetition claims and obligations owed to the Lenders and outstanding on September 17,

---

[2] Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed thereto in the DIP Loan Agreement.

[3] The DIP Loan Agreement was presented to this Court in substantially the form proposed to be executed by the Debtor and Lenders on the Closing Date, contemporaneous with the submission of the Motion.

2002 (the "Relief Date") pursuant to that certain Amended and Restated Credit Agreement, dated as of August 9, 2000, between the Debtor and the Lenders (as amended, supplemented or otherwise modified from time to time, the "Prepetition Loan Agreement") (which amounts are stipulated to be secured by substantially all of the assets of the Debtor), (iv) subject to the terms of the DIP Loan Agreement and the Interim Order, and as more fully described in the Interim Order, pay fees, costs, expenses, disbursements to professionals retained by the Debtor, or an official committee of unsecured creditors subsequently appointed in the Case pursuant to Section 1102 of the Bankruptcy Code (the "Committee"), the costs and expenses of the members of the Committee, as approved by the Court, and bankruptcy related charges as allowed by the Court and as permitted by the DIP Loan Documents, and (v) pay fees and expenses (including, without limitation, reasonable attorneys' fees and expenses) owed to the Lenders under the DIP Loan Agreement and the other DIP Loan Documents (as such term is defined below);

    B.  requesting, pursuant to Section 364(c) and (d) of the Bankruptcy Code, that the financing under the DIP Loan Agreement (i) have priority over any and all administrative expenses, including, without limitation, the kind specified in Sections 503(b) and 507(b) of the Bankruptcy Code, except for Carve-Out Expenses up to the Carve-Out Amount as provided for herein and (ii) be secured by a first priority security interest in, and lien upon, all existing and hereafter acquired property of the Debtor, and the Debtor's estate, of whatever kind or nature, real or personal, whether acquired prepetition or postpetition, including without limitation and by way of general description only, all real estate interests; all interests under leases, licenses or occupancy agreements covering personal or real property; all motor vehicles; all accounts and accounts receivable (including without limitation any tax refunds and any reimbursement rights); all agreements, contracts, contract rights, franchise rights, intercompany

notes, copyrights, trademarks and patents and other general intangibles; all deposit accounts, all instruments; all documents; all securities; all chattel paper; all loan proceeds; all other obligations in whatever form owing to the Debtor and all rights in the merchandise or services which give rise to any of the foregoing, all inventory, including, without limitation, raw materials, work in process, finished goods and other personal property held for lease or sale or to be furnished under contracts for service, or to be consumed in the Debtor's business; all machinery, equipment, furniture, furnishings, fixtures and other personal property acquired for use primarily in the Debtor's business; all causes of action, whether arising in contract, tort or otherwise; and all other claims and property recovered by or on behalf of the Debtor or Debtor's estate (exclusive of any avoidance actions available to the bankruptcy estate of the Debtor pursuant to Sections 544, 545, 547, 548, 549, 550, 553(b) or 724(a) of the Bankruptcy Code (the "Avoidance Actions") and molds and tools owned by third parties), and all substitutions, accessions and proceeds of all of the foregoing, including insurance related thereto or other proceeds (all of the foregoing, collectively, the "Collateral"), as provided for by Section 364(c) and (d) of the Bankruptcy Code, subordinate to only the valid, perfected and unavoidable senior liens (if any) defined as "Senior Claims" in the DIP Loan Agreement (the "Senior Claims"[4]) and the Carve-Out Expenses up to the Carve-Out Amount as provided for herein, and secured by a second priority security interest in and lien upon all Collateral otherwise encumbered by Senior Claims, all as provided by Section 364(c) of the Bankruptcy Code;

        C.     seeking the Court's authorization pursuant to Sections 361(a), 363(c) and 364(d)(1) of the Bankruptcy Code to provide adequate protection as set forth herein, to (i)

---

[4] As used herein, "Senior Claims" shall not include the liens, claims and security interest of the Prepetition Agent and the Prepetition Lenders under the Prepetition Loan Agreement or the Senior Subordinated Lenders under the Senior Subordinated Secured Note Agreement. Such liens, claims and security interests shall be "primed" herein by the financing under the DIP Loan Agreement in accordance with Section 364(d) of the Bankruptcy Code.

the Prepetition Lenders on account of their claims under the Prepetition Loan Agreement until such claims are paid in full pursuant and subject to the terms hereof and the Final Order, and (ii) the Senior Subordinated Secured Lenders under the Senior Subordinated Secured Note Agreement, which claims are to be "primed" by the financing provided herein;

D.    requesting, pursuant to Bankruptcy Rule 4001, that an interim hearing (the "Emergency Interim Hearing") be held before this Court on an emergency basis to consider entry of an interim order (this "Interim Order") authorizing the Debtor to obtain the financing contemplated in the DIP Loan Agreement, and further requesting that a final hearing (the "Final Hearing") thereafter be held before this Court to consider entry of a final order (the "Final Order") authorizing the financing contemplated by the DIP Loan Agreement, as set forth in the Motion and the DIP Loan Agreement and the other loan documents related thereto (collectively, with the DIP Loan Agreement, the "DIP Loan Documents")

28.    The Debtor requires immediate interim financing, among other things, to finance its ongoing capital expenditure and working capital needs until such time as a Final Hearing may be conducted. The Debtor is unable to obtain adequate unsecured credit allowable under Section 503(b)(1) of the Bankruptcy Code as an administrative expense and is unable to obtain, within the time required by their needs to avoid immediate and irreparable harm, other financing under Section 364(c) or (d) of the Bankruptcy Code on equal or more favorable terms than the DIP Loan Agreement and the other DIP Loan Documents. A facility in the amount provided by the DIP Loan Agreement and the other DIP Loan Documents is unavailable to the Debtor without the Debtor's granting to Lender, pursuant to Section 364(c) and (d) of the Bankruptcy Code, (i) priority claims, with respect to all Loans advanced post-petition, including reimbursement obligations with respect to Letters of Credit, and all other obligations of the

Debtor under the DIP Loan Agreement and the other DIP Loan Documents (collectively, the "Postpetition Obligations"), having priority over any and all administrative expenses, including, without limitation, the kind specified in Sections 105, 326, 330, 331, 503(b), 507(a), 507(b) and 726 of the Bankruptcy Code (except as otherwise expressly provided herein), and (ii) as security for all such Postpetition Obligations, a first priority senior security interest in the Collateral that is not otherwise encumbered by Senior Claims and a second priority security interest in and lien upon all Collateral otherwise encumbered by allowed Senior Claims (except as otherwise expressly provided in the Interim Order).

29. **Exigency.** The ability of the Debtor to obtain sufficient working capital and liquidity through the incurrence of new indebtedness under the DIP Loan Agreement and other financial accommodations under the DIP Loan Agreement is vital to the Debtor's estate and creditors thereof, so that the business needs of the Debtor's operations under normal business terms may be met. The preservation and maintenance of the going concern value of the Debtor is integral to a successful reorganization of the Debtor pursuant to the provisions of Chapter 11 of the Bankruptcy Code. Absent entry of the Interim Order, the Debtor's estate will be immediately and irreparably harmed.

30. **Good Faith Bargaining.** The DIP Loan Agreement and the other DIP Loan Documents have been negotiated in good faith and at arm's-length between the Debtor, the Agent and the Lenders, and any Loan extended and other financial accommodations made to the Debtor by the Agent and the Lenders pursuant to the Interim Order and the DIP Loan Agreement shall be deemed to have been extended by the Agent and Lenders in good faith, as that term is used in Section 364(e) of the Bankruptcy Code.

31. **Borrowing Authorization**. Upon finalizing and executing the DIP Loan Agreement and the other DIP Loan Documents and provided that the Debtor is not in default under the terms of the Interim Order, (a) the Debtor is immediately authorized to borrow or obtain Loans and Letters of Credit pursuant to the DIP Loan Agreement and the other DIP Loan Documents up to an aggregate amount of $12,000,000 principal of revolving Advances, as are necessary for the Debtor to continue to operate its business, in accordance with the availability and terms and conditions under the DIP Loan Agreement and the other DIP Loan Documents. Available financing and advances under the DIP Loan Agreement until the Final Hearing will be made only to fund the Debtor's ordinary working capital, capital expenditures and general corporate needs, in accordance with the Interim Order, the Budget and the DIP Loan Agreement and other amounts required or allowed to be paid pursuant to the DIP Loan Agreement. Until the Final Hearing, collections received by the Debtor on account of the Collateral in which the Lenders shall have a first priority security interest shall be applied to the Prepetition Revolving Loans and other claims and obligations outstanding, due and owing under the Prepetition Loan Agreement in accordance with the terms of the Interim Order and the DIP Loan Agreement until such amounts are paid in full, and, thereafter, to claims and obligations due and owing under the DIP Loan Agreement.

32. The Debtor notes that the proposed Interim Order contains the following stipulations:

**As to Debtor's Prepetition Obligations to the Prepetition Agent and the Prepetition Lenders and to Debtor's Subordinated Obligations to the Subordinated Agent and Senior Subordinated Lenders**

(i) Prior to the Relief Date, Foothill Capital Corporation, as a Lender and as successor Agent (the "Prepetition Agent") for itself and certain Lenders (the "Prepetition Lenders"), provided financing to the Debtor pursuant to that certain Prepetition Loan Agreement dated as of August 9, 2000 (as modified, amended or

otherwise supplemented from time to time prior to the Relief Date) (the "Prepetition Loan Agreement");

(ii)     Prior to the Relief Date, Highland Loan Funding V Ltd, Highland Crusader Offshore Partners, L.P., Pamco Cayman, Ltd. And Pam Capital Funding, L.P. (the "Senior Subordinated Lenders") with Foothill Capital Corporation as the successor agent (the "Subordinated Agent") and the Debtor entered into that certain Senior Subordinated Secured Note Agreement dated as of December 21, 2001 (as modified, amended or otherwise supplemented from time to time prior to the Relief Date) (the "Subordinated Loan");

(iii)    The Debtor hereby acknowledges and agrees that it has no offsets, defenses, claims, or counterclaims against the Prepetition Agent, Prepetition Lenders, Senior Subordinated Lenders and Subordinated Agent and their respective officers, directors, employees, attorneys, representatives, parent, affiliates, predecessors, successors, or assigns with respect to the claims under the Prepetition Loan Agreement and Subordinated Loan or otherwise and further acknowledges and agrees that if the Debtor now has or ever did had, any offsets, defenses, claims or counterclaims against the Prepetition Agent, Prepetition Lenders, Senior Subordinated Lenders, and Subordinated Agent, their respective officers, directors, employees, attorneys, representative, parent, affiliate, predecessors, successors or assigns, whether known or unknown, at law or in equity, as of the Relief Date, all of them are hereby expressly WAIVED, and the Debtor hereby RELEASES the Prepetition Agent, Prepetition Lenders, Senior Subordinated Lenders and Subordinated Agent and their respective officers, directors, employees, attorneys, representatives, parent, affiliates, predecessors, successors, and assigns from any liability thereunder;

(iv)     the liens and security interests held by the Prepetition Agent on behalf of the Prepetition Lenders under the Prepetition Loan Agreement and the other Prepetition Loan Documents and the liens and security interests held by the Senior Subordinated Lenders under the Subordinated Loan are valid, enforceable, properly perfected and non-avoidable and that in accordance therewith, the Prepetition Agent and Subordinated Agent shall be entitled to continue to charge to the account of the Debtor and to pay in accordance with the Prepetition Loan Agreement and Subordinated Loan all fees, expenses and other costs owing as of the Relief Date and which may arise in the normal course of the Debtor's business during the Chapter 11 Case;

(v)      the Debtor agrees and acknowledges that the Prepetition Agent's and the Prepetition Lenders' commitment to provide ongoing financing to the Debtor under the Prepetition Loan Agreement have been terminated by the Prepetition Agent and the Prepetition Lenders upon the Relief Date;

(vi)     the Debtor agrees and acknowledges that as of the Relief Date the principal balance due under the Prepetition Loan Agreement consisting of: (i) [$23,458,137.21] in respect of the Revolving Loans (as defined in the Prepetition

Loan Agreement) inclusive of Letters of Credit and (ii) [$8,938,312.80] in respect of the Term Loan (as defined in the Prepetition Loan Agreement), in each case, plus interest, fees, costs and other expenses (all of the afore-detailed indebtedness, including the fees, costs and legal and other expenses, being collectively referred to as the "Prepetition Obligations," such term including all "Obligations" owing under and as defined in the Prepetition Loan Agreement);

(vii) the Debtor agrees and acknowledges that as of the Relief Date the principal balance due under the Subordinated Loan was $33,804,785.83, plus interest, fees costs and other expenses (the "Subordinated Obligations").

**As to Debtor's Postpetition Obligations to the Agent and the Lenders**

(viii) the Debtor is not aware of any claim, counterclaim, setoff or defense of any kind or nature which would in any way (i) affect the validity, enforceability and non-voidability of the Postpetition Obligations owing or to be owing to the Agent and the Lenders or (ii) reduce or affect the obligations of the Debtor to pay any of such Postpetition Obligations;

(ix) in entering into the DIP Loan Documents, the Debtor acknowledges that it will receive substantial direct and indirect benefits by reason of the making of the Postpetition Obligations and other financial accommodations provided to Debtor in the DIP Loan Agreement;

(x) the Debtor has obtained all requisite corporate authorizations to enter into the DIP Loan Documents and the Debtor's entry into and performance under the DIP Loan Documents does not conflict with or constitute a violation or breach of any contract, mortgage, lease, agreement, indenture, or instrument to which Debtor is a party or which is binding upon Debtor. The Debtor has obtained all authorizations, consents and approvals necessary from, and made all filings with and given all notices to, all federal, state and local governmental agencies, authorities and instrumentalities required to be obtained, made or given by the Debtor in connection with the execution, delivery, performance, validity and enforceability of the DIP Loan Documents to which the Debtor is a party and none of the transactions contemplated by the DIP Loan Agreement (including, without limitation, the use of the proceeds of the Loans or other extensions of credit thereunder), will violate or result in a violation of Section 7 of the Securities Exchange Act of 1934, as amended, any regulations pursuant thereto, or Regulations T, U or X of the Board of Governors of the Federal Reserve System;

**The Budget, Cash Management and Reporting**

(xi) in entering into the DIP Loan Documents, and as consideration therefor, the Debtor hereby agrees that until such time as all Postpetition Obligations, Prepetition Obligations and Subordinated Obligations are paid in full in cash and commitments thereunder terminated, the Debtor will not make payments or incur any obligations other than those necessary to conduct Debtor's business as set

forth in the Budget as defined in the DIP Loan Agreement. The Debtor warrants and represents that the Budget includes all reasonable, necessary and foreseeable expenses to be incurred in the Debtor's ordinary course of business in connection with the operation of its business for the period set forth in the Budget;

(xii) the Debtor also agrees not to incur any administrative expenses other than as set forth in the Budget, including any permitted variances thereof, exclusive of professional fees whose engagements are approved by the Bankruptcy Court pursuant to 11 U.S.C. § 327 and fees payable pursuant to 28 U.S.C. § 1930 (as set forth in the Budget) without the prior consent of the Agent and Lenders or approval by the Bankruptcy Court after notice to the Agent and a hearing;

(xiii) the Debtor, the Agent and the Lenders may modify the Budget, to take effect upon five (5) business' days written notice to any Committee and the U.S. Trustee, without further order of this Court;

(xiv) in entering into the DIP Loan Documents, and as consideration therefor, the Debtor hereby agrees that until such time as all Postpetition Obligations, Prepetition Obligations are indefeasibly paid in full in cash, the Debtor agrees to deliver to the Agent such financial and other information as the Agent and Lenders shall reasonably request including, but not limited to the following: (x) any financial information and pleadings filed with the Bankruptcy Court; (y) all other financial information and reports prepared by the Debtor, including any financial information required by the Bankruptcy Court or by the Operating Guidelines and Reporting Requirements of the United States Trustee's Office; and (z) all other reports and financial information required by the DIP Loan Agreement;

**No Priming**

(xv) in entering into the DIP Loan Documents, and as consideration therefor, the Debtor hereby agrees that until such time as all Postpetition Obligations, Prepetition Obligations and Subordinated Obligations are indefeasibly paid in full in cash, the Debtor shall not in any way prime either the liens provided to (i) the Agent in favor of the Lenders under the terms of this Interim Order, (ii) the currently existing liens and security interests granted to (i) the Prepetition Agent for the benefit of the Prepetition Lenders, or (iii) the Subordinated Agent for the benefit of the Senior Subordinated Lenders, except as contemplated by this Interim Order or any related Final Order, by offering a subsequent DIP Lender or a party-in-interest a superior or pari passu lien or claim pursuant to Section 364(d) of the Bankruptcy Code; and

**The Agent Not in Control of the Debtor's Operations**

(xvi) in making the decision to make Loans and to extend other financial accommodations to the Debtor under the DIP Loan Agreement or to collect the indebtedness and obligations of the Debtor, the Agent shall not be deemed to be in control of the operations of the Debtor or to be acting as a responsible person or

owner or operator with respect to the operation or management of the Debtor (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation, and Liability Act, as amended, or any similar Federal or State statute).

33.     The foregoing stipulations shall be binding on the Debtor and the Debtor's estates, and the Debtor's successors and assigns for all purposes in these Cases, but shall not bind the Committee, and if no Committee is appointed shall not bind any non-debtor party in interest, unless and until further order of the Court after notice and a hearing or the passing of the Investigation Termination Date (as defined below) with no objection, adversary proceeding or appropriate litigation being initiated in accordance with Paragraph 8 of the Interim Order.

34.     The Debtors further respectfully request that the Interim Order further provide that:

(i)     **Investigation Rights.** Notwithstanding anything herein to the contrary, the Committee, shall have ninety (90) days from the date the Committee, or the Committee's counsel, receives the Prepetition Loan Documents and Subordinated Loan documents (and in the event a Committee is not appointed, all non-debtor parties in interest shall have sixty (60) days from the Relief Date (the "Investigation Termination Date") to investigate the validity, perfection and enforceability of the Prepetition Liens, the prepetition liens under the Subordinated Loan, the Prepetition Obligations, or the Subordinated Obligations, or to assert any other claims or causes of action against the Prepetition Agent, Prepetition Lenders, Senior Subordinated Lenders, or Subordinated Agent. If the Committee, or any non-debtor party in interest, determine that there may be a challenge to the Prepetition Liens, Prepetition Obligations or Subordinated Obligations by the Investigation Termination Date, upon two (2) business days written notice to the Debtor, the Prepetition Agent and the Senior Subordinated Lenders, the Committee, or other non-debtor party in interest, shall be permitted to file and prosecute an objection or claim related thereto, and shall have only until the Investigation Termination Date to file such objection or otherwise initiate an appropriate action or adversary proceeding on behalf of the Debtor's estate setting forth the basis of any such challenge, claim or cause of action. If such action is not filed on or before the Investigation Termination Date (or such other later date as extended by the written consent of the Debtor and the Prepetition Agent), the stipulations contained in subsection (a) through (g) of Paragraph 8 of this Interim Order shall be irrevocably binding on the Committee and all parties in interest without further action by any party or this Court. Unless the Prepetition Agent and the Debtor each consents in writing to an extension, the Investigation Termination Date may not be extended, unless cause therefor is

shown and only after notice to the Prepetition Agent and the Debtor and a hearing on the request to extend the Investigation Termination Date being held before the expiration of the Investigation Termination Date.

(ii) **Power to Execute Necessary Documents.** The Debtor is expressly authorized and empowered to enter into and deliver, among other documents, the DIP Loan Agreement and the other attendant DIP Loan Documents, substantially in the form presented at the initial hearing to consider the Motion. The Debtor also is authorized, empowered and directed to perform all of its obligations under the DIP Loan Agreement and the other attendant DIP Loan Documents and such other agreements as may be required by the Agent to give effect to the terms of the financing provided for in this Interim Order. The Debtor is authorized to perform and do all acts that may be required in connection with the DIP Loan Agreement and the other DIP Loan Documents, including, without limitation, the payment of fees and the reimbursement of present and future reasonable costs and expenses, including but not limited to attorneys fees and legal expenses paid or incurred by the Agent as provided in this Interim Order, the DIP Loan Agreement and the other DIP Loan Documents, all of which unpaid fees, commissions, costs and expenses shall be and are included as part of the principal amount of the Postpetition Obligations, and secured by a first priority lien and security interest in all of the Collateral, as provided for in this Interim Order. The DIP Loan Agreement and the other DIP Loan Documents shall constitute valid and binding obligations of the Debtor enforceable against the Debtor, and the Debtor's successors and assigns, in accordance with their terms, subject to the terms of this Interim Order. Following execution, the Debtor may enter into any non-material amendments or modifications to the DIP Loan Agreement and the other DIP Loan Documents without the need of further notice and hearing or Order of this Court, provided that such modifications or amendments do not materially and adversely affect the rights of any creditor, equity holder or party-in-interest and provided further, that prior to entering into such modifications or amendments, the Debtor shall have consulted with any Committee. For purposes of this Interim Order, non-material amendments or modifications to the DIP Loan Agreement and the DIP Loan Documents shall include, without limitation, clarifications of procedures and reporting requirements, insertions of incomplete information, corrections of any errors, any waivers or consents that the Agent may exercise at its discretion, or to the extent authorized by the DIP Loan Agreement or the other DIP Loan Documents and to the extent that such amendments or modifications do not cause an increase in the maximum amount available to be borrowed pursuant to the DIP Loan Agreement and the other DIP Loan Documents.

(iii) **Lien Status and Priority.**

(a) For all of the Post-Petition Obligations, the Agent, for the ratable benefit of the Lenders is hereby granted pursuant to Sections 363(e), 364(c)(1) and 364(d) of the Bankruptcy Code an allowed claim (the "Superpriority Claim") having priority over any and all administrative expenses, including, without limitation, the kind specified in Sections 105, 326, 330, 331, 503(b) , 506(c), 507(a), 507(b)

and 726 of the Bankruptcy Code and fees of the U.S. Trustee, all as more fully set forth herein below, subject only to the Carve-Out (as defined below) up to the Carve-Out Amount (as defined below). Further, the respective liens and security interests granted herein to the Lenders in the Collateral or, as the case may be, the priorities accorded to the Post-Petition Obligations as set forth in this Interim Order, shall be subject only to the Senior Claims and the Carve-Out (which Carve-Out shall have an administrative priority superior to that granted by this Interim Order) up to the Carve-Out Amount, and shall otherwise have the priority and senior secured status afforded by Section 364(c) and 364(d)(1) of the Bankruptcy Code, as applicable. So long as an Event of Default shall not have occurred and be continuing, the Debtor shall be permitted to pay Professional Fees and Expenses (as defined below) of the kind specified in Section 503(b) of the Bankruptcy Code incurred in the ordinary course of business of the Debtor or otherwise permitted hereunder, and court-approved administrative expenses related to compensation and reimbursement of expenses allowed and payable under Sections 330 and 331 of the Bankruptcy Code, as the same may be due and payable, within the parameters of this Interim Order and the amounts to be advanced pursuant to the DIP Loan Agreement; provided that the aggregate of any such payments made on or after the occurrence, declaration and continuance of a Default or Event of Default (as defined in the DIP Loan Agreement) to professionals covered by the Carve-Out, from the Carve-Out, shall not exceed the Carve-Out Amount, subject to application and Court approval therefor by such professionals, and subject to objection by the Lenders, if any. As used in the preceding sentence, "court approved administrative expenses" shall include payments made pursuant to any Court approved procedure for monthly or other payment of administrative expenses to which the Lenders may consent and/or paid from any prepetition retainer paid by the Debtor; provided that nothing contained herein shall be read to exempt those persons hereafter receiving interim compensation payments or reimbursement of expenses pursuant to any such Court approved procedure for monthly or other payment of administrative expenses from otherwise applicable provisions of bankruptcy law, including but not limited to requirements that such compensation or reimbursement be allowed on a final basis after the filing of appropriate fee applications, and when applicable, any subsequent order of this Court requiring that such payments be disgorged; provided further that nothing contained herein shall be construed as consent to the allowance of any fees and expenses referred to above and shall not affect any right of the Lenders to object to the reasonableness of such amounts; and provided further that the Debtor shall not be permitted hereunder to pay, from the Carve-Out or otherwise, any fees or expenses incurred by any party, including the Debtor or the Committee, in connection with the preparation, initiation, prosecution or defense of any claims, causes of action, adversary proceedings or other litigation against the Agent or the Lenders (whether prepetition or postpetition), including, without limitation, challenging the amount, validity, priority or enforceability of, or asserting any defense, counterclaim, or offset to, the Prepetition Obligations, Postpetition Obligations, Subordinated Obligations or the security interests or liens of the Agent held for the ratable benefit of the

Lenders in respect thereof or the security interests or liens held by the Senior Subordinated Lenders (any fees so incurred being referred to as "Non-Permitted Fees"), but allowing fees and expenses related to investigation as provided for in paragraph 8 of this Interim Order. No other liens or priority status, other than the Senior Claims and the Professional Fees and Expenses (as defined below) up to the Carve-Out Amount, having a lien or administrative priority superior to or pari passu with that granted by this Interim Order to the Agent, for the ratable benefit of the Lenders, shall be granted while any portion of the Post-Petition Obligations under the DIP Loan Agreement remains outstanding, absent the consent of the Lenders.

**(b)**     Any provision of this Interim Order or the DIP Loan Agreement to the contrary notwithstanding, the Liens and Superpriority Claim granted to the Agent, for the ratable benefit of the Lenders, pursuant to this Interim Order and the DIP Loan Agreement shall be subject and subordinate to a carve-out (the "Carve-Out") for (x) the payment of professional fees and disbursements allowed by order of the Court and incurred by the Debtor, the Committee and any disbursements of any member of the Committee ("Professional Fees and Expenses") in an aggregate amount not to exceed [$200,000] (the "Carve-Out Amount") and (y) fees payable to the United States Trustee pursuant to 28 U.S.C. § 1930(a)(6) and any fees payable to the clerk of the Court; provided that no part of the Carve-Out may be used to pay any Non-Permitted Fees; and provided further that the Carve-Out Expenses shall not include any other claims that are or may be senior to or pari passu with any of the Carve-Out Expenses or any Professional Fees and expenses of a Chapter 7 trustee.

(iv)     **Limitation Upon Additional Surcharges**. With the exception of Carve-Out Expenses and except as otherwise permitted by the DIP Loan Agreement, neither the Collateral nor the Agent nor the Lenders shall be subject to surcharge, pursuant to Section 506(c) of the Bankruptcy Code or otherwise, by the Debtor or any other party in interest, until all Postpetition Obligations, Prepetition Obligations, and Subordinated Obligations are indefeasibly paid in full in cash without the prior written consent of the Agent and Lenders, and no such consent shall be implied from any other action, inaction, or acquiescence by the Agent or the Lenders in this proceeding, including but not limited to funding of the Debtor's ongoing operation by the Agent. In no event shall the Agent or the Lenders be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the Collateral.

(v)     **Lien to Secure Prepetition Obligations and Subordinated Obligations.**

(a) In addition to the existing rights and interests of the Prepetition Agent and Prepetition Lenders under the Prepetition Loan Agreement, until all Prepetition Obligations have been paid and in an effort to provide adequate protection, pursuant to Section 361, of the interests of the Prepetition Lenders under the Prepetition Loan Agreement, the Prepetition Agent, for the ratable benefit of the Prepetition Lenders, is hereby granted, a valid, perfected and enforceable security

interest in and replacement lien, and, if necessary, adequate protection lien, upon all of the assets of the Debtor created after the Relief Date, including, without limitation, the Collateral, and all of the Debtor's accounts, contract rights, inventory, general intangibles and such other collateral in which the Prepetition Agent and Prepetition Lenders had an interest prior to the Relief Date and all improvements thereof, all books and records with respect thereto and all products and proceeds of the foregoing, but excluding Avoidance Actions and molds and tools owned by third parties.

(b)     In addition to the existing rights and interests of the Senior Subordinated Lenders under the Subordinated Loan, in an effort to provide adequate protection, pursuant to Section 361, of the interests of the Senior Subordinated Lenders, the Senior Subordinated Lenders are hereby granted, a valid, perfected and enforceable security interest in and replacement lien, and, if necessary, adequate protection lien, upon all of the assets of the Debtor created after the Relief Date, including, without limitation, the Collateral, and all of the Debtor's accounts, contract rights, inventory, general intangibles and such other collateral in which the Senior Subordinated Lenders had an interest prior to the Relief Date and all improvements thereof, all books and records with respect thereto and all products and proceeds of the foregoing, but excluding Avoidance Actions, provided however, that such security interest and liens are subordinate and junior to the Prepetition Agent and Prepetition Lenders' security interest and liens.

(c)     The liens and security interests granted in this Paragraph 12 shall be effective immediately and without the necessity of the execution or filing by the Debtor of a security agreement, financing statements, trademark, copyright, tradename or patent assignment filings with the United States Patent and Trademark Office or Copyright Office, mortgages, landlord lien waivers, licensee consents or otherwise.

(d)     Furthermore, as additional adequate protection to the Prepetition Lenders, but subject to the provisions of Paragraph 6 of the Interim Order, the collections on accounts and sale of inventory of the Debtor shall be applied to the Prepetition Obligations, including specifically to pay current interest, fees and expenses on the Prepetition Obligations as adequate protection payments to the Prepetition Lenders, all as set forth in the DIP Loan Agreement. In addition, the Debtor is authorized to pay current interest, fees and expenses on the Subordinated Obligations as adequate protection payments to the Senior Subordinated Lenders pursuant to the terms of the Budget and in accordance with the Subordinated Loan. All such payments are adequate protection payments and are to be afforded the full and complete protection given to such payments under the Bankruptcy Code. These payments are to be made to the Prepetition Lenders and the Senior Subordinated Lenders because, among other things, the Debtor will continue to use the prepetition collateral that secures the claims and obligations owing under the Prepetition Loan Agreement and Subordinated Loan and continue to use its ongoing businesses and manufacturing facilities. Such payments are being made for the purpose of, among other things, protecting the Prepetition Lenders'

prepetition claims and obligations and the Senior Subordinated Lenders'claims and obligations, and collateral interest from such use and the potential depreciation and deterioration of the collateral as a result thereof.

(vi) **Lien to Secure Postpetition Obligations**. As security for all of the Postpetition Obligations, the Agent, for the ratable benefit of the Lenders, is hereby granted (effective immediately and without the necessity of the execution or filing by the Debtor of a security agreement, financing statements, trademark, copyright, tradename or patent assignment filings with the United States Patent and Trademark Office or Copyright Office, mortgages, landlord lien waivers, licensee consents or otherwise), pursuant to Section 364(c) and 364(d)(l) (except only to the extent of an allowed Senior Claim) of the Bankruptcy Code, a first priority security interest in and lien upon all of the prepetition and postpetition Collateral, senior in all respects to any and all present and future liens or claims, if any, that encumber the Collateral (including, without limitation, liens and security interests, if any, of prepetition and postpetition landlords, and liens and security interests, if any, granted in favor of the Prepetition Agent for itself and the Prepetition Lenders, any governmental authority for any liability under federal or state environmental laws or regulations or for damages arising from or costs incurred by such governmental authority in response to a release or threatened release of a hazardous or toxic waste, substance or constituent, or other substance into the environment or otherwise) and subject only to the Senior Claims and the Carve-Out Expenses up to the Carve-Out Amount, and a second priority security interest in and lien upon all Collateral otherwise encumbered by allowed Senior Claims. The security interests and liens in the Collateral granted hereunder include, but are not limited to: (i) those items and types of collateral in which security interests may be created under Article 9 of the Uniform Commercial Code; (ii) those items and types of Collateral not governed by Article 9 of the Uniform Commercial Code, including, without limitation, licenses issued by any federal or state regulatory authority and any leasehold or other real property interests; and (iii) the products and proceeds of any of the foregoing. Notwithstanding anything to the contrary herein, the Collateral shall not include any Avoidance Actions. Said liens and security interests discussed herein shall not be (i) subject to any lien or security interest that is avoided and preserved for the benefit of the Debtor's estate under Section 551 of the Bankruptcy Code, or (ii) except as act forth herein, subordinated to or made pari passu with any other lien or security interest under Section 364(d) of the Bankruptcy Code or otherwise. The security interests arising hereunder shall be and hereby are fully perfected security interests, such that no additional steps need be taken by Agent on behalf of the Lenders to perfect said interests. Pursuant to Sections 363(b)(l) and 364(c)(2) of the Bankruptcy Code, any provision of any lease or other license, contract or other agreement that requires the consent or approval of one or more landlords or other parties in order for the Debtor to pledge, grant, sell, transfer or otherwise transfer any such leasehold interest or the proceeds thereof or other Collateral are and shall be deemed to be inconsistent with the provisions of the Bankruptcy Code and are and shall have no force and effect with respect to the transactions granting the Agent on behalf of the Lenders a priority security interest in such leasehold interest or

the proceeds of any assignment and/or sale thereof by the Debtor in favor of the Agent on behalf of the Lenders in accordance with the terms of the use of Cash Collateral, DIP Loan Agreement and related DIP Documents. In addition to the extent that the Debtor is authorized to continue to utilize their existing cash management systems pursuant to an order of this Court, any claims of the cash management banks against the Debtor that arise out of or are incurred in connection with the existing cash management systems shall have administrative expense priority and lien priority with the administrative expense priority and lien priority granted by the Agent, for the ratable benefit of the Lenders, pursuant to the Interim Order.

(vii) **Additional Perfection Measures.** The liens and priority claims granted to the Agent, for the ratable benefit of the Lenders, pursuant to the Interim Order and the DIP Loan Agreement shall be perfected by operation of law upon execution of the Interim Order by the Court. The Agent shall not be required to enter into or to obtain landlord waivers, mortgagee waivers, bailee waivers, or warehouseman waivers or to file or record financing statements, mortgages, deeds of trust, leasehold mortgages, notices of lien or similar instruments in any jurisdiction, or obtain consents from any licensor or similar party-in-interest, or take any other action in order to validate and to perfect the security interest and lien granted to the Agent, for the ratable benefit of the Lenders, pursuant to the Interim Order. If the Agent, in its sole discretion, chooses to obtain consents from any licensor or similar party-in-interest, to file such financing statements, notices of lien or similar instruments or to otherwise confirm perfection of such security interests and liens: (i) all such documents shall be deemed to have been recorded and filed as of the time and on the date of entry of the Interim Order, and (ii) no defect in any such act shall affect or impair the validity, perfection and enforceability of the liens granted hereunder. In lieu of obtaining such consents or filing such financing statements, notices of lien or similar instruments, the Agent may, at its sole discretion, choose to file a certified copy of the Interim Order in any place at which any such instruments would or could be filed, together with a description of Collateral located within the geographic area covered by such place of filing, and such filing by the Agent shall have the same effect as if such financing statements, notices of lien or similar instruments had been filed or recorded at the time and on the date of entry of the Interim Order.

(viii) **Access to Collateral – No Landlord's Liens.** Each landlord waiver, mortgagee waiver and bailee letter executed in connection with the Prepetition Loan Agreement shall continue to govern the rights of the respective parties thereto, and such waivers and letters shall be equally applicable to, and shall govern such parties rights in connection with, the DIP Loan Agreement. Notwithstanding anything contained herein to the contrary and without limiting any other rights or remedies of the Agent, for the ratable benefit of the Lenders, contained in the Interim Order or the DIP Loan Documents, or otherwise available at law or in equity, and subject to the terms of the DIP Loan Agreement, upon written notice to the landlord of any leased premises that an Event of Default has occurred and is continuing under the DIP Loan Documents, the Agent may, subject to any

separate agreement by and between such landlord and the Agent, enter upon any leased premises of the Debtor for the purpose of exercising any remedy with respect to Collateral located thereon and shall be entitled to all of the Debtor's rights and privileges as lessee under such lease without interference from the landlords thereunder, provided that the Agent shall only pay rent and additional rent obligations of the Debtor that first arise after the Agent's written notice referenced above and that are payable during the period of such occupancy by the Agent, calculated on a per diem basis. Nothing herein shall require the Agent to assume any lease as a condition to the rights afforded to the Agent in this paragraph. Furthermore, other than Senior Claims, any landlord's lien, right of distraint or levy, security interest or other interest that any landlord or mortgagee may have in any Collateral of the Debtor located on such leased premises, to the extent the same is not void under Section 545 of the Bankruptcy Code, is hereby expressly subordinated to the lien of the Agent, for the ratable benefit of the Lenders, in such Collateral.

(ix)     **Fees**. Pursuant to the Interim Order, the Debtor is authorized to pay the fees contemplated in the DIP Loan Agreement and DIP Loan Documents ("DIP Facility Fees") as follows (i) a closing fee of $750,000 to Agent for its benefit and for the benefit of the Lenders on a pro-trata basis in accordance with such Lenders' Commitment ratio, payable (y) $250,000 on the date the Interim Order is entered (the "Interim Closing Fee") and (z) $500,000 subject to entry of the Final Order (the "Final Closing Fee"); (ii) an administrative fee of $10,000 per month payable in advance of each month to Agent for its sole benefit; (iii) an unused commitment fee equal to the unused revolver Commitment multiplied by 0.50% on a per annum basis paid monthly, in arrears, on the first day of each month (the "Unused Commitment Fee"); (iv) a letter of credit fee equal to 3.0% per annum on the outstanding face amount of any Letter of Credit issued pursuant to the DIP Faciity, paid monthly in arrears on the last day of each month (the "Letter of Credit Fee"); and (v) an issuing bank fee paid to the issuing bank equal to .375% multiplied by the face amount of any Letter of Credit issued pursuant to the DIP Facility, due upon the issuance thereof to the issuing bank (the "Issuing Bank Fee"). The Interim Closing Fee paid by Debtor to the Agent and the Lenders for providing the debtor in possession financing is reasonable, fully earned and is hereby approved to be paid at closing, without the necessity of the Agent or Lenders filing any further application with the Court. The Administration Fee, the Unused Commitment Fee, Letter of Credit Fee and Issuing Bank Fee are authorized and shall be paid by the Debtor to the Agent and Lenders as the fees come due under the Interim Order. The Final Closing Fee shall remain subject to entry of the Final Order.

(x)     **Enabling Clause**. The Debtor is authorized to perform all acts, to make, execute and deliver all instruments and documents and to pay fees which may be required or necessary for their performance under the DIP Loan Agreement and the other DIP Loan Documents including, without limitation, the execution and delivery of the DIP Loan Agreement and the other DIP Loan Documents.

(xi)     **Automatic Stay Modified**.  Subject only to the provisions of the DIP Loan Agreement, the automatic stay provisions of Section 362 of the Bankruptcy Code are vacated and modified to the extent necessary so as to permit the Agent on behalf of the Lenders:

(xii)    Upon notice of an Event of Default, to require all cash, checks or other collections or proceeds from Collateral received by the Debtor in accordance with Section 9.1(h) of the DIP Loan Agreement, and to apply amounts deposited in any such account and other amounts paid to or received by the Lender under the DIP Loan Agreement and the other DIP Loan Documents as provided in Section 2.4 of the DIP Loan Agreement;

(xiii)   upon the occurrence of an Event of Default and subject to five (5) business days' written notice to the Debtor, the Debtor's counsel, the Committee, Committee's Counsel, and the U.S. Trustee, to exercise all rights and remedies provided for in the DIP Loan Agreement and the other DIP Loan Documents, pursuant and subject to the provisions of Article 9 of the DIP Loan Agreement without requiring prior authorization of this Court in order to exercise such rights and remedies. The automatic stay shall be deemed terminated as provided herein without the necessity of any further action by the Court, the Debtor, the Committee, the Agent or any of them, in the event that the Debtor, Committee or U.S. Trustee have not obtained an Order from this Court to the contrary within five (5) business days after receiving written notice from the Agent pursuant to this Paragraph 17(b).

(xiv)    The Debtor, Committee and/or the U.S. Trustee shall have the burden of proof at any hearing on any request by the Debtor, the Committees and/or the U.S. Trustee to re-impose or continue the automatic stay as provided for herein;

(xv)     This Court shall retain exclusive jurisdiction to hear and resolve any disputes and enter any orders required by the provisions of this Paragraph 17 and relating to the application, re-imposition or continuance of the automatic stay as provided hereunder.

(xvi)    **Successors and Assigns**.  The DIP Loan Agreement and the other DIP Loan Documents and the provisions of the Interim Order shall be binding upon the Agent, the Lenders, the Prepetition Agent and the Prepetition Lenders, the Debtor and its respective successors and assigns and the same shall inure to the benefit of the Agent and the Lenders and the Debtor and its respective successors and assigns.

(xvii)   **Binding Nature of Agreement**.  Each of the DIP Loan Documents to which the Debtor is and will become a party shall constitute legal, valid and binding obligation of the Debtor, enforceable in accordance with their respective terms. The DIP Loan Documents upon execution, will have been duly executed and delivered to the Agent by the Debtor. The rights, remedies, powers, privileges, liens and priorities of the Agent on behalf of the Lenders provided for in the

Interim Order and in any other DIP Loan Documents shall not be modified, altered or impaired in any manner by any subsequent order (including a confirmation order) or by any plan of reorganization or liquidation in these Cases or in any subsequent Cases under the Bankruptcy Code unless the Postpetition Obligations have first been paid in full and completely satisfied.

(xviii) **Subsequent Reversal or Modification**. The Interim Order is entered pursuant to Sections 361, 363 and 364 of the Bankruptcy Code. The Agent and the Lenders are entitled to all protection afforded by Section 364(e) of the Bankruptcy Code. If any or all of the provisions of the Interim Order are hereafter reversed, modified, vacated or stayed, such reversal stay, modification or vacation shall not affect: (y) the validity of any obligation, indebtedness or liability incurred postpetition hereunder by the Debtor to the Agent and the Lenders prior to the date of receipt of written notice to the Agent of the effective date of such reversal, stay, modification or vacation; or (z) the validity and enforceability of any lien or priority authorized or created hereby or pursuant to the DIP Loan Agreement or the other DIP Loan Documents. Notwithstanding any such reversal, stay, modification or vacation, any indebtedness, obligation or liability incurred postpetition hereunder by the Debtor to the Agent and the Lenders prior to written notice to the Agent of the effective date of such reversal, stay, modification or vacation shall be governed in all respects by the original provisions of the Interim Order and the Agent, Lenders, Prepetition Agent, Prepetition Lenders, Subordinated Agent and Senior Subordinated Lenders shall be entitled to all the rights, remedies, privileges and benefits granted herein and pursuant to the DIP Loan Agreement and the other DIP Loan Documents with respect to all such indebtedness, obligations or liability.

(xix) **No Waiver**. The Interim Order shall not be construed in any way as a waiver or relinquishment of any rights that the Agent and the Lenders may have to bring or be heard on any matter brought before this Court.

(xx) **No Dismissal; No Sale**. The Debtor shall not request any order dismissing or converting these Cases under Section 1112 unless: (i) each and every Postpetition Obligation of the Debtor to the Agent and the Lenders shall have been paid indefeasibly in full in cash and completely satisfied prior to the entry thereof, or (ii) an order is entered by this Court reaffirming the Agent's, on behalf of the Lenders, and the Subordinated Agent's, on behalf of the Senior Subordinated Lenders, priority, liens and security interests in the Collateral without the requirement of the filing, recording, or noticing of any additional documentation by the Agent or Debtors with any other jurisdiction, or (iii) the effectiveness of any order dismissing or converting these Cases shall not occur until sixty (60) days after it is entered in order to give Agent, on behalf of the Lenders, and Subordinated Agent, on behalf of the Senior Subordinated Lenders, the opportunity to perfect its security interests and liens in the Collateral under non-bankruptcy law, including, without limitation, the filing or recording of financing statements, mortgages, deeds of trust, leasehold mortgages, notices of lien or similar instruments in any jurisdiction (including trademark, copyright, tradename

or patent assignment filings with the United States Patent and Trademark Office, Copyright Office or any similar United States) and the procurement of waivers from any landlord, mortgagee, bailee or warehouseman and consents from any licensor or similar party-in-interest. No order providing for the sale of the Debtor or the sale of substantially all of the Debtor's assets under Section 363 of the Bankruptcy Code or otherwise shall be entered unless either: (i) all Postpetition Obligations shall have be paid indefeasibly in full in cash and completely satisfied as part of such transaction; or (ii) the Agent and Lenders expressly consents to said transaction.

(xxi) **Supremacy of Terms**. To the extent of any conflict between or among the express terms or provisions of any of the DIP Loan Documents, the Motion, any other order of this Court, or any other agreements and the express written terms and provisions of the Interim Order, the terms and provisions of the Interim Order shall govern. Notwithstanding any contrary provision within any order, document or agreement, except as expressly provided in the Interim Order, the DIP Loan Agreement or the other DIP Loan Documents, or as consented to by the Agent in writing; (i) except as set forth herein, no other liens or priority status, other than the Senior Claims and the Carve-Out Expenses up to the Carve-Out Amount, having a lien or administrative priority superior to or <u>pari passu</u> with that granted by the Interim Order to the Agent for the benefit of the Lenders, shall be granted while any portion of the Postpetition Obligations and/or Prepetition Obligations as defined under the DIP Loan Agreement remains outstanding, and (ii) the Agent and Lenders shall not have any obligation to make loans available to or for the benefit of the Debtor, to fund the Debtor's operations, or to pay expenses incurred by the Debtor prior or subsequent to the entry of the Interim Order except as provided for in the DIP Loan Agreement. The liens and claims arising under the Prepetition Loan Agreement shall specifically be subordinate to the liens and claims of the DIP Loan Agreement pursuant to the terms of the Interim Order and Section 364(d)(1) of the Bankruptcy Code. In addition, the liens and claims arising under the Subordinated Loan and adequate protection liens and claims granted in the Interim Order to the Subordinated Agent for the Senior Subordinated Lenders, shall specifically be subordinated to the liens and claims granted to the Agent and Lenders under the DIP Loan Agreement and liens and claims the Prepetition Agent and Prepetition Lenders under the Prepetition Loan Agreement pursuant to the terms of the Interim Order and Section 364(d)(1) of the Bankruptcy Code.

(xxii) **Final Hearing**. A final hearing on the Debtor's authorization for DIP Financing shall be heard before this Court on the ____ day of _____, 2002 at ____ .m. in Court Room ____ at the United States Bankruptcy Court, 615 E. Houston Street, San Antonio, Texas 78295.

<u>Authority</u>

**Approval of the Post-Petition Financing is Supported by the Debtor's Exercise of Sound Business Judgment**

35.     Section 364 of the Bankruptcy Code provides, in pertinent part, as follows:

(c)     If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt –

(1)     with priority over any and all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;

(2)     secured by a lien on property of the estate that is not otherwise subject to a lien; or

(3)     secured by a junior lien on property of the estate that is subject to a lien.

(d)(1)  The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if –

(A)     the trustee is unable to obtain such credit otherwise; and

(B)     there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

36.     Generally, sections 364(c) and (d) of the Bankruptcy Code require a debtor to demonstrate that alternative sources of credit are not available under section 364(a) or (b).  See In re Ames Dep't Stores, Inc., 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("a debtor is not required to seek credit from every possible source … [but only to] show that it has made a reasonable effort to seek other sources of credit available.").

37.     Against this statutory backdrop, courts will evaluate the facts and circumstances of a debtor's case, and will accord significant weight to the debtor's business judgment regarding the necessity for obtaining the financing.  See, e.g., Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co.), 789 F.2d 1085, 1088 (4th Cir. 1986); Ames, 115 B.R. at 40.  For example, the need for a swift injection of cash to preserve a debtor's business satisfied the requirements of

Bankruptcy Code § 364(d) when coupled with unsuccessful attempts to locate alternative financing. See Ames, 115 B.R. at 40; Snowshoe, 789 F.2d at 1088 (primary facts supporting priming included lack of alternative financing sources and need to obtain prompt cash infusion to preserve value of debtor's business).

38. Prepetition, with the guidance of its financial advisors, the Debtor determined that, in connection with the Chapter 11 cases, the Debtors would need to fund operations through new financing. According to the interim budget, the Debtor will require not in excess of $12,000,000.00 in borrowings through October [___], 2002.

39. The Debtor attempted, but was unable, to obtain the required funds in the form of unsecured debt allowable under § 503(b)(1) of the Bankruptcy Code as an administrative expense pursuant to §§ 364(a) or (c) of the Bankruptcy Code, unsecured debt having the priority afforded by § 364(c)(1) of the Bankruptcy Code, or debt secured only as described in §§ 364(c)(2) or (3) of the Bankruptcy Code because the liens of the Prepetition Agent and the Prepetition Lenders encumber substantially all of the Debtor's assets.

40. Additionally, any borrowing facility with a third party would have included a request for lien which would have primed the liens of the Prepetition Lenders. To the extent the Debtor obtained a commitment from any third party, the Debtor would have incurred significant risks and costs that would have been associated with litigation over the requested priming liens. Therefore, the Debtor concluded in its sound business judgment, and after investigating and soliciting other sources of financing without success, that the proposal for debtor in possession financing provided by the Agent was the most favorable under the circumstances and addressed the Debtor's reasonably foreseeable working capital needs.

41.     A critical need exists for the Debtors to obtain financing, in order to continue the operation of its business. Without such funds, the Debtor will not be able to pay its payroll or other direct operating expenses and obtain goods and services needed to carry on its business during this critical period.

42.     The Debtor's decision to enter into the DIP Loan Agreement represents an exercise of sound business judgment. Without the financing, the Debtor simply cannot continue to conduct its operations, much less successfully reorganize. Without financing to cover the Debtors' cash needs, the Debtors will be unable to satisfy timely their administrative obligations. The DIP Loan Agreement addresses this need by providing the Debtor with funds necessary to meet ongoing operating needs and by instilling the Debtor's customers and employees with the sense of the Debtor's financial security.

43.     Further, the Debtor has negotiated the best financing arrangements that they can realistically expect to obtain under the circumstances. The costs of failing to approve the postpetition financing (e.g. loss of jobs and going concern value) would be catastrophic to the creditors. See, e.g., In re Western Pacific Airlines, Inc., 223 B.R. 567, 570-71 (Bankr. D. Col. 1997).

**The Priming Liens Should Be Approved Because the Prepetition Agent and the Prepetition Lenders Have Consented to the Priming Liens and Their Interests Will Be Adequately Protected**

44.     The proposed Superpriority Claims will provide the Agent and the Lenders with a first priority lien on all Collateral that is otherwise subject to the liens existing in favor of the Prepetition Agent and the Prepetition Lenders to secure the Debtor's obligations under the DIP Loan Documents. The Lenders are not attempting to prime the liens of any secured creditors other than the Prepetition Lenders.

45.     As adequate protection for the Superpriority Liens, the Debtor has agreed to grant to the Prepetition Agent, for the sole benefit of the Prepetition Agent and the Prepetition Lenders, valid, binding, enforceable and perfected Liens (the "Adequate Protection Liens") in all Collateral to secure the aggregate amount of any diminution in the value of the Collateral after the Petition Date in the same extent and priority that existed prepetition (the "Adequate Protection Obligations"). Additionally, as adequate protection, the Debtor has agreed to pay to the Prepetition Lenders all interest, expenses and fees when due pursuant to the Prepetition Loan Agreement until all obligations under the Prepetition Loan Agreement are paid in full.

46.     Highland, as the sole lender under the Mezzanine Facility, has agreed to the priming of its liens granted under such facility as contemplated herein as in the DIP Loan Documents, subject to the payment of adequate protection and the implementation of certain severance agreements, as contemplated in the DIP Loan Documents.

47.     For the avoidance of doubt, any liens granted pursuant to the DIP Loan Documents and related orders will not prime any Senior Liens and will not attach to any molding tools, other equipment or other assets used by the Debtors in the course of its business, but owned by certain non-debtor third parties, including, but not limited to, several of the Debtor's customers.

48.     Because the Prepetition Agent and the Prepetition Lenders have consented to the Superpriority Liens and will be provided with adequate protection, the Superpriority Liens should be approved. See Anchor Sav. Bank FSB v. Sky Valley, Inc., 99 B.R. 117, 122 (N.D. Ga. 1989) (where existing lienholders tacitly consented to imposition of priming lien, such consent "relieved the debtor of having to demonstrate that [the lienholders] were adequately protected").

**Need for Immediate Financing**

49.     Pursuant to Rule 4001(c)(2) of the Bankruptcy Rules, a minimum of fifteen (15) days' notice is required before a final hearing on this Motion may commence.  However, that rule also provides that the Court "may conduct a hearing before such 15-day period expires, but… may authorize the obtaining of credit only to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing."  See also Local Rule 4001(b)(1).  It is essential to the continued operation of the Debtor's business that it be authorized by this Court to obtain interim financing in the requested amount pending the final hearing on the Motion.  Unless financing is approved on an interim basis, the Debtor will not be able to fund employee payroll and meet its other immediate working capital needs, as shown on the interim budget.  Moreover, in the absence of immediate post-petition financing the Debtor's attempt to reorganize will be immediately and irreparably jeopardized.  Thus, funds are urgently needed to meet all of the Debtor's working capital and other liquidity needs.

50.     The interim relief requested hereby is necessary, appropriate, fully warranted, and is essential to avoid immediate and irreparable harm to the Debtor, its estate and creditors.  Accordingly, the Debtor respectfully requests that, pending a final hearing on the Motion, the terms and provisions of the DIP Loan Agreement be approved on an emergency interim basis, on the terms and subject to the conditions set forth in the DIP Loan Agreement and the Interim Order.  The Agent and the Lenders have agreed to fund the Debtor during this period in accordance with the Interim Budget.

## Notice

51.     No trustee, examiner or creditors' committee has been appointed in this case. Notice of this Motion has been served by: (i) hand delivery upon the Office of the United States Trustee; (ii) facsimile or email to counsel for Highland and Foothill; and (iii) overnight mail to:

(a) those parties appearing on the list of the twenty largest unsecured creditors of the Debtor; (b) each of the participating lenders under the Debtor's prepetition and post-petition secured credit facilities; (c) the Debtor's landlords and mortgage holders; and (d) other parties designated on the service list by the Debtor to receive notice. Given the nature of the relief requested herein, the Debtor submits that no further notice is necessary.

52.     No prior application for the relief requested herein has been made to this or any other Court.


WHEREFORE, the Debtor respectfully requests that the Court enter an Order in the form attached hereto (i) authorizing the Debtor to obtain postpetition financing, (ii) granting security interest and priority, (iii) providing adequate protection to prepetition secured lenders; (iv) scheduling a final hearing pursuant to Bankruptcy Rule 4001; and (v) granting such other and further relief as the Court deems appropriate.

Dated: _9/17/02_

Respectfully submitted,

**MOLL INDUSTRIES, INC.**

By its proposed attorneys,


Raymond W. Battaglia (Bar No. 01918055)
Oppenheimer, Blend, Harrison & Tate, Inc.
711 Navarro, Sixth Floor
San Antonio, TX  78205
Tel.: (210) 224-2000
Fax: (210) 224-7540

# Exhibit A

**Consolidated (000's)**
**Mbil Industries, Inc.**

| | 5 9/14/02 | 6 9/21/02 | 7 9/28/02 | 8 10/5/02 | 9 10/12/02 | 10 10/19/02 | 11 10/26/02 | 12 11/2/02 | 13 11/9/02 | 14 11/16/02 | 15 11/23/02 | 16 11/30/02 | 17 12/7/02 | 18 12/14/02 | 19 12/21/02 | 20 12/31/02 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Sales** | 3,004 | 2,962 | 3,598 | 2,867 | 3,044 | 3,123 | 3,719 | 2,550 | 2,687 | 2,738 | 3,197 | 1,703 | 2,555 | 2,591 | 2,532 | 1,760 |
| **Cash Receipts** | | | | | | | | | | | | | | | | |
| Cash Collections | 1,356 | 1,395 | 1,387 | 2,775 | 2,779 | 2,829 | 2,871 | 2,412 | 2,418 | 2,380 | 2,428 | 2,476 | 2,468 | 2,445 | 2,483 | 2,250 |
| Asset sale proceeds | | | | | | | | | | | | | | | | |
| Other | | 20 | | 1 | | 20 | | | | 20 | | | | | 20 | |
| **Total Cash Receipts** | 1,356 | 1,416 | 1,387 | 2,776 | 2,779 | 2,849 | 2,871 | 2,412 | 2,418 | 2,400 | 2,428 | 2,476 | 2,468 | 2,445 | 2,503 | 2,250 |
| **Cash Disbursements** | | | | | | | | | | | | | | | | |
| Materials costs | 1,048 | 86 | 69 | 65 | 156 | 164 | 211 | 226 | 697 | 569 | 724 | 689 | 595 | 835 | 657 | 1,142 |
| Rebates | | | | | | | | 3,392 | | | | | | | | |
| Payroll and benefits | 1,179 | 889 | 1,016 | 792 | 635 | 1,249 | 835 | 1,109 | 558 | 1,114 | 558 | 1,239 | 489 | 996 | 489 | 1,362 |
| Rent expense - building | 11 | 1 | 1 | 54 | | 1 | | 56 | 1 | 44 | 1 | | 55 | 1 | 44 | |
| Rent expense - equipment | 1 | | | 145 | 22 | 33 | 21 | 172 | | | 21 | 21 | 172 | | 21 | 21 |
| Income taxes | | | | | | | | | | | | | | | | |
| Utilities | 9 | 88 | 58 | 187 | 21 | 121 | 60 | 145 | 19 | 134 | 49 | 689 | 156 | 9 | 140 | 34 |
| General insurance | | | | | | | | | | 260 | | | | | 55 | |
| Workers Comp Insurance | 20 | 20 | 18 | 19 | 18 | 20 | 31 | 27 | 42 | 74 | 75 | 68 | 63 | 54 | 20 | |
| Supplies | 60 | | | | | 28 | | | | | | | | | 68 | 93 |
| Professional fees | | | | | | | | | | | | | | | | |
| Legal | 10 | | 10 | | 10 | 10 | 10 | 10 | 10 | 10 | 10 | | 10 | | 10 | |
| Audit & Tax | | 5 | | | 7 | 7 | 75 | | | | 50 | | | | | 50 |
| Other | 20 | 5 | 20 | 20 | 7 | 20 | 20 | 7 | 21 | 7 | 5 | 5 | 5 | 5 | 5 | 5 |
| Travel & entertainment | 5 | 20 | 33 | 20 | 21 | 55 | 20 | 21 | 21 | 21 | 21 | 89 | 19 | 19 | 19 | 19 |
| Other | 63 | 40 | | 29 | | | 47 | 34 | 46 | 101 | 69 | 69 | 46 | 54 | 73 | 98 |
| **Total Operating Disbursements** | 2,406 | 856 | 1,232 | 1,299 | 910 | 1,698 | 1,119 | 5,190 | 1,400 | 2,344 | 1,582 | 2,113 | 1,611 | 1,973 | 1,582 | 2,827 |
| **Net Operating Cash Flow** | (1,049) | 658 | 155 | 1,476 | 1,869 | 1,151 | 1,752 | (2,777) | 1,018 | 66 | 846 | 363 | 866 | 472 | 922 | (576) |
| **Non-Operating Disbursements** | | | | | | | | | | | | | | | | |
| Capital Expenditures | 66 | 66 | 80 | 80 | 80 | 80 | 188 | 188 | 188 | 188 | 188 | 110 | 110 | 110 | 110 | 193 |
| Debt Amortization | | | | 82 | | | | 62 | | | | | 62 | | | |
| Interest | | | | 889 | | | | 306 | | | | | 311 | | | |
| Restructuring Fees | | | | | | | | | | | | | | | | |
| Debtor's counsel | 623 | | | | | | | | | | 212 | | | | 212 | |
| Debtor's financial advisors | 54 | | | | | | | | | | 27 | | | | 27 | |
| Lender's counsel & advisors | 212 | | | | | | | | | | 187 | | 156 | | 187 | |
| Committee counsel | 42 | | | | | | | | | | 67 | | | | 67 | |
| Committee financial advisors | 17 | | | | | | | | | | 27 | | | | 27 | |
| Chief Restructuring Officer | | | | | | | | 100 | | | 100 | | | | 100 | |
| Other | | | | | | | | | | | | | | | | |
| Frozen payables - critical | | 1,462 | 1,463 | 1,462 | 1,483 | 1,475 | 1,475 | 1,475 | 1,545 | | | | | | | |
| Frozen payables - noncritical | 285 | | | | 500 | 357 | | | | | | | | | | |
| Adequate protection payments | | | | | | | | | | | | | | | | |
| Key employee retention payments | | | | | | 357 | | | | | | | | | | |
| Bonus and Severance costs | 24 | | | | | | | | | 15 | | | | 15 | | |
| Other | | 25 | | 63 | | 25 | | | | | 15 | | | | 25 | |
| **Total Non-Operating Disbursements** | 1,611 | 1,672 | 1,562 | 2,575 | 2,062 | 1,951 | 1,970 | 2,031 | 1,733 | 228 | 808 | 110 | 483 | 124 | 763 | 193 |
| **Net Cash Flow** | (2,660) | (1,114) | (1,407) | (1,098) | (194) | (800) | (218) | (4,808) | (716) | (172) | 40 | 253 | 383 | 347 | 159 | (769) |
| **Revolver Balance:** | | | | | | | | | | | | | | | | |
| Beginning revolver balance | 22,287 | 885 | 1,999 | 3,406 | 4,505 | 4,699 | 5,499 | 5,717 | 10,525 | 11,240 | 11,411 | 11,372 | 11,118 | 10,745 | 10,397 | 10,229 |
| Cash receipts | (1,356) | (1,395) | (1,387) | (2,775) | (2,779) | (2,829) | (2,871) | (2,412) | (2,418) | (2,380) | (2,428) | (2,476) | (2,468) | (2,445) | (2,483) | (2,250) |
| Cash disbursements | 4,018 | 2,509 | 2,794 | 3,874 | 2,973 | 3,630 | 3,069 | 7,221 | 3,133 | 2,561 | 2,388 | 2,222 | 2,094 | 2,097 | 2,316 | 3,020 |
| DIP financing | (24,062) | | | | | | | | | | | | | | | |
| **Ending Revolver balance** | 885 | 1,999 | 3,406 | 4,505 | 4,699 | 5,499 | 5,717 | 10,525 | 11,240 | 11,411 | 11,372 | 11,118 | 10,745 | 10,397 | 10,229 | 10,998 |

# Consolidated (000's)
## Moll Industries, Inc.

| | 21 1/4/03 | 22 1/11/03 | 23 1/18/03 | 24 1/25/03 | 25 2/1/03 | 26 2/8/03 | 27 2/15/03 | 28 2/22/03 |
|---|---|---|---|---|---|---|---|---|
| **Sales** | 2,336 | 2,449 | 2,491 | 2,803 | 2,630 | 2,758 | 2,801 | 3,235 |
| **Cash Receipts** | | | | | | | | |
| Cash Collections | 2,542 | 2,315 | 2,388 | 2,346 | 2,306 | 2,310 | 2,279 | 2,320 |
| Asset sale proceeds | | | | | | | | |
| Other | - | - | 20 | - | - | - | 20 | - |
| **Total Cash Receipts** | 2,542 | 2,315 | 2,388 | 2,346 | 2,306 | 2,310 | 2,299 | 2,320 |
| **Cash Disbursements** | | | | | | | | |
| Materials costs | 153 | 672 | 521 | 617 | 365 | 622 | 653 | 668 |
| Rebates | | | | | 1,071 | | | |
| Payroll and benefits | 547 | 547 | 1,098 | 547 | 1,157 | 564 | 1,162 | 584 |
| Rent expense - building | 54 | 3 | 1 | 44 | 55 | 1 | 44 | 44 |
| Rent expense - equipment | 172 | 1 | 44 | 21 | 172 | | | |
| Property taxes | | | | 169 | | | 387 | 156 |
| Utilities | 175 | 8 | 118 | 47 | 75 | 67 | 48 | 114 |
| General insurance | | | 55 | | | | 55 | |
| Workers Comp Insurance | 41 | 62 | 20 | | 60 | 63 | 75 | 75 |
| Supplies | | | 73 | 73 | | | | |
| Professional fees | | | | | | | | |
| Audit & Tax | | | | | | | | |
| Legal | | 10 | 50 | 10 | 7 | 10 | 7 | 10 |
| Other | 7 | 7 | 7 | 7 | 7 | 7 | 7 | 7 |
| Travel & entertainment | 20 | 20 | | 20 | 20 | | 50 | |
| Other | 57 | 65 | 69 | 78 | 62 | 64 | 71 | 68 |
| **Total Operating Disbursements** | 1,226 | 1,391 | 2,096 | 1,587 | 3,046 | 1,437 | 2,572 | 1,712 |
| **Net Operating Cash Flow** | 1,317 | 924 | 293 | 759 | (740) | 873 | (273) | 608 |
| **Non-Operating Disbursements** | | | | | | | | |
| Capital Expenditures | 193 | 193 | 193 | 165 | 81 | 81 | 81 | 81 |
| Debt Amortization | 62 | | | | | | | |
| Interest | 913 | | | | 62 | 302 | | |
| Restructuring Fees | | | | | | | | |
| Debtor's counsel | | | | | | | 172 | 165 |
| Debtor's financial advisors | | | | | | | 31 | 31 |
| Lender's counsel & advisors | | | | | | | 187 | 187 |
| Committee counsel | | | | | | | 57 | 57 |
| Committee financial advisors | | | | | | | 67 | 58 |
| Chief Restructuring Officer | | | | | | | 23 | 23 |
| Other | | | | | | | 88 | 100 |
| Frozen payables - critical | | | | | | | | |
| Frozen payables - noncritical | | | | | | | | |
| Adequate protection payments | | | | | | | | |
| Key employee retention payments | | | | 15 | 15 | | | 31 |
| Bonus and Severance costs | 63 | | | | | | | |
| Other | | | | | | | 25 | 25 |
| **Total Non-Operating Disbursements** | 1,231 | 193 | 233 | 653 | 144 | 383 | 675 | 684 |
| **Net Cash Flow** | 86 | 731 | 60 | 106 | (884) | 490 | (948) | (76) |
| **Revolver Balance:** | | | | | | | | |
| Beginning revolver balance | 10,998 | 10,912 | 10,181 | 10,121 | 10,015 | 10,899 | 10,409 | 11,357 |
| Cash receipts | (2,542) | (2,315) | (2,388) | (2,346) | (2,306) | (2,310) | (2,279) | (2,320) |
| Cash disbursements | 2,457 | 1,584 | 2,308 | 2,240 | 3,189 | 1,820 | 3,228 | 2,396 |
| DIP financing | | | | | | | | |
| Ending Revolver balance | 10,912 | 10,181 | 10,121 | 10,015 | 10,899 | 10,409 | 11,357 | 11,433 |

DRAFT

**Consolidated (000's)**
**Moti Industries, Inc.**

| | 29 3/1/03 | 30 3/8/03 | 31 3/15/03 | 32 3/22/03 |
|---|---|---|---|---|
| **Sales** | 2,305 | 2,519 | 2,643 | 2,638 |
| **Cash Receipts** | | | | |
| Cash Collections | 1,612 | 1,607 | 1,590 | 1,616 |
| Asset sale proceeds | - | - | 20 | - |
| Other | - | - | - | - |
| **Total Cash Receipts** | 1,612 | 1,607 | 1,610 | 1,616 |
| **Cash Disbursements** | | | | |
| Materials costs | 723 | 680 | 788 | 711 |
| Rebates | - | - | - | - |
| Payroll and benefits | 1,119 | 562 | 1,124 | 562 |
| Rent expense - building | 55 | 1 | 1 | 1 |
| Rent expense - equipment | 194 | - | 44 | - |
| Property taxes | - | - | - | - |
| Utilities | 17 | 149 | 8 | 130 |
| General insurance | - | 55 | 55 | - |
| Workers Comp insurance | - | - | 143 | - |
| Supplies | 59 | 53 | 66 | 59 |
| Professional fees | - | - | 59 | - |
| Audit & Tax | - | 10 | - | - |
| Legal | - | - | - | 10 |
| Other | 5 | 5 | 50 | 5 |
| Travel & entertainment | 20 | 20 | 20 | 20 |
| Other | 57 | 59 | 78 | 59 |
| **Total Operating Disbursements** | 2,250 | 1,540 | 2,384 | 1,577 |
| **Net Operating Cash Flow** | (637) | 67 | (773) | 39 |
| **Non-Operating Disbursements** | | | | |
| Capital Expenditures | 58 | - | - | - |
| Debt Amortization | - | 263 | - | - |
| Interest | - | - | - | 165 |
| Restructuring Fees | | | | |
| Debtor's counsel | - | - | - | 27 |
| Debtor's financial advisors | - | - | - | 187 |
| Lender's counsel & advisors | - | - | - | 67 |
| Committee counsel | - | - | - | 27 |
| Committee financial advisors | - | - | - | 100 |
| Chief Restructuring Officer | - | - | - | - |
| Other | - | - | - | - |
| Frozen payables - critical | - | - | - | 63 |
| Frozen payables - noncritical | - | - | - | - |
| Adequate protection payments | - | - | 15 | 1,488 |
| Key employee retention payments | - | - | - | - |
| Bonus and Severance costs | - | - | - | - |
| Other | - | - | - | 25 |
| **Total Non-Operating Disbursements** | 58 | 263 | 15 | 2,128 |
| **Net Cash Flow** | (696) | (196) | (788) | (2,089) |
| **Revolver Balance:** | | | | |
| Beginning revolver balance | 11,433 | 12,122 | 12,325 | 13,113 |
| Cash receipts | (1,612) | (1,607) | (1,590) | (1,616) |
| Cash disbursements | 2,308 | 1,803 | 2,379 | 3,705 |
| DIP financing | - | - | - | - |
| **Ending Revolver balance** | 12,129 | 12,325 | 13,113 | 15,202 |

DRAFT

## CERTIFICATE OF SERVICE

I hereby certify that I have served a true and correct copy of the above and foregoing document by First Class mail, postage prepaid, on this the 17th day of September, 2002 addressed to all parties in interest.

_____
RAYMOND W. BATTAGLIA