FILED

SEP 1 8 2002

U.S. BANKRUPTCY COURT
BY _____ DEPUTY

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| MOLL INDUSTRIES, INC. | ) | Case No. 02-54341-RBK |
|  | ) |  |
| Debtor. | ) |  |
|  | ) |  |

## DEBTOR'S APPLICATION FOR AUTHORITY TO EMPLOY AND RETAIN NIGHTINGALE & ASSOCIATES, LLC AS FINANCIAL ADVISORS

Moll Industries, Inc. ("Moll"), the debtor and debtor in possession in this Chapter 11 case (the "Debtor") files this application (the "Application") for an order authorizing the retention and employment of Nightingale & Associates, LLC ("Nightingale") as financial advisors to the Debtor. Additionally, the Application contemplates that Michael R. D'Appolonia ("D'Appolonia"), the President and Principal of Nightingale, will assume the position of Chief Restructuring Officer ("CRO"). In support of this Application, the Debtor respectfully states as follows:

### Jurisdiction

1.      The Court has jurisdiction over this Motion under 28 U.S.C. § 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A) and (O).

2.      Venue of the Debtor's Chapter 11 case and this Motion in this District is proper pursuant to 28 U.S.C. §§1408 and 1409.

3.      The statutory basis for relief requested herein is Section 327, Title 11 of the United States Code (the "Bankruptcy Code").

4.     On September 6, 2002 (the "Petition Date"), affiliates of Highland Capital Management, L.P. ("Highland") who hold a majority of Moll's 10½% Series B Senior Subordinated Notes due in 2008 (the "Subordinated Notes") filed an involuntary Chapter 11 bankruptcy petition against Moll.

5.     During the "gap" period, the Debtor continued to operate in the ordinary course of its business, while negotiating the debtor in possession financing facility with its proposed post-petition lenders and preparing various first day motions.

6.     On September 17, 2002, Moll filed an assent to convert the involuntary case to a voluntary case under Chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). The Debtor continues to operate its business and manage its property as a debtor and debtor in possession, pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

## The Debtor's Business[1]

### *Moll is a leading manufacturer and designer of custom molded and assembled plastic components*

7.     The Debtor is a leading full service manufacturer and designer of custom molded and assembled plastic components for a broad variety of customers and end markets throughout North America and in Europe and Brazil.  The Debtor was formed through the merger in 1998 (the "Merger") of two leading plastics injection molders, Moll PlastiCrafters Limited Partnership ("Moll L.P.") and Anchor Advanced Products, Inc. ("Anchor Advanced"), which were each controlled by Mr. George T. Votis.  Immediately prior to the Merger, Moll L.P. and Anchor Advanced were independently operated entities.  Anchor Advanced survived the Merger and changed its name to "Moll Industries, Inc."

---

[1] The facts set forth herein are supported by the affidavit of William W. Teeple filed contemporaneously herewith.

8. The Debtor operates domestic manufacturing, design, or related facilities located in San Antonio, TX; Austin, TX; El Paso, TX; Morristown, TN; Lavergne, TN; Ft. Smith, AR; Newberg, OR; Seagrove, NC; Fairport, NY; Evansville, IN; and Duluth, GA. The Debtor constitutes a significant presence in its host communities and employs approximately 1,096 employees. Its workers are an asset, key to its reputation as a leader in the custom molded plastics industry.

### *The Debtor's Corporate Structure*

9. Non-debtor AMM Holdings, LLC is a Delaware limited liability company whose only assets are the stock of AMM Holdings, Inc. AMM Holdings, Inc., a Delaware corporation and a non-debtor, is a holding company whose only assets are the outstanding capital stock of Anchor Holdings, Inc. ("Anchor"), which is also a Delaware corporation and a non-debtor. Anchor is a holding company whose only assets are the outstanding capital stock of Moll, a Delaware corporation.

10. The Debtor is the primary operating entity and parent to Moll Industries, LLC and Moll Brazil Holding, LLC, both Delaware limited liability companies and non-debtors. The Debtor owns 99.9% and Moll Brazil Holding, LLC owns 0.1% of Moll do Brazil LTDA, a Brazilian limited liability company. Moll Industries, LLC is the parent to Moll Plastics, LLC, also a Delaware limited liability company.

11. The Debtor, together with non-debtor affiliates Moll Industries, LLC; Moll Plastics, LLC; and Moll Brazil Holding, LLC, owns a 100% interest in the following foreign subsidiaries, which are not debtors in proceedings before this Court:

     A. Compression, Inc., an Ontario corporation;

     B. Moll Industries UK, Limited, a United Kingdom private limited company;

     C. Moll Industries, Limited, a United Kingdom private limited company;

D. Moll France SARL, a Société à Responsabilité Limitée (limited liability company) formed under the laws of the Republic of France;

E. Moll do Brasil Ltda., a Brazilian limited liability company; and

F. Anchor Advanced Products Foreign Sales Corporation, a Barbados foreign sales corporation.

### The Foreign Operations

12. The Debtor derived approximately 36% of its 2001 net sales from its operations in Europe. The Debtor's international operations are subject to risks inherent in international business activities, including, in particular, compliance with a variety of foreign laws and regulations, unexpected changes in regulatory requirements, overlap of different tax structures, foreign currency exchange rate fluctuations and general economic conditions. The Debtor has had financial difficulties relating to certain of its European facilities and continues to have such difficulties.

13. In light of the operational losses suffered in the UK and significant market changes in the hand-held telecom sector which adversely affected demand for molded products, the Debtor restructured its UK operations in an attempt to retain a viable manufacturing capacity in the UK. This restructure included (1) the disposal in January 2002 by Moll Industries Limited of the non-core business of its wholly-owned subsidiary, Moll Engineering UK Limited and (2) the formalization in March 2002 of a plan to consolidate the operations of the Debtor's Gloucester UK facility (previously owned and operated by Moll Industries UK Limited) into the facility of Moll Industries Limited located in Morecambe. The Debtor continues to monitor the UK situation in its attempt to retain a viable manufacturing capacity in the UK.

14. Due to deteriorating financial performance, the Debtor decided in June 2002 to close its Villefranche, France facility. Moreover, the Debtor's French subsidiaries have been put

on an "alert" status by their statutory auditors. In connection therewith, an overseer for the
Debtor's French subsidiaries has been appointed by a French tribunal, the governmental body in
France overseeing these matters. There can be no assurances that the situation will improve in
France without an additional infusion of capital. The Debtor has no source for an infusion of
capital into its French subsidiaries. Without this additional money, the French subsidiaries could
be forced into a bankruptcy filing in France. Given the current situation in France, there are no
assurances that the Debtor's French subsidiaries will have any continuing value to the Debtor.
Rather, they pose a drain on an already extended management team in the United States and a
risk of claims or litigation against the Debtor as the equity holder of its French subsidiaries.

15. The Debtor's prices its products and incurs operating expenses in Europe in the
currency of the country in which the product is manufactured and sold and, in the United States,
in United States dollars. To the extent that costs and prices are in the currency of the country in
which the products are manufactured and sold, the costs and prices of such products in dollars
will vary as the value of the dollar fluctuates against such currencies. There can be no assurance
that there will not be increases in the value of the dollar against such currencies that will reduce
the dollar return to the Debtor on the sale of its products in such countries.


***Events Leading to Chapter 11***

16. The Debtor's operating results have been lower than expected since the Merger.
The disappointing results are primarily attributable to worse than expected performance in the
Debtor's Brush, Display, Medical, and Compression divisions in North America and all of the
European divisions, along with costs incurred to sell or close unnecessary facilities.
Management of the Debtor has and continues to evaluate all of the Debtor's operations. These
evaluations to date have resulted in:

A.    the sale of the metal fabrication business in March, 1999 to a supplier;

B.    the sale of a non-essential tool building division in March, 1999;

C.    the closing of the Round Rock, Texas molding facility, moving production from such facility to existing capacity in other of the Debtor's facilities;

D.    the sale of the Germany division, which had incurred significant losses due to declines in volume, in December, 1999;

E.    the sale of the Chalon, France tooling operation in June 2000;

F.    the discontinuance of the Display division in November, 2000;

G.    the sale of the Cosmetics division in November, 2000;

H.    the sale of the California location of the Compression division in December, 2000;

I.    the downsizing of the Morristown, Tennessee Brush facility in December, 2000;

J.    the consolidation of the operations of the Crissey, France facility into the Rouvray, France facility in May, 2001;

K.    the consolidation of the operations of the Morristown, Tennessee facility into other existing facilities in September, 2001;

L.    the consolidation of the operations of the Rochester, New York facility into other existing facilities in September, 2001;

M.    the closure of the tooling operation in Mansfield, UK;

N.    the consolidation of the operations in Gloucester, UK into the Morecambe, UK facility in March, 2002;

O.    the decision in June, 2002 to close the Villefranche, France facility, and

P.      significant overhead reduction commencing in December, 2001 and continuing into 2002.

17.      Management continues to evaluate other divisions as to their future strategic fit within the organization and their projected results of operations.  Subject to this Court's approval, additional locations or divisions may be sold or closed as management continues the evaluation.

18.      Prior to the Petition Date, the Debtor took the following measures to reduce its debt structure:

A.      In August 2000, the Debtor reduced its leverage by $7.5 million when it purchased through a tender offer $50.0 million of its previously issued 11¾% Series B Senior Notes due 2004 (the "Senior Notes") at a 15% discount, utilizing proceeds from the term loan and revolving loan of that certain Amended and Restated Credit Agreement dated as of August 9, 2000, among the lenders named therein, Bank of America, N.A., as agent, and Moll Industries, Inc., as amended, supplemented and otherwise modified (the "Senior Credit Facility").  This transaction resulted in a gain of $4.9 million that was recorded in 2000.

B.      In November 2000, the Debtor used the proceeds of the sale of the Cosmetics division to purchase $41.4 million of the Senior Notes at a 15% discount, resulting in a gain of $5.0 million that was recognized in 2000.  The Debtor used remaining proceeds from the sale of the Cosmetics division to retire $11.4 million under the Senior Credit Facility.

C.      In January 2001, the Debtor reduced its debt structure by an additional $8.6 million as it used availability under the revolving loan component of the Senior Credit Facility to repurchase through a tender offer $13.5 million of its outstanding Subordinated Notes

at a 63.5% discount. This transaction resulted in a gain of $7.7 million that was recognized in 2001.

D.    In December 2001, the Debtor further reduced its outstanding debt by $22.8 million by purchasing $28.8 million of the Subordinated Notes for $6.0 million. This reduction was financed through that certain Term Loan Credit Agreement dated as of December 21, 2001, among the lenders named therein, Bank of America, N.A. and any successor thereto, as agent, and Moll Industries, Inc., as amended, supplemented and otherwise modified (the "Mezzanine Facility"). The transaction resulted in a gain of $20.1 million that was recognized in 2001.

E.    In January 2002, the Debtor utilized additional borrowings under the Mezzanine Facility to purchase $14.2 million of the Subordinated Notes for $6.4 million, resulting in a gain of $7.1 million and reduced leverage of $7.8 million.

19.    As of the Petition Date, approximately $8.6 million remains outstanding under the Senior Notes and $73.5 million remains outstanding under the Subordinated Notes.

20.    As of the Petition Date, the Debtor is a party to the Senior Credit Facility and the Mezzanine Facility. The Senior Credit Facility consists of a $30 million revolving credit facility of which $20.7 million is outstanding and a $10 million term loan facility, of which $9.3 million is outstanding. The Senior Credit Facility expires June 30, 2004.

21.    Pursuant to that certain Restructuring Agreement dated June 10, 2002, by and among AMM Holdings, Inc., Anchor Holdings, Inc., Moll, George T. Votis, Highland and Foothill Capital Corporation ("Foothill") (the "Restructuring Agreement"), Highland agreed to purchase all existing commitments and loans (other than those owned by Foothill) under the Debtor's Senior Credit Facility. Contemporaneously with the Restructuring Agreement, Bank of

America and other lenders thereto sold all existing commitments and loans (other than those owned by Foothill) under the Senior Credit Facility to various investment funds collaterally managed by Highland. Shortly thereafter, Bank of America assigned to Foothill its position as agent under the Debtor's Senior Credit Facility. Subsequent to this transaction, investment funds collaterally managed by Highland own 81.25% and Foothill owns 18.75% of the commitments and loans under the Debtor's Senior Credit Facility.

22.     Under the Mezzanine Facility, $33.8 million is outstanding and various investment funds collaterally managed by Highland own 100% of the outstanding loans. The Mezzanine Facility expires December 31, 2004.

23.     The Debtor continued to experience significant financial liquidity problems following the implementation of the foregoing measures, as it attempted to improve its operating results. The Debtor failed to make a scheduled payment of interest on the Subordinated Notes in the amount of approximately $3.9 million due on July 1, 2002 and failed to cure such non-payment of interest within the 30-day period provided in that certain Indenture dated as of June 26, 1998, as supplemented by a First Supplemental Indenture dated as of December 28, 2001, by and between State Street Bank and Trust Company, as Trustee, and the Debtor (as so supplemented and amended, the "Indenture"). The Debtor was therefore in default, as of the Petition Date, under the terms of the Indenture. On July 19, 2002, the Debtor was informed by the current agent for the Senior Credit Facility that "Events of Default" (as such term is defined in the Senior Credit Facility) were existing under the Senior Credit Facility. Some or all of these "Events of Default" are also events of default under the Mezzanine Facility.

24.     For more than a year prior to the execution of the Restructuring Agreement, the Debtor diligently pursued options to refinance the Senior Credit Facility, including:

A. attempting a real estate refinancing which failed because the proposed structure violated the terms of the Debtor's indentures;

B. attempting a refinancing with a new lender which failed due to environmental underwriting concerns;

C. engaging an advisor to locate possible lenders and the unsuccessful pursuit of a refinancing with such lenders; and

D. most recently, attempting a refinancing with other lenders which ultimately failed due to the Debtor's inability to find a lender which would lend appropriate amounts against the Debtor's real estate collateral.

All such attempts at refinancing the Senior Credit Facility were unsuccessful.

25. In June, 2002, the Debtor faced a liquidity crisis related to the scheduled interest payment on the Subordinated Notes, at which time the only viable financing option, which would provide the Debtor with the immediate liquidity it needed that could be effected in time to prevent an emergency bankruptcy filing was entering into the Restructuring Agreement with Highland. Although this transaction with Highland did not solve the Debtor's long term liquidity problems, at that time it was the only proposal put forth by any lending institution that would provide the Debtor with sufficient current liquidity and therefore presented the best and only alternative for strengthening the Debtor's financial situation and preserving and maximizing value for all its constituencies, including its creditors.

26. Following the acquisition of a majority position in the Senior Credit Facility by Highland and pursuant to the terms of the Restructuring Agreement, the Debtor used its best efforts to effect a capital and debt restructuring outside of court, as the Debtor believed such to be in the best interests of all its constituencies. On September 6, 2002, the involuntary petition was filed by the Highland managed bondholders as described above.

## Relief Requested

27.    The Debtor wishes to employ Nightingale as its financial advisors.  Such employment is necessary because the Debtor requires the specialized knowledge and experience which Nightingale is able to provide.  The Debtor believes that Nightingale is well qualified to represent it in this case.  The Debtor requests that this Court grant final approval of Nightingale's retention upon the resignation of George T. Votis and Charles B. Schiele from their positions as officers and directors of the Debtor in accordance with the terms of their respective severance agreements.

28.    The Debtor contemplates that Nightingale will render services to the Debtor as needed throughout the course of this Chapter 11 case.  In particular, the Debtor anticipates that Nightingale, will perform the following functions:

(i)     Interview selected members of management to obtain their individual assessments of company strengths, weaknesses, opportunities, problems, etc;

(ii)    Review any operational improvement/restructuring plans previously developed by management;

(iii)   Analyze near and medium term cash flow projections including capital expenditure commitments and potential asset dispositions;

(iv)    Review, assess and analyze available historical data (past 3 years) and current operating trends and performance;

(v)     Review and evaluate the Debtor's competitive position including an assessment of market share, margins, product mix and customer concentration;.

(vi)    Review the Debtor's business plan assumption and rationale;

(vii)   Review the Debtor's periodic financial and operational reporting (including financial statements, cash flow and production levels) and assess the Debtor's actual performance to its plan;

(viii)  Advise and assist the Debtor, as a debtor in a bankruptcy case, in forecasting, planning, controlling and other aspects of managing cash;

(ix)     Advise and assist the Debtor in organizing its resources to effectively plan, coordinate and manage a bankruptcy proceeding;

(x)      As CRO, implement actions approved by the Debtor's Board of Directors to preserve and protect asset values, improve profitability, restructure the capital structure and use its best efforts to confirm a plan of reorganization consistent with that certain Restructuring Agreement by and among the Debtor, its Lenders, George T. Votis and certain other parties, dated as of June 10, 2002 (the "Restructuring Agreement"), if feasible.

29.     As a condition of the granting of DIP financing the secured debtor in possession financing lenders (the "DIP lenders") are requiring that the Debtor retain a CRO. The CRO shall report directly the Debtor's Board of Directors.

30.     D'Appolonia, as CRO, will perform, among others, the following duties and will have the following authorities, subject to approval by the Debtor's Board of Directors:

(i)      manage the Debtor's business affairs;

(ii)     use our best efforts to develop, evaluate and implement a plan of reorganization consistent with that certain Restructuring Agreement by and among the Company, its Lenders, Votis and certain other parties, dated as of June 10, 2002;

(iii)    serve as the principal negotiator with the authority to bind the Debtor in negotiations with any of its creditor constituencies, any official or unofficial committees, any customers or any vendors;

(iv)     review and direct any and all financial and operating policies, plans and programs and approve all disbursements made by the Debtor to ensure conformity with any budget agreed to in connection with any debtor-in-possession financing facility;

(v)      undertake a review and evaluate of the Debtor's business to assess available cost-cutting measures to improve the Debtor's liquidity;

(vi)     assist management in obtaining and negotiating appropriate debtor-in-possession financing;

(vii)    direct and assist the Debtor in developing and implementing a communication plan to improve relations with its employees, customers vendors and creditors.

31.     The Debtor requires knowledgeable financial advisors to render the foregoing essential professional services. The Debtor has selected Nightingale as its financial advisor due

to the fact that Nightingale has substantial bankruptcy expertise and is well qualified to perform these services and represent the Debtor's interests in this Chapter 11 case.

32.     Nightingale will receive a retainer of $125,000.00. Nightingale's professional fees will be billed at a fixed rate of $125,000.00 per month. In addition to professional time fees, out-of-pocket expenses are billed at cost, and generally range from 10% to 15% of professional time fees, depending on the amount of travel involved. Nightingale expects, because of the current in-place operations management and information and work developed and completed by other consultants, Nightingale's services will incorporate providing a full-time Chief Restructuring Officer, with the duties, responsibilities and authority as outlined above, and limited support staffing associated with operational, financial and cash flow analysis, and report preparation. In the event Nightingale is asked to provide additional staffing to serve in other interim management positions or to provide other advisory, asset disposition or bankruptcy support services, such services would be discussed with the Company and the secured lenders in advance and billed on an hourly basis pursuant to Nightingale's standard terms and conditions.

33.     The terms of Nightingale's engagement also provide for the execution of a "Release and Indemnification" which is set out in detail in Nightingale's Engagement Letter. Nightingale does not seek indemnification from the gross negligence and/or willful misconduct on the part of Nightingale or any of its officers, associates or staff.

34.     After due consideration and deliberation, the Debtor has concluded that its interests, and the interests of its estate and creditors, would be served best by retaining Nightingale to render such financial advising services as are necessary and appropriate in connection with the prosecution of this bankruptcy case. Nightingale has indicated its willingness to act on behalf of the Debtor and to provide the services set forth above, and to be

compensated in accordance with terms set forth above, upon application to this Court in accordance with any orders of this Court and the provisions of the Bankruptcy Code and the Bankruptcy Rules. The Debtor's engagement letter with Nightingale is attached hereto as Exhibit A.

35.    No other payments have been made to Nightingale for services rendered, or to be rendered, in connection with this chapter 11 case. Subject to the approval of this Court, the source of all compensation for professional services to be rendered on behalf of the Debtor shall be the funds of the Debtor's estate, including funds provided by any debtor in possession financing agreement that is approved by this Court. The Debtor requests that Nightingale not be required to apply the retainer to any monthly payments of interim fee awards, nor place it in a segregated account.

36.    To the best of Debtor's knowledge, information and belief, other than Nightingale's role as the Debtor's financial advisors in connection with this case, Nightingale has no connection with the Debtor, its creditors or any other party in interest, or their respective attorneys or accountants or the United States Trustee or any person employed in the Office of the United States Trustee, except as set forth herein and in the Affidavit of D'Appolonia, a copy of which is attached hereto as Exhibit B and incorporated herein by reference (the "D'Appolonia Affidavit").

37.    Nightingale has or may have provided professional services to, currently provide professional services to and may in the future provide professional services to certain of the Debtor's creditors and other parties in interest in this case and their respective attorneys and accountants in matters unrelated to this Chapter 11 case. Certain of these creditors, parties in interest, attorneys or accountants have or may have provided goods or services to, currently

provide or may currently provide goods and services to and may in the future provide goods or services to Nightingale in matters unrelated to this Chapter 11 case. Nightingale has significant client relationships with or provides a variety of services to parties in interest in matters unrelated to this Chapter 11 case, including but not limited to, Highland Capital Management, Foothill Capital Corporation, Merrill Lynch, SocGen, Credit Lyonnase, Solomon Smith Barney, Blackrock, and ING Funds. In light of the fact that a number of bondholders and noteholders, which are creditors of the Debtor, may hold their positions in street name, it is possible that some relationship or connection between Nightingale and the above entities will be discovered at a later date. As represented in the D'Appolonia Affidavit, in that event Nightingale will, if necessary, submit a supplemental affidavit to the Court and interested parties.

38. To the best of the Debtor's knowledge, information and belief, Nightingale does not represent and does not hold any interest materially adverse to the interests of the Debtor, or of any class of creditors of the Debtor, by reason of any direct or indirect relationship to, connection with, or interest in the Debtor for any other reason. Accordingly, Nightingale is a "disinterested person" within the meaning of Sections 101(14) and 327 of the Bankruptcy Code, and its retention is in the best interest of the Debtor, its estate and creditors.

39. The Debtor is aware that Nightingale represents certain creditors and other parties in interest in matters unrelated to this bankruptcy case. The Debtor has reviewed the D'Appolonia Affidavit and is aware of such creditors and interested parties listed therein. The Debtor has no objection to Nightingale continuing its representation of such creditors and interested parties in matters unrelated to this case.

40. The Debtor requests that its retention of Nightingale as set forth herein be effective as of the Petition Date, pursuant to L. Rule 2014(c).

**Notice**

41.     No trustee, examiner or creditors' committee has been appointed in this case. Notice of this Motion has been served by: (i) hand delivery upon the Office of the United States Trustee; (ii) facsimile or email to counsel for Highland and Foothill; and (iii) overnight mail to: (a) those parties appearing on the list of the twenty largest unsecured creditors of the Debtor; (b) each of the participating lenders under the Debtor's prepetition and post-petition secured credit facilities; (c) the Debtor's landlords and mortgage holders; and (d) other parties designated on the service list by the Debtor to receive notice. Given the nature of the relief requested herein, the Debtor submits that no further notice is necessary.

42.     No prior application for the relief requested herein has been made to this or any other Court.

WHEREFORE, the Debtor respectfully requests that the Court enter an order authorizing the Debtor to retain and employ Nightingale to represent the Debtor as described herein in this Chapter 11 case pursuant to Section 327 of the Bankruptcy Code, Bankruptcy Rule 2014 and L. Rule 2014, with such final approval to be effective upon the resignation of of George T. Votis and Charles B. Schiele in accordance with the terms of their severance agreements; and granting such additional relief as the Court deems just and appropriate in the circumstances.

Dated:  September 18, 2002                 Respectfully submitted,

                                        **MOLL INDUSTRIES, INC.**

                                        *William W Teeple*

                                        By: *Willm. W. Teeple*

                                        Its:  Chief Financial Officer

## CERTIFICATE OF SERVICE

I hereby certify that I have served a true and correct copy of the above and foregoing document by First Class Mail and/or Facsimile on this the 18th day of September, 2002, addressed to all parties on the attached Service List.

RAYMOND W. BATTAGLIA

# MASTER SERVICE LIST

## UNITED STATES TRUSTEE

Office of the United States Trustee
Richard W. Simmons
615 E. Houston Street, Suite 533
San Antonio, TX 78205
Tel: 210-472-4640
Fax: 210-472-4649

## MOLL INDUSTRIES, INC.

Moll Industries, Inc.
Attn: William W. Teeple
2100 S.W. 71st Terrace
Davie, FL  33317
Tel:  954-577-2662
Fax:  954-474-5992

## COUNSEL TO MOLL INDUSTRIES, INC.

Oppenheimer, Blend, Harrison & Tate, Inc.
Raymond W. Battaglia
711 Navarro, Suite 600
San Antonio, TX 78205-1796
Tel: 210.224.2000
Fax: 210.224.7540

## SPECIAL CORPORATE COUNSEL TO MOLL INDUSTRIES, INC.

Choate, Hall & Stewart
Exchange Place
53 State Street
Boston, MA  02109-2891
Tel:  617-248-5000
Fax:  617-248-4000

## CHIEF RESTRUCTURING OFFICER

Michael R. D'Appolonia
Nightingale & Associates, LLC
Soundview Plaza
1266 East Main Street
Stamford, CT 06902
Tel: 203-359-3855
Fax: 203-359-4551


## FOOTHILL CAPITAL CORPORATION

Foothill Capital Corporation
Joseph Massaroni
1000 Abernathy Road
Suite 1450
Atlanta, GA 30328
Tel: 770-508-1300
Fax: 770-508-1375


## COUNSEL TO FOoTHILL CAPITAL CORPORATION

Paul, Hastings, Janofsky & Walker LLP
Jess Austin
600 Peachtree Street, N.E.
Suite 2400
Atlanta, Georgia 30308
Tel: 404-815-2400
Fax: 404-815-2424

## SECURED LENDERS

Highland Capital Management, L.P.
Two Galleria Tower, Suite 1300
13455 Noel Road
Dallas, Texas 75240
Attention: Mr. Wesley Olfers
Fax: 972-628-4147

PamCo Cayman Ltd.
Two Galleria Tower, Suite 1300
13455 Noel Road
Dallas, Texas 75240
Attention: Mr. Wesley Olfers
Fax: 972-628-4147

Highland Legacy Limited
Two Galleria Tower, Suite 1300
13455 Noel Road
Dallas, Texas 75240
Attention: Mr. Wesley Olfers
Fax: 972-628-4147

Highland Loan Funding V Ltd.
Two Galleria Tower, Suite 1300
13455 Noel Road
Dallas, Texas 75240
Attention: Mr. Wesley Olfers
Fax: 972-628-4147

California Public Employees' Retirement
System ML CBO IV (Cayman) Ltd.
Two Galleria Tower, Suite 1300
13455 Noel Road
Dallas, Texas 75240
Attention: Mr. Wesley Olfers
Fax: 972-628-4147

Highland Crusader Offshore Partners, L.P.
Two Galleria Tower, Suite 1300
13455 Noel Road
Dallas, Texas 75240
Attention: Mr. Wesley Olfers
Fax: 972-628-4147

Morgan Stanley Senior Funding, Inc.
1633 Broadway, 26th Floor
New York, NY 10019
Attn: James Morgan
Fax: 212-537-1867

**COUNSEL TO HIGHLAND CAPITAL MANAGEMENT, L.P.**

Haynes and Boone, LLP
1000 Louisiana St., Suite 4300
Houston, Texas 77002
Attn: Lenard Parkins, Esq. and
Scott G. Night, Esq.
Fax: 214-200-0564


**TWENTY LARGEST CREDITORS**

Whirlpool Corp.
P.O. Box 17001
Ft. Smith, AR 72917-7001
Tel: 479-648-2000

John J. Nugent
129 Blanchette Drive
Marlboro, MA 01752
Tel: 508-480-9037

Dr. Wolfgang Kohler
Muhlenweg 3
59555 Lippstadt
Germany

Claude I. Kyker
5815 Hiawatha
Morristown, TN 37814
Tel: 423-581-9352

GE Polymerland, Inc.
P.O. Box 890336
Dallas, TX 75389

Staffmark, Inc.
P.O. Box 957849
St. Louis, MO 63195-7870

Robert T. Parkey
8880 Oldham Way
West Palm Beach, FL  33412

Francis H. Olmstead, Jr.
7328 Misty Meadow Place
Knoxville, TN  37919
Tel: 865-690-4464

Asyst Technologies, Inc.
48761 Kato Rroad
Fremont, CA  94538

Phyllis Best
4320 Shipe Rd
Corryton, TN  37721
Tel:  865-688-8730

Polyone Distribution
DEPT. CH14046
Palatine, IL  60055-4046

RTP CO
P.O. Box 86
SDS-12-1939
Minneapolis, MN  55486-1939

Robert J. Epley
1001 Westmoreland Blvd
Knoxville, TN  37919
Tel:  865-531-6351

Geoffrey DeRohan
7320 Parliament Drive
Knoxville, TN  37919
Tel: 865-690-1819

Terrance O. Jones
279 County Farm Rd
Jonesbourough, TN  37659
Tel: 423-753-8850

Lloyd A. Etter
536 Windridge Lane
Morristown, TN  37814
Tel: 423-587-2549

Philips
HIGHTECH CAMPUS VIENNA/PSS
Gutheil-Schoder Gasse 10
Vienna Austria A-1102

Reliance Insurance Co.
P.O. Box 70873
Chicago, IL  60673-0873
Tel: 312-655-1850

Huntsman Corp.
P.O. Box 371190
Pittsburgh, PA  15251-7190

DSM Engineering Plastics, INC.
135 S. LaSalle
Dept. 4094
Chicago, IL  60674-4094

Diamond Tool & Die Co
404 Winston Avenue
Dayton, OH  45403

London Manhattan Co.
693 Ocean Avenue
Portland, ME  04103
Tel: 207-874-0604

Uniplas Enterprises
235 Hunt Club Blvd
Longwood, FL  32779
Tel: 407-869-1155

Graphic Applications Inc.
977 Mount Read Blvd
Rochester, NY 14606
Tel: 585-254-3988

E.I. Dupont
P.O. Box 905552
Charlotte, NC 28290-5552

William R. Cavalari
32 Moreland Ave
Oakville, CT 06779
Tel: 860-274-4118

Vincent M. Pignatelli
7260 Autumn View Land
Powell, TN 37849
Tel: 865-938-4257

Christler Chemical & Plastics, Inc.
30150 S.W. Parkway Avenue
Wilsonville, OR 97070

Thermedics Polymers Products
Dept. CH10691
Palatine, IL 60055-0691

Daltek, Inc.
1030 Vista Drive
Dalton, GA 30721
Tel: 706-277-2049

Pro-Stainless, Inc.
333 East Brokaw
San Jose, CA 95112
Tel: 408-437-0600

## LANDLORDS AND MORTGAGE HOLDERS

Bill Spurling Properties
3201 N. Green River Road
Evansville IN  47715
Tel: 812-474-1001

Duke Weeks Realty L.P.
75 Remittance Dr, Ste 3205
Chicago, IL  10041

Freeborn I, L.P.
P.O. Box 680475
San Antonio, TX  78268

GE Capital Business
Asset Funding
P.O. Box 402363
Atlanta, GA  30374-0317

Legg Mason Real Estate Services
P.O. Box 281979
Atlanta, GA
Tel:  404-237-2456

Sealy Alamo Buildings LP
P.O. Box 972935
Dallas, TX 40290-1152

Scalemen of Florida, Inc.
2200 SW 71 Terrace
Davie, FL  33317

**Bondholders:**

Wes Olfers

Portfolio Manager
Highland Capital Management LP
Two Galleria Tower
1344 Noel Road
Suite 1300
Dallas, Texas 75240
Phone:  (972) 233-4300
Fax: (972) 628-4147
wolfers@hcmlp.com

Mike Brown
Merrill Lynch Investment Management
P.O. Box 9011
Princeton, NJ  08543
Phone:  (609) 282-3001
Fax:  (609) 282-2940 or (609) 282-2756
E-mail:  mike_brown@ml.com

800 Scudders Mill Road
Plainsboro, NJ 08536 * **Address for Overnight Mail


Jeff Kobylarz
Salomon Smith Barney
338 Greenwich Street
New York, NY  10013
Phone:  (212) 816-4768
Fax:  (212) 816-4218
E-mail:  Jeffrey.kobylarz@citigroup.com

David Chin
Credit Suisse Asset Management
466 Lexington Avenue
14th Floor
New York, NY 10017
(212) 201-9034
Email:  David.K.Chin@csam.com

**DTC Participants:**

Bank of New York

c/o Cecile Lamarco
925 Patterson Plank Road
Secaucus, NJ  07094
Phone:  (201) 319-3066
Fax: (201) 319-3073

JP Morgan Chase Bank
c/o Elizabeth Cooper

Phone:  (212) 623-7288
Elizabeth.Cooper@jpmorgan.com

State Street Bank Trust Custody
c/o Ed Chaney
1776 Heritage Drive
North Quincy, MA  02171
Phone:  (617) 664-3424
Fax:  (617) 664-8559

Boston Safe Deposit & Trust Company
c/o Melissa White
525 William Penn Place; Suite 3631
Pittsburgh, PA  15259
Phone:  (412) 234-2475
Fax:  (412) 236-1012
Tarasovich.m@mellon.com.

The Northern Trust Company
c/o Jamie Kummer
Reorganization Dept.
801 S. Canal C-1N
Chicago, IL  60607
Phone:  (312) 557-0821
Fax:
jmk8@ntrs.com

State Street Bank & Trust Company
c/o Joseph J. Callahan
1776 Heritage Drive
Global Corporate Action Unite JAB 5NW
North Quincy, MA  02171
Phone:  (617) 985-6453
Fax:  (617) 537-5004

Rob Morino
State Street Mutual Fund Services
500 College Road
Princeton, NJ 08540
tel:  609-580-5057
fax:  609-580-5520
email:  rfmorino@statestreet.com

Andrea Delgaldo
ING Funds
Phone:  480-477-2276
Email: andrea.delgaldo@ingfunds.com

Elizabeth Cooper
JP Morgan
Phone:  (212) 623-7288
Email:  Elizabeth.Cooper@jpmorgan.com


**DTC:**

Joe Clark
**Brenda McKnight handling Joe on vacation until 9/3/02
DTC
55 Water Street
25th Floor - Announcements
New York, NY 10041
Phone : (212) 855-5482 (Brenda)
Fax: 212-855-5278
FEDEX A/C# 103464900
Moll Industries 10.5% due 2008 is 608684 AB2

**Trustee:**

   Michael Hopkins
   State Street Bank & Trust Company
   225 Asylum Street, 23rd Floor
   Hartford, CT  06103
   Phone:  (860) 244-1820
   Fax:  (860) 244-1889
   E-mail:  mhopkins@statestreet.com

Corinne Kerner
Protiviti, Inc.
122 E. 42nd Street, Suite 4405
New York, NY 10168
Phone: (212) 651-6200
Fax: (212) 651-6239
ckerner@crllp.com

# Exhibit A



Nightingale & Associates, LLC
Soundview Plaza
1266 East Main Street
Stamford, Connecticut 06902

Tel: 203.359.3855
Fax: 203.359.4551
Email: info@nightingale-
associates.org

Principals:
Michael R. D'Appolonia
Kevin I. Dowd
Dennis J. Duckett
Howard S. Hoffmann
S. Douglas Hopkins
Stephen J. Hopkins
James. D. Neidhart

Senior Advisors:
William J. Nightingale
Tor B. Arneberg

September 16, 2002

Mr. William Teeple
Moll Industries, Inc.
2200 SW 71st Terrace
Ft. Lauderdale, FL  33317

Dear Mr. Teeple

Further to our discussions, this Engagement Letter sets forth our current understanding of the scope and objectives of the proposed assignment as well as the general terms and conditions for the retention of Nightingale & Associates, LLC ("Nightingale") by Moll Industries, Inc. ("Moll" or the "Company"). It is our understanding that Nightingale will be engaged by Moll and will report to the Company's Board of Directors.


## I.    BACKGROUND

Moll Industries, Inc. is a world leader in the design, manufacture and packaging of precision injection molded plastic products for consumer, medical and business applications. With over 2000 employees in its domestic and foreign operations Moll Industries manufactures products for some of the world's largest and most recognized companies and brands.

On September 6, 2002 certain creditors of the Company filed an involuntary bankruptcy proceeding under Chapter 11 of the US Bankruptcy Code in San Antonio, Texas. Currently the Company is in the process of reaching an understanding with its secured lenders pursuant to which such lenders will provide the Company with Debtor in Possession ("DIP") financing and support the Company's petition to convert the involuntary filing to a voluntary Chapter 11 proceeding. It is understood that the Company's current Chairman and Chief Executive Officer George T. Votis ("Votis") and its President Charles Schiele are expected to resign both as officers and employees of the Company following the conversion to a voluntary Chapter 11 filing and approval by the Bankruptcy court of their respective Severance

Agreements. As a result, William Teeple will be the Company's sole remaining board member.

As a condition of the granting of the DIP financing the debtor in possession lenders (the "DIP lenders") are requiring that the Company retain a Chief Restructuring Officer ("CRO"). CRO shall report to the Company's Board of Directors.

## II.     **OBJECTIVES OF THE ENGAGEMENT**

Based on our discussions, we perceive the objectives of this assignment to be as follows:

1) Upon the commencement of the engagement, Michael R. D'Appolonia ("D'Appolonia") will be appointed Chief Restructuring Officer ("CRO") of the Company. As CRO, D'Appolonia will perform, to the best of his ability, among others, the following duties and will have the following authorities, subject to approval by the Company's Board of Directors.

   i.   manage the Company's business affairs;

   ii.  use our best efforts to develop, evaluate and implement a plan of reorganization consistent with that certain Restructuring Agreement by and among the Company, its Lenders, Votis and certain other parties, dated as of June 10, 2002 (the "Restructuring Agreement");

   iii. serve as the principal negotiator with the authority to bind the Company in negotiations with any of its creditor constituencies, any official or unofficial committees, any customers or any vendors;

   iv.  review and direct any and all financial and operating policies, plans and programs and approve all disbursements made by the Company to ensure conformity with any budget agreed to in connection with any debtor-in-possession financing facility;

   v.   undertake a review and evaluate of the Company's business to assess available cost-cutting measures to improve the Company's liquidity;

   vi.  assist management in obtaining and negotiating appropriate debtor-in-possession financing

   vii. direct and assist the Company in developing and implementing a communication plan to improve relations with its employees, customers vendors and creditors.

2) Following the conversion of the current involuntary Chapter 11 filing to a voluntary Chapter 11 proceeding, D'Appolonia will be appointed to the Company's Board of Directors and if requested, serve as its Chairman.

3) Provide such other advice, assistance and services as the Company may from time to time request.

## III.    OUR APPROACH TO THE ENGAGEMENT

Based on our understanding of the objectives of this assignment, we would approach the assignment as follows:

1) Interview selected members of management to obtain their individual assessments of company strengths, weaknesses, opportunities, problems, etc;

2) Review any operational improvement/restructuring plans previously developed by management;

3) Analyze near and medium term cash flow projections including capital expenditure commitments and potential asset dispositions;

4) Review, assess and analyze available historical data (past 3 years) and current operating trends and performance;

5) Review and evaluate the Company's competitive position including an assessment of market share, margins, product mix and customer concentration;

6) Review the Company's business plan assumptions and rationale;

7) Review the Company's periodic financial and operational reporting (including financial statements, cash flow and production levels and assess the Company's actual performance to its plan;

8) Advise and assist the Company, as a debtor in a bankruptcy case, in forecasting, planning, controlling and other aspects of managing cash;

9) Advise and assist the Company in organizing its resources to effectively plan, coordinate and manage a bankruptcy proceeding;

10) As CRO, implement actions approved by the Debtor's Board of Directors to preserve and protect asset values, improve profitability, restructure the capital structure and use our best efforts to confirm a plan of reorganization consistent with the Restructuring.


## IV.    DISCUSSION

It is our understanding that because of the current in-place operations management and information and work developed and completed by other consultants, Nightingale's services will incorporate providing a full-time Chief Restructuring Officer, with the duties, responsibilities and authority outlined above in the Objectives of the Engagement section and limited support staffing associated with operational, financial and cashflow analysis. In the event that Nightingale is asked to provide additional staffing to serve in other interim management positions or to provide other advisory, asset disposition or bankruptcy support services, such services would be  discussed with the Company and the secured lenders in advance and billed on an hourly basis pursuant to Nightingale's standard terms and conditions.

Nightingale approaches all assignments such as the one under discussion as a team effort with the management and employees of the Company involved. It would be our intention and practice to utilize Company management and employees to undertake fact finding and analysis on our mutual behalf to the greatest extent possible.

In addition, we would utilize work done by the Company or its professionals and other consultants, to the extent it may be available, in order to avoid or minimize duplication of work.

## V.  RESPONSIBILITY AND STAFFING FOR THE WORK

Michael R. D'Appolonia, President and Principal of Nightingale will act as Officer-In-Charge of this assignment, responsible for its overall management, direction and control; will direct the operational and strategic evaluations and recommendations, and will serve as the Company's Chief Restructuring Officer ("CRO"). Other members of Nightingale, as needed, will assist him. Each of the individuals assigned to this engagement will have extensive financial and operational restructuring experience

Due to the accelerated crisis nature of the project and the present lack of information regarding the availability and/or capability of Company personnel to assist with completion of various urgent tasks, it may be necessary to utilize the services of additional Nightingale Associates on the project. Additional Nightingale associates will be billed on an hourly basis pursuant to the attached Exhibit I. Nightingale agrees that it will confer with the Company and the DIP Lenders before adding additional Associates to the project team.

## VI.  ESTIMATE OF TIME AND COST

As of this writing, we do not have sufficient information about the Company's operating issues and problems, its management information and control systems, the form and format of the Company's current business plan, cash flow, and financial projections, and detail of work which may have already been undertaken by the Company to provide a definitive estimate of the total the time and cost to undertake this project. However, based on assuming the position of Chief Restructuring Officer of Moll Industries, Inc. Nightingale's professional fees for the services described above will be billed at a fixed rate of $125,000 per month. Any carve out of DIP financing for payment of Nightingale's fees will be limited to $500,000.

In addition to professional time fees, out-of-pocket expenses are billed at cost, and generally range from 10% to 15% of professional time fees, depending on the amount of travel involved. Out-of-pocket expenses consist primarily of travel and transportation, meals, lodging, telephone, specifically assignable office assistance and report production.

Invoices are submitted monthly at the end of each month. Prompt payment of Nightingale invoices following bankruptcy court approval, if required, is a prerequisite for Nightingale's continued work on an engagement.

Nightingale fully understands that the Company desires to keep costs to a minimum, commensurate with achieving the objectives of the assignment and given a reasonable degree of comfort relative to the judgments, conclusions, and recommendations involved.

## VII.   ADVANCE DEPOSIT

Nightingale requires an Advance Deposit for all assignments of the type described above. Given this situation, Nightingale requires an Advance Deposit of $125,000, which must be paid simultaneously with beginning project work. Subject to approval of the court, the Advance Deposit will not be applied to payment of monthly interim fees nor will the Advance Deposit be placed in a segregated account. At the completion of the project and at the direction of the Company, Nightingale will either apply the Deposit to any outstanding invoices or, if there are no unpaid invoices owing to Nightingale, promptly return the Deposit to the Company.

## VIII.   INDEMNIFICATION

Given the nature of this assignment, Nightingale will require a release in the form of a "Release and Indemnification" agreement from a financially responsible party prior to undertaking the project. The form of "Release and Indemnification" agreement we require is attached as Exhibit II.

The rationale for this requirement is that, to the extent that any adversarial issues or proceedings occur between parties, Nightingale, by its very presence and activities, could be caught in the "cross fire". Of course, the indemnity excludes gross negligence and/or willful misconduct on the part of Nightingale or any of its officers, associates or staff.

## IX.   CONFIDENTIALITY OF CLIENT INFORMATION

Nightingale recognizes and acknowledges that the firm and its officers and staff have access to proprietary and confidential information in most, if not all, client assignments. Nightingale assures clients that all such non-public information received by the firm, its officers, and staff from the Company will be held and treated in strict confidence, and will not knowingly be disclosed by Nightingale, its officers, and staff to third parties. Nightingale shall have the right to include Moll Industries, Inc. in the list of Nightingale's clients in any business development materials or advertisements used by Nightingale in the normal course of business.

**X.**     **CAVEAT**

Given the nature of business turnaround/crisis management and related assignments, there can be no assurance that unforeseen problems may not be encountered.  In addition, it is likely that difficult and complex judgments and conclusions will have to be made on a rapid basis without full and complete information and analysis readily available.    Accordingly, Nightingale undertakes such assignments on a "Best Efforts" basis only, and makes no representations, warranties or guarantees relative to outcome, performance or results. Further, in the event that Mr. D'Appolonia or other members of Nightingale are requested to serve as Directors of Moll Industries, Inc. or any of its subsidiaries, it is expressly understood that the Company will provide appropriate Directors and Officers insurance coverage.

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

Nightingale works under an arrangement whereby our services can be terminated by our clients, or by ourselves, at any time, upon oral notice followed by written confirmation. Of course, the Company will be responsible for professional time and expense charges up to the time of notice of termination. It is understood by both Nightingale and the Company that any termination of Nightingale by the Company following the conversion of the involuntary bankruptcy case to a voluntary one will be subject to bankruptcy court approval. Should either party contemplate termination, reasonable advance notice is desirable in the interest of orderly phase out and completion of work underway.

Nightingale will be working on other client assignments during the period we will be working on this assignment. However, we fully expect to be able to arrange our schedules so that work on this matter will proceed at a mutually satisfactory pace.

Nightingale's continued engagement hereunder following the conversion of the pending involuntary proceeding to a voluntary one will be subject to Bankruptcy Court approval; however, Nightingale will continue providing services to the Company pending order by the Bankruptcy Court approving Nightingale, provided the Company includes the appropriate pleadings to have Nightingale approved in its "first day" filings.

If this Engagement Letter conforms to your understanding of the terms and conditions of our retention, please have the appropriate party signify agreement by signing and returning the enclosed extra copy of this Engagement Letter.

We look forward to working with you and management of the Company on this interesting and challenging assignment.

Sincerely,

Michael R. D'Appolonia
President and Principal

**READ, UNDERSTOOD AND AGREED TO BY:**

**Moll Industries Inc.**

By: *William W Teeple*

Title: *CFO*

Date: *9/18/02*

**EXHIBIT I**

# NIGHTINGALE & ASSOCIATES, LLC
## SUMMARY OF COMPENSATION AND FEE ARRANGEMENTS

**I.**     **PROFESSIONAL TIME FEES AND EXPENSES**

Nightingale & Associates, LLC ("Nightingale") generally charges professional time fees on an hourly basis for all assignments. The prevailing professional time fees for Principals range from $500 - $525 per hour. For Managing Directors the range is from $375 - $425 per hour and for Associates the range is from $260 - $375 per hour.

The rates quoted in the Engagement Letter are typically held throughout the life of the assignment. However, on long-term assignments of six months or more, changing market conditions may require an adjustment to Nightingale's billing rates. Accordingly, Nightingale reserves the right to adjust its rates upon 30 days written notice to the client.

Out-of-pocket expenses are billed at cost, and generally range from 10% to 15% of professional time fees, depending on the amount of travel involved. Out-of-pocket expenses consist primarily of transportation costs, meals, lodging, telephone, specifically assignable office assistance and report production and, in the case of divestiture related assignments, advertising and mailing costs. Out-of-pocket expenses also apply to Nightingale staff members who reside out of the area when working out of Nightingale's offices in Stamford, CT or San Francisco, CA on a client project. For assignments undertaken for clients domiciled in the State of Connecticut, a 6% professional service tax on Professional Time Fees and Performance Fees also applies.

Invoices are submitted either biweekly or such other term agreed to by the client and are due and payable upon presentation. Prompt payment of invoices is a prerequisite for Nightingale's continued work on an assignment.

**II.**     **CONTINGENT PERFORMANCE FEES**

For certain types of assignments, including divestitures, interim management, asset recovery management, licensing, acquisitions, mergers, joint ventures, and refinancings, Nightingale charges a contingent Performance Fee in addition to per diem professional time fees.

The rationale for the contingent Performance Fee is that Nightingale can usually materially assist a client achieve more favorable results and returns than would otherwise be the case. Nightingale brings unique skills and creativity, along with proven and highly successful experience, to those transaction and interim management oriented assignments where Performance Fees are charged.

The Performance Fee is based upon the size, circumstances, and complexity of each particular situation, and is established and agreed to by mutual consent between the client and prior to formal engagement.

**EXHIBIT I**

## III.   OTHER ENGAGEMENT TERMS AND CONDITIONS

- ◆ Nightingale works under a policy whereby the services of our firm can be terminated by the client, or by Nightingale, at any time upon oral notice, followed by written confirmation.

  - - The client is responsible for professional time fees and expense charges up to the time of notification of termination. In addition, Performance Fee payments, if applicable, are due and payable on a pro rata basis in the event of unilateral termination by the client.

  - - Should Nightingale resign during the course of an assignment, we agree to remain active and provide every reasonable assistance during a designated transition period to phase in, on an orderly basis, a replacement organization of the client's choosing.

- ◆ Given the nature and complexity of our work, there can be no assurance that unforeseen problems and issues may not be encountered, or that difficult and complex operating judgments and decisions may not have to be made and recommended. Accordingly, Nightingale undertakes assignments on a "Best Efforts" basis only, and makes no representations, warranties, or guarantees relative to operating results or other performance achieved.

- ◆ An Advance Deposit for professional time fees and expenses is required. The Deposit is retained until the conclusion of the engagement and, at the Client's discretion, is either offset against the final Nightingale invoice(s) or refunded to the Client upon receiving full payment of all outstanding invoices.

- ◆ For most types of assignments, including Company Viability Evaluations for third parties, Interim Management, Operational Turnaround and Asset Recovery/Liquidation Management assignments, Nightingale requires a broad Indemnity Agreement from the client or other financially responsible party.

  - - The rationale for requiring an Indemnity Agreement is that by their very nature, Viability Evaluations, Interim Management, Operational Turnaround and Asset Recovery Management assignments require a great many decisions and operating judgments to be made on a day to day basis, and the firm necessarily acts as the Agent or representative of its client. To the extent any real or potential adversarial issues or proceedings are related to the situation Nightingale, by its very presence, could be caught in the "crossfire."



# EXHIBIT II

## RELEASE AND INDEMNIFICATION

The undersigned, Moll Industries Inc., (the "Company"), acknowledging that Nightingale & Associates, LLC ("Nightingale") has been engaged to render services to the Company, for and on behalf of itself and its subsidiaries, and the successors and assigns of the Company and its subsidiaries, hereby waives and releases any and all claims or causes of action that it may now have or which may arise in the future against any "Consultant Party" (which shall consist of, collectively, Nightingale and each of its contractors and subcontractors, and all of the employees, officers, directors, shareholders and principals of Nightingale and all of its contractors and subcontractors), arising out of or relating in any way to "Covered Services" (which shall consist of services rendered by any Consultant Party pursuant to the attached agreement relating to the Company or any aspect of its business or assets, whether such services consist of consulting services, management services, or any other type of services), including, without limitation, any loss or claim thereof arising or allegedly incurred as a result of actions taken or omitted to be taken by the Company, its shareholders, or any other party, based in any way upon any recommendations or suggestions by any Consultant Party relating to the Company or any aspect of its business or assets; but excluding from the foregoing waiver and release any claim or cause of action arising out of any act of gross negligence or willful misconduct of any Consultant Party. The Company further hereby agrees to indemnify and hold harmless each of the Consultant Parties from and against any liabilities, obligations, losses, damages, claims, penalties, actions, judgments, suits, costs, expenses and disbursements of any kind or nature whatsoever which may be imposed upon, incurred by or asserted against any of the Consultant Parties arising out of or relating in any way to Covered Services pursuant to the attached agreement including, (without limitation, any loss or claim thereof arising or allegedly incurred as a result of actions taken or omitted to be taken by the Company, its shareholders, or any other party, based in any way upon any recommendations or suggestions by any Consultant Party relating to the Company or any aspect of its business or assets); but excluding from the foregoing indemnification obligation any matter arising out of any act of gross negligence, willful misconduct, or fraud of any Consultant Party.

Dated: September _____, 2002

**Moll Industries, Inc.**

_____

By

_____

Name

_____

# EXHIBIT B

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| MOLL INDUSTRIES, INC., | § | CASE NO. 02-54341-K |
| | § | |
| DEBTOR | § | CHAPTER 11 |

## AFFIDAVIT AND DISCLOSURE STATEMENT OF MICHAEL R. D'APPOLONIA IN SUPPORT OF APPLICATION FOR THE RETENTION OF NIGHTINGALE & ASSOCIATES, LLC AS FINANCIAL ADVISORS TO THE DEBTOR

Michael R. D'Appolonia, being duly sworn, deposes and says:

1.      I am President and Principal of Nightingale & Associates, LLC ("Nightingale"), a Delaware corporation with offices located at 1266 East Main Street, Stamford, CT 06902. This affidavit and disclosure statement is submitted pursuant to sections 327, 328, 330, 331, 504 and 1103 of Title 11 of the United States Code ("Bankruptcy Code") and Rule 2014(a) of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules"), in support of the application (the "Application") of Moll Industries, Inc. (the "Debtor"), to retain Nightingale as the Debtor's financial advisors.

2.      Nightingale is experienced and qualified to represent the Debtor in this Chapter 11 case. It has been retained in numerous bankruptcy cases of similar size to the above-captioned case.

3.      Nightingale has, or may have, provided professional services to, currently provide or may currently provide professional services to, and may in the future, provide professional services to certain of the Debtor's creditors, other parties in interest in this case and their respective attorneys and accountants in matters unrelated to this Chapter 11 case. Certain of these creditors, parties in interest, attorneys or accountants have, or may have, provided goods or services to,

currently provide or may currently provide goods and services to and may in the future provide goods or services to Nightingale. Nightingale has client relationships with or provides a variety of services to parties in interest in matters unrelated to this Chapter 11 case, including, but not limited to, Highland Capital Management, Foothill Capital Corporation, Merrill Lynch, SocGen, Credit Lyonnase, Solomon Smith Barney, Blackrock, and ING Funds. In light of the fact that a number of bondholders and noteholders may hold their positions in street name, it is possible that some relationship or connection between Nightingale and the above entities will be discovered at a later date. In that event, Nightingale will, if necessary, submit a supplemental affidavit to the Court and interested parties.

4.      The Debtor has agreed to pay a retainer of $125,000.00 (the "Post-Petition Retainer") to Nightingale. The Post-Petition Retainer will be held by Nightingale as security during the pendency of this case, and is not intended to be applied until all alternative sources of payment (including without limitation any carve out of the debtor in possession facility lenders' collateral and any interim payments) have been applied. The Debtor requests that Nightingale not be required to apply the retainer to any monthly payments of interim fee awards, nor place it in a segregated account.

5.      No other payments have been made to Nightingale for services rendered, or to be rendered, in connection with this Chapter 11 case. Subject to the approval of this Court, the source of all compensation for professional services to be rendered on behalf of the Debtor shall be funds of the Debtor's estate.

6.      To the best of my knowledge, after due inquiry, neither Nightingale, nor any of its professional personnel, have any relationship with the Debtor that would impair Nightingale's ability

to provide professional services as to which professional and regulatory requirements of independence exist.

7.      To the best of my knowledge, after due inquiry, Nightingale has not been retained to assist any entity or person other than the Debtor on matters relating to, or in connection with, this Chapter 11 case. If this Court approves Nightingale's proposed retention by the Debtor, Nightingale will not accept any engagement or perform any service for any entity or person other than the Debtor in this Chapter 11 case. Nightingale may provide professional services to entities or persons that may be creditors of the Debtor or parties-in-interest in this Chapter 11 case, provided that such services do not relate to, or have any direct connection with, this Chapter 11 case or the Debtor.

8.      Under Bankruptcy Code §§ 328 and 1103, neither I nor Nightingale, insofar as I have been able to ascertain, hold or represent any interest materially adverse to the interest of the Debtor, or of any class of creditors of the Debtor, by reason of any direct or indirect relationship to, connection with, or interest in the Debtor for any other reason. I believe Nightingale to be a "disinterested person" within the meaning of Bankruptcy Code § 101(14).

9.      I have reviewed the list of Top 20 Unsecured Creditors in this estate and, to the best of my knowledge and belief, Nightingale has no connection with any party. Since Nightingale is involved in numerous bankruptcy matters, it is possible that Nightingale has or will provide some services to creditors and/or parties in interest in unrelated matters.

10.     Certain of the advisory services that Nightingale will render to the Debtor may be summarized as follows:

(i)     Interview selected members of management to obtain their individual assessments of company strengths, weaknesses, opportunities, problems, etc.;

(ii)     Review any operational improvement/restructuring plans previously developed by management;

(iii)    Analyze near and medium term cash flow projections including capital expenditure commitments and potential asset dispositions;

(iv)     Review, assess and analyze available historical data (past 3 years) and current operating trends and performance;

(v)      Review and evaluate the Debtor's competitive position including an assessment of market share, margins, product mix and customer concentration;

(vi)     Review the Debtor's business plan assumption and rationale;

(vii)    Review the Debtor's periodic financial and operational reporting (including financial statements, cash flow and production levels) and assess the Debtor's actual performance to its plan;

(viii)   Advise and assist the Debtor, as a debtor in a bankruptcy case, in forecasting, planning, controlling and other aspects of managing cash;

(ix)     Advise and assist the Debtor in organizing its resources to effectively plan, coordinate and manage a bankruptcy proceeding;

(x)      As CRO, implement actions approved by the Debtor's Board of Directors to preserve and protect asset values, improve profitability, restructure the capital structure and use our best efforts to confirm a plan of reorganization consistent with that certain Restructuring Agreement by and among the Debtor, its Lenders, George T. Votis and certain other parties, dated as of June 10, 2002 (the "Restructuring Agreement").

11.     D'Appolonia, as CRO, will perform, among others, the following duties and will have the following authorities, subject to approval by the Debtor's Board of Directors:

(i)      manage the Debtor's business affairs;

(ii)     use our best efforts to develop, evaluate and implement a plan of reorganization consistent with that certain Restructuring Agreement by and among the Company, its Lenders, Votis and certain other parties, dated as of June 10, 2002;

(iii)    serve as the principal negotiator with the authority to bind the Debtor in negotiations with any of its creditor constituencies, any official or unofficial committees, any customers or any vendors;

(iv)    review and direct any and all financial and operating policies, plans and programs and approve all disbursements made by the Debtor to insure conformity with any budget agreed to in connection with any debtor-in-possession financing facility;

(v)    undertake a review and evaluation of the Debtor's business to assess available cost-cutting measures to improve the Debtor's liquidity;

(vi)    assist management in obtaining and negotiating appropriate debtor-in-possession financing;

(vii)    direct and assist the Debtor in developing and implementing a communication plan to improve relations with its employees, customers, vendors and creditors.

12.    Nightingale's professional fees will be billed at a fixed rate of $125,000.00 per month. In addition to professional time fees, out-of-pocket expenses are billed at cost, and generally range from 10% to 15% of professional time fees, depending on the amount of travel involved. Nightingale expects, because of the current in-place operations management and information and work developed and completed by other consultants, Nightingale's services will incorporate providing a full-time Chief Restructuring Officer, with the duties, responsibilities and authority as outlined above, and limited support staffing associated with operational, financial and cash flow analysis, and report preparation. In the event Nightingale is asked to provide additional staffing to serve in other interim management positions or to provide other advisory, asset disposition or bankruptcy support services, such services would be discussed with the Company and the secured lenders in advance and billed on an hourly basis pursuant to Nightingale's standard terms and conditions. Nightingale's normal hourly rates are as follows:

Principals                      $425 to $525

|                     |                  |
|---------------------|------------------|
| Managing Directors  | $325 to $425     |
| Associates          | $175 to $325     |

The rates set forth above are subject to periodic adjustment by Nightingale.

13.    In addition to compensation for professional services by Nightingale, Nightingale shall seek reimbursement for reasonable and necessary expenses incurred in connection with this case, including but not limited to, transportation costs, meals, lodging, telephone, specifically assignable office assistance and report production and, in the case of divestiture related assignments, advertising and mailing costs. Out of pocket expenses also apply to Nightingale staff members who reside out of the area when working out of Nightingale's office in Stamford on a client project.

14.    Nightingale will apply for compensation for professional services rendered and for reimbursement of expenses incurred in connection with the Debtor's Chapter 11 case, in accordance with applicable provisions of the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, the Local Rules of this Court, and any applicable Orders of this Court.

15.    Nightingale has not shared or agreed to share any of its compensation from the debtor or with any other person, other than the employees of Nightingale as permitted by the Bankruptcy Code.

16.    Nightingale understands that, in accordance with the Bankruptcy Code, final payment and all interim payments are subject to approval by this Court. All sums received shall be credited against the amount ultimately allowed Nightingale upon the filing by Nightingale of an appropriate application for allowance of compensation and reimbursement of expenses.

17.    The proposed engagement of Nightingale is not prohibited by Rule 5002 of the Bankruptcy Rules.

18.    Nightingale requests that its retention as accountants and financial advisors be approved *nunc pro tunc* to September 17, 2002, to perform services as set forth above.

FURTHER AFFIANT SAYETH NOT.



Michael R. D'Appolonia

STATE OF TEXAS          §
                        §
COUNTY OF BEXAR         §

SUBSCRIBED AND SWORN TO BEFORE ME by the said MICHAEL R. D'APPOLONIA on this the 18th day of September, 2002 to certify which witness my hand and seal of office.

ELLEN S. FARRAR
Notary Public, State of Texas
My Commission Expires May 11, 2005

NOTARY PUBLIC, STATE OF TEXAS