**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| MOLL INDUSTRIES, INC., | § | CASE NO. 02-54341-K |
| | § | CHAPTER 11 |
| DEBTOR | § | |

---

# MOLL INDUSTRIES, INC.

## AMENDED DISCLOSURE STATEMENT FOR DEBTOR'S FIRST AMENDED PLAN OF REORGANIZATION



---

### IMPORTANT DATES

➢ Date by which Ballots must be received: May 30, 2003 at 5:00 p.m. (Prevailing Central Time)

➢ Date by which Objections to Confirmation of the Plan must be filed and served May 30, 2003 at 5:00 p.m. (Prevailing Central Time)

➢ Hearing on confirmation of the Plan: June 5, 2003 at 9:00 a.m. (Prevailing Central Time)

OPPENHEIMER, BLEND,
HARRISON & TATE, INC.
Raymond W. Battaglia, Esq.
711 Navarro, Suite 600
San Antonio, Texas 78205-1796
Tel. No. (210) 224-2000
Facsimile No. (210) 224-7540

Dated: May 8, 2003 ATTORNEYS FOR MOLL INDUSTRIES, INC., DEBTOR IN POSSESSION

<u>IMPORTANT NOTICE</u>

**THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION, NOR HAS THE SECURITIES AND EXCHANGE COMMISSION PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.**

**THIS DISCLOSURE STATEMENT INCLUDES FORWARD LOOKING STATEMENTS BASED LARGELY ON THE CURRENT EXPECTATIONS OF THE DEBTOR AND PROJECTIONS ABOUT FUTURE EVENTS AND FINANCIAL TRENDS AFFECTING THE FINANCIAL CONDITION OF THE DEBTOR OR THE REORGANIZED DEBTOR'S BUSINESS. THE WORDS "BELIEVE," "MAY," "WILL," "ESTIMATE," "CONTINUE," "ANTICIPATE," "INTEND," "EXPECT" AND SIMILAR EXPRESSIONS INDENTIFY THESE FORWARD LOOKING STATEMENTS. THESE FORWARD LOOKING STATEMENTS ARE SUBJECT TO A NUMBER OF RISKS, UNCERTAINTIES AND ASSUMPTIONS, INCLUDING THOSE DESCRIBED BELOW UNDER THE CAPTION "RISK FACTORS." IN LIGHT OF THESE RISKS AND UNCERTAINTIES, THE FORWARD LOOKING EVENTS AND CIRCUMSTANCES DISCUSSED IN THIS DISCLSOURE STATEMENT MAY NOT OCCUR AND ACTUAL RESULTS COULD DIFFER MATERIALLY FROM THOSE ANTICIPATED IN THE FORWARD LOOKING STATEMENTS. NEITHER THE DEBTOR NOR THE REORGANIZED DEBTOR UNDERTAKE ANY OBLIGATIONS TO UPDATE OR REVISE ANY FORWARD LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS OR OTHERWISE.**

**NO REPRESENTATIONS OR OTHER STATEMENTS CONCERNING THE DEBTOR (PARTICULARLY AS TO ITS FUTURE BUSINESS OPERATIONS OR THE VALUE OF ITS ASSETS) ARE AUTHORIZED BY THE DEBTOR, OTHER THAN THOSE EXPRESSLY SET FORTH IN THIS DISCLOSURE STATEMENT. ANY REPRESENTATIONS OR INDUCEMENTS MADE TO SECURE YOUR ACCEPTANCE, WHICH ARE OTHER THAN AS SET FORTH IN THIS STATEMENT, SHOULD NOT BE RELIED UPON BY YOU IN ARRIVING AT YOUR DECISIONS. ANY SUCH ADDITIONAL REPRESENTATIONS AND INDUCEMENTS SHOULD BE REPORTED TO COUNSEL FOR THE DEBTOR WHO SHALL DELIVER SUCH INFORMATION TO THE BANKRUPTCY COURT WHICH MAY TAKE SUCH ACTION AS IT DEEMS APPROPRIATE.**

**THE INFORMATION CONTAINED HEREIN HAS NOT BEEN INDEPENDENTLY AUDITED, EXCEPT AS SPECIFICALLY REFERENCED HEREIN. THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN SUBMITTED BY THE DEBTOR, ITS INTERNAL ACCOUNTING STAFF, UNLESS SPECIFICALLY STATED TO BE FROM OTHER SOURCES. THE DEBTOR'S PLAN IS AN INTEGRAL PART OF THIS DISCLOSURE STATEMENT, AND EACH CREDITOR IS URGED TO REVIEW THE PLAN PRIOR TO VOTING ON IT.**

**THE DEBTOR MAKES NO REPRESENTATIONS WITH RESPECT TO THE EFFECTS OF TAXATION (STATE OR FEDERAL) ON THE INTEREST HOLDERS OR CREDITORS WITH RESPECT TO THE TREATMENT OF THEIR CLAIMS OR INTERESTS UNDER**

**THE PLAN, AND NO SUCH REPRESENTATIONS ARE AUTHORIZED BY THE DEBTOR. CREDITORS AND INTEREST HOLDERS ARE ENCOURAGED TO SEEK THE ADVICE OF THEIR OWN PROFESSIONAL ADVISORS IF THEY HAVE ANY SUCH QUESTIONS.**

# Table of Contents

Article  1. INTRODUCTION .............................................................................. 1
   1.01    Filing of the Debtor's Chapter 11 Case ............................................... 1
   1.02    Purpose of Disclosure Statement ....................................................... 1
   1.03    Plan Balloting and Confirmation Procedures ..................................... 3
       1.03.01     Holder of Claims and Interests Entitled to Vote .............................. 3
       1.03.02     Voting Procedures ......................................................................... 3
       1.03.03     Voting Requirements for Class Acceptance of the Plan ..................... 3
       1.03.04     Confirmation Hearing ................................................................... 4
Article  2. DEBTOR'S BACKGROUND AND FINANCIAL PICTURE ................... 4
   2.01    General .............................................................................................. 4
   2.02    Corporate Structure ........................................................................... 6
   2.03    Post-Merger Operations ..................................................................... 6
   2.04    Pre-Petition Debt Structure ............................................................... 7
   2.05    Debt Reduction .................................................................................. 8
   2.06    Refinancing Alternatives Pursued ....................................................... 9
   2.07    Restructuring Agreement ................................................................. 10
Article  3. SELECTED FINANCIAL INFORMATION, PROJECTIONS AND VALUATION
ANALYSIS .......................................................................................................... 10
   3.01    General ............................................................................................ 10
   3.02    Operating Performance .................................................................... 11
       3.02.01     Pre-Petition Operations ................................................................ 11
       3.02.02     Post-Petition Operations ............................................................... 11
   3.03    Financial Projections of Reorganized Moll ....................................... 12
   3.04    Projected Income Statement for Reorganized Moll ........................... 13
       3.04.01     Assumptions and Notes ................................................................. 13
       3.04.02     Income Projections ...................................................................... 19
       3.04.03     Cash Flow Projections ................................................................. 20
       3.04.04     Pro Forma Balance Sheets ............................................................ 21
   3.05    Valuation of the Debtor .................................................................... 23
       3.05.01     Enterprise Value and Assumptions ................................................ 23
       3.05.02     Valuation of Assets Associated With Discontinued Operations ....... 27
       3.05.03     Liquidation Valuation and Assumptions ........................................ 29
Article  4. PROCEEDINGS IN THE CHAPTER 11 CASE ..................................... 31
   4.01    Commencement and Administration of the Case ............................... 31
       4.01.01     Approval of Employment of Debtor's Counsel ............................... 32
       4.01.02     Appointment of Unsecured Creditors Committee ........................... 32
       4.01.03     First Day Orders .......................................................................... 32
       4.01.04     Post-Petition Financing ................................................................ 33
       4.01.05     Chief Restructuring Officer .......................................................... 34
       4.01.06     Votis/Schiele Severance Agreements ............................................. 35
       4.01.07     Key Employee Retention Program ................................................. 35
       4.01.08     Adoption of Severance Policy ....................................................... 36
       4.01.09     Setting Claims Bar Date ................................................................ 36
       4.01.10     Post-Petition Assets Sales ............................................................. 36

    4.01.11      Payment of the Whirlpool Rebate ............................................................ 36
    4.01.12      Creditors Committee Investigation .......................................................... 37
    4.01.13      Highland Litigation .................................................................................. 37
    4.01.14      Plan Settlement Negotiations ................................................................... 37
  4.02     Operations during the Chapter 11 Case ......................................................... 38
    4.02.01      Domestic Operations ............................................................................... 38
    4.02.02      Foreign Operations .................................................................................. 39
Article 5. SUMMARY OF THE DEBTOR'S PLAN .................................................. 40
  5.01     Explanation of Chapter 11 ............................................................................ 40
  5.02     Summary of the Plan .................................................................................... 40
  5.03     Terms of the Plan Control ............................................................................ 43
  5.04     Classification and Treatment of Claims and Interests .................................. 43
  5.05     Unclassified Administrative Expenses and Priority Tax Claims................... 45
    5.05.01      General .................................................................................................... 45
    5.05.02      Bar Dates for Administrative Expense Claims ........................................ 46
  5.06     Classification and Treatment of Classified Claims and Interests ................. 47
    5.06.01      Class 1 - Priority Non Tax Claim ............................................................ 47
    5.06.02      Class 2 - Allowed Secured Claims of GE Capital ................................... 48
    5.06.03      Class 3 - Allowed Secured Claims of LICOGA ..................................... 48
    5.06.04      Class 4 - Allowed Secured Claims of DIP Lenders................................. 49
    5.06.05      Class 5 - Allowed Claims of Mezzanine Lenders.................................... 49
    5.06.06      Class 6 - Allowed Secured Claims of Miscellaneous Secured Creditors ......... 50
    5.06.07      Class 7 - SERP Allowed Claims............................................................. 51
    5.06.08      Class 8 - Allowed Claims of General Unsecured Creditors ............................ 53
    5.06.09      Class 9 – Senior Unsecured Note Claims ................................................ 55
    5.06.10      Class 10 – Subordinated Unsecured Note Claims ................................... 55
    5.06.11      Class 11 - Equity Interest Holders .......................................................... 55
    5.06.12      Dissolution of the Committee ................................................................. 55
    5.06.13      Discharge of Claims and Cancellation of Equity Interests ...................... 55
    5.06.14      Injunction ................................................................................................ 56
    5.06.15      Plan Releases and Exculpation ............................................................... 56
    5.06.16      Indemnification Obligations .................................................................... 57
    5.06.17      Injunction ................................................................................................ 57
Article 6. MANAGEMENT OF THE REORGANIZED DEBTOR ........................... 57
  6.01     Board of Directors of the Reorganized Debtor ............................................ 57
  6.02     Senior Management of the Reorganized Debtor .......................................... 58
  6.03     Reorganized Moll Stock Incentive Plan ...................................................... 59
Article 7. IMPLEMENTATION OF THE PLAN ...................................................... 59
  7.01     Means for Execution of Plan........................................................................ 59
  7.02     Exit Financing .............................................................................................. 60
  7.03     Vesting of Assets ......................................................................................... 60
  7.04     Preservation of Debtor's Claims................................................................... 60
  7.05     Creation of the Moll Industries Litigation Trust.......................................... 60
    7.05.02      Standing of the Litigation Trust .............................................................. 61
    7.05.03      Governance of the Litigation Trust.......................................................... 61
    7.05.04      Administration of the Litigation Trust..................................................... 61
    7.05.05      Funding of the Litigation Trust................................................................ 61

    7.05.06      Initial Funding of the Litigation Trust ............................................... 62
    7.05.07      Protection of the Litigation Trustee and the Trust Committee ........................ 62
  7.06     Implementation of the Settlement Agreements............................................. 62
    7.06.01      Highland Settlement............................................................................... 62
    7.06.02      Schiele Settlement................................................................................ 62
  7.07     Treatment of Executory Contracts and Unexpired Leases ............................. 63
    7.07.01      Executory Contracts and Leases Not Expressly Assumed are Rejected........... 63
    7.07.02      Cure of Defaults................................................................................... 63
    7.07.03      Determination of Cure Claims ............................................................... 63
    7.07.04      Pension Plans ...................................................................................... 64
    7.07.05      Bar Date for Claims Relating to Executory Contracts Rejected Pursuant to the
    Plan      64
  7.08     Cancellation of Equity Interests and Issuance of Reorganized Moll Common Stock .. 64
  7.09     Claims and Causes of Action ..................................................................... 65
    7.09.01      Notice to Creditors that All Claims are Preserved................................... 65
    7.09.02      General Description of Significant Claims .............................................. 66
Article  8. CONFIRMATION OF THE PLAN ................................................................. 67
  8.01     Feasibility................................................................................................ 67
  8.02     Best Interests Test .................................................................................... 67
Article  9. ALTERNATIVES TO THE PLAN .................................................................. 68
  9.01     General................................................................................................... 68
  9.02     Alternative Plans of Reorganization .......................................................... 68
  9.03     Liquidation Under Chapter 7 ..................................................................... 68
  9.04     Liquidation Analysis ................................................................................ 69
  9.05     Dismissal of the Case............................................................................... 69
Article  10. RISK FACTORS ...................................................................................... 70
  10.01    General.................................................................................................. 70
  10.02    Lack of Recent History of Profitability ....................................................... 70
  10.03    Reliance on Major Customers.................................................................... 70
  10.04    Competition............................................................................................ 71
  10.05    Raw Materials ........................................................................................ 71
  10.06    Dependence on Key Personnel ................................................................. 72
  10.07    Environmental Matters............................................................................. 72
  10.08    Uncertainty in the Financial Projections...................................................... 72
Article  11. CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN .......... 72
  11.01    Federal Income Tax Consequences to the Debtor ....................................... 73
    11.01.01    Cancellation of Indebtedness ............................................................. 73
    11.01.02    Limitation on Net Operating Losses ..................................................... 74
  11.02    Federal Income Tax Consequences to Holders of Claims and Equity Interests....... 75
    11.02.01    Holders of Priority Claims and Certain General Unsecured Claims ............... 75
    11.02.02    Holders of Equity Interests ................................................................. 75
Article  12. REQUEST FOR APPROVAL AND ACCEPTANCE OF PLAN ........................... 76

# TABLE OF EXHIBITS

EXHIBIT 1        Debtor's Plan of Reorganization

EXHIBIT 2        Order Under 11 U.S.C. § 1125, and Fed. R. Bankr. P. 3017 Approving
                 Disclosure Statement and Fixing Time for Filing Acceptances or
                 Rejections of Plan of Reorganization

EXHIBIT 3        Exit Financing Term Sheet

EXHIBIT 4        Potential Avoidance Actions

# GLOSSARY

The terms in the table below are used in this Disclosure Statement and in most cases in the Plan. The definitions are intended to mirror those set out in the Plan, to the extent differences may exist, the complete definition contained in the Plan shall control.

| | |
|---|---|
| *Administrative Expense Claim or Administrative Claim* | means a Claim for any cost or expense of administration entitled to priority in accordance with the provisions of Sections 503(b), 507(b) or 1114(e)(2) of the Bankruptcy Code, incurred after the Filing Date and prior to the Confirmation Date in connection with this Chapter 11 Case, including, without limitation: (a) the actual, necessary costs and expenses of preserving the Debtor's Estate; (b) all allowances of compensation for legal or other Professional services or reimbursement of costs and expenses under Sections 330, 331 or 503 of the Bankruptcy Code, or otherwise allowed by the Court; (c) all fees and charges assessed against the Debtor's Estate under Chapter 123, Title 28, United States Code, 28 U.S.C. § 1911-1930; and (d) Administrative Trade Claims. |
| *Administrative Trade Claim* | means an Administrative Expense Claim arising from or with respect to the sale of goods or rendition of services on or after the Filing Date in the ordinary course of the Debtor's business, including Administrative Expense Claims of employees for ordinary course wages, expense reimbursement and health and welfare benefits. |
| *Affiliate* | shall have the meaning ascribed to such term in section 101(2) of the Bankruptcy Code. |
| *Allowed or Allowed Claim* | means (a) a Claim that: (i) has been listed by the Debtor in its Schedules as other than disputed, contingent or unliquidated; (ii) and is not otherwise a Disputed Claim; (b) a Claim (i) for which a proof of Claim or request for payment of Administrative Expense Claim has been filed by the applicable Bar Date or otherwise has been deemed timely filed under applicable law; and (ii) that is not otherwise a Disputed Claim; or (c) a Claim that is allowed: (i) in any stipulation executed by the Debtor and the Claim holder; (ii) in a Final Order; or (iii) pursuant to the terms of the Plan. |
| *Allowed . . . Claim* | means an Allowed Claim in the particular Class or category specified. Any reference herein to a particular Allowed Claim includes both the secured and unsecured portions of such Claim. |
| *Amended Organizational Documents* | means the corporate organizational documents of the Debtor as amended and adopted on the Effective Date as necessary to comply with the requirements of the Bankruptcy Code and effect the terms of this Plan (including the implementation of the Exit Financing Agreement), which shall be filed with the Bankruptcy Court as part of the Plan Supplement. |
| *Avoidance Actions* | means all statutory causes of action preserved for the Estate under Sections 542, 543, 544, 545, 547, 548, 549 and 550 of the Bankruptcy Code, except for the Excluded Avoidance Actions. |
| *Avoidance Action Proceeds* | means the net proceeds recovered from the prosecution of Avoidance Actions, after deduction of reasonable and necessary costs incurred in the prosecution of such Avoidance Actions. |
| *Ballot* | means the form or forms distributed to each holder of an impaired Claim entitled to vote on the Plan on which the holder indicates acceptance or rejection of the Plan. |
| *Bankruptcy Code or Code* | means Title 11, United States Code, Section 101 et. seq., in effect on the Filing Date, and all amendments thereto and in effect on or before the Confirmation Date, or thereafter to the extent such amendments are retroactive. |
| *Bankruptcy Rules* | means collectively, the Federal Rules of Bankruptcy Procedure and the local rules of the Bankruptcy Court, in effect on the Filing Date, and all amendments thereto and in effect on or before the Confirmation Date, or thereafter to the extent such amendments are retroactive. |
| *Bar Date* | means the applicable bar date by which a proof of Claim or request for payment of an Administrative Expense Claim must be or must have been filed, as established by an |

| | |
|---|---|
| | order of the Bankruptcy Court, including the Bar Date Order or the Confirmation Order. |
| *Bar Date Order* | means the order of the Bankruptcy Court establishing Bar Dates for filing proofs of Claims. |
| *Business Day* | means a day other than a Saturday, Sunday or legal holiday (as such term is defined in Bankruptcy Rule 9006(a)).. |
| *Capital Stock* | means with respect to the Debtor, its authorized corporate stock and any other interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distributions of assets of the Debtor, existing as of the Filing Date. |
| *Cash* | means legal tender of the United States of America. |
| *Chapter 11 Case or Case* | means the Chapter 11 Case styled as In re: Moll Industries, Inc., Case No. 02-54341-RBK, commenced by Highland Crusader Offshore Partners, L.P., PAM Capital Funding, L.P., and Pamco Cayman, Ltd., on September 6, 2002, by filing an involuntary Bankruptcy petition against the Debtor, which case was converted to a voluntary bankruptcy by a filing made by the Debtor dated September 17, 2002. |
| *Claim(s)* | means a "claim" against the Debtor, as defined in Section 101(5) of the Bankruptcy Code. |
| *Class or Classification* | means the particular class designated in the Plan, pursuant to Section 1122 and Section 1129 of the Bankruptcy Code, into which the Claims of all Creditors have been segregated for purposes of voting and distributions. |
| *Collateral* | means any Property or interest in Property of the Estate subject to a Lien to secure the payment or performance of a Claim, the Lien not being subject to avoidance under the Bankruptcy Code, disallowance under Section 506 of the Bankruptcy Code, or that otherwise is invalid under the Bankruptcy Code or applicable state law. |
| *Committee* | means the Official Committee of Unsecured Creditors appointed in this Case pursuant to Section 1102 of the Bankruptcy Code. |
| *Confirmation or Confirmation of the Plan* | means the approval of this Plan by the Bankruptcy Court at the Confirmation Hearing. |
| *Confirmation Date* | means the date on which the clerk dockets a Confirmation Order determining that the Plan meets the requirements of Chapter 11 of the Bankruptcy Code, which order has been previously entered by the Court. |
| *Confirmation Hearing* | means the hearing(s) which will be held before the Bankruptcy Court in which the Debtor will seek Confirmation of this Plan. |
| *Confirmation Order* | means the order of the Bankruptcy Court confirming the Plan. |
| *Court or Bankruptcy Court* | means the United States Bankruptcy Court for the Western District of Texas, San Antonio Division, presiding over the Chapter 11 Case, or, if necessary, the United States District Court for the District and Division having original jurisdiction over the Chapter 11 Case. |
| *Creditor(s)* | means all creditors of the Debtor holding Claims for debts, liabilities, demands or Claims of any character whatsoever, as defined in Section 101(5) of the Bankruptcy Code. |
| *Cure Claim* | means any Claim arising at any time under or relating to any Executory Contract to which the Debtor was a party on the Filing Date which has been or will be assumed under Section 365(a) of the Bankruptcy Code or pursuant to the Plan, including, without limitation, any Claim of breach of or default under a contract. |
| *Debtor or Debtor in Possession* | means Moll Industries, Inc., a Delaware corporation. |
| *Deficiency Claim* | means, with respect to a Secured Claim, the amount by which the Allowed Claim exceeds the sum of (i) any set off rights of the holder of such Claim against the Debtor under Sections 506 and 553 of the Bankruptcy Code, and (ii) the net proceeds realized from the disposition of the Collateral securing such Claim or, if such Collateral is not liquidated, the value of the interests of the holder of the Claim in the Debtor's interest in the Collateral securing such Claim, as determined by the Bankruptcy Court under Section 506 of the Bankruptcy Code; provided, however, that if the holder of such Claim makes the election provided for in Section 1111 of the Bankruptcy Code, there shall be no Deficiency Claim in respect of such Claim. |

| | |
|---|---|
| *DIP Credit Facility* | means collectively (i) that certain Senior Secured, Super-Priority Debtor-In-Possession Loan and Security Agreement dated as of September 19, 2002, by and among the Debtor, the Lenders named therein, and Foothill Capital Corporation as the Administrative Agent and their respective successors and assigns; (ii) all amendments thereto and extensions thereof; and (iii) all security agreements and instruments related to the documents identified in (i) and (ii). |
| *DIP Financing Order* | means the order entered by this Court on October 15, 2002, entitled "Final Order Approving Debtor's Motion for Authorization to (A) Obtain Post-Petition Financing, (B) Grant Security Interest and Priority, and (C) Provide Adequate Protection To Pre-Petition Secured Lenders". |
| *DIP Lenders* | means those entities identified as "Lenders" in the DIP Credit Facility and their respective successors and assigns. |
| *Disallowed* | means, with respect to a Claim, Interest, Administrative Expense, or portion thereof, that it is determined by a Final Order that the Claim, Interest, Administrative Expense or portion thereof is not allowed under sections 502 or 503 of the Bankruptcy Code. |
| *Disclosure Statement* | means the disclosure statement (including all schedules and exhibits thereto or referenced therein) prepared by the Debtor in conjunction with the Plan and approved by the Court in accordance with Section 1125 of the Bankruptcy Code, as the same may be amended or supplemented from time to time. |
| *Disputed Claim* | means (i) a Claim, Interest or Administrative Expense that is subject to a pending objection; or (b) until the Objection Deadline: (a) a Claim for which a corresponding Claim has not been listed in the Debtor's Schedules or for which the corresponding Claim is listed in the Debtor's Schedules with a differing amount, with a differing classification, or as a disputed, contingent, or unliquidated Claim;(b) a Claim which a Debtor in good faith believes is held by a holder either (i) from which property is recoverable by the applicable Debtor under any of sections 542, 543, 550 or 553 of the Bankruptcy Code or (ii) that is a transferee of a transfer avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549 or 724(a) of the Bankruptcy Code unless the holder has paid the amount, or turned over any such property for which such holder is liable under the terms of sections 522(i), 542, 543, 550, or 553 of the Bankruptcy Code; and (c) an Interest for which a corresponding Interest has not been listed in the Debtor's List of Equity Security Holders or has been listed in a different number (to the extent of such difference); or  (d) in any event, a Claim which has been paid during the pendency of this Chapter 11 Case pursuant to an order of the Court allowing the payment of such pre-petition claim. |
| *Distribution Record Date* | means the Confirmation Date. |
| *Effective Date* | means the first Business Day on or after the Confirmation on which all conditions to the effectiveness of this Plan specified in Section 7.2 of the Plan have been met or waived. |
| *Equity Interest or Interest* | means Capital Stock and all warrants, options or other rights to acquire Capital Stock. This term does not include any debt security that is convertible into, or exchangeable for, Capital Stock. |
| *Estate* | means the estate created pursuant to section 541 of the Bankruptcy Code by the commencement of the Chapter 11 Case. |
| *Exchange Act* | means the Securities Exchange Act of 1934. |
| *Excluded Avoidance Actions* | means any Avoidance Action against any person whose prepetition claim was paid in full pursuant to an order of the Bankruptcy Court, including, but not limited to: (i) Critical Vendors; (ii) employees of the Debtor as of the Petition Date (excluding George Votis); (iii) providers of employee benefits to employees in the direct employ of the Debtor; (iv) taxing authorities; and (iv) parties to Executory Contracts with the Debtor, whose Executory Contracts have been assumed by order of the Bankruptcy Court or confirmation of the Plan. |
| *Executory Contract* | shall have the meaning described in Section 365 of the Bankruptcy Code. |
| *Exit Financing Agreements* | means collectively all loan agreements, notes, security agreements and ancillary documents executed to memorialize and facilitate the Exit Financing Term Loan and the Exit Financing Revolving Credit Facility. |

| | |
|---|---|
| *Exit Financing Lender* | means the Person(s) named as the lender(s) under the Exit Financing Revolving Credit Facility and the Exit Financing Term Loan. |
| *Exit Financing Revolving Credit Facility* | means a secured revolving credit facility in an amount and on terms satisfactory to the Debtor which will be entered into by Reorganized Moll and the Exit Financing Lender on the Effective Date. |
| *Exit Financing Term Loan* | means a secured term loan in an original principal and on terms satisfactory to the Debtor which will be entered into by Reorganized Moll and the Exit Financing Lender on the Effective Date. |
| *Filing Date or Petition Date* | means September 6, 2002, the date upon which the Chapter 11 Case was commenced as an involuntary bankruptcy case. |
| *Final Decree* | means the order of the Court entered after the Plan is substantially consummated which closes the Chapter 11 Case. |
| *Final Order* | means an order or judgment of the Court, or other court of competent jurisdiction, as entered on the docket of the respective court, that has not been reversed, stayed, modified, or amended, and as to which the time to appeal or seek certiorari or move for a new trial, reargument or rehearing has expired, and no appeal or petition for certiorari or other proceeding for a new trial, reargument or rehearing has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been timely filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, reargument or rehearing shall have been denied or resulted in no modification of such order; *provided, however,* that no order shall fail to be a Final Order solely because of the possibility that a motion pursuant to Rule 60 of the Federal Rules of Civil Procedure may be filed with respect to such order.. |
| *GE Capital* | means GE Capital Business Asset Funding Corporation. |
| *GE Capital Mortgage Financing Agreements* | means that certain mortgage note dated as of November 12, 1997, by and between the Debtor and MetLife Capital Financial Corporation and currently held by GE Capital and all applicable loan agreements, including, but not limited to, promissory notes, security agreements and assignments of leases and rents as the same may be amended or modified from time to time. |
| *General Unsecured Creditor* | means all holders of Unsecured Claims excluding Claims classified as Class 7, Class 9 and Class 10 Creditors under the Plan. |
| *Highland* | means collectively, Highland Capital Management L.P., and the following investment funds: Highland Crusader Offshore Partners, L.P., Highland Legacy Limited, Highland Loan Funding V Ltd., ML CBO IV (Cayman) Ltd., California Public Retirement System, PAM Capital Funding, L.P. Pamco Cayman, Ltd., and Prospect Street High Income Portfolio, Inc. |
| *Highland Litigation* | means the adversary proceeding styled Highland Capital Management L.P., et. al. vs. Moll Industries, Inc., et. al.; adversary proceeding no. 03-5021K, pending in the Bankruptcy Court which shall be dismissed with prejudice upon the Effective Date. |
| *Highland Release* | means a mutual release supported by sufficient and valuable consideration pursuant to which Highland and all Class 9 Creditors, as of the Effective Date, forever release, waive and discharge the other and their affiliates, officers, directors, employees, professional advisors and agents thereof from any and all claims, demands, rights, causes of action and controversies, whether known or unknown, arising from or relating to the Senior Unsecured Notes, the Mezzanine Credit Facility or otherwise relating to or involving the Debtor, except as provided for in the Highland Settlement, the form of which shall be filed with the Bankruptcy Court as part of the Plan Supplement. |
| *Highland Settlement* | means the compromise and settlement for sufficient and valuable consideration that is embodied in the Plan of all issues, claims and disputes, whether known or unknown, between Highland, the Debtor's Estate and the Committee, including, but not limited to, those allegations embodied in the Highland Litigation. |
| *Impaired Class and Unimpaired Class* | shall have the meaning described in Section 1124 of the Bankruptcy Code. |
| *LICOGA* | means Life Insurance Company of Georgia. |

| | |
|---|---|
| *LICOGA Mortgage Financing Agreements* | means that certain mortgage note dated as of March 1, 1997, by and between Robert S. and Linda Hayberg and the Debtor and currently held by LICOGA, together with all applicable loan agreements, including, but not limited to, promissory notes, security agreements and assignments of leases and rents as the same may be amended or modified from time to time. |
| *Lien* | means mortgage, pledge, judgment lien, security interest, charging order, or other charge or encumbrance on Property as is effective under applicable law as of the date of the commencement of the Chapter 11 Case. |
| *Litigation Trust* | means the Moll Industries Litigation Trust established in Article 6 of the Plan. |
| *Litigation Trust Agreement* | means that Litigation Trust Agreement for the Moll Industries Litigation Trust which shall be entered into by the Debtor and the Trustee, the form of which shall be filed with the Bankruptcy Court as part of the Plan Supplement. |
| *Litigation Trustee* | means an individual mutually acceptable to the Debtor, the Committee and Highland, who shall serve as the trustee of the Litigation Trust. |
| *Mezzanine Credit Facility* | means that certain Term Loan Credit Agreement dated as of December 21, 2001, among the lenders named therein, Bank of America, N.A. and any successor thereto, as agent, and the Debtor, and as the same may be further amended, modified, supplemented, extended, restated, replaced, renewed or refinanced from time to time. |
| *Mezzanine Debt* | means any indebtedness outstanding under the Mezzanine Credit Facility. |
| *Mezzanine Financing Agreements* | means the Mezzanine Credit Facility and all applicable loan agreements, including, but not limited to, promissory notes, security agreements and other agreements and documents executed in concert with the Mezzanine Credit Facility, as the same may be amended or modified from time to time. |
| *Mezzanine Lenders* | means the lenders named in the Mezzanine Credit Facility and their permitted assigns. |
| *Objection Deadline* | means the deadline for Reorganized Moll to file objections to Claims with the Bankruptcy Court established in Article 8 of the Plan. |
| *Person* | means an individual, partnership, corporation, limited liability company, business trust, joint stock company, trust, unincorporated association, joint venture, governmental authority or entity of whatever nature. |
| *Plan* | means Debtor's Plan of Reorganization in its present form or as it may be amended, modified or supplemented from time to time, together with all exhibits thereto. |
| *Plan Supplement* | means, including without limitation, the forms of the material documents to implement the provisions of the Plan, that are to be filed with the Bankruptcy Court as early as is practicable, but in no event later than seven (7) Business Days before the Confirmation Hearing, or on such other date as the Bankruptcy Court may determine. The Plan Supplement is incorporated into the Plan as if fully set forth in the Plan, and all references to the Plan refer also to the Plan Supplement. |
| *Priority Non-Tax Claim* | means any Claim (or portion of such Claim) entitled to priority under Section 507(a)(3), (4), (5), (6), (7) or (9) of the Bankruptcy Code, other than: (i) Priority Tax Claims; (ii) Priority Secured Tax Claims; (iii) Administrative Expenses Claims; (iv) Administrative Trade Claims; or (v) Professional Fee Claims. |
| *Priority Secured Tax Claim* | means a Secured Claim of a governmental entity whose claim would be a Priority Tax Claim under Sections 502(i) or 507(a) of the Bankruptcy Code if it was not a Secured Claim. |
| *Priority Tax Claims* | means a Claim that is entitled to priority pursuant to Sections 502(i) or 507(a)(8) of the Bankruptcy Code other than (i) a Secured Tax Claim, or (ii) an ad valorem or other form of state or local authority tax assessed on property which was transferred or foreclosed prior to the Confirmation Date. |
| *Professional* | means any professional employed in the Chapter 11 Case pursuant to Sections 327, 328 or 1103 of the Bankruptcy Code or otherwise and the professionals seeking compensation or reimbursement of expenses in connection with the Chapter 11 Case pursuant to Section 503(b)(4) and 503(b)(5) of the Bankruptcy Code. |
| *Professional Fee Claim* | means a Claim of a Professional for compensation for services rendered, and/or reimbursement of costs and expenses incurred, after the Filing Date and prior to and including the Confirmation Date. |

| | |
|---|---|
| *Proof of Claim* | means any proof of claim filed with the Bankruptcy Court with respect to the Debtor pursuant to Bankruptcy Rules 3001 or 3002. |
| *Property or Property of the Estate* | means all assets of Debtor which are property of the Estate pursuant to Section 541 of the Bankruptcy Code. |
| *Pro Rata Share* | means with respect to Claims, the proportion that the amount of an Allowed Claim in a particular Class bears to the aggregate amount of all Claims in such Class, exclusive of Disallowed Claims, but including Disputed Claims. |
| *Reorganized Debtor or Reorganized Moll* | means Moll Industries, Inc., on and after the Effective Date, surviving after confirmation of the Plan. |
| *Reorganized Mezzanine Term Note* | means the promissory note dated as of the Effective Date, to be executed by Reorganized Moll in favor of the Mezzanine Lenders, which shall be filed with the Bankruptcy Court as part of the Plan Supplement. |
| *Reorganized Moll Common Stock* | means the 100,000 shares of $.01 par value common stock of Reorganized Moll to be authorized pursuant to Reorganized Moll's Amended Organizational Documents and issued pursuant to the Plan and Reorganized Moll Stock Incentive Plan. |
| *Reorganized Moll Stock Incentive Plan* | means the equity incentive plan to be adopted by Reorganized Moll within 120 days after the Effective Date, under which shares of Reorganized Moll Common Stock representing in the aggregate up to 10.0% of the authorized Reorganized Moll Common Stock on a fully diluted basis will be available for issuance. The Plan shall provide that the Reorganized Moll Common Stock issued under the incentive plan shall be distributed among members of the management group of Reorganized Moll, as determined by the newly installed board of directors of Reorganized Moll. The terms and conditions of the Reorganized Moll Stock Incentive Plan shall be determined by the newly installed board of directors of Reorganized Moll. |
| *Schedules and Statements* | means the Schedules, Statements and Lists filed by the Debtor with the Bankruptcy Court pursuant to Bankruptcy Rule 1007, as they have been and may be amended or supplemented from time to time. |
| *Schiele Settlement* | means the settlement and resolution among: (a) C. B. Schiele, an individual residing in the State of Florida ("Schiele"); (b) (i) AMM Holdings, LLC, a Delaware limited liability company ("Holdings"), (ii) AMM Holdings, Inc., a Delaware corporation, ("AMM"), (iii) Anchor Holdings, Inc., a Delaware corporation ("Anchor"), and (iv) the Debtor; (c) the Mezzanine Lenders; (d) Foothill Capital Corporation, a California corporation ("Foothill"), in its capacity as lender and agent under the Amended and Restated Credit Agreement, dated as of August 9, 2000 (as amended, restated, supplemented or otherwise modified from time to time) (the "Senior Credit Agreement") and as agent under the Mezzanine Credit Facility as contemplated in the Schiele Severance Agreement (all such parties being collectively referred to as the "Schiele Settlement Parties"). |
| *Schiele Severance Agreement* | means an agreement between the Schiele Settlement Parties attached to the Plan as Exhibit "A". |
| *Secured Claim* | means the Claim of any Creditor which is secured by a valid, duly perfected Lien (whether voluntary or involuntary) on, or a security interest in Collateral, or which is subject to setoff under Bankruptcy Code Section 553, to the extent of the lesser of: (i) the value of the Collateral; or (ii) the amount of such Allowed Claim. |
| *Senior Unsecured Notes* | means those certain $11^{3/4}$% Series B Senior Notes issued by the Debtor and due April 1, 2004. |
| *Senior Unsecured Note Claim* | means the Claim of a holder of Senior Unsecured Notes. |
| *SERP* | means that one certain Supplemental Employee Retirement Plan as Amended and Restated dated November 25, 1994, and established for the benefit of certain executive employees of the Debtor. |
| *SERP Allowed Claim* | means an Allowed Claim of arising out of the SERP which shall be an Unsecured Claim and treated as a Class 7 claimant. |
| *SERP Amended Plan* | means the Amended and Restated Supplemental Employee Retirement Plan which will be entered into on the Effective Date by Reorganized Moll incorporating the terms and conditions set forth in the Plan for holders of SERP Allowed Claims, which Amended |

| | |
|---|---|
| | Plan is attached as Exhibit B to the Plan. |
| *Subordinated Unsecured Notes* | means those certain $10^{1/2}\%$ Series B Senior Notes issued by the Debtor and due July 1, 2008. |
| *Subordinated Unsecured Note Claim* | means the Claim of a holder of Subordinated Unsecured Notes. |
| *Timely Filed* | with respect to a Claim, Interest or Administrative Expense, means, that a proof of such Claim or Interest or request for payment of such Administrative Expense was filed with the Bankruptcy Court within such applicable period of time fixed by the Plan, statute, or pursuant to both Bankruptcy rule 3003(c)(3)and a Final Order (e.g., the Bar Date). |
| *United States Trustee* | means the United States Trustee for the Western District of Texas |
| *Unsecured Claim* | means any Claim (regardless of whether such Claim is covered by insurance) that is neither secured nor entitled to priority under the Bankruptcy Code or by a Final Order of the Bankruptcy Court, including, but not limited to: (a) any claim arising from the rejection of an Executory Contract under section 365 of the Bankruptcy Code, and (b) any portion of a Claim to the extent the value of the holder's interest in the applicable Estate's interest in the property securing such Claim is less than the amount of the Claim, or to the extent that the amount of the Claim subject to setoff is less than the amount of the Claim, as determined pursuant to Section 506(a) of the Bankruptcy Code. |
| *Votis Claims* | means any and all claims which the Debtor may have against George Votis ("Votis") and any Affiliate of George Votis (including Avoidance Actions). |

# ARTICLE 1.
## INTRODUCTION

This Disclosure Statement is submitted by Moll Industries, Inc. **("Moll" or "Debtor"),** the Chapter 11 Debtor in Possession in the above-captioned Case, in connection with the Debtor's efforts to solicit votes necessary to confirm the Debtor's Plan of Reorganization ("Plan"). A copy of the Plan is attached hereto as **Exhibit 1.**

## 1.01  Filing of the Debtor's Chapter 11 Case

On September 6, 2002, ("Petition Date" or "Filing Date") three investment funds collaterally managed by Highland Capital Management, L.P. filed an involuntary petition for relief under Chapter 11 of Title 11 of the United States Code in the United States Bankruptcy Court for the Western District of Texas, San Antonio Division ("Court" or "Bankruptcy Court"). On September 17, 2002, Moll filed its assent to the involuntary petition, thereby converting the involuntary case to a voluntary Chapter 11 Case. The Court entered an Order for Relief on September 24, 2002. The Debtor continues to manage its affairs as Debtor-in-Possession pursuant to Bankruptcy Code Section 1107. This Disclosure Statement and the accompanying Plan are filed on behalf of the Debtor.

## 1.02  Purpose of Disclosure Statement

The purpose of this Disclosure Statement is to provide you, as the holder of a Claim against the Debtor or as a shareholder of the Debtor, with information to enable you to make a reasonably informed decision on the Plan before exercising your right to vote to accept or reject the Plan[1].

On May 8, 2003, after notice and a hearing, the Bankruptcy Court approved this Disclosure Statement as containing information, of a kind and in sufficient detail, adequate to enable the holders of Claims against and shareholders of the Debtor to make an informed judgment to accept or reject the Plan (A copy of the Order Under 11 U.S.C. Section 1125, and FED. R. BANKR. P. 3017 Approving Disclosure Statement and Fixing Time for Filing Acceptances or Rejections of Plan of Reorganization is attached hereto as **Exhibit 2**). **THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A GUARANTY OF THE ACCURACY OR COMPLETENESS OF THIS INFORMATION OR THE BANKRUPTCY COURT'S ENDORSEMENT OF THE PLAN.**

You should read all of this Disclosure Statement before voting on the Plan. **HOWEVER, THE DISCLOSURE STATEMENT IS NOT INTENDED TO REPLACE A CAREFUL AND DETAILED REVIEW AND ANALYSIS OF THE PLAN BY EACH HOLDER OF A CLAIM OR INTEREST. THE DISCLOSURE STATEMENT IS INTENDED TO AID**

---

[1] Capitalized terms that are not defined in the Disclosure Statement are defined in the Plan.

**AND SUPPLEMENT THAT REVIEW. THE DESCRIPTION OF THE PLAN IS A SUMMARY ONLY. HOLDERS OF CLAIMS AND INTERESTS AND OTHER PARTIES IN INTEREST ARE CAUTIONED TO REVIEW THE PLAN AND ANY RELATED ATTACHMENTS FOR A FULL UNDERSTANDING OF THE PLAN'S PROVISIONS. THE DISCLOSURE STATEMENT IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN.**

You are urged to consult with your own financial and other advisors in deciding whether to vote to approve or reject the Plan. No solicitation of votes may be made except pursuant to this Disclosure Statement, and no person has been authorized to use any information concerning the Debtors or their businesses other than the information contained in this Disclosure Statement.

➢ **About this Disclosure Statement**:

• The statements contained in this Disclosure Statement are made as of the date that the Bankruptcy Court enters an order approving this Disclosure Statement, unless another time is specified in this Disclosure Statement. Neither the delivery of this Disclosure Statement nor any action taken in connection with the Plan implies that the information contained in this Disclosure Statement is correct as of any time after that date.

• Unless the context requires otherwise: (a) the gender (or lack of gender) of all words used in this Disclosure Statement includes the masculine, feminine and neuter; (b) references to articles and sections (other than in connection with the Bankruptcy Code, the Bankruptcy Rules, another specified law or regulation or another specified document) refer to the articles and sections of this Disclosure Statement; and (c) "including" means "including, without limitation".

• Many capitalized words used in this Disclosure Statement have been defined in the context of the provisions in which they first appear within this Disclosure Statement. Any other capitalized terms used in this Disclosure Statement are intended to have the meanings ascribed to them in the Plan. Any capitalized term not defined in the context of a provision or in the Plan shall have the meaning ascribed to that term in the Bankruptcy Code or Bankruptcy Rules, whichever is applicable.

• You may not rely on this Disclosure Statement for any purpose other than to determine how to vote on the Plan. Nothing contained in this Disclosure Statement constitutes or will be deemed to be advice on the tax or other legal effects of the Plan on holders of Claims or interests.

• Certain of the information contained in this Disclosure Statement is forward-looking. This Disclosure Statement contains estimates and assumptions that may prove not to have been accurate and financial projections that may be materially different from actual future experiences.

• Acceptance or rejection of the Plan is subject to a number of risks. See *"Risk Factors "* at Section 10 of this Disclosure Statement.

## 1.03    Plan Balloting and Confirmation Procedures

### 1.03.01          Holder of Claims and Interests Entitled to Vote

Only Classes of Claims and interests which are (i) "impaired" by a plan of reorganization and (ii) entitled to receive a distribution under such a plan are entitled to vote to accept or reject a plan under the Bankruptcy Code. In this case, only holders of Claims in Class 2, Class 3, Class 5, Class 6, Class 7 Class 8 and Class 9 are impaired by the Plan and entitled to vote to accept or reject the Plan. Claims in Class 1 and Class 4 are unimpaired by the Plan, and the holders thereof are conclusively presumed to have accepted the Plan. Class 10 and Class 11 will receive no distributions under the Plan and are therefore deemed to have rejected the Plan.

### 1.03.02          Voting Procedures

If you are entitled to vote to accept or reject the Plan, a Ballot (the "Ballot") for acceptance or rejection of the Plan and a pre-addressed envelope for return of the Ballot are enclosed. BALLOTS FOR ACCEPTANCE OR REJECTION OF THE PLAN ARE BEING PROVIDED ONLY TO HOLDERS OF CLAIMS IN CLASS 2, CLASS 3, CLASS 5, CLASS 6, CLASS 7, CLASS 8 AND CLASS 9 BECAUSE THEY ARE THE ONLY HOLDERS OF CLAIMS THAT MAY VOTE TO ACCEPT OR REJECT THE PLAN. If you are the holder of a Claim in one of these Classes and did not receive a Ballot, received a damaged or illegible Ballot, or lost your Ballot, or if you are a party in interest and have any questions concerning the Disclosure Statement, and Exhibits hereto, the Plan or the voting procedures in respect thereof, please contact:

> Raymond W. Battaglia, Esq.
> Counsel for Moll Industries, Inc.
> Oppenheimer, Blend, Harrison & Tate, Inc.
> 711 Navarro, Suite 600
> San Antonio, Texas 78205

After carefully reviewing this Disclosure Statement, please indicate your acceptance or rejection of the Plan by voting in favor of or against the Plan, then return the Ballot to the Debtor's counsel, at the address set forth on the Ballot, in the enclosed, postage paid, return envelope by 5:00 p.m., (Prevailing Central Time) on May 30, 2003. Any Ballot not indicating an acceptance or rejection will be deemed an acceptance of the Plan. You may also return your Ballot by courier or fax by following the instructions on the Ballot. ANY BALLOTS RECEIVED BY THE DEBTOR'S COUNSEL AFTER 5:00 P.M., PREVAILING CENTRAL TIME, ON MAY 30, 2003, WILL NOT BE COUNTED, UNLESS THIS DATE IS EXTENDED BY THE BANKRUPTCY COURT.

### 1.03.03          Voting Requirements for Class Acceptance of the Plan

Your acceptance of the Plan is important. In order for the Plan to be "accepted" by Creditors and interest holders, at least sixty-six and two-thirds percent (66.66%) in amount of Allowed Claims and more than fifty percent (50%) in number of Allowed Claims voting in each

Class must accept the Plan. By not voting, a Creditor favoring acceptance of the Plan jeopardizes confirmation.

### 1.03.04    *Confirmation Hearing*

The Bankruptcy Court has entered an order fixing June 5, 2003, at 9:00 a.m. (Prevailing Central Time), Courtroom 3, United States Bankruptcy Court, 615 East Houston St., San Antonio, Texas as the date, time and place for the initial commencement of a hearing on confirmation of the Plan, and fixing May 30, 2003 at 5:00 p.m., (Prevailing Central Time), as the time by which all objections to confirmation of the Plan must be filed with the Bankruptcy Court and served on counsel for the Debtor. The confirmation hearing may be adjourned from time to time without further notice except for the announcement of the adjourned time and date at the confirmation hearing or any adjournment thereof.

Section 1128(a) of the Bankruptcy Code provides that any party in interest may object to confirmation of a plan. Any objection to confirmation of the Plan must be in writing, conform to Federal Rules of Bankruptcy Procedure and Local Rules of the Bankruptcy Court, set forth the name of the objecting party, the nature and amount of the Claim or Interest held or asserted by the objecting party against the Debtor's Estate, the basis for the objection and the specific grounds therefor.  The objection, together with proof of service thereof, must then be filed with the Bankruptcy Court, with copies served upon the following and upon the Limited Service list in this case:

| | |
|---|---|
| **OPPENHEIMER, BLEND,** | **AKIN, GUMP, STRAUSS, HAUER** |
| **HARRISON & TATE, INC.** | **& FELD LLP** |
| Attn: Raymond W. Battaglia | Attn: Mr. Matthew Okin |
| 711 Navarro, Suite 600 | 1900 Pennzoil Place - South Tower |
| San Antonio, Texas 78205 | 711 Louisiana Street |
| | Houston, TX 77002-2720 |

**UNLESS AN OBJECTION IS TIMELY AND PROPERLY SERVED AND FILED BY MAY 30, 2003, AT 5:00 P.M. (PREVAILING CENTRAL TIME), IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

### ARTICLE 2.
### DEBTOR'S BACKGROUND AND FINANCIAL PICTURE

### 2.01    General.

Prior to the Petition Date, Moll was a leading full service manufacturer and designer of custom molded and assembled plastic components for a broad variety of customers and end markets throughout North America and Europe. Moll served over 350 customers, including leading multinational companies such as Asyst, Invensys, Kimberly-Clark, Motorola, Renault, Schering-Plough, SEB, Siemens, Whirlpool and Xerox. Products using Moll's plastic

components were sold in a wide range of end markets, including telecommunications, household appliances, automobiles and medical devices. Moll believed that the diversity of its customers, markets and geographic regions created a stable revenue base and reduced Moll's exposure to particular market or regional economic cycles. As of the Petition Date, Moll was one of the largest non-automotive plastic injection molding companies in North America as well as in Europe.

Prior to the Petition Date, Moll had 22 plastic production and tool manufacturing facilities with approximately 600 molding machines throughout North America and Europe, including France, the United Kingdom. Moll was, and remains capable of providing its customers with integrated design and prototype development, mold design and manufacturing, advanced plastic injection molding capabilities, and value-added finishing services, such as hot stamping, pad printing, assembly and complete product testing, all of which enabled it to provide "one-stop" shopping to customers seeking a wide range of services. Moll's technologically advanced production facilities and equipment enabled it to provide customized solutions to highly demanding customer specifications. Management believed that few competitors offer the scale, expertise, reputation and range of services that Moll provided.

Moll was formed through the merger in 1998 (the "Merger") of two leading plastic injection molders, Moll PlastiCrafters Limited Partnership ("PlastiCrafters") and Anchor Advanced Products, Inc. ("Anchor"), which were each controlled by Mr. George Votis. Immediately prior to the Merger, Moll and Anchor were independently operated entities. Anchor survived the Merger and changed its name to "Moll Industries, Inc." Mr. Votis acquired Moll's predecessor in 1989 and has since completed seven acquisitions, increasing Moll's revenues from approximately $8 million in 1989 to approximately $223.5 million in 1998 on a pro forma basis. Such acquisitions included the acquisition in August 1997 of a group of companies that had previously been under common ownership ("Hanning") which supplied injection molded plastic components for use in digital photocopiers with manufacturing facilities located in the United States, the United Kingdom and Germany, which had 1998 revenues of $47.0 million, and the acquisition in January 1998 of Somomeca Industries S.A.R.L. and its subsidiaries ("Somomeca"), a French injection molder which had 1998 revenues of $90.5 million. In March 1998, Mr. Votis acquired Anchor, which began operations in 1941 as a manufacturer of cosmetic brushes for Maybelline and which had revenues of $143.0 million in 1998. In June 1998, Moll acquired Gemini Plastic Services, Inc. ("Gemini") which had revenues of $19.6 million in 1998. In April 1999, Moll acquired three locations of Compression, Inc., which designs products for the industrial and consumer products markets. In May 1999, Moll acquired Souplex, Limited, a telecommunications and consumer products plastic molding and tooling building company with two locations in the United Kingdom. In November 2000, Moll formed Moll do Brazil LTDA. This entity serves as a holding company for investments made in Brazilian plastic injection molding companies.

Moll was formed to combine the manufacturing, marketing and management resources of Moll and Anchor to create further opportunities for growth and development. As a result of the Merger, management believed that Moll was positioned to benefit from the growth and consolidation of the plastics industry. Moll also believed that the consummation of the Merger significantly enhanced its future growth prospects and revenue stability by broadening its

customer base, manufacturing capabilities and geographic presence. Moreover, Moll believed it would benefit from its increased scale, ability to centralize certain key logistical functions and cost savings opportunities.

## 2.02    Corporate Structure

AMM Holdings, Inc., a Delaware corporation ("AMM"), is a holding company whose only assets are the outstanding capital stock of Anchor Holdings, Inc., a Delaware corporation ("Holdings"). Holdings is a holding company whose only assets are the outstanding capital stock of the Debtor. As of the Petition Date, the organizational and debt structure of AMM and its subsidiaries, was as follows:



| | |
|---|---|
| **AMM Holdings, Inc.** | 13 1/2% Senior Discount Notes due 2009 ($68,000,000 Aggregate Principal Amount Outstanding) |
| **Anchor Holdings, Inc.** | Guarantee of 11 3/4% Senior Unsecured Notes due 2004 (see below) Guarantee of Senior Credit Facility (see below) Guarantee of Mezzanine Facility (see below) |
| **Moll Industries, Inc.** | Senior Credit Facility ($33,571,000 Principal Amount Outstanding) Mezzanine Facility ($34,116,000 Principal Amount Outstanding) 11 3/4% Senior Unsecured Notes due 2004 ($8,649,000 Aggregate Principal Amount Outstanding) 10 1/2% Senior Subordinated Unsecured Notes due 2008 ($73,520,000 Aggregate Principal Amount Outstanding) 8.4% Mortgage due 2012 ($2,351,000 Principal Amount Outstanding) 8.45% Mortgage due 2012 ($2,254,000 Principal Amount Outstanding) |

Subsidiaries: Compression, Inc. | Moll Industries UK, Limited | Moll Industries, Limited | Moll France SARL (indirectly owned) | Moll do Brasil Ltda. | Anchor Advanced Products Foreign Sales Corporation

## 2.03    Post-Merger Operations

The Debtor's operating results have been materially lower than expected since the Merger. The disappointing results are primarily attributable to under-performance in the Debtor's Brush, Display, Medical and Compression divisions in North America and all of the European divisions, along with charges incurred by the Debtor in connection with the sale or closing of unnecessary facilities. Management of the Debtor has and continues to evaluate all of its operations. Prior to the Petition Date, these evaluations resulted in:

- the sale of its metal fabrication business in March, 1999 to a supplier;

- the sale of a non-essential tool building division in March, 1999;

- the closing of its Round Rock, Texas molding facility, moving production from this facility to existing capacity in other of the Debtor's facilities;

- the sale of its German division, which had incurred significant losses due to declines in volume, in December, 1999;

- the sale of its Chalon, France tooling operation in June, 2000;

- the discontinuance of its Display division in November, 2000;

- the sale of its Cosmetics division in November, 2000;

- the sale of the California location of its Compression division in December, 2000;

- the downsizing of its Morristown, Tennessee Brush facility in December, 2000;

- the consolidation of the operations of its Crissey, France facility into its Rouvray, France facility in May, 2001;

- the consolidation of the operations of its Morristown, Tennessee Brush facility into other existing facilities in September, 2001;

- the consolidation of the operations of its Rochester, New York facility into other existing facilities in September, 2001;

- the closure of its tooling operation in Mansfield, UK;

- the consolidation of the operations in Gloucester, UK into its Morecambe, UK facility in March, 2002;

- the decision in June, 2002 to close its Villefranche, France facility; and

- significant overhead reduction commencing in December, 2001 and continuing into 2002.

## 2.04    Pre-Petition Debt Structure

Prior to the Petition Date, the Debtor had outstanding the following credit facilities, notes and mortgages:

- that certain Amended and Restated Credit Agreement dated as of August 9, 2000, among the lenders named therein, Foothill Capital Corporation, as agent, and the Debtor, as the

same may be further amended, modified, supplemented, extended, restated, replaced, renewed or refinanced from time to time (the "Senior Credit Facility"), of which a principal amount of $33,571,000 was outstanding as of the Petition Date;

- that certain Term Loan Credit Agreement dated as of December 21, 2001, among the lenders named therein, Foothill Capital Corporation as agent, and the Debtor, as the same may be further amended, modified, supplemented, extended, restated, replaced, renewed or refinanced from time to time (the "Mezzanine Debt") of which a principal amount of $34,116,000 was outstanding as of the Petition Date;

- those certain 11-3/4% Series B Senior Notes issued by the Debtor and due 2004 (the "Senior Unsecured Notes"), of which an aggregate principal amount of $8,649,000 was outstanding as of the Petition Date;

- those certain 10-1/2% Series B Senior Subordinated Notes issued by the Debtor and due 2008 (the "Subordinated Unsecured Notes"), of which an aggregate principal amount of $73,520,000 was outstanding as of the Petition Date;

- that certain 8.4% mortgage due 2012 pursuant to that certain mortgage loan agreement dated November 12, 1997 by and between the Debtor and Metlife Capital Financial Corporation and currently held by GE Capital secured by a first lien upon the Debtor's Round Rock, Texas facility, of which a principal amount of $2,351,000 was outstanding as of the Petition Date; and

- that certain 8.45% mortgage due 2012 pursuant to that certain mortgage loan agreement dated as of March 1, 1997, by and between Robert S. and Linda Hayberg and the Debtor and currently held by LICOGA, secured by a first lien upon the Debtor's Fort Lauderdale, Florida facility, of which a principal amount of $2,254,000 was outstanding as of the Petition Date.

## 2.05   **Debt Reduction**

Prior to the Petition Date, the Debtor undertook the following measures to reduce its leverage:

- In August 2000, the Debtor reduced its leverage by $7.5 million when it purchased $50.0 million of the Senior Unsecured Notes at a 15% discount utilizing proceeds from the Senior Credit Facility. This transaction resulted in a gain of $4.9 million that was recorded in 2000.

- In November 2000, the Debtor used the proceeds of the sale of the Cosmetics division to purchase $41.4 million of the Senior Unsecured Notes at a 15% discount, resulting in a gain of $5.0 million that was recognized in 2000. The Debtor used remaining proceeds from the sale of the Cosmetics division to retire $11.4 million under the Senior Credit Facility.

- In January 2001, the Debtor reduced its leverage by an additional $8.6 million as it used availability under its revolving loan of the Senior Credit Facility to repurchase $13.5 million of the Subordinated Unsecured Notes at a 63.5% discount. This transaction resulted in a gain of $7.7 million that was recognized in 2001.

- In December 2001, the Debtor further reduced its leverage by $22.8 million by purchasing $28.8 million of the Subordinated Unsecured Notes for $6.0 million. This reduction was financed through the Mezzanine Facility. The transaction resulted in a gain of $20.1 million that was recognized in 2001.

- In January 2002, the Debtor utilized additional borrowings under the Mezzanine Facility to purchase $14.2 million of the Subordinated Unsecured Notes for $6.4 million, resulting in a gain of $7.1 million and reduced leverage of $7.8 million.

## 2.06    Refinancing Alternatives Pursued

For over a year prior to the execution of the Restructuring Agreement described below, the Debtor pursued options to refinance the Senior Credit Facility, including:

- a refinancing with a consortium of lenders, including a mezzanine loan, which failed when the structure of the senior loan was unacceptable to the proposed mezzanine lender;

- a February 2002 refinancing which failed due to the proposed lender's decision not to proceed with the loan;

- a refinancing with a new lender which failed due to environmental underwriting concerns;

- engaging an advisor to locate possible lenders and the unsuccessful pursuit of a refinancing with such lenders; and

- most recently attempting a refinancing with other lenders which ultimately failed due to the Debtor's inability to find a lender which would lend appropriate amounts against the Debtor's real estate collateral.

None of these options were available to the Debtor and by June 2002, the only refinancing option which provided the Debtor with the immediate liquidity it needed that could be effected in time to prevent an emergency bankruptcy filing was the acquisition by Highland of 81.25% of the senior lenders commitments in the Senior Credit Facility described below under "Restructuring Agreement." Although this acquisition by Highland did not solve the Debtor's long term liquidity problems, at that time it was the only proposal put forth by any lending institution that would provide the Debtor with current liquidity and therefore presented the best and only alternative for strengthening the Debtor's financial situation and preserving and maximizing value for all of its constituencies, including its Creditors.

As a result of entering into the Restructuring Agreement, the Debtor was able to avoid an emergency bankruptcy filing at that time and obtain some additional liquidity through over-advances from the lenders under its Senior Credit Facility. These borrowings were used by the Debtor to fund critical operational liquidity needs and to pay costs associated with restructuring, including payments of overdue professional fees.

## 2.07   Restructuring Agreement

After the numerous attempts at refinancing described above had failed, Highland agreed to acquire 81.25% of the existing commitments and loans (other than those held by Foothill) under the Senior Credit Facility if the Debtor and certain of its affiliates listed below agreed to a capital and debt restructuring. Effective as of June 7, 2002, the Debtor, AMM, Holdings and George T. Votis (the Debtor's then Chairman and Chief Executive Officer) entered into the Restructuring Agreement Highland and Foothill. Pursuant to the Restructuring Agreement, the Debtor and certain of its affiliates agreed, among other things, to engage a financial advisor, to take cost cutting measures, to undertake an exchange of the Subordinated Unsecured Notes for certain new 12% Notes due 2008 equal to 30% of the principal amount of the Subordinated Unsecured Notes and a pro rata portion of 90% of certain new shares of common stock in the Debtor, and to undertake a transaction in which AMM would offer to purchase all of the outstanding 13 1/2% Senior Discount Notes due 2009 for $7.94 for each $1,000 principal amount.

Between June 6, 2002, and September 6, 2002, the Company was actively pursuing an out of court restructuring conforming to the terms of the Restructuring Agreement. Before the Debtor could complete those efforts, on September 6, 2002, three investment funds collaterally managed by Highland Capital Management, L.P., majority holders of the Subordinated Unsecured Notes, filed an involuntary petition initiating this Chapter 11 Case.

## ARTICLE 3.
## SELECTED FINANCIAL INFORMATION,
## PROJECTIONS AND VALUATION ANALYSIS

## 3.01   General

This section provides summary financial information concerning the recent financial performance of the Debtor, three year financial projections for the Debtor and discusses an estimated reorganization valuation for the Debtor. The projections and reorganization value are based on information available as of the date of this Disclosure Statement. The Debtor's financial information is maintained by its internal accounting staff. The financial information contained in this Disclosure Statement has not been audited. All income statements are presented on an accrual basis and all financial information is prepared in accordance with Generally Accepted Accounting Principles ("GAAP"). The significant assumptions underlying the projections and valuation and the basis of their preparation are discussed below.

## 3.02    Operating Performance

### 3.02.01    Pre-Petition Operations

A description of Moll's pre-petition operating performance for fiscal year 2001 and 2002 (through September 14, 2002)[2] is summarized in the table below. Information concerning the Debtor's operating performance on a consolidated basis for prior years (including audited financial statements) are available over the Internet at **www.sec.gov** or **www.freeedgar.com.**

| **Moll Industries, Inc.** **Summary of Pre Petition Operations** **(Dollars in Thousands)** | | | | |
|---|---|---|---|---|
| | Year Ended December 31, 2001 | Nine Months Ended September 14, 2002 | Three Months Sept 15-Dec 31, 2002 | Year Ended December 31, 2002 |
| **Statements of Operating Data:** | | | | |
| Net Sales | 158,450 | 109,518 | 41,841 | 151,359 |
| Gross Profit | 18,164 | 12,770 | 5,568 | 18,338 |
| Selling, General and Administrative Expenses | 15,613 | 7,322 | 2,310 | 9,632 |
| Loss on Asset Impairment | 9,943 | - | - | - |
| Loss on Restructure or Closure of Facility | 8,448 | 1,369 | 32,482 | 33,851 |
| Operating Income (Loss) | (15,840) | 4,079 | (29,225) | (25,146) |
| Interest Expense, net | 22,890 | 16,857 | 5,453 | 22,310 |
| Income (Loss) before Taxes and Extraordinary Item | (36,839) | (13,234) | (35,030) | (48,264) |
| Income (Loss) before Extraordinary Item | (36,741) | (13,234) | (35,030) | (48,264) |
| | | | | |
| **Other Data:** | | | | |
| EBITDA | (6,363) | 7,497 | (28,402) | (20,905) |
| Cash Flows From (Used In) Operating Activities | (3,065) | (1,786) | (3,351) | (5,137) |
| Cash Flows From (Used In) Investing Activities | (961) | (431) | (255) | (686) |
| Cash Flows From (Used In) Financing Activities | 7,561 | (2,711) | 4,034 | 1,323 |
| Depreciation and Amortization | 7,586 | 3,874 | 1,096 | 4,970 |
| Capital Expenditures | (2,581) | (431) | (255) | (686) |
| Cash Interest Expense, net | 20,849 | 12,026 | 973 | 12,999 |
| Ratio of EBITDA to Cash Interest Expense, net | (0.31)x | 0.62x | (29.19)x | (1.61)x |

### 3.02.02    Post-Petition Operations

Set forth below is a summary of the Debtor's operations during the post-petition period commencing September 15, 2002, through January 25, 2003.

---

[2] The financial closing most proximate to the Petition Date was performed on September 14, 2002.

<table>
<thead>
<tr><th colspan="3" style="text-align:center">Moll Industries, Inc.<br>Summary of Post Petition Operations<br>(Dollars in Thousands)</th></tr>
</thead>
</table>

| | Three Months<br>Sept 15-Dec 31, 2002 | Three Months Ended<br>March 29, 2003 |
|---|---|---|
| **Statements of Operating Data:** | | |
| Net Sales | 41,841 | 36,392 |
| Gross Profit | 5,568 | 6,019 |
| Selling, General and Administrative Expenses | 2,310 | 1,500 |
| Loss on Asset Impairment | - | - |
| Loss on Restructure or Closure of Facility | 32,482 | 2,070 |
| Operating Income (Loss) | (29,225) | 2,449 |
| Interest Expense, net | 5,453 | 3,413 |
| Income (Loss) before Taxes and Extraordinary Item | (35,030) | (1,587) |
| Income (Loss) before Extraordinary Item | (35,030) | (1,587) |
| | | |
| **Other Data:** | | |
| EBITDA | (28,402) | 2,937 |
| Cash Flows From (Used In) Operating Activities | (3,351) | 778 |
| Cash Flows From (Used In) Investing Activities | (255) | 314 |
| Cash Flows From (Used In) Financing Activities | 4,034 | (1,648) |
| Depreciation and Amortization | 1,096 | 1,111 |
| Capital Expenditures | (255) | (155) |
| Cash Interest Expense, net | 973 | 1,546 |
| Ratio of EBITDA to Cash Interest Expense, net | (29.19)x | 1.90x |

## 3.03    Financial Projections of Reorganized Moll

As part of its efforts to evaluate its operations and develop its Plan, the Debtor, through its management, with the assistance of Nightingale & Associates ("Nightingale"), developed projections of the financial performance for a three-year period following the anticipated Effective Date (the "Projections"). The Projections included in this Disclosure Statement are based upon a number of important assumptions, which are subject to significant business, economic and competitive risks and uncertainties that are not within Moll's control and could cause actual results to differ materially and adversely from the Projections. Such factors include the effect of the Chapter 11 filing upon the Debtor's business and operations as well as the effect of general economic conditions. These and other factors are described in greater detail in Section 10 entitled "Risk Factors".

The Projections are not and should not be regarded as a representation that the forecasted revenue and expense levels will be achieved. However, based upon the Projections, the Debtor believes that the Reorganized Debtor will be able to meet all of its financial obligations under the Plan and, accordingly, that confirmation of the Plan is not likely to be followed by liquidation or the need for further reorganization. The Projections must be read in conjunction with the assumptions and notes set forth hereinbelow.

**3.04     Projected Income Statement for Reorganized Moll**

   *3.04.01          Assumptions and Notes*

Operations - The Company plans to streamline its operations by shutting down/selling less productive operations and focusing its remaining assets on its core business. Assets from discontinued operations (real estate, equipment, etc.) will be sold with proceeds from the sale of those assets used to pay down debt. Proceeds from asset sales will be applied first to the revolver and then to the term loan.

   Continuing Operations - The following is a summary of the expected continuing operations of Moll upon emerging from Bankruptcy:

- Fort Smith, AR
- Nashville, TN
- Seagrove, NC
- New Braunfels, TX (The Company's San Antonio (leased facility) and Austin (owned facility) are being combined into a new leased facility located in New Braunfels, TX.  The Austin facility and any excess equipment will be sold.
- Brazil (Presently a minority investment accounted for under the equity method).  Present operations are breakeven and will remain a part of continuing operations.

   Discontinued Operations - The following operations have been or will be closed with any assets not used for Moll's continuing operations to be liquidated:

- Fort Lauderdale
- Newberg
- Compression (leased facility)
- Austin
- San Antonio (leased facility)
- Moll France SARL
- Moll United Kingdom Limited

Other Considerations - The opening balance sheets have not been fully adjusted to reflect "fresh start accounting" per SOP 90-7, i.e., assets have not been adjusted to their fair market value and the proper amount for "reorganization value in excess of fair market value" has not been established. Nightingale has determined an enterprise value for Moll. For purposes of this forecast, the model includes an enterprise value of approximately $56 million upon emergence from bankruptcy plus $16.4 million of surplus assets to be liquidated. As such, the capital structure has been modified to reflect this valuation as detailed further in the assumptions (including a negative net worth upon emergence from bankruptcy). Such adjustments do not have a material "cash impact".

It is assumed the Fort Lauderdale and Newberg plants close on February 28, 2003 and April 30, 2003, respectively. San Antonio and Austin plants are assumed to be closed May 31, 2003 and July 31, 2003, respectively and consolidated into a new Texas plant[3].

The Brazil operation is a minority owned venture with results of operations accounted for under the equity method. Presently this operation has a negligible impact on the consolidated operations of Moll.

Bankruptcy Assumptions - The financial forecast uses the following assumptions as it relates to Moll's reorganization and emergence from bankruptcy:

| Task | Targeted Date |
|------|---------------|
| Filing of bankruptcy plan and disclosure statement | January, 2003 |
| Confirmation of plan | June, 2003 |
| Effective date of plan | June, 2003 |

- Income Statement -

*Revenues* - Where available, revenues are forecast by the customer. Risks inherent in the revenue forecast include the following assumptions for three significant customers. Due to the sensitive nature of this customer information, they are identified only as Customer A, B and C:

Customer A - Customer A represents in excess of 50% of total revenue for Moll. It is assumed unit volume with Customer A will remain flat in 2003, 2004 and 2005; however, price concessions above and beyond the existing rebate program will reduce revenue by 2% in 2003, an additional 1 % in 2004 and an additional 1 % in 2005.

Customer B - The forecast reflects planned growth in Customer B sales from 2003 to 2005 ($4.5 million to $12 million).

Customer C - Sales to Customer C are significantly reduced in 2003 and eliminated in 2004 and 2005.

Other new business - the forecast assumes unidentified new business (unidentified as of the beginning of 2003) of $4 million in 2003, $8.5 million in 2004 and $11.5 million in 2005.

---

[3] Since the completion of the Debtor's financial projections, the anticipated dates for closing the Ft. Lauderdale, San Antonio and Austin plants have been deferred to the dates indicated above. The financial projections have not been modified to include this new closing date, however, such change would have no material effect on the financial projections contained in this Disclosure Statement.

*Variable Cost of Sales* - It is assumed that the sales mix will approximate recent history by plant and part type with variable costs established accordingly. Costs fluctuate in direct proportion to sales volume including labor expense / head count, material costs and other variable costs.

*Fixed Cost of Sales* - Fixed cost of sales are established through a "bottoms up" budgeting process by plant. Where applicable, such costs are budgeted to increase at a nominal rate of inflation per year.

*Cost of Sales Reductions* - Cost savings of $500,000 in 2003 and $1 million in 2004 and 2005 have been reflected in the forecast based on anticipated efficiencies to be gained in manufacturing.

*Payroll / Headcount* - Variable payroll / head count are derived as a function of sales volume. Temporary employees are derived based on a historical percentage of temporary employees to total direct labor. Fixed labor is specifically identified by location through a "bottoms up" budgeting process.

*Other Administrative Costs Including Corporate* - Expenses were derived from a "bottoms up" budgeting process by plant with the assumption that Corporate is relocated to Nashville. Amounts for payroll were specifically identified by position or employee. Severance payments of $250,000 per year, for three years, are assumed to be paid to George Votis. These payments are assumed to be fully offset by payments on a loan receivable from Mr. Votis. For purposes of the balance sheet, this loan receivable is reserved fully to a net balance of zero. Other costs were derived based on actual historical results or estimates where such results were not available.

*Capital and Operating Leases* - Capital leases aggregating $936,000 are reflected at the full balance as of the filing date and amortized over three years. It is assumed that operating leases are rejected as plants are closed regardless of contracted terms (representing a reduction of approximately $1.5Million) to approximately $1.3 million in continuing operating lease expense.

*Other Income* - Included in Corporate is annual royalty income of $200,000 representing patents derived from the Company's brush operation. Such patents were not sold with the brush business (see discontinued operations).

*Income Taxes* - Income taxes are provided for at 40% (combined Federal and State effective rate) factoring in the carry forward tax basis of depreciable assets. It is assumed that the Company will not lose any material portion of that tax basis due to debt forgiveness.

*Accounts Receivable* - Accounts receivable is derived based on an estimated number of days sales outstanding (DSO). DSO is derived by plant based on historical collection trends or known terms by customer.

*Inventory* - Inventory is derived based on an estimated number of inventory turns by plant location as calculated from cost of sales. The number of inventory turns is derived by plant based on historical production trends.

*CAPX* - Capital additions are reflected by location. It is assumed that all CAPX are purchased and fully funded with cash. No additional leases are assumed in the forecast. See summary schedule of CAPX for details.

*Accounts Payable* - Accounts payable is derived based on an estimated number of days accounts payable are outstanding (DPO). DPO is derived by plant based on specifically identified expenses, historical payable trends or know terms by vendor.

*Prepaid Expenses & Accrued Liabilities* - Amounts are derived from identified expenses where specific payment dates and amounts are known. Amounts include insurance, vacation pay, insurance, Whirlpool rebates, taxes, etc.

- Debt Service - The following outlines Moll's assumed restructured debt and equity upon emergence from bankruptcy:

| | Pre-Emergence 06/30/03 Balance | | 7/1/03 Post- Emergence Balance |
|---|---|---|---|
| Impaired Liabilities | $ 19,000 | (a) | $ 3,600 |
| DIP Revolver | | (1) | - |
| DIP Term | 33,000 | (1) | |
| New Revolver | | (2) | |
| New Term | | (3) | 35,000 |
| Mezzanine | 35,531 | (4) | 24,000 |
| Real Estate Mortgages | 2,274 | (5) | 2,274 |
| 11.75% Notes | 8,600 | (6) | |
| 10.5% Notes | 73,520 | (6) | |
| Total Debt / Liabilities | 171,925 | | 64,874 |
| Common Stock / Gain on Debt Forgiveness | | (6) | 107,051 |
| Total Debt and Equity | $ 171,925 | | $ 171,925 |

| **(a) Impaired Liabilities (estimated)** | |
|---|---|
| Prepetition Accounts Payable | $ 6,700 |
| Interest | $ 6,000 |
| SERP | 3,300 |
| Facility Leases | 400 |
| Equipment Leases | 600 |
| German Liability | 1,500 |
| Other | 500 |
| | $ 19,000 |

(1) Assumed balance prior to emerging from bankruptcy (after $9 million credited to revolver from asset sales). DIP revolver capped at $17 MM.

(2) Revolving facility of $15MM beginning 7/1/03.

(3) Mezzanine reduced to $24 million and paid interest semi-annually at a rate of LIBOR plus 6% (5% cash interest, 3% PIK). Claim represents full face of debt of $33 million plus accrued PIK interest. As consideration for this reduction in claim amount, it is assumed the mezzanine holders receive all or substantially all of the equity of Moll.

(4) Principal plus interest paid monthly with principal balance retired through the sale of real estate.

(5) Forecast assumes no consideration is given to the holders of the 10.5% and $1.5 million is paid to the 11.75% note holders.

*Interest Rate Environment -* The forecast assumes a stable interest rate environment through 2005. However, for each 1% increase in short term interest rates, the Company may be exposed to an additional $250,000 to $400,000 in cash interest payments annually.

*New Revolving Line of Credit -* Assumes interest is paid monthly, based on the average outstanding balance for the period. Assumed interest rate is Prime + 2% or 6.25%. Proceeds from asset sales are applied to the outstanding revolver balance first.

*New Secured Term Loan-* Assumes interest is paid quarterly and accrues at 7% per annum. Assumes principal amortization begins in the first quarter of 2004. Balance amortized at

1 % of the original principal outstanding ($35 million) per quarter beginning in April, 2004. In addition, excess Cash is swept to reduce the term loan on an annual basis based on the following formula:

> 75% of excess Cash until Total Leverage is below 4.0x, and 50% of excess Cash if Total Leverage is below 4.0x. Excess Cash Flow is defined as EBITDA less CAPEX, Interest paid, taxes paid, principal payments on borrowed money (other than the Revolving Facility) and Bankruptcy expenses.

*Real Estate Mortgages* - Real estate mortgage principal and interest are paid in accordance with the terms of those loans. Mortgages are assumed to be paid in full upon the sale of the applicable property mortgaged.

*Mezzanine Debt* - Assumes interest on the mezzanine debt at 8% (LIBOR plus 6%) per annum (5% cash and 3% PIK), payable semi-annually. Assumes principal balloons on May 31, 2008.

- Discontinued Operations

*Plant Closure Dates*[4]

- Fort Lauderdale - 3/31/03
- San Antonio/Austin - 5/31/03 and 7/31/03 respectively
- Newberg - 4/30/03

*Expenses* - Expenses for discontinued operations include insurance, security, property taxes and utilities. Amounts were derived based on actual historical results or estimates where such results were not available.

*Timing and amount derived from asset sales* - The timing and amount of the net realizable value derived from equipment sales is based on recent appraisals, net of auction and other expenses and anticipated schedules for those auctions. The timing and amount of the net realizable value derived from real estate assets is based on real estate appraisals, less sales commissions and other expenses. The time required to market the real estate is based on appraisal and real estate broker input as well as ongoing sale efforts to date.

---

[4] See footnote 3 above.

| Property Location | Estimated Timing of Sale (Quarter Ended) | Recent Appraised Values | | |
| | | Six Month Disposition | Twelve Month Plus Disposition | Mid Point / Expected Value |
|---|---|---|---|---|
| Austin, TX | | | | |
| Building | 3/31/04 | $ 2,500 | $ 3,500 | $ 3,000 |
| Land - Long Vista Drive | 9/30/04 | 310 | 440 | 375 |
| Fort Lauderdale, FL (a.) | 6/30/03 | 5,000 | 5,000 | 4,650 |
| Harlingen, TX | 6/30/03 | 530 | 760 | 500 |
| Morristown, TN | | | | - |
| Desoto Ave (b.) | 6/30/03 | 1,150 | 1,525 | 900 |
| Davis Ave (c.) | 4/30/03 | 450 | 625 | 425 |
| Newberg, OR | 6/30/04 | 4,000 | 5,000 | 4,500 |
| Rochester, NY (d.) | 4/30/03 | 2,100 | 2,850 | 2,600 |
| Contingency | | | | (1,500) |
| Selling Costs @ 8% | | | | (1,250) |
| Net proceeds | | | | $ 14,200 |

(a.)     Recent offer – $4.7 million
(b.)     Sold for  $0.9 million
(c.)     Under contract for  $0.425 million
(d.)     Sold for  $2.6 million

The net proceeds derived from the sale of the brush division were $800,000 in March, 2003.

Based on the estimated realizable value from the disposition of surplus assets, net of carrying and interest costs, it is forecast that approximately $15.1 million of debt (including $4.6 million in real estate mortgages) will be repaid through the liquidation of these assets.

### 3.04.02     *Income Projections*

Based upon, and subject to the notes and assumptions above, the Debtor projects its financial performance for 2003 through 2005 as follows:

| | | | | | | | | Percent Change over Prior Year | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | **Actual** | **Actual** | **Est.** | **Forecast** | **Forecast** | **Forecast** | | **2000-** | **2001-** | **2002-** | **2003-** | **2004-** |
| | **2000** | **2001** | **2002** | **2003** | **2004** | **2005** | | **2001** | **2002** | **2003** | **2004** | **2005** |
| **Revenue and EBITDA Summary** | | | | | | | | | | | | |
| **Net Revenues** | | | | | | | | | | | | |
| Continued Operations | | | | | | | | | | | | |
| Gross Sales | $110,696.0 | $114,885.0 | $120,694.0 | $111,439.6 | $115,026.7 | $124,819.2 | | 3.8% | 5.1% | (7.7%) | 3.2% | 8.5% |
| Returns and Allowances | (887.0) | (739.0) | (727.0) | (782.9) | (606.9) | (647.9) | | (16.7%) | (1.6%) | 7.7% | (22.5%) | 6.8% |
| Rebates | - | (2,226.0) | (4,165.0) | (3,012.3) | (334.1) | (513.6) | | 0.0% | 87.1% | (27.7%) | (88.9%) | 53.7% |
| Net Sales - Continued Ops | $109,809.0 | $111,920.0 | $115,802.0 | $107,644.4 | $114,085.8 | $123,657.6 | | 1.9% | 3.5% | (7.0%) | 6.0% | 8.4% |
| Discontinued Operations | | | | | | | | | | | | |
| Gross Sales | $112,766.0 | $39,856.0 | $30,909.0 | $6,937.5 | $0.0 | $0.0 | | | | | | |
| Returns and Allowances | (2,256.0) | (866.0) | (1,127.0) | (98.9) | - | - | | | | | | |
| Rebates | - | - | - | - | - | - | | | | | | |
| Net Sales - Discontinued Ops | $110,510.0 | $38,990.0 | $29,782.0 | $6,838.6 | $0.0 | $0.0 | | | | | | |
| Total | | | | | | | | | | | | |
| Gross Sales | $223,462.0 | $154,741.0 | $151,603.0 | $118,377.1 | $115,026.7 | $124,819.2 | | | | | | |
| Returns and Allowances | (3,143.0) | (1,605.0) | (1,854.0) | (881.8) | (606.9) | (647.9) | | | | | | |
| Rebates | - | (2,226.0) | (4,165.0) | (3,012.3) | | | | | | | | |
| Total Net Sales | $220,319.0 | $150,910.0 | $145,584.0 | $114,483.0 | $114,085.8 | $123,657.6 | | | | | | |
| **EBITDA** | | | | | | | | | | | | |
| Total EBITDA before Corporate | $34,409.0 | $23,040.0 | $20,374.0 | $14,939.6 | $15,106.9 | $17,945.2 | | | | | | |
| Corporate | (10,304.0) | (8,945.0) | (7,949.0) | (4,195.0) | (3,599.7) | (3,710.1) | | | | | | |
| EBITDA | $24,105.0 | $14,095.0 | $12,425.0 | $10,744.7 | $11,507.1 | $14,235.1 | | | | | | |

*Note: EBITDA in 2003-2005 is before bankruptcy and restructuring costs*
*Corporate expense is total corporate expense plus corporate depreciation for 2003-2005*

### 3.04.03     *Cash Flow Projections*

Based upon, and subject to the notes and assumptions above, the Debtor projects its cash flow for 2003 through 2005 as follows:

<table>
<tr><td colspan="4" align="center">**Moll Industries**<br>**Statements of Cash Flows**<br>*Dollar Amounts in Thousands*</td></tr>
<tr><td></td><td colspan="3" align="center">**Fiscal Year Ended**</td></tr>
<tr><td></td><td align="center">**2003**</td><td align="center">**2004**</td><td align="center">**2005**</td></tr>
<tr><td>**Cash Flow from Operations**</td><td></td><td></td><td></td></tr>
<tr><td>Net Income/(Loss)</td><td>($7,517.8)</td><td>$2,348.5</td><td>$4,459.0</td></tr>
<tr><td>Depreciation and Amortization</td><td>4,263.9</td><td>3,533.4</td><td>3,204.1</td></tr>
<tr><td>Paid-in-Kind Interest Expense</td><td>360.0</td><td>720.0</td><td>720.0</td></tr>
<tr><td>Changes in Assets and Liabilities:</td><td></td><td></td><td></td></tr>
<tr><td>Accounts Receivable</td><td>$8,382.3</td><td>($1,890.1)</td><td>($1,278.7)</td></tr>
<tr><td>Inventories</td><td>3,799.0</td><td>(515.5)</td><td>(562.5)</td></tr>
<tr><td>Other Current Assets</td><td>1,229.9</td><td>(9.8)</td><td>61.5</td></tr>
<tr><td>Accounts Payable</td><td>(954.0)</td><td>177.8</td><td>408.7</td></tr>
<tr><td>Accrued and Other Liabilities</td><td>(4,980.5)</td><td>1,309.0</td><td>516.9</td></tr>
<tr><td>Total Adjustments</td><td>$7,476.7</td><td>($928.6)</td><td>($854.1)</td></tr>
<tr><td>**Net Cash used in Operating Activities**</td><td>**$4,582.8**</td><td>**$5,673.3**</td><td>**$7,529.0**</td></tr>
<tr><td>**Cash Flow from Investing Activities**</td><td></td><td></td><td></td></tr>
<tr><td>Capital Expenditures</td><td>($2,303.7)</td><td>($3,397.2)</td><td>($2,153.1)</td></tr>
<tr><td>Proceeds on Disposal of Assets</td><td>9,987.0</td><td>5,709.4</td><td>-</td></tr>
<tr><td>**Net Cash used in Investing Activities**</td><td>**$7,683.3**</td><td>**$2,312.2**</td><td>**($2,153.1)**</td></tr>
<tr><td>**Cash Flow from Financing Activities**</td><td></td><td></td><td></td></tr>
<tr><td>Net Proceeds from Revolving Loan Facilities</td><td>($5,952.9)</td><td>$0.0</td><td>$0.0</td></tr>
<tr><td>Principal Payments on Long-Term Obligations</td><td>(4,748.8)</td><td>(9,732.8)</td><td>(5,375.9)</td></tr>
<tr><td>**Net Cash Provided by Financing Activities**</td><td>**($10,701.7)**</td><td>**($9,732.8)**</td><td>**($5,375.9)**</td></tr>
<tr><td>**Net Change in Cash**</td><td>**1,564.4**</td><td>**(1,747.3)**</td><td>**-**</td></tr>
<tr><td>Balance at Beginning of Period</td><td>682.9</td><td>2,247.3</td><td>500.0</td></tr>
<tr><td>Balance at End of Period</td><td>2,247.3</td><td>500.0</td><td>500.0</td></tr>
<tr><td>**Supplemental Information**</td><td></td><td></td><td></td></tr>
<tr><td>Cash Paid for Interest</td><td>4,013.8</td><td>3,383.3</td><td>2,959.9</td></tr>
<tr><td>Cash Paid for Income Taxes</td><td>-</td><td>1,548.2</td><td>2,940.4</td></tr>
</table>

### 3.04.04    *Pro Forma Balance Sheets*

The following projected and pro forma balance sheets illustrate the pro forma unaudited pre-confirmation balance sheets and pro forma adjustments to record the Plan confirmation. The pro forma balance sheets are subject to the notes and assumptions above.

## Moll Industries
### Balance Sheets
*Dollar Amounts in Thousands*

| | Fiscal Year Ended | | |
|---|---|---|---|
| | **2003** | **2004** | **2005** |
| **Assets** | | | |
| **Current Assets** | | | |
| Cash and Cash Equivalents | $2,247.3 | $500.0 | $500.0 |
| Accounts Receivable, net | 20,318.5 | 22,208.6 | 23,487.3 |
| Inventories, net | 7,342.3 | 7,857.8 | 8,420.3 |
| Other Current Assets | 5,641.6 | 5,651.4 | 5,589.9 |
| **Total Current Assets** | **$35,549.7** | **$36,217.8** | **$37,997.5** |
| Property Plant and Equipment, Net | 19,013.0 | 13,167.4 | 12,116.4 |
| Investments | 240.0 | 240.0 | 240.0 |
| **Total Assets** | **$54,802.7** | **$49,625.2** | **$50,353.9** |
| **Liabilities** | | | |
| **Current Liabilities** | | | |
| Short-Term Borrowings | $0.0 | $0.0 | $0.0 |
| Accounts Payable | 10,081.4 | 10,259.2 | 10,667.8 |
| Accrued Interest | 880.9 | 1,600.9 | 2,320.9 |
| Accrued Liabilities | 5,568.6 | 6,398.0 | 6,442.2 |
| Other Current Liabilities | 4,355.7 | 4,355.7 | 4,355.7 |
| **Total Current Liabilities** | **$20,886.6** | **$22,613.8** | **$23,786.6** |
| **Long Term Liabilities** | **$60,953.5** | **$51,700.3** | **$46,797.1** |
| **Total Liabilities** | **$81,840.1** | **$74,314.1** | **$70,583.7** |
| **Equity** | | | |
| Common Stock ($.01 par value, [] shares authorized, [] shares issued and outstanding) | $0.0 | $0.0 | $0.0 |
| Liabilities in Excess of Assets | (25,006.5) | (25,006.5) | (25,006.5) |
| Retained Earnings | (2,030.9) | 317.6 | 4,776.7 |
| **Total Equity/(Deficit)** | **($27,037.4)** | **($24,688.9)** | **($20,229.8)** |
| **Total Liabilities and Equity** | **$54,802.7** | **$49,625.2** | **$50,353.9** |

| Moll Industries | |
| :---: | ---: |
| **Opening Balance Sheet** | |
| *Dollar Amounts in Thousands* | |
| | **Fresh Start** |
| **Assets** | **7/1/2003** |
| **Current Assets** | |
| Cash and Cash Equivalents | $2,754.4 |
| Accounts Receivable, net | 26,410.0 |
| Inventories, net | 8,274.9 |
| Other Current Assets | 6,515.8 |
| **Total Current Assets** | **$43,955.1** |
| Property Plant and Equipment, Net | 20,545.6 |
| Investments | 240.0 |
| **Total Assets** | **$64,740.7** |
| **Liabilities** | |
| **Current Liabilities** | |
| Short-Term Borrowings | $0.0 |
| Accounts Payable | 11,910.1 |
| Accrued Interest | - |
| Accrued Liabilities | 6,679.6 |
| Other Current Liabilities | 4,355.7 |
| **Total Current Liabilities** | **$22,945.4** |
| **Long Term Liabilities** | **$62,349.6** |
| **Total Liabilities** | **$85,295.0** |
| **Equity** | |
| Common Stock ($.01 par value, [] shares authorized, | |
| [] shares issued and outstanding) | $0.0 |
| Liabilities in Excess of Assets | (20,554.3) |
| Retained Earnings | - |
| **Total Equity/(Deficit)** | **($20,554.3)** |
| **Total Liabilities and Equity** | **$64,740.7** |

## 3.05    Valuation of the Debtor

As part of its efforts to evaluate its operations and develop its Plan, the Debtor, through its management, and in conjunction with Nightingale, analyzed the value of the Debtor as a "going concern" and also on a liquidation basis.

### 3.05.01    *Enterprise Value and Assumptions*

Valuation Methodology - There are several methods used to value companies. The Internal Revenue Service has outlined in Revenue Ruling 59-60 the factors to be considered in the valuation of closely held companies.

Market value of the business enterprise can be defined as: "The cash price in an active market that is being or would probably be agreed upon by a seller willing but under no compulsion to sell, and a buyer willing but under no compulsion to buy, when both parties have reasonable knowledge of the facts."

To briefly summarize Revenue Ruling 59-60 the following factors should be considered in the valuation of the business enterprise: 1) The nature and history of the company; 2) The general economic conditions and outlook; 3) The earning capacity of the company; 4) The dividend-paying capacity of the company; 5) Whether or not the company has unique intangibles that enhance the company's value; 6) The market price of stocks of companies engaged in the same or similar line(s) of business, traded in free and open markets, either on an exchange or over-the-counter; 7) The prices paid for companies engaged in similar industries and activities.

Typically cash flow, assets or replacement values, or a combination of these, are considered when determining the value of a company. The following reviews various valuation methodologies that were considered by Nightingale:

(a)     Replacement Costs

Generally, the value of a company does not relate to the value of replacing the assets of the company. Sometimes the replacement value of the property, plant and equipment, or PP&E, is far higher than the market value of the operating business. Sometimes the value of goodwill, such as customer relations, corporate logo, patents, and technical expertise are far higher than the replacement value of the PP&E.

An investor can often choose to invest in a particular industry by expanding facilities already owned, investing in entirely new facilities, or by purchasing all or part of a new company operating in the industry. The decision as to which investment to make depends, in part, on the relative cost of each. If a prospective buyer is already operating in a certain industry, they may choose to invest by expanding existing facilities. Alternatively, a prospective buyer could build a "green-field" site with the assurance that such a facility would find a ready market for all its production.

An investor or buyer must consider a number of factors including capacity utilization, location, environmental, political, and legal issues among other things in determining where and how to invest.

The replacement cost approach was not considered given the extraordinary amount time and cost of assembling the personnel, technology and customer relationships that have been built over the years by Moll.

The Company's enterprise value to a buyer or investor is better based upon valuation methods other than the replacement cost approach.

(b)      Discounted Cash Flow Analysis

Another method to determine a company's value is the anticipated cash flow that the company will generate. Discounted Cash Flow ("DCF") analysis is a valuation method that isolates a company's projected cash flow that is available to service debt and provide a return to equity; the net present value of this free cash flow to capital is computed over a projected period based on the perceived risk of achieving such cash flow and the cost of debt. This effectively takes into account the time value of capital. It is widely recognized that the DCF approach to estimating the enterprise value of a closely-held or private company is a preferred method.

Management of the Debtor, assisted by Nightingale, prepared a financial forecast that served as the basis for Nightingale's discounted cash flow analysis in order to assist in the determination of the enterprise value of the Company.

(c)      Comparable Public Company Analysis

The market value of public companies is determined every day through the decisions made by many buyers and sellers of its publicly traded securities. These minority interest values can easily be determined and can be adjusted for control premiums. Since there are generally several public companies that are similar to any given private company, the market value of comparable companies can generally be used to estimate the market value of private companies, provided that the companies are comparable.

Comparable companies often are different in size and performance to a target private company; it is generally necessary to compare a comparable company's market value to some performance measure such as revenue, cash flow or assets. This comparison generally results in a multiple that can then be applied to the same performance measure of the private company to derive the market value of the private company. Nightingale has considered this approach in determining the market value of the Debtor

(d)      Comparable Transactions Analysis

A company that has recently sold all or a large portion of its equity provides an immediate indication of value. Its performance indicators can be used as a benchmark for a similar private company to measure its market value against.

Nightingale reviewed the acquisitions made by the Company, as well as other acquisitions of companies in the plastics (both film and injecting molding segments) business to determine the applicability of these transactions to the determination of the enterprise value of Moll.

(e)      Asset Appraisal Analysis

It is generally possible to liquidate the assets (both tangible and intangible) of a company, and after paying off the company's liabilities, the net proceeds would accrue to the equity of the company. It is necessary to determine whether such liquidation analysis should be performed assuming rapid or orderly liquidation of the assets. However, even when assuming an orderly liquidation of a company, it is generally the case that an operating company will be of substantially higher value.

Enterprise Valuation - The determination of the market value of the Debtor's business enterprise value as of July 1, 2003, has been estimated using the Discounted Cash Flow, Market Comparable and Comparable Transaction methods. Additionally, a hypothetical liquidation value of the Debtor's assets and liabilities was prepared with a valuation date of July 1, 2003. The estimates of the market value for the business enterprise using these methods are summarized below:

| Valuation Method | Estimated Market Value |
|---|---|
| Discounted Cash Flow | $56.0 million |
| Capitalization Ratio | $55.0 million |
| Comparable Transactions | $46.3 million |
| Hypothetical Liquidation | $50.2 million |

Each of these methods is considered a valid method in determining value. Since the task is to estimate the Market Value of the Business Enterprise of Moll at the date of emergence, it is implicit in this statement that the Debtor is operating as a going concern. Therefore, the value that is based on a hypothetical liquidation of the Debtor is not an appropriate method by which the Enterprise Value should be determined. Also, note that in the following section there are assets to be sold which are not part of the Enterprise Value, where the liquidation value has been used to estimate there value. Therefore in concluding on the market value of the business enterprise, the Hypothetical Liquidation Value has not been considered.

The Comparable Transactions approach is limited because of the universe of comparable transactions within a reasonable timeframe to consider them comparable. Therefore, while this is an acceptable approach, we choose not to rely upon the Enterprise Value calculated using this method in arriving at our conclusion of market value.

The Capitalization Ratio method is predicated on applying capitalization ratios derived from comparable public companies and applying it to Moll. The difficulty in applying this method is that the "comparable public companies" are not exactly comparable to Moll. Moll is emerging from bankruptcy; the "comparable public companies" are not. Some of the "comparable public companies" are either larger or smaller, compete in market segments other than injecting molding, do not have the same concentration of sales to a specific customer, or are publicly held companies whose share have an active market. Moll does not have similar

attributes. The Capitalization Ratio method is useful in assessing market value among similar companies, however, because of the dissimilarities between Moll and the "comparable public companies," the value ascribed using the Capitalization Ratio method is not considered an acceptable estimated of the enterprise value.

The Discounted Cash Flow method has its deficiencies as a method for estimating the Moll's Enterprise Value. The method uses as a basis an estimate of the future cash flows that, while carefully formulated, are estimates that can not be guaranteed and which are only compounded by the precarious nature of Moll as it emerges from bankruptcy. However, it has been estimated that the forecasted cash flows are properly reduced by applying a discount rate that factors in the risk elements. Had the risks been less, the discount rate would be reduced, and the estimated Enterprise Value would have been greater. The DCF method considers both the working capital requirements and the capital expenditures necessary to achieve the forecasted operating results, as well as the value of the business enterprise at the end of the forecast period.

It is possible to take an average of the three methods (excluding the liquidation value), in which case the estimated enterprise value would be $52.4 million. However, the average of the three methods reflects the deficiencies of all three without giving adequate weight to the operations of Moll as they are forecasted, given the associated risks of attaining the forecasted results.

It is Nightingale's opinion that the Market Value of Business Enterprise of Moll, based on the Discounted Cash Flow Method, as of July 1, 2003, is: **Fifty-Six Million Dollars ($56,000,000)**.

### 3.05.02         *Valuation of Assets Associated With Discontinued Operations*

The Debtor has certain assets that are not part of the Business Enterprise Valuation (referred to as "Discontinue Assets"). The Debtor is in the process of disposing of the assets either through auctions or through direct sales to third parties. In valuing these assets an analysis has been completed of the individual asset or asset group as to the timing of the sale, the cost to hold the asset until a sale is completed and an estimate of the net proceeds to be received from the sales.

    <u>Real Property</u> - The assets being held for sale and the associated estimated recovery value consist of the following:

| Facility | Mortgage | Description / Comments | 6 Mo Sale Appraisal Value[5] | High Appraisal Value[6] | Current Estimated Net Recovery[7] |
|---|---|---|---|---|---|
| Perinton Parkway Fairport, NY | $ 0 | 87.5 thousand sq ft, industrial building on 13.1 acres. | $ 2,100 | $ 2,850 | $ 2,400 |
| Davis Ave Morristown, TN | $ 0 | 179.1 thousand sq ft, multi-story manufacturing facility on 13.7 acres. | $ 450 | $ 625 | $ 400 |
| DeSoto Ave Morristown, TN | $ 0 | 122.3 thousand sq ft, manufacturing facility on 19.1 acres. | $ 1,150 | $ 1,525 | $ 800 |
| Harlingen, TX | $ 0 | 43.8 thousand sq ft industrial building on 5.4 acres | $ 530 | $ 760 | $ 450 |
| Davie, FL | $2,198 | 94.9 thousand sq ft warehouse on 5.0 acres | $ 5,000 | $ 5,000 | $ 4,300 |
| Austin, TX | $ 0 | Adjacent 5.05 acre parcel | $ 310 | $ 440 | $ 350 |
| Austin, TX | $2,274 | 71.8 thousand sq ft industrial facility on 5.1 acres. | $ 2,500 | $ 3,500 | $ 2,800 |
| Newberg, OR | $ 0 | Two one-story buildings; 53.7 thousand and 43.3 thousand sq ft. on 6.4 acres | $ 4,000 | $ 5,000 | $ 4,200 |
| Contingencies | | | | | $(1,500) |
| | $4,472 | **Total** | **$16,040** | **$19,700** | **$ 14,200** |

    <u>Miscellaneous Equipment</u> - In addition to the real property that is being disposed of as part of the reorganization of the business, the Debtor has identified significant amounts of excess equipment that will not be required for future operations. The Debtor has arranged to conduct public auctions of the equipment which have been scheduled for April 29, 2003, and May 1, 2003. The auctioneer has estimated that the proceeds to the Debtor from the auction of this equipment are estimated to be in a range from $1.0 million to $1.2 million.

    <u>Brush Business</u> - The Company has sold its brush business for $800,000 in a sale which closed in March 2003. The proceeds from the sale of the brush business, along with proceeds from the sale of any other discontinued assets will be used by the Company as described in the Plan of Reorganization.

    Based on this analysis, the market value of the Discontinued Assets can be summarized as follows:

---

[5] Source: Cushman & Wakefield most recent appraisals of November 2002 or September 2001.

[6] Source: Cushman & Wakefield most recent appraisals of November 2002 or September 2001. Highest appraisal values generally assume marketing period a minimum of 12 months.

[7] Source: Summary of Proceeds at February 25, 2003; estimated net of selling costs

| Discontinued Assets Category | Market Value |
|---|---:|
| Real Estate Held for Sale | $16,950,000 |
| Brush Business | 800,000 |
| Miscellaneous Equipment to be Sold/Auctioned | 1,200,000 |
| Total Market Value of Discontinued Assets | $18,950,000 |

Since a number of the sales have not been completed, nor have buyers been identified, a contingency provision of $1,500,000 (approximately 8% of the estimated proceeds) is considered reasonable. Costs to dispose of the assets are expected to approximate $1,250,000. Therefore, the concluded market value of the Discontinued Assets is: **Sixteen Million Two Hundred Thousand Dollars ($16,200,000.00)**.

• <u>Enterprise Valuation Conclusion</u> - It is Nightingale's opinion that the Market Value of Business Enterprise of Moll, as of July 1, 2003, together with the realizable value of the Discontinued Assets is: **Seventy Two Million Two Hundred Fifty Thousand Dollars ($72,250,000.00).**

### 3.05.03 *Liquidation Valuation and Assumptions*

Nightingale has assisted the Debtor in the preparation of its liquidation analysis. Nightingale has relied upon appraisals of the plant and equipment performed by Dove Bid, Inc., internationally recognized valuation and auction experts. The value of the Debtor's real properties and related improvements were based upon appraisals provided by Cushman & Wakefield. Nightingale's liquidation valuation is based upon a number of assumptions which are indicated below. The estimates of liquidation values were developed solely for the purpose of formulating, negotiating and confirming a plan on behalf of the Debtor.

- The Estate of Moll Industries, Inc. includes only the Debtor's U.S. operations.

- Book Values are as of November 23, 2002.

- All assets are liquidated under a Chapter 7 filing under the supervision of a Chapter 7 trustee. A forced liquidation was assumed for the following reasons: 1) Conversion to a Chapter 7 with little prospect to pay pre-petition trade claims would limit the Debtor's ability to obtain critical supplies; 2) Ability of the Debtor to keep employees without assurances of paying on post-petition obligations would not be possible, especially for key employees; and 3) OEM customers would need significant assurances that orders would be filled on a timely basis so as not to cause disruption to OEM's manufacturing operations that the Debtor could not provide for the time period to sell the business as a going concern.

- Bank and mortgage Claims are properly perfected.

- Letters of credit primarily associated with state self-insured worker compensation plans are assumed to be drawn in liquidation and become part of the Secured Claim.

- Environmental cleanup costs, if any, are not anticipated to materially impact net sale proceeds.

- Cash is assumed to be swept daily and has been applied to reduce DIP borrowings.

- Book Value and estimated liquidation values for accounts receivable are reflected net of direct offsets for Whirlpool raw material debit memos and earned but unpaid rebates ($10.3 million as of 11/23/2002) and bad debt reserves ($1 million). Recovery rates were set at 85% to 95% based on the general industry practice of high recovery on collections prior to customer tool release.

- Recovery rates for raw materials and finished goods inventory are set at 80% to 90% based on the general industry practice of receiving high recovery from customers pending customer tool release.

- Property, plant and equipment realization percentages are estimates given the current economic environment for the sale of distressed assets assuming a limited period to market the assets held for sale. As such, the liquidation values presented in this analysis do not represent a guarantee. Each asset category was reviewed in detail in order to determine the amounts to be realized from the liquidation of the Debtor's assets. Equipment and real estate values were derived from appraisals prepared by a national equipment auctioneer and real estate brokerage firms. Furniture and fixtures, computer hardware, and software assets having a net book value of $1.1 million were assigned $100,000 of value in liquidation. For purposes of this presentation, assets previously classified as held for sale are included in property, plant and equipment. Estimated liquidation proceeds are reflected net of first lien mortgages. Capitalized leased assets are included in Book Value but excluded from Estimated Liquidation Proceeds.

- Other assets include prepaid assets, goodwill, patents, capitalized fees, pension and other assets. A value of $500,000 to $1.5 million was assigned to reflect license and other intangible assets associated with the Debtor's Brush business. Prepaid expenses are assumed to reduce administrative expenses that would otherwise be incurred by estate.

- Investments in foreign subsidiaries are valued at zero based on the European subsidiaries being in receivership.

- Trustee and other fees include Chapter 7 trustee fees, counsel for the trustee, etc.

|  | Book Value | Estimated Realization Percentages | | | Estimated Liquidation Proceeds | | |
|---|---|---|---|---|---|---|---|
|  |  | Low | Midpoint | High | Low | Midpoint | High |
| Accounts Receivable (a) | $ 20.5 | 85% | 90% | 95% | $ 17.5 | $ 18.5 | $ 19.5 |
| Inventory | 12.7 | 72% | 76% | 81% | 9.1 | 9.7 | 10.3 |
| Property Plant & Equipment (b) | 34.2 | 56% | 68% | 82% | 19.1 | 23.2 | 28.2 |
| Investments in Consolidated Subsidiaries | 47.0 | 0% | 0% | 0% | - | - | - |
| Other Assets | 13.9 | 4% | 7% | 11% | .5 | 1.0 | 1.5 |
| **Total Assets** | 128.3 | 36% | 41% | 46% | 46.1 | 52.3 | 59.4 |

*Cost to Dispose of Assets*

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Estimated Trustee and Other Fees | | | | | 2.1 | 2.1 | 2.2 |
| **Net Proceeds available for Secured Claims, Priority Claims, and Unsecured Claims** | | | | | 44.1 | 50.2 | 57.2 |

*Secured Claims (c)*

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Outstanding Dip Loan | 37.9 | | | | | | |
| Letters of Credit | 1.4 | | | | | | |
| Mezzanine Claim | 33.9 | | | | | | |
| Total Secured Claims | 73.2 | | | | (73.2) | (73.2) | (73.2) |
| Excess / (Deficiency) in satisfying Secured Claims | | | | | (29.1) | (23.0) | (16.0) |
| Percentage of Secured Claim Deficiency | | | | | -40% | -31% | -22% |

(a) Book value and estimated liquidation proceeds net of direct offsets for Whirlpool raw material debit memos and earned but unpaid rebates ($10.3 million as of 11/23/2002).

(b) Estimated liquidation proceeds are net of first lien mortgages ($4.5 million), selling and carrying costs ($.3 to $1.3 million). Capitalized leases are included in book value but are excluded from estimated liquidation proceeds.

( c) Secured claims (as of 11/23/2002) exclude real property first mortgage liens ($4.5 million) which are net of estimated liquidation proceeds from property, plant and equipment.

## ARTICLE 4.
## PROCEEDINGS IN THE CHAPTER 11 CASE

### 4.01    Commencement and Administration of the Case

The case was commenced with the filing of an involuntary petition on September 6, 2002. On September 17, 2002, the Debtor filed its assent to the involuntary petition, thereby converting this case to a voluntary case under Chapter 11. The Order for Relief was entered on September 24, 2002. Since the Debtors assented on September 17, 2002, the Case has been prosecuted through the filing and prosecution of a number of motions filed by various parties in interest seeking to protect their respective rights. While proceedings in this case have been extensive, the following is a description of the more significant matters to have come before the Court.

### 4.01.01      Approval of Employment of Debtor's Counsel

Pursuant to Section 327 of the Bankruptcy Code, the Court authorized the Debtor to employ the law firm of Oppenheimer, Blend, Harrison & Tate, Inc. as counsel for the Chapter 11 Debtor. As counsel for the Debtor, Oppenheimer, Blend, Harrison & Tate, Inc. is entitled to seek interim and final compensation from the Estate of Moll Industries, Inc. upon duly noticed application and after a hearing before the Court.

### 4.01.02      Appointment of Unsecured Creditors Committee

The United States Trustee, a division of the United States Department of Justice, appointed the Creditors' Committee in the case to represent the interests of the Unsecured Creditors of Moll Industries, Inc. During the course of the Debtor's Chapter 11 Case, the Creditors' Committee has met frequently to perform the duties prescribed under Section 1103 of the Bankruptcy Code.

Pursuant to Section 1103 of the Bankruptcy Code, the Court authorized the Creditors' Committee to employ the law firm of Akin, Gump, Strauss, Hauer & Feld, L.L.P. as its attorneys. As counsel to the Creditors' Committee, Akin, Gump, Strauss, Hauer & Feld, L.L.P. is entitled to seek interim and final compensation from the Estate of Moll Industries, Inc. upon duly noticed application and after a hearing before the Court.

### 4.01.03      First Day Orders

Contemporaneously with the filing of its assent, the Debtor also filed a number of "first day" motions on September 17, 2002, seeking various forms of expedited relief required in order to maintain uninterrupted operations. The following motions were among the relief sought by the Debtor in its first day motions:

- The DIP Financing Motion

Pursuant to the Debtor's Motion for an Interim Order (I) Authorizing the Debtor to (A) Obtain Post-petition Financing, (B) Grant Security Interest and Priority, and (C) Provide Adequate Protection to Pre-petition Secured Lenders and (II) Scheduling Final Hearing Pursuant to Bankruptcy Rule 4001 (the "DIP Financing Motion"), the Debtor sought authority, among other things, to obtain interim financing for its ongoing capital expenditures and working capital needs. An Emergency Interim Order granting the relief requested in the DIP Financing Motion was entered by the Court on September 19, 2002, and a Final Order granting such relief was entered by the court on October 15, 2002 (the "DIP Financing Order"). The terms and conditions of the Debtor-in-Possession financing are discussed more fully below.

- Motion for Authority to Pay Pre-Petition Wages and Employee Benefits

Pursuant to the Debtor's Motion for Authority to Pay Pre-petition Employee Salary, Wage, Benefit and Expense Reimbursement Obligations and to Continue Use of Pre-petition Payroll System (the "Employee Obligations Motion"), the Debtor sought authority, among other things, to pay certain pre-petition Claims for, among other things, salary, wages and other compensation paid by the Debtor to its employees in the ordinary course. An order granting the relief requested in the Employee Obligations Motion was entered by the Court on September 25, 2002.

- The Critical Vendor Motion

Pursuant to the Debtor's Motion for Order Authorizing Payment of Pre-petition Claims of Critical Vendors and Suppliers (the "Critical Vendor Motion"), the Debtor requested discretionary authority to make payments in the ordinary course of its business to certain critical vendors and suppliers. An order granting the relief requested in the Critical Vendor Motion was entered by the Court on September 19, 2002, and an amended order authorizing such relief was entered by the Court on September 24, 2002.

Pursuant to the Critical Vendor Motion, the Debtor paid in Cash or through recoupment of offsetting obligations more than $14,719,000 in pre-petition obligations owed to trade creditors whose goods or services were critical to the continued operations of the Debtor.

### 4.01.04     *Post-Petition Financing*

On September 17, 2002, the court entered interim orders authorizing the Debtor to enter into a Debtor-in-Possession Credit Facility, subject to a final hearing held on October 15, 2002. On October 15, 2002, the Court entered the DIP Financing Order approving the relief requested in the DIP Financing Motion. Under the terms of the DIP Financing Order, the Debtor obtained, from Foothill Capital Corporation, as agent for itself and certain lenders described therein, direct borrowings and a subfacility for letters of credit pursuant to the terms of that certain $50,000,000 Senior Secured, Super-Priority Debtor-in-Possession Loan and Security Agreement dated as of September 19, 2002 (the "DIP Credit Facility"). The credit facilities provided in the DIP Credit Facility supersede and replace in its entirety the indebtedness outstanding pursuant to the pre-petition Senior Credit Facility. As a result, the Senior Credit Facility described above has been replaced by the DIP Credit Facility.

In general, the DIP Credit Facility enables the Debtor to (i) finance the capital expenditure needs of the Debtor, (ii) fund ongoing working capital needs of the Debtor, (iii) pay certain pre-petition Claims and obligations outstanding as of the Petition Date on the basis described therein, (iv) pay, subject to the terms of the DIP Credit Facility and the Court's Final Order approving the DIP Motion, fees, costs, expenses, disbursements to Professionals retained by the Debtor, the U.S. Trustee's fees, the Official Committee of Unsecured Creditors, the costs and expenses of members of the Committee, as approved by the Court, and bankruptcy related charges as allowed by the Court and as permitted by the DIP Credit Facility, and (v) pay fees and expenses owed to the lenders under the DIP Credit Facility and other DIP Loan Documents.

Pursuant to the terms of the DIP Credit Facility, the Debtor is authorized to borrow up to an aggregate amount of $50,000,000, a portion of which shall be used to pay all amounts due as of the Petition Date with respect to the Debtor's pre-petition obligations owed to certain of the lenders named in the DIP Credit Facility, or affiliates thereof. The balance of the Debtor's borrowings under the DIP Credit Facility shall be for the operation of the Debtor's business in accordance with the availability and terms and conditions under the DIP Credit Facility and the Debtor's needs as set forth in the Debtor's budget of September 14, 2002.

Under its terms, the DIP Credit Facility expires on June 30, 2003. As of March 20, 2003, approximately $7.2 million (net of reserves and letters of credit) of the $50 million DIP Credit Facility remains available for the Debtor's use. Most of the credit extended under the DIP Credit Facility to date has been used to pay Critical Vendors, to pay the Whirlpool Rebate (discussed hereinbelow), to pay interest expenses to secured creditors and to pay reorganization expenses.

### 4.01.05    *Chief Restructuring Officer*

The Bankruptcy Court authorized the retention of Nightingale to serve as the Debtor's Chief Restructuring Officer (the "Nightingale Retention"). Pursuant to the Nightingale Retention, Michael R. D'Appolonia ("D'Appolonia"), the president and a principal of Nightingale, has been appointed as the Chief Restructuring Officer ("CRO") of the Debtor.

D'Appolonia's duties as CRO include:

- managing the business and affairs of the Debtor;

- developing, evaluating and implementing the Plan;

- negotiating with the Debtor's creditor constituencies, committees, customers and vendors;

- reviewing and directing the Debtor's financial and operating policies, plans and programs to ensure conformity with the budget prepared and submitted pursuant to the DIP Credit Facility; and

- reviewing and evaluating the Debtor's business to assess available cost-cutting measures to improve liquidity.

Nightingale's Professional Fees for the services to be provided to the Debtor are to be billed at a fixed rate of $125,000 per month, plus additional fees for "add on" services which are billed at an hourly rate, but it has been agreed that Nightingale's monthly fees will not exceed $150,000, on average for the duration of this case.

### 4.01.06    *Votis/Schiele Severance Agreements*

On September 17, 2002, the Debtor filed a motion seeking approval of a settlement between the Debtor, George T. Votis ("Votis"), and certain of the Debtor's pre-petition lenders. A similar settlement was presented to the Court with respect to Mr. Charles Schiele (the "Severance Motion"). The Severance Motion provided that the employment agreements between the Debtor and Messrs. Votis and Schiele would be rejected and replaced by severance agreements. In addition, Votis and Schiele would resign as officers of the Debtor, and in the case of Mr. Votis, as a director of the Debtor.

The proposed severance agreement with Votis (the "Votis Severance Agreement") provided that the Debtor would pay Votis severance compensation in the amount of $250,000 per year for three years and pay Votis up to $50,000 in payment of his personal attorneys' fees related to the negotiation of the Severance Agreement. In turn Votis agreed to: (i) provide consulting services to the Debtor; (ii) refrain from competing with the Debtor within the United States, the United Kingdom and France; and (iii) refrain from using or disclosing proprietary information of the Debtor. Finally, the Votis Severance Agreement provided for comprehensive mutual releases; provided, however, that Votis' release by the Debtor was capped at $1,500,000, and excluded any liabilities or obligations arising from fraud, misappropriation or defalcation. The Votis Severance Agreement would also release Votis from his obligations under his December 28, 2001, Guaranty of the Mezzanine Debt.

The proposed severance agreement with Charles Schiele ("Schiele") provided for the payment of $400,000 in severance payable in twelve (12) monthly installments. In turn Schiele agreed to: (i) provide consulting services to the Debtor; (ii) refrain from competing with the Debtor within the United States, the United Kingdom and France; and (iii) refrain from using or disclosing proprietary information of the Debtor. Finally, the Schiele Severance Agreement provided for comprehensive mutual releases; excluding liabilities or obligations arising from fraud, misappropriation or defalcation committed by Schiele.

The Votis and Schiele Severance Agreements were approved by the Court on an interim basis, subject to objections by the Creditors Committee required to be filed on or before January 14, 2003. Based on the agreements set out in the interim order, Votis resigned as a director and officer of the Debtor and Schiele has resigned as an officer but remains a director of the Debtor, and both remain as employees of the Debtor. The Committee has initiated its investigation into possible claims against Votis and Schiele and has timely filed its objection to the Votis and Schiele Severance Agreements. As part of the Plan, the Debtor intends to seek approval of the Schiele Severance Agreement, but not the Votis Severance Agreement.

### 4.01.07    *Key Employee Retention Program*

On November 12, 2002, the Court entered an order approving the Adoption of a Key Employee Retention Plan (the "KERP"). The KERP provides certain of the Debtor's key employees with financial incentives to both remain in their employment with the Debtor and to achieve certain financial goals of the Debtor.

### 4.01.08    Adoption of Severance Policy

On November 18, 2002, the Court entered orders approving the Debtor's adoption of its pre-petition severance policy.

### 4.01.09    Setting Claims Bar Date

On October 3, 2002, the Court approved the Debtors retention of Bankruptcy Services, LLC to serve as the Claims Agent and established December 13, 2002 as the Bar Date for filing proofs of Claim.

### 4.01.10    Post-Petition Assets Sales

The Debtor maintains a significant inventory of assets formerly employed in connection with discontinued operations. From time to time the Debtor has sought and obtained orders permitting the Debtor to consummate sales of limited specific assets. On January 2, 2003, the Court entered an Order establishing a protocol for the Debtor to sell assets valued at less than $100,000 without seeking further orders granting relief for each specific sale. The Debtor has employed that process to consummate the sale of small items of personal property from time to time. In addition, the Debtor has sought and obtained Court approval of a number of sales of real and personal property during the course of the case, including the following sales:

| Asset Description | Description | Sale Price *(Dollars in Thousands)* |
|---|---|---|
| Perinton Parkway Fairport, NY | 87.5 thousand sq ft, industrial building on 13.1 acres. | $ 2,600 |
| Davis Ave Morristown, TN | 179.1 thousand sq ft, multi-story manufacturing facility on 13.7 acres. | $425 |
| DeSoto Ave Morristown, TN | 122.3 thousand sq ft, manufacturing facility on 19.1 acres. | $900 |
| Davie, FL (pending) | 94.9 thousand sq ft warehouse on 5.0 acres. | $ 4,700 |
| Equipment Auction (Estimated Net recovery) | Various items of production related equipment | $800 |
| Brush Division | | $800 |
| | Total: | $10,225 |

### 4.01.11    Payment of the Whirlpool Rebate

On January 9, 2003, the Court entered an Order authorizing the Debtor to pay rebate payments due to Whirlpool Corporation under the terms of a supply agreement between the Debtor and Whirlpool Corporation. Whirlpool is the Debtor's largest customer. Under the existing Agreements between the parties, Whirlpool is entitled to a rebate based on gross sales volume by the Debtor to Whirlpool Corporation. The Court's order authorized the payment of a

rebate for the third quarter of 2002 in the amount of $3.31 million and a fourth quarter 2002 rebate payment in the approximate amount of $1.3 million.

### 4.01.12    Creditors Committee Investigation

Under the terms of the DIP Financing Order, the Debtor stipulated to the amount of the indebtedness owed to the DIP Lenders and the Mezzanine Lenders and to the validity and priority of their Liens. The Debtor also released the DIP Lenders and Mezzanine Lenders from any claims it may have held against them arising out of any pre-petition conduct. The DIP Financing Order permitted the Committee an opportunity to investigate the existence of any pre-petition claims against the DIP Lenders and Mezzanine Lenders and to contest their Liens and Claims. The Committee is required to assert such claims and objections not later than the earlier to occur of (i) February 12, 2003; or (ii) the last date set for filing objections to the Plan. The investigation deadline has been extended by the Court on two occasions at the request of the Committee and expires on March 21, 2003.

The Debtor has produced thousands of pages of documents to the Committee's counsel and provided it with the opportunity to interview numerous witnesses in furtherance of the Committee's investigation. Highland and its affiliates have also produced substantial amounts of documents and made witnesses available for deposition.

The Committee alleges that it has certain claims and causes of action relating to the conduct of the Mezzanine Lenders, particularly in the time frame from October 2001 through February 2002. The Committee filed pleadings with the Court seeking to retain counsel to pursue these alleged claims. Under the terms of the proposed contingency fee, counsel would receive 50% of any recoveries as its fee.

### 4.01.13    Highland Litigation

On February 19, 2003, Highland filed a preemptory lawsuit against the Debtor and the Committee seeking declaratory relief.  Generally, Highland's complaint requested that the Court find that Highland had not committed the types of actionable conduct which the Committee alleged as the basis of certain claims against Highland.

On March 21, 2003, the Committee through its Court approved special litigation counsel filed its answer and counterclaim to the Highland Litigation, asserting various counterclaims, including claims to recover alleged fraudulent conveyances and preferences, to equitably subordinate Highland's claims and seeking the disallowance of certain claims by Highland against the Debtor.

### 4.01.14    Plan Settlement Negotiations

Beginning in late March, the Debtor, Highland and the Committee meet on several occasions to attempt to mediate their disputes and arrive at a consensual plan of reorganization.

As a result of those settlement efforts, the parties were able to arrive at the a term sheet which is the foundation for the Plan. In light of the parties agreement to a consensual plan, the Highland Litigation has been abated pending the outcome of the Confirmation Hearing.

## 4.02    Operations during the Chapter 11 Case

As of the Petition Date, the Debtor maintained domestic production facilities in San Antonio, Texas; Austin, Texas; Ft. Smith, Arkansas; Seagrove, North Carolina; Newberg, Oregon; Fort Lauderdale, Florida; and LaVergne, Tennessee. In addition, the Debtor maintained sales and engineering offices outside of Atlanta, Georgia and in Evansville, Indiana. The Debtor also conducted operations internationally in France, the United Kingdom and Portugal through its subsidiaries, Moll France SARL and Moll Industries UK Limited, and maintained a small engineering office in Toronto, Canada through Moll's wholly owned subsidiary, Compression, Inc. Since the Petition Date, the nature and scope of the Debtor's foreign and domestic operations have changed.

### 4.02.01         Domestic Operations

In an effort to restructure its business affairs to meet the needs of its customers, enhance its profitability and return to its core competencies, the Debtor's management has determined to sell or close certain of its operations and facilities. A brief description of these changes in the Debtor's domestic operations is set forth below.

*Ft. Lauderdale, Florida* - In addition to serving as the corporate headquarters for Moll, the Debtor operated a production facility in Davie, Florida dedicated to the manufacture of brushes, telecommunications plastic parts, defense manufacturing and a number of other disparate injection molding operations. After an extensive review of the Debtor's operations, management came to the conclusion that the Debtor should divest itself of its operations in Davie, Florida and consolidate its corporate headquarters with its accounting and MIS functions located in LaVergne, Tennessee.

Moll announced the closing of the Davie plant in December 2002 and immediately began efforts to sell its brush division operations and the Davie, Florida facility. In March 2003, the Court approved a sale of the brush division to TEAM Technologies for $800,000. The Debtor has a contract with an party unrelated to TEAM to buy the Davie, Florida plant for a contract price of $4.7 million. Due to the existence of significant interest in that facility by a number of bidders, the Debtor has requested that the Court authorize an auction with regard to the Davie, Florida property. The Court has approved the auction which is to be conducted on May 9, 2003 at the Davie Florida property.

*Newberg, Oregon* - Before the company's 2002 bankruptcy filing, Moll's primary customer at its Newberg, Oregon facility decided to outsource all of its internal and external manufacturing to a multi-billion dollar, world-class contract manufacturer in the Far East. Moll worked out an agreement that allowed it to continue supplying the company until April 30, 2003, as it launched an aggressive campaign to replace this lost business. However, despite these

efforts, Moll can not continue to operate this facility profitably. The plant will close at the end of April 2003. The disposition of the plant's assets will be applied to the company's debt reduction.

*San Antonio and Austin, Texas* - During the course of its review of the Debtor's operations, the Debtor's management has also determined that its operations in San Antonio and Austin, Texas have been under performing due to under utilization and inefficiencies inherent in the facilities themselves. In order to maximize its return from its Texas operations, the Debtor has decided to close both the San Antonio and Austin Facilities and to consolidate the operations now conducted at those facilities to a new facility to be located in New Braunfels, Texas (the "New Braunfels Facility"). After careful analysis, the Debtor has concluded that the consolidation of the San Antonio Facilities and the Austin Facility into the New Braunfels Facility will enable the Debtor to operate the New Braunfels Facility at a higher capacity, thereby increasing the Debtor's net profit margins as compared with the operations now conducted at the San Antonio Facilities and the Austin Facility. The Debtor further believes that the overhead and other general and administrative expenses of a manufacturing facility to be located in New Braunfels, Texas will be less than similar expenses in either San Antonio or Austin, Texas, thereby enabling the Debtor to further reduce its operating expenses and increase its net profit margins on the operations of the existing facilities.

The Debtor has leased a building located in New Braunfels, Texas, containing approximately 102,940 square feet (the "Leased Premises"). The Leased Premises was previously occupied by Flextronics, a leading international electronics manufacturing services company. The Leased Premises was built and operated by Flextronics to manufacture engineered injection molded plastics products for Dell. Consequently, the Leased Premises is ideally suited for Moll's operations and of sufficient size that it will easily accommodate the Debtor's Austin and San Antonio operations while leaving room for future expansion. The Debtor anticipates completion of the relocation to New Braunfels in July of 2003.

### 4.02.02     Foreign Operations

Moll France, SARL - In September, 2002, Moll France was placed in administration proceedings in France. The Debtor's interest in Moll France is of no economic value to this Bankruptcy Estate.

Compression, Inc. - Located in Toronto Canada, Compression, Inc. employed approximately 10 people involved in the design and engineering of injection molded products. Due the reduction in domestic operations many of the services provided by Compression, Inc. became redundant. Consequently, in December 2002, Moll's management decided to discontinue the operations of Compression, Inc.

Moll Industries, UK Limited ("Moll UK") - Moll UK undertook extensive restructuring efforts, including management changes, plant closings, and headcount reductions after a top down evaluation of its operations and expense structure in early 2002. Moll UK pursued grants from the British government and the Debtor evaluated making inter-company loans in an effort to provide Moll UK with desperately needed working capital. Ultimately, Debtor's management determined that prospect for a long term return of Moll UK was sufficiently uncertain that the

Debtor could not justify the inter-company loan. Lacking sufficient operating capital, in November 2002, Moll UK was placed into administration proceedings in the United Kingdom. The Debtor's interest in Moll UK is of no economic value to this Bankruptcy Estate.

## ARTICLE 5.
## SUMMARY OF THE DEBTOR'S PLAN

### 5.01    Explanation of Chapter 11

Chapter 11 is the principal reorganization chapter of the Bankruptcy Code. Under Chapter 11, an attempt is made to restructure a debtor's financial affairs so that the debtor can continue its business operations and repay its creditors according to restructured terms. Reorganization under Chapter 11 normally implies a restructuring of the debtor's business operations and obligations to restore the debtor to economic vitality. The Chapter 11 plan is the debtor's agreement with its creditors containing the terms and conditions for the operation or liquidation of the properties and assets of the debtor and the treatment of the Claims and interests of creditors and parties-in-interest.

According to Section 1125 of the Code, acceptances of a Chapter 11 plan may be solicited by the debtor only after a written disclosure statement approved by the Bankruptcy Court as containing adequate information has been provided to each creditor or equity interest holder.

### 5.02    Summary of the Plan

The Plan provides for the emergence of Moll Industries, Inc. from Chapter 11 and the continuation of the Debtor's core business operations. During the pendency of the Chapter 11 case, the Debtor's operations have been streamlined through: (i) the elimination of certain unprofitable affiliates; (ii) the discontinuation of non-core operating divisions; (iii) the consolidation of plants and operations to enhance operating profit margins; (iv) the monetization of surplus equipment and (iv) the reduction of overhead expenses. Certain of these efforts begun during the Chapter 11 case will continue post-confirmation.

Upon the Effective Date, the existing Equity Interests in the Debtor will be cancelled and ownership of Reorganized Moll will be controlled by the Mezzanine Lenders who will receive distributions of ninety percent of the issued and outstanding Reorganized Moll Common Stock in partial satisfaction of their Allowed Claims. The remainder of the Reorganized Moll Common Stock will be reserved for distribution to management pursuant to a Stock Incentive Plan which will be implemented by Reorganized Moll post-confirmation.

All Allowed Administrative Claims against the Debtor will be paid in full under the Plan. The obligations to the DIP Lenders will be paid through exit financing in the form of an Exit Financing Term Loan and an Exit Financing Revolving Credit Facility. The Exit Financing Revolving Credit Facility will provide the Debtor with sufficient liquidity to meet its obligations

under the Plan. The Debtor believes that the Mezzanine Lenders' Secured Claim is in the approximate amount of $25 million based upon the value of the collateral securing that claim. The Mezzanine Lenders' Secured Claim will be paid through the issuance of a restructured note which is in the reduced amount of $24 million, together with the issuance of 90% of the Reorganized Moll Common Stock. Moreover, the restructured Mezzanine Debt will provide for reduced interest and more favorable payment terms, thereby enhancing Reorganized Moll's cash flow going forward.

During the pendency of the Chapter 11 Case, the Debtor paid more than $14.7 million in critical vendor Claims. At the outset of the Case, the Debtor anticipated sufficient cash flow to support a higher valuation of the Debtor's assets and operations and to sustain greater payments to Creditors under the Plan. However, during the pendency of the Chapter 11 Case, the Debtor has suffered customer losses affecting both its top line and bottom line revenue estimates and anticipates further revenue reductions from discontinued operations. Based upon the Debtor's anticipated level of sales and resulting EBITDA going forward, the Debtor believes its enterprise value and cash flow are insufficient to permit any meaningful distributions to Unsecured Creditors, in the absence of the compromises agreed to between the Debtor, Highland, and the Committee reflected in the Plan.

The compromises agreed to by the Debtor, the Committee and Highland have allowed the Debtor to propose a Plan which provides significantly greater value to all Unsecured Creditors. The Plan treatment of Highland's Mezzanine Debt reflects a compromise of the treatment such claims would otherwise be entitled to, in the following respects:

- The Mezzanine Debt is being compromised from approximately $33 million to $24 million;

- The payment terms provided for the Mezzanine Debt in the Plan represent significant compromises both in terms of (i) interest rate (the Plan provides for interest on the Mezzanine Debt of only 8% per annum as compared to a market rate which ranges from 18% to 25% for similar mezzanine funding) and (ii) amortization (the Plan provides for only a balloon payment 63 months after the Effective Date); and

- The Mezzanine Lenders are accepting the Plan treatment in full satisfaction of their Claims, representing a forgiveness of approximately $8 million of indebtedness.

- The Mezzanine Lenders have accepted the forgoing compromises in the treatment of their Claims notwithstanding the inclusion terms in the Plan which transfer considerable value to Unsecured Creditors and which may not be confirmable without the consent of the Mezzanine Lenders. These Plan terms include the following:

  o The payment on the Effective Date of $1.5 million by the Debtor to Class 9 Senior Unsecured Note Claim holders in full satisfaction of their Claims;

o    The Debtor's assumption of the SERP Amended Plan which will provide approximately $1 million in net present value payments to SERP Allowed Claims, to be funded from Reorganized Moll's operating cash flow;

o    The Debtor's assumption of its two defined pension benefit plans, to be funded from Reorganized Moll's operating cash flow;

o    The Debtor's agreement to fund up to $50,000 in Professionals Fees and expenses to prosecute the Avoidance Actions assigned to the Litigation Trust for the benefit of Class 8 General Unsecured Creditors; and

o    The guaranty by the Debtor of a minimum recovery of $1 million from Avoidance Actions to be paid to Class 8 General unsecured Creditors.

The Debtor believes that the recoveries afforded Unsecured Creditors under the Plan are considerably greater than would be attainable without a complete victory in the Highland Litigation. Highland disputes the validity of the claims asserted by the Committee in the Highland Litigation and has demonstrated its intent to aggressively and vigorously defend itself against those claims. Accordingly, no assurances could be given that prosecution of the Highland Litigation would result in any recovery to Unsecured Creditors. Moreover, continued prosecution of the Highland Litigation would seriously jeopardize the continuing viability of the Debtor by impairing the Debtor's ability to bid on new contracts or even retain existing contracts with current customers. Consequently, continued prosecution of that litigation was "an all or nothing proposition."

As a result of the Highland Settlement, the Plan provides for payment of $1.5 million from the Exit Financing to be paid to the Class 9 Senior Unsecured Note Claim holders in full satisfaction of their Claims. Holders of SERP Allowed Claims will be paid from an amended retirement plan to be adopted by Reorganized Moll. The SERP Amended Plan will pay approximately $1 million in present value to Class 7 creditors over time.

The Plan proposes to distribute Avoidance Action Proceeds to Class 8 Unsecured Creditors, up to a maximum of $2 million. The Plan treatment of Class 7 and Class 9 claims enhances the recoveries to Class 8 General Unsecured Claims by reducing the amount of Claims in Class 8. More importantly, the Debtor intends to assume its two defined benefit pension plans. By doing so, the Debtor is avoiding the realization of significant claims by the Pension Benefit Guaranty Corporation ("PBGC"), a United States wholly-owned government corporation and agency of the United States. The PBGC asserts that these claims are entitled to priority claim status which would be entitled to payment before any distributions are made to Class 8 Creditors. If the Debtor rejected the pension plans, the claims of the PBGC would consume substantially all, if not all, of the Avoidance Action Proceeds, leaving no recovery to Class 8 Creditors.

**5.03    Terms of the Plan Control**

The following represents the Debtor's best efforts to describe the treatment afforded the Claims of the Creditors in various Classes. Creditors should be aware that the terms of the Plan control the treatment of all Claims. In the event of any inconsistencies between the Plan and this Disclosure Statement, the terms of the Plan shall be, in all events, determinative. The Debtor urges all Creditors to read the Plan for a complete understanding of the treatment of their Claims.

**5.04    Classification and Treatment of Claims and Interests**

The Bankruptcy Code requires that a plan group creditors in Classes with other creditors holding similar Claims or interests. The Code provides little guidance as to how to classify Claims other than to prohibit the placement of creditors with dissimilar Claims in the same class. Generally, every creditor holding a Secured Claim is separately classified in recognition of the fact that each secured creditor's rights are different from every other creditor. Creditors whose Claims and rights are similar are generally grouped into the same class of Claims. Certain types or groups of creditor are not classified for treatment under the Plan. The Classification of Claims under the Plan is reflected in the table below.

| Class | Designation | Impairment | Entitled to Vote | Treatment |
|---|---|---|---|---|
| N/A | Administrative Expense Claims | N/A | No | Payment in full on the Effective Date or on other agreed terms.<br><br>Estimated Recovery: Full recovery |
| N/A | Administrative Trade Claims | N/A | No | Paid in accordance with existing terms.<br><br>Estimated Recovery: Full recovery |
| N/A | Professional Fee Claims | N/A | No | Paid in full in Cash on Allowance or on other agreed terms.<br><br>Estimated Recovery: Full recovery |
| N/A | Priority Tax Claims and Priority Secured Tax Claims | N/A | No | Paid in full in Cash on Allowance or on other agreed terms.<br><br>Estimated Recovery: Full recovery |
| **Class 1** | Priority Non-Tax Claims | Unimpaired | No (deemed to accept) | Paid in full in Cash on Allowance, in accordance with existing terms, or on other agreed terms.<br><br>Estimated Recovery: Full recovery |
| **Class 2** | Claims of G.E. Capital | Impaired | Yes | Paid through cure and reinstatement of exiting instruments, with elimination of pre-payment penalty provisions.<br><br>Estimated Recovery: Full recovery |
| **Class 3** | Claims of LICOGA | Impaired | Yes | Paid through cure and reinstatement of exiting instruments, with elimination of pre-payment penalty provisions.<br><br>Estimated Recovery: Full recovery |
| **Class 4** | Claims of DIP Lenders | Unimpaired | No (deemed to accept) | Paid in full through Exit Financing.<br><br>Estimated Recovery: Full recovery |
| **Class 5** | Claims of Mezzanine Lenders | Impaired | Yes | Paid in full through issuance of $24 million note and 90% of Reorganized Moll Common Stock.<br><br>Estimated Recovery: 100% of Secured Claim |
| **Class 6** | Miscellaneous Secured Claims | Impaired | Yes | Paid through (i) cure and reinstatement of existing instruments, (ii) in cash upon the Effective Date, or (iii) on other agreed terms.<br><br>Estimated Recovery: Full recovery |
| **Class 7** | SERP Allowed Claims | Impaired | Yes | Reorganized Moll will adopt the SERP Amended Plan which will pay $1 million in net present value to Class 7 Creditors over time.<br><br>Estimated Recovery: Holders of SERP Allowed Claims will receive approximately 32% of the value of their original benefits over time. |

| Class 8 | Unsecured Creditors | Impaired | Yes | Will receive a Pro Rata Share of Avoidance Action Proceeds distributed every six months after the Effective Date. Reorganized Moll will pay up to $50,000 in professionals fees to prosecute Avoidance Actions (which are refundable after recovery of $1 million in Avoidance Action Proceeds). Reorganized Moll will guaranty minimum Avoidance Action Proceeds of $1 million to be paid in semi annual installments over two years. Total distributions from Avoidance Action Proceeds shall not exceed $2 million. |
| | | | | Estimated Recovery: Total Class 8 Claims are estimated to be approximately $7 to $9 million. Class 8 Creditors are estimated to receive from 11% to 20% of their Allowed Claims over two years. |
| Class 9 | Senior Unsecured Note Claims | Impaired | Yes | Will receive a Pro Rata Share of $1.5 million in cash distributed on the later to occur of (i) 10 days after the Effective Date; or (ii) execution and delivery of the Highland Release. |
| | | | | Estimated Recovery: Approximately 17.5%. |
| Class 10 | Subordinated Unsecured Note Claims | Impaired | No (deemed to reject) | Subordinated Unsecured Note Claims are contractually subordinated to the Claims of Class 9 Creditors (among others) and are not entitled to receive any distributions until Class 9 Claims are paid in full. Since Class 9 Claims are not being paid in full, Class 10 Creditors shall receive nothing on account of their Claims. |
| | | | | Estimated Recovery: No recovery |
| Class 11 | Equity Interest Holders | Impaired | No (deemed to reject) | All equity interests in the Debtor will be canceled on the Effective Date and Class 11 Equity Interests shall receive nothing on account of their interests. |
| | | | | Estimated Recovery: No recovery |

## 5.05 Unclassified Administrative Expenses and Priority Tax Claims

The Plan provides for payment in full in Cash of the Allowed Administrative Claims in this Case. These Administrative Claims include costs and expenses incurred in connection with reorganization, such as trade and certain other Claims arising subsequent to the commencement of this Chapter 11 Case, as well as attorneys', accountants' and consultants' fees allowed by the Court.

### 5.05.01 General

Except as otherwise provided for herein, on, or as soon as reasonably practicable after, the later of (i) thirty (30) days after the Effective Date, or (ii) thirty (30) days following the date

of a Final Order determining and Allowing such Claim as an Administrative Expense Claim, each holder of an Allowed Administrative Expense Claim shall receive in full satisfaction, settlement, and release of and in exchange for such Allowed Administrative Expense Claim: (a) Cash equal to the unpaid portion of such Allowed Administrative Expense Claim, or (b) such other treatment as to which Reorganized Moll and such holder shall have agreed upon in writing.

Administrative Trade Claims. Administrative Trade Claims will be paid by Reorganized Moll consistent with past practices and in accordance with the terms and conditions of the particular transaction giving rise to such Administrative Trade Claim, without any further action by the holders of such Administrative Trade Claims.

Professional Fee Claims. Professional Fee Claims shall be paid in full on the later of (i) thirty (30) days after the Effective Date, or (ii) thirty (30) days following the date of a Final Order determining and Allowing such Claim as a Professional Fee Claim. In the alternative, Professional Fee Claims may be paid on such other terms as may be agreed upon between the Debtor and the holder of such Claim

Statutory Fees. On or before the Effective Date, Administrative Expense Claims for fees payable pursuant to 28 U.S.C. Section 1930, as determined by the Bankruptcy Court at the Confirmation Hearing, will be paid in Cash equal to the Allowed amount of such Administrative Expense Claims. All fees payable pursuant to 28 U.S.C. Section 1930 subsequent to the Confirmation Date will be paid by the Reorganized Debtor in accordance therewith until the entry of a Final Decree.

Claims Under the DIP Credit Facility. On the Effective Date, the Debtor shall pay or arrange for the payment of all amounts outstanding under the DIP Credit Facility according to the terms of the DIP Credit Facility and the DIP Financing Order. Once such payments have been made, the DIP Credit Facility shall be deemed terminated.

Priority Tax Claims and Priority Secured Tax Claims. Except to the extent that a holder of an Allowed Priority Tax Claim or Priority Secured Tax Claims and the Debtor agree to a different treatment, each holder of an Allowed Priority Tax Claim or Priority Secured Tax Claims will receive in full satisfaction of such Claim, Cash payments from Reorganized Moll over a period not exceeding six (6) years from the date of assessment of the Priority Tax Claim or Priority Secured Tax Claims. Payments by Reorganized Moll provided for herein shall be made in equal monthly installments with the first payment due sixty (60) days after the Effective Date. Interest shall accrue on the Priority Tax Claim or Priority Secured Tax Claims at a rate equal to the federal judgment rates in effect as of the Confirmation Date. All Allowed Priority Tax Claims and Priority Secured Tax Claims that are not due and payable on or before the Effective Date shall be paid in the ordinary course of business as such obligations become due.

### 5.05.02        *Bar Dates for Administrative Expense Claims*

General Bar Date Provisions - The holder of an Administrative Expense Claim, ***other than*** (i) Professional Fee Claims; (ii) Priority Tax Claims; (iii) Priority Secured Tax Claims; (iv) Claims Under the DIP Credit Facility; (v) Administrative Trade Claims; and (vi) statutory fee Claims must file with the Bankruptcy Court and serve on the Debtor and its counsel no later than

thirty (30) days after the Confirmation Date, a request for payment of the Administrative Expense Claim. Such request for payment must conform to the requirements provided for in the Bankruptcy Code and Bankruptcy Rules and at a minimum identify the name of the claimant, the nature of and basis for the Claim, and the amount of the Claim. Holders of Administrative Expense Claims required to file a request for payment hereunder who fail to Timely File and serve a request for payment will be forever barred from asserting such Administrative Expense Claims against the Debtor, the Reorganized Debtor and their respective property, and such Administrative Expense Claims shall be deemed discharged as of the Effective Date. An Administrative Expense Claim will be Allowed if no objection is filed within thirty (30) days after filing and service of a request for payment. If an objection is filed to the Allowance of an Administrative Expense Claim, such Claim shall become an Allowed Administrative Expense Claim only to the extent Allowed by a Final Order.

Bar Dates for Certain Administrative Expense Claims

(a)     Administrative Trade Claims - Holders of Administrative Trade Claims are not required to file or serve any request for payment of such Administrative Claims.

(b)     Professional Fee Claims - Each holder of a Professional Fee Claim incurred before the Effective Date shall be required to file with the Bankruptcy Court, and serve upon all parties required to receive notice, an application for final allowance of such Claim within thirty (30) days after the Effective Date. The failure to Timely File a Professional Fee Claim or other application shall result in the Professional Fee Claim being barred and discharged. Timely Filed Professional Fee Claims shall be Allowed only to the extent Allowed by Final Order. Notwithstanding the forgoing, any Professional retained pursuant to orders of the Court permitting the Debtor to retain "ordinary course professionals" may continue to receive compensation and reimbursement of expenses pursuant to the terms of such order without further review or approval. Any Professional's Fee Claim incurred subsequent to the Effective Date by the (i) Reorganized Debtor, or (ii) the Litigation Trust, to the extent payment is provided for in the Plan, may be paid without application to the Bankruptcy Court.

(c)     Claims Under the DIP Credit Facility - Holders of Administrative Claims under or evidenced by the DIP Credit Facility will not be required to file or serve any request for payment of such Claims. Such Claims will be satisfied pursuant to Section 4.4 of the Plan.

(d)     Priority Tax Claims and Priority Secured Tax Claims - Holders of Priority Tax Claims and Priority Secured Tax Claims must file Claims on or before the Bar Date established in the Bar Date Order.

## 5.06    Classification and Treatment of Classified Claims and Interests

### 5.06.01      Class 1 - Priority Non Tax Claim

On or as soon as reasonably practicable after the Effective Date, to the extent not already paid, each holder of an Allowed Claim in Class 1 shall receive Cash in the amount of the

claimant's Allowed Claim, except to the extent that: (i) the holder of a Class 1 Claim and the Debtor agree to different treatment; or (ii) existing agreements between the Debtor and the holder of a Class 1 Claim (or in the case of employee Claims, policies of the Debtor) provide for payment of such Allowed Claims on different terms, such Claims shall be satisfied in accordance with those pre-existing agreements or policies.

### 5.06.02    *Class 2 - Allowed Secured Claims of GE Capital*

The Class 2 Creditor is the owner and holder of a note secured by a first deed of trust Lien upon the Debtor's Austin, Texas plant. The value of the Class 2 Creditor's Collateral exceeds the indebtedness to the Class 2 Creditor. According to the Debtor's books and records, the Debtor was current under the terms of the GE Capital Mortgage Financing Agreements as of the Petition Date, except for the September 2002 payment. During the pendency of the Case, the Debtor has paid all post-petition installments due to the Class 2 Creditor under the terms of its debt instruments. The approximate balance due to the Class 2 Creditor as of the Petition Date was $2,351,000.

Under the terms of the Plan, the Class 2 Creditor shall retain its Lien upon the Collateral securing its Claim. The pre-petition obligations to the Class 2 Creditor shall be cured and reinstated in accordance with the terms and conditions of the GE Capital Mortgage Financing Agreements, however, those Agreements shall be modified to eliminate the contractual pre-payment penalty.

The cure due under the GE Capital Mortgage Financing Agreements, including, but not limited to penalty interests and reasonable attorney's fees (the "Class 2 Cure Claim") shall be paid on the date such Claim becomes and Allowed Claim. The Allowed amount of the Class 2 Cure Claim will be determined as follows:

Determination of Cure Amounts - The Class 2 Claimant must file with the Bankruptcy Court and serve on the Debtor and its counsel no later than thirty (30) days after the Confirmation Date a request for payment of the Class 2 Cure Claim. Such request for payment must conform to the requirements provided for in the Bankruptcy Code and the Bankruptcy Rules and, at a minimum, identify the name of the claimant, the nature of and basis for the Claim, and the amount of the Claim. If the Class 2 Claimant fails to Timely File and serve a request for payment of the Class 2 Cure Claim, such Claim will be forever barred against the Debtor, Reorganized Moll and their respective property, and such Class 2 Cure Claim shall be deemed discharged as of the Effective Date. A Class 2 Cure Claim that is Timely Filed will be Allowed if no objection is filed within thirty (30) days after filing and service of a request for payment. If an objection is filed to the Allowance of a Class 2 Cure Claim, such Claim shall become an Allowed Class 2 Cure Claim only to the extent Allowed by a Final Order.

### 5.06.03    *Class 3 - Allowed Secured Claims of LICOGA*

The Class 3 Creditor is the owner and holder of a note secured by a first deed of trust Lien upon the Debtor's Ft. Lauderdale, Florida plant. The value of the Class 3 Creditor's

Collateral exceeds the indebtedness to the Class 3 Creditor. According to the Debtor's books and records, the Debtor was current under the terms of the LICOGA Mortgage Financing Agreements as of the Petition Date, except for the September 2002 payment. During the pendency of the Case, the Debtor has paid all post-petition installments due to the Class 3 Creditor under the terms of its debt instruments. The approximate balance due to the Class 3 Creditor as of the Petition Date was $2,254,000.

Under the terms of the Plan, the Class 3 Creditor shall retain its Lien upon the Collateral securing its Claim. The pre-petition obligations to the Class 3 Creditor shall be cured and reinstated in accordance with the terms and conditions of the LICOGA Mortgage Financing Agreements, however, those Agreements shall be modified to eliminate the contractual pre-payment penalty.

The cure due under the LICOGA Mortgage Financing Agreements, including, but not limited to penalty interests and reasonable attorney's fees (the "Class 3 Cure Claim") shall be paid on the date such Claim becomes and Allowed Claim. The Allowed amount of the Class 3 Cure Claim will be determined as follows:

Determination of Cure Amounts - The Class 3 Claimant must file with the Bankruptcy Court and serve on the Debtor and its counsel no later than thirty (30) days after the Confirmation Date a request for payment of the Class 3 Cure Claim.  Such request for payment must conform to the requirements provided for in the Bankruptcy Code and the Bankruptcy Rules and, at a minimum, identify the name of the claimant, the nature of and basis for the Claim, and the amount of the Claim.  If the Class 3 Claimant fails to Timely File and serve a request for payment of the Class 3 Cure Claim, such Claim will be forever barred against the Debtor, Reorganized Moll and their respective property, and such Class 3 Cure Claim shall be deemed discharged as of the Effective Date.  A Class 3 Cure Claim that is Timely Filed will be Allowed if no objection is filed within thirty (30) days after filing and service of a request for payment.  If an objection is filed to the Allowance of a Class 3 Cure Claim, such Claim shall become a Class 3 Cure Claim only to the extent Allowed by a Final Order.

### 5.06.04        *Class 4 - Allowed Secured Claims of DIP Lenders*

The Secured Claims of the DIP Lenders, together with any Administrative Expense Claims of the DIP Lenders, shall be fully and finally satisfied from the proceeds of the Exit Financing Revolving Credit Facility and the Exit Financing Term Loan.

### 5.06.05        *Class 5 - Allowed Claims of Mezzanine Lenders*

On the Effective Date, the Class 5 Creditors shall receive the Reorganized Mezzanine Term Note and 90% of the authorized Reorganized Moll Common Stock in full satisfaction of all Claims of the Class 5 Creditors. The Reorganized Mezzanine Term Note and related security documents shall contain the following terms:

Initial Principal Balance: $24 million

Maturity: The Reorganized Mezzanine Term Note shall mature on the first (1st) day of the sixty-third (63rd) month following the Effective Date (the "Maturity Date").

Interest Rate: The Reorganized Mezzanine Term Note shall provide for interest at LIBOR (as defined in the Mezzanine Financing Agreements) plus six percent (6%).

Payment Terms: The Reorganized Mezzanine Term Note shall provide for semiannual payments of interest only at a rate of LIBOR plus three percent (3%) in Cash, commencing on the first day of the seventh month following the Effective Date. Any accrued interest not paid in Cash shall be added to the principal amount of the Reorganized Mezzanine Term Note and shall bear interest as provided in the Reorganized Mezzanine Term Note. All obligations under the Reorganized Mezzanine Term Note shall be due and payable on the Maturity Date.

Collateral: With respect to the obligations evidenced by the Reorganized Mezzanine Term Note, the Mezzanine Lenders shall retain their Liens on any Collateral upon which the Mezzanine Lenders held a valid, perfected and enforceable pre-petition Liens and upon which they were granted Liens pursuant to the terms of the DIP Financing Order.

### 5.06.06    Class 6 - Allowed Secured Claims of Miscellaneous Secured Creditors

For the purpose of voting and receiving distributions under the Plan, each holder of an Allowed Class 6 Claim is considered to be in its own separate subclass within Class 6, and each subclass is deemed to be a separate Class for purposes of the Plan.

Retention of Liens - The holders of Allowed Secured Class 6 Claims shall retain Liens upon their Collateral, except as is otherwise provided herein.

Treatment - On the Effective Date, the Debtor shall elect, at its option, one of the following alternative treatments for each Class 6 Creditor:

a.    Abandonment - Within thirty (30) days following the Effective Date, Reorganized Moll may abandon or surrender to the holder of such Allowed Secured Claim in Class 6 the Collateral securing such Allowed Secured Claim.  Any Deficiency Claim asserted by a holder of an Allowed Secured Claim in Class 6 shall be filed with the Bankruptcy Court within thirty (30) days following the date of the surrender or abandonment of such Creditor's Collateral.  If the Class 6 Claimant fails to Timely File and serve a Class 6 Deficiency Claim, such Class 6 Deficiency Claim will be forever barred against the Debtor, Reorganized Moll and their respective property, and such Class 6 Deficiency Claim shall be deemed discharged as of the Effective Date.  A Class 6 Deficiency Claim that is Timely Filed will be Allowed if no objection is filed within thirty (30) days after filing and service of such Class 5 Deficiency Claim.  If an objection is filed to the Allowance of a Class 6 Deficiency Claim, such Claim shall become an Allowed Class 6 Deficiency Claim only to the extent Allowed by a Final Order.  Any such Allowed Class 6 Deficiency Claim shall be treated as a Class 8 Claim.

b.    Cash - On the Effective Date, or as soon thereafter as is reasonably practicable, Reorganized Moll may pay to the holder of an Allowed Class 6 Claim Cash equal to the amount

of the Allowed Class 6 Secured Claim or such lesser amount to which the holder of such Claim and Reorganized Moll shall agree. Such payment shall be in full satisfaction and release of such Claim. Upon the payment to the holder of an Allowed Class 6 Claim by Reorganized Moll, any Lien related to such Allowed Secured Claim shall be deemed released and terminated.

      c.      Cure/Reinstatement - Notwithstanding the occurrence of any event of default in performance of the Debtor's obligations to the holder of a Class 6 Claim, the Class 6 Claim shall be satisfied in full by the reinstatement of the Class 6 Claim on the pre-default terms or such obligations. Reorganized Moll shall cure all defaults occurring before or after the Filing Date, other than defaults of a kind specified in Section 365(b)(2) of the Bankruptcy Code. The cure payment due to the holder of a Class 6 Claim, including, but not limited to penalty interests and attorneys' fees (the "Class 6 Cure Claim"), shall be paid on the date such Claim becomes an Allowed Claim. The Class 6 Claimant must Timely File with the Bankruptcy Court and serve on the Debtor and its counsel no later than thirty (30) days after the Confirmation Date a request for payment of the Class 6 Cure Claim. Such request for payment must conform to the requirements provided for in the Bankruptcy Code and Bankruptcy Rules and at a minimum identify the claimant, the nature of and basis for the Claim, and the amount of the Claim. If the Class 6 Claimant fails to Timely File and serve a request for payment of the Class 6 Cure Claim, such Claim will be forever barred against the Debtor, the Reorganized Debtor and their respective property, and the Class 6 Cure Claim shall be deemed discharged as of the Effective Date. The Class 6 Cure Claim will be Allowed if no objections are filed within thirty (30) days after filing and service of a request for payment. If an objection is filed to the Class 6 Cure Claim, such Claim shall become an Allowed Claim only to the extent Allowed by a Final Order.

      d.      Mutual Agreement - The holder of an Allowed Class 6 Secured Claim may be treated in accordance with the terms and conditions of any agreement entered into by the Debtor and the holder of such Claim with respect to such Claim.

### 5.06.07      *Class 7 - SERP Allowed Claims*

The Allowed Claim of each holder of an Allowed Class 7 Claim shall be satisfied in its entirety by the implementation of the SERP Amended Plan and holders of Class 7 Claims will receive distributions according to the terms of the SERP Amended Plan.

In the Event the Litigation Trust recovers in excess of $2 million in Avoidance Action Proceeds, the Litigation Trustee shall distribute all Avoidance Action Proceeds in excess of $2 million to Reorganized Moll for deposit into a segregated, interest bearing account, dedicated exclusively to funding payments to Class 7 Claims pursuant to the terms of the SERP Amended Plan.

The SERP Amended Plan modifies the SERP in several respects which are outlined in the discussion below.  Generally, the SERP Amended Plan is intended to afford holders of SERP Allowed Claims to realize, over time,  30% of the total benefits which would have been available under the SERP.

The most significant modification to the SERP by the SERP Amended Plan are as follows:[8]

Elimination of Early Retirement - Retirement benefits are only available after age 65

Adjustment of Lifetime Benefit - Benefits are payable for 15 years.

Reduction of Normal Monthly Benefits – Benefits are reduced to 32% of the Normal Monthly Benefit.

Adjustment for Benefits Paid to Date - In the event that payments have already commenced to a participant, the Lifetime Benefit will be reduced by the number by the number of months for which the participant has previously received payments. The reduced Lifetime Benefit will be deducted from the end of the benefit period.

Based upon these adjustments to the SERP in the SERP Amended Plan, the Debtor projects that holders of SERP Allowed Claims would receive the benefits set forth in the following table.

---

[8] You should read the SERP Amended Plan in its entirety before voting on the Plan. The summary description contained in this Disclosure Statement is not intended to replace a careful and detailed review and analysis of the SERP Amended Plan by each holder of a claim or interest. The summary of the SERP Amended Plan contained in the Disclosure Statement is qualified in its entirety by reference to the SERP Amended Plan.

| | (a) Total Proj. Benefit | (b) Proj. Annual Benefit YR - 65 | (c) =b/12 Proj. Mon Benefit YR - 65 | (d) = (c)* 180 Lifetime Benefit | (e) Payments Already Made | (f) = (d) - (e) Remaining Total Lifetime Benefits | (g) = (f)*adj. Estimated Remaining Total Adj. Lifetime Benefits | (h) = (c) * adj. Estimated Adj. Monthly Benefits | (i) = (g)/(h) Remaining Months of Payments | (j) = (g)/(a) % Recovery |
|---|---|---|---|---|---|---|---|---|---|---|
| **Last Name** | | | | | | | **32.0%** | **32.0%** | | |
| Nugent | 2,719,200 | 123,604 | 10,300 | 1,854,060 | 576,818 | 1,277,242 | 408,717 | 3,296 | 124.0 | 15.0% |
| Kyker | 1,833,077 | 79,699 | 6,642 | 1,195,485 | 208,231 | 987,254 | 315,921 | 2,125 | 148.6 | 17.2% |
| Olmsted | 1,186,848 | 65,936 | 5,495 | 989,040 | 208,797 | 780,243 | 249,678 | 1,758 | 142.0 | 21.0% |
| Parkey | 1,101,685 | 64,805 | 5,400 | 972,075 | 233,643 | 738,432 | 236,298 | 1,728 | 136.7 | 21.4% |
| Viglione | 607,245 | 40,483 | 3,374 | 607,245 | - | 607,245 | 194,318 | 1,080 | 180.0 | 32.0% |
| Best | 471,705 | 31,447 | 2,621 | 471,705 | - | 471,705 | 150,946 | 839 | 180.0 | 32.0% |
| Epley | 378,540 | 25,236 | 2,103 | 378,540 | - | 378,540 | 121,133 | 673 | 180.0 | 32.0% |
| deRohan | 361,815 | 24,121 | 2,010 | 361,815 | - | 361,815 | 115,781 | 643 | 180.0 | 32.0% |
| Jones | 323,955 | 21,597 | 1,800 | 323,955 | - | 323,955 | 103,666 | 576 | 180.0 | 32.0% |
| Etter | 292,620 | 19,508 | 1,626 | 292,620 | - | 292,620 | 93,638 | 520 | 180.0 | 32.0% |
| Cavalari | 188,175 | 12,545 | 1,045 | 188,175 | - | 188,175 | 60,216 | 335 | 180.0 | 32.0% |
| Pignatelli | 180,780 | 12,052 | 1,004 | 180,780 | - | 180,780 | 57,850 | 321 | 180.0 | 32.0% |
| Simon | 158,400 | 10,560 | 880 | 158,400 | - | 158,400 | 50,688 | 282 | 180.0 | 32.0% |
| Valerian | 154,860 | 10,324 | 860 | 154,860 | - | 154,860 | 49,555 | 275 | 180.0 | 32.0% |
| Scholle | 148,395 | 9,893 | 824 | 148,395 | - | 148,395 | 47,486 | 264 | 180.0 | 32.0% |
| Hendricks | 136,095 | 9,073 | 756 | 136,095 | - | 136,095 | 43,550 | 242 | 180.0 | 32.0% |
| Vocak | 128,910 | 8,594 | 716 | 128,910 | - | 128,910 | 41,251 | 229 | 180.0 | 32.0% |
| Herlitze | 123,105 | 8,207 | 684 | 123,105 | 24,730 | 98,375 | 31,480 | 219 | 143.8 | 25.6% |
| Shannon | 115,695 | 7,713 | 643 | 115,695 | - | 115,695 | 37,022 | 206 | 180.0 | 32.0% |
| Lail | 93,272 | 7,175 | 598 | 107,625 | 29,985 | 77,640 | 24,845 | 191 | 129.9 | 26.6% |
| Franz | 106,680 | 7,112 | 593 | 106,680 | - | 106,680 | 34,138 | 190 | 180.0 | 32.0% |
| Williams | 105,570 | 7,038 | 587 | 105,570 | - | 105,570 | 33,782 | 188 | 180.0 | 32.0% |
| Owens | 102,630 | 6,842 | 570 | 102,630 | - | 102,630 | 32,842 | 182 | 180.0 | 32.0% |
| Allen | 102,405 | 6,827 | 569 | 102,405 | - | 102,405 | 32,770 | 182 | 180.0 | 32.0% |
| Sherman | 82,500 | 5,500 | 458 | 82,500 | - | 82,500 | 26,400 | 147 | 180.0 | 32.0% |
| Wisser | 79,035 | 5,269 | 439 | 79,035 | - | 79,035 | 25,291 | 141 | 180.0 | 32.0% |
| Walker | 62,805 | 4,187 | 349 | 62,805 | - | 62,805 | 20,098 | 112 | 180.0 | 32.0% |
| Fassler | 70,538 | 4,072 | 339 | 61,080 | 19,986 | 41,094 | 13,150 | 109 | 121.1 | 18.6% |
| Price | 60,240 | 4,016 | 335 | 60,240 | - | 60,240 | 19,277 | 107 | 180.0 | 32.0% |
| Lail | 59,790 | 3,986 | 332 | 59,790 | - | 59,790 | 19,133 | 106 | 180.0 | 32.0% |
| Cox | 58,515 | 3,901 | 325 | 58,515 | - | 58,515 | 18,725 | 104 | 180.0 | 32.0% |
| Johnson | 57,555 | 3,837 | 320 | 57,555 | - | 57,555 | 18,418 | 102 | 180.0 | 32.0% |
| Hopkins | 51,825 | 3,455 | 288 | 51,825 | - | 51,825 | 16,584 | 92 | 180.0 | 32.0% |
| Mack | 68,616 | 3,431 | 286 | 51,465 | 14,295 | 37,170 | 11,894 | 91 | 130.0 | 17.3% |
| Carper | 46,155 | 3,077 | 256 | 46,155 | - | 46,155 | 14,770 | 82 | 180.0 | 32.0% |
| Smith | 44,100 | 2,940 | 245 | 44,100 | - | 44,100 | 14,112 | 78 | 180.0 | 32.0% |
| Behun | 29,988 | 2,499 | 208 | 37,485 | 8,747 | 28,738 | 9,196 | 67 | 138.0 | 30.7% |
| Villegas | 4,785 | 319 | 27 | 4,785 | - | 4,785 | 1,531 | 9 | 180.0 | 32.0% |
| **Totals** | $11,898,109 | $670,880 | $55,907 | $10,063,200 | $1,325,232 | $8,737,968 | $2,796,150 | $17,890 | 156.3 | 23.5% |

### 5.06.08      *Class 8 - Allowed Claims of General Unsecured Creditors*

Class 8 consists of the Claims of all Unsecured Creditors except for SERP Allowed Claims, Senior Unsecured Note Claims and Subordinated Unsecured Claims. Based upon the Debtor's review of the Schedules and the Proofs of Claim on file, the Debtor anticipates that General Unsecured Claims will range from $7 million to $9 million[9].

Under the Plan, the Debtor will assign the right to recoveries from Avoidance Actions to a Litigation Trust which will be managed for the benefit of Class 8 Creditors by a Litigation Trustee. The Litigation Trustee is to be selected jointly by the Debtor, the Class 5 Creditors and the Committee. The Litigation Trustee is subject to oversight for certain functions by the

---

[9] The ultimate dollar amount of General Unsecured Claims depends primarily upon the amount recovered from Avoidance Actions. Under the Code, a party who returns a preference or other avoidable transfer to the Estate may be entitled to an Unsecured Claim equal to the amount of the avoided transfer.

Litigation Trust Committee.  The Litigation Trust Committee consist of two members, one selected by the Committee and one selected by the Class 5 Creditors.

Reorganized Moll will provide initial funding to the Litigation Trust by paying reasonable Professionals Fees and expenses incurred in the prosecution of the Avoidance Actions in an amount not to exceed $50,000.  The actual amount funded by Reorganized Moll will be reimbursed by the Litigation Trust from the first dollars recovered after the Litigation Trust recovers $1 million in Avoidance Action Proceeds.

Reorganized Moll will also guaranty a minimum of $1 million in Avoidance Action Proceeds to be paid in semi annual installments of not less than $250,000.  The Litigation Trust will distribute Avoidance Action Proceeds to Class 8 Creditors beginning on the first Business Day of the first month following six months after the Effective Date and shall continue every six months thereafter until all Avoidance Action Proceeds, not to exceed $2 million, have been distributed.  Reorganized Moll will pay the difference between the amount of Avoidance Action Proceeds to be distributed in each of the first four semi annual distributions to Class 8 Creditors and $250,000.

Prior to each semi annual distribution date, the Litigation Trustee and Reorganized Moll shall reconcile the actual amount of Avoidance Action Proceeds with the amount paid by Reorganized Moll and determine any amount due from Reorganized Moll under its guaranty or due to Reorganized Moll for over payment under its Class 8 guaranty.  Essentially, Reorganized Moll is insuring that Class 8 Creditors will receive not less than $1 million in distributions from Avoidance Action Proceeds in semi-annual installments over two years of not less than $250,000.

In the event total Avoidance Action Proceeds exceed $2 million, any additional Avoidance Action proceeds over that amount shall be paid to Reorganized Moll for deposit into a segregated, dedicated account for payment to Class 7 Creditors under the terms of the SERP Amended Plan.

In addition to the Avoidance Actions, the Debtor will also assign the Votis Claims to the Litigation Trust on the Effective Date.  Prosecution of the Votis Claims will be undertaken on a contingency fee basis and will not be paid by Reorganized Moll or from the Avoidance Action Proceeds.   Recoveries by the Litigation Trust from the Votis Claims are excluded from the $2 million cap in Avoidance Actions and are not considered in connection with the $1 million guaranty by Reorganized Moll.

The Litigation Trustee shall establish and maintain appropriate reserves for costs of prosecution of the Avoidance Actions and for distributions on account of Class 8 Disputed Claims.  Distributions to Class 8 Disputed Claims shall be made on the first distribution date after such claim becomes an Allowed Class 8 Claim.

A description of the potential Avoidance Action claims is contained in Section 7.09 below.  The Debtor estimates that the Avoidance Action Proceeds will be in a range from $1.5

million to $2.0 million.  Based upon this range of recoveries and the estimated Class 8 Claims, distributions to Class 8 Creditors are estimated to be from 11% to 20% over two years.

### 5.06.09        *Class 9 – Senior Unsecured Note Claims*

Class 9 consists of the holders of Allowed Senior Unsecured Note Claims.  Each holder of an Allowed Class 9 Claim shall receive a Pro Rata Share of $1.5 million in Cash paid on the later to occur of (i) 10 days after the Effective Date; or (ii) execution of and delivery to counsel for Highland of a Highland Release.  Distributions to holders of Allowed Class  9 Claims will be funded from the  Exit Financing Revolving Credit Facility.

### 5.06.10        *Class 10 – Subordinated Unsecured Note Claims*

Holders of Allowed Class 10 Claims shall not be entitled to receive or retain any rights, property or distributions under the Plan.  Class 10 Creditors are impaired and are deemed to reject the Plan.  Under the terms of the Subordinated Unsecured Notes and the governing indenture, the Claims of Class 10 Creditors are expressly subordinated to the Claims of certain "senior indebtedness".  The senior indebtedness includes at least the Claims of the Class 9 Creditors.  That indenture further provides that the Class 10 Claims assign any rights to any recoveries on their Claims to the Class 9 Creditors (and other senior indebtedness) until those Claims are paid in full.

Under the Plan, Class 9 Creditors are not being paid in full.  Accordingly, Class 10 Creditors are not entitled to receive any distributions under the Plan or under the terms of the agreements and instruments evidencing their Claims.

### 5.06.11        *Class 11 - Equity Interest Holders*

Holders of Equity Interests in the Debtor shall not receive or retain any rights, property or distributions under the Plan.  All Equity Interests in the Debtor shall be extinguished as of the Effective Date   Class 11 Creditors are impaired and are deemed to reject the Plan.

### 5.06.12        *Dissolution of the Committee*

The Committee shall cease to exist after the Effective Date except for the following limited purposes: (a) to participate in matters related to implementation and consummation of the Plan for a period not to exceed ten (10) days after the Effective Date and (b) to review, prepare and prosecute Professional Fee Claims and objections thereto.

### 5.06.13        *Discharge of Claims and Cancellation of Equity Interests*

The rights afforded in the Plan and the payments and distributions to be made thereunder are in complete exchange for, and in full satisfaction and release of, all existing Claims, Equity

Interests, debts and obligations of any kind, nature or description whatsoever of or against the Debtor or any of its assets or property to the fullest extent permitted under Section 1141 of the Bankruptcy Code. Upon the Effective Date, all existing Claims against and Equity Interests in the Debtor and Reorganized Moll shall be and shall be deemed to be discharged. All holders of Equity Interests and Claims shall be precluded from asserting against the Debtor, or any of its assets or property, any other or further Claim based upon any act or omission, transaction or other activity of any kind or nature that occurred prior to the Effective Date, whether or not such holder filed a proof of Claim or proof of interest. Upon the Effective Date, the Debtor shall be deemed discharged and released from any and all Equity Interests and Claims, including, but not limited to, demands and liabilities that arose before the Effective Date, and all debts of the kind specified in Sections 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not (i) a proof of Claim or Interest based upon such obligation is filed or deemed filed under Section 501 of the Bankruptcy Code; (ii) a Claim or Interest based upon such debt is Allowed under Section 502 of the Bankruptcy Code; or (iii) the holder of a Claim or Interest based upon such debt has accepted the Plan. Except as provided herein, the Confirmation Order shall be a judicial determination of discharge of all liabilities of the Debtor and Reorganized Moll. In accordance with Section 524 of the Bankruptcy Code, the discharge provided for hereunder shall void any judgment against the Debtor to the extent it relates to a Claim discharged, and operates as an injunction against the prosecution of any action against the Debtor or its Property to the extent it relates to a discharged Claim or Equity Interest.

### 5.06.14    Injunction

Except as otherwise provided in the Plan, the Confirmation Order shall provide, among other things, that from and after the Confirmation Date, all Persons or entities who have held, hold, or may hold Claims against or Equity Interests in the Debtor are permanently enjoined from taking any of the following actions against the Estate, Reorganized Moll, the Committee, or any of their property on account of any such Claims or Equity Interests:  (i) commencing or continuing, in any manner or in any place, any action or other proceeding; (ii) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order; (iii) creating, perfecting or enforcing any Lien or encumbrance; and (iv) commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of the Plan; provided, however, that nothing contained herein shall preclude such Persons from exercising their rights pursuant to and consistent with the terms of the Plan.

### 5.06.15    Plan Releases and Exculpation

None of the Debtor, Reorganized Moll, the Committee, Highland or any of their respective members, officers, directors, employees, agents, advisors or Professionals have or may incur any liability to any holder of a Claim or Equity Interest, or any other party in interest, or any of their respective members or former members, agents, employees, representatives, financial advisors, attorneys or affiliates, or any of their successors or assigns, for any act or omission in connection with, relating to or arising out of the Chapter 11 Case, the negotiation and pursuit of confirmation of the Plan, the consummation of the Plan or the administration of the Plan (the "Chapter 11 Activities"), except for their acts or omissions constituting willful misconduct or gross negligence, as finally determined by a court of competent jurisdiction, and

in all respects are entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities in connection with the Chapter 11 Activities. No holder of a Claim, Equity Interest or any other party in interest, including their respective agents, employees, representatives, financial advisors, attorneys or affiliates, have any right of action against the Debtor, the Committee or Reorganized Moll, Highland or any of their respective officers, directors, members, employees, agents, advisors or Professionals for any act or omission in connection with the Chapter 11 Activities, except for their acts or omissions constituting willful misconduct or gross negligence as finally determined by a court of competent jurisdiction.

Except for the Votis Claims, as of the Effective Date, the Debtor shall be deemed to have released its current and prior directors and officers from any claims or causes of action the Debtor may have against such parties, unless such claims or causes of action arise out of acts or omissions by such parties constituting willful misconduct or gross negligence.

### 5.06.16    Indemnification Obligations

Nothing in the Plan, including the discharge or release of the Debtors, diminishes or impairs the enforceability of any obligation of the Debtor to indemnify, reimburse or limit the liability of any Person, including but not limited to any officer or director of the Debtor, or any agent, Professional or financial advisor, relating to any acts or omissions occurring subsequent to the Petition Date and such obligations shall be assumed by Reorganized Moll.

### 5.06.17    Injunction

Except as otherwise provided in the Plan, the Confirmation Order shall provide, among other things, that from and after the Confirmation Date, all Persons or entities who have held, hold, or may hold Claims against or Equity Interests in the Debtor are permanently enjoined from taking any of the following actions against the Estate, Reorganized Moll, the Creditors' Committee, or any of their property on account of any such Claims or Equity Interests: (i) commencing or continuing, in any manner or in any place, any action or other proceeding; (ii) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order; (iii) creating, perfecting or enforcing any Lien or encumbrance; and (iv) commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of the Plan; provided, however, that nothing contained herein shall preclude such Persons from exercising their rights pursuant to and consistent with the terms of the Plan.

## ARTICLE 6.
## MANAGEMENT OF THE REORGANIZED DEBTOR

### 6.01    Board of Directors of the Reorganized Debtor

The Board of Directors of Reorganized Moll shall initially consist of three (3) members. The directors of the Debtor immediately prior to the Effective Date shall continue to serve immediately after the Effective Date as interim directors of the Reorganized Debtor. Until such

time as the holders of the Reorganized Moll Common Stock elect a new Board of Directors (but in no event more than 60 days after the Effective Date) the interim Board of Directors shall continue to serve in their capacity as directors of Reorganized Moll. The Debtor anticipates that the holders of the Reorganized Moll Common Stock will chose to elect new directors after the Effective Date.

The present Board of Directors of the Debtor consists of the following individuals:

*Charles B. Schiele.* Mr. Schiele served as President, Assistant Secretary and as a Director of the Debtor prior to the Petition Date. As described below, Mr. Schiele his position as an officer of the Debtor effective November 9, 2002. Prior to joining Anchor, Mr. Schiele served as Executive Vice President of Alcoa's Closure Systems International Division, a global packaging company since 1994. Mr. Schiele served as President of HC Industries, Regional Manager for the Americas, and Global Manager, Plastic Closures from 1984 to 1993.

*William W. Teeple.* Mr. Teeple has served as Chief Financial Officer and Assistant Secretary of the Debtor since May 2000. Mr. Teeple was selected to serve as a Director of the Debtor on September 16, 2002. Prior to joining the Debtor, he was the Chief Financial Officer of The Stackpole Corporation from 1988 to 1998 and Chief Financial Officer of Stackpole Limited from 1993 to 1998, Vice President of the Computer Products Group from 1984 to 1988 and Chief Financial Officer from 1983 to 1984 of Nashua Corporation. Prior to 1982, he was with the Monsanto Company (1977-1982) and International Paper Company (1970-1977).

*Michael D'Appolonia.* Mr. D'Appolonia is the President and a principal with Nightingale. Mr. D'Appolonia was retained by the Debtor to serve as its Chief Restructuring Officer. Mr. D'Appolonia's retention by, and role with, the Debtor was approved by the Court and he has served in that capacity since September 18, 2002. Mr. D'Appolonia was appointed to the Board of Directors to fill the vacancy created upon Mr. Votis' resignation.

## 6.02 <u>Senior Management of the Reorganized Debtor</u>

The officers of Reorganized Moll immediately prior to the Effective Date shall continue to serve immediately after the Effective Date as interim officers of the Reorganized Debtor in their respective capacities. They shall continue to serve at existing salaries and benefits until such time as the reconstituted Board of Reorganized Moll negotiates other arrangements.

The present senior officers of the Debtor include the following individuals:

*William W Teeple.* Mr. Teeple has served as Chief Financial Officer and Assistant Secretary of the Debtor since May 2000.

*Michael D Appolonia.* Mr. D'Appolonia has served as Chief Restructuring Officer of the Debtor since September 2002.

*David A. Strickland.* Mr. Strickland has over 8 years experience at the management level in the plastics industry. Prior to becoming Senior Vice President of the Debtor in February 2000, Mr. Strickland was Vice President, Manufacturing of the Debtor beginning in November 1998. Mr. Strickland was Plant Manager with Sunbeam Consumer Products from 1995 to 1998, was Manager, Operations - Tupperware North America from 1994 to 1995, and became a Plant Manager in 1992 with Ampex Recording Media Corporation after holding a variety of positions within that organization.

*Ron Embree.* Mr. Embree joined Moll in 1990. Mr. Embree has played a major role in the company's growth with Whirlpool as well as within Moll's Ft. Smith, Nashville and, most recently, Texas plants. Embree has over 20 years of manufacturing experience, and 14 years of direct injection molding experience. His manufacturing experience is in industries as diverse as frozen pizza to missiles. He has held management positions in quality, production, planning and scheduling, and distribution with companies such as Moll Industries, Texas Instruments, Pillsbury, Masco Industries and Fuller Brush.

### 6.03    Reorganized Moll Stock Incentive Plan

Within one hundred twenty (120) days after the Effective Date, Reorganized Moll shall adopt and implement the Reorganized Moll Stock Incentive Plan. That plan will provide for the distribution of shares of Reorganized Moll Common Stock representing in the aggregate up to 10.0% of the authorized Reorganized Moll Common Stock on a fully diluted basis to selected management of Reorganized Moll in accordance with a stock incentive plan, which will be adopted by the new Board of Directors of Reorganized Moll.

**ARTICLE 7.**
**IMPLEMENTATION OF THE PLAN**

### 7.01    Means for Execution of Plan

The Debtor shall continue to exist as Reorganized Debtor after the Effective Date in accordance with applicable state laws and pursuant to the certificate of incorporation and by-laws in effect prior to the Consummation Date, except to the extent such certificate of incorporation and bylaws are amended under this Plan.

After the Effective Date, the Reorganized Debtor shall continue in business and shall carry on its business affairs without consultation or approval from the Bankruptcy Court or the Creditors. The Reorganized Debtor shall be free to use or sell its assets, hire and compensate professionals and otherwise operate free of the restrictions, limitations and constraints existing under the Code. The Reorganized Debtor shall operate in conformity with the Plan and shall make distributions to Creditors timely and in accordance with the Plan.

The source of Cash for all payments under the Plan shall be (i) Reorganized Moll's Cash balances; (ii) Cash generated from operations; (iii) borrowings under the Exit Financing Agreements; (iv) Avoidance Action Proceeds; and (iv) recoveries from the Votis Claims.

**7.02    Exit Financing**

The Plan proposes that all Claims of Class 4 Creditors shall be fully and finally satisfied from the proceeds of the Exit Financing Revolving Credit Facility and the Exit Financing Term Loan. A copy of the term sheet with the Exit Financing Lender is attached to the Disclosure Statement as Exhibit 3.  The Debtor anticipates the initial advances on the Effective Date necessary to pay the Class 4 Claim will be $32 million, plus reserves of an additional $1.2 million on account of outstanding letters of credit.  The Exit Financing Revolving Credit Facility, will provide the Debtor with up to $15 million in credit availability upon the Effective Date which will be available to fund other required payments at consummation of the Plan and for general corporate purposes, including on-going capital expenditures of Reorganized Moll.

**7.03    Vesting of Assets**

On the Effective Date, all Property of the Estate of the Debtor, including, but not limited to any rights or causes of action, whether under the Bankruptcy Code or any other applicable law, shall vest in Reorganized Moll, except for Avoidance Actions and the Votis Claims which shall be assigned to the Moll Industries Litigation Trust (the "Litigation Trust").  Upon any conversion of the Bankruptcy Case to Chapter 7, all assets vesting in Reorganized Moll or the Litigation Trust shall pass to the Chapter 7 trustee as property of the Chapter 7 Bankruptcy Estate.

**7.04    Preservation of Debtor's Claims**

Any and all causes of action which the Debtor may have, including, but not limited to Avoidance Actions, or which may be enforceable under any statute, shall be preserved and shall constitute Property of the Estate.  On the Effective Date, the Avoidance Actions and the Votis Claims shall be assigned to the Litigation Trust for the benefit of Class 8 Claims.  All other claims and causes of action of the Debtor shall be conveyed to Reorganized Moll on the Effective Date.  The Court shall retain jurisdiction to determine all such causes of action.

**7.05    Creation of the Moll Industries Litigation Trust**

The Litigation Trust, a trust for the benefit of holders of Class 8 Claims, shall be formed on or before the Effective Date.  The trustee of the Litigation Trust (the "Litigation Trustee") is hereby authorized, subject to the terms of the Litigation Trust Agreement to do the following:

a)    commence and/or prosecute the Avoidance Actions and the Votis Claims;

b) make all disbursements of proceeds of the Litigation Trust to the holders of Class 8 Claims in the manner and to the extent required by the Plan;

c) perform such other duties as set forth in the Litigation Trust Agreement; and

d) hire such Professionals as the Litigation Trustee deems necessary to carry out the Litigation Trustee's responsibilities as set forth in this Plan and the Litigation Trust Agreement.

### 7.05.02      *Standing of the Litigation Trust*

In addition to the Litigation Trust being the assignee of the Avoidance Actions and Votis Claims, the Litigation Trust shall be deemed to be a successor-in-interest to the Committee and shall have standing on behalf of the holders of Class 7 Claims and Class 8 Claims to enforce the rights granted them under this Plan.

### 7.05.03      *Governance of the Litigation Trust*

The Litigation Trust will be governed by the Litigation Trust Agreement which shall be filed with the Bankruptcy Court as part of the Plan Supplement. The Litigation Trust will be governed by a Litigation Trust Committee initially consisting of three members, the Litigation Trustee, one representative designated by the Committee and one representative designated by Reorganized Moll. Succession of Litigation Trust Committee members shall be in accordance with the Litigation Trust Agreement. Litigation Trust Committee members will not be compensated, although they will be entitled to reimbursement for their out-of-pocket expenses.

### 7.05.04      *Administration of the Litigation Trust*

The Litigation Trust will be administered by a Litigation Trustee to be selected jointly by the Debtor, the Committee and Highland and approved by the Court at or prior to the Confirmation Hearing. All major decisions including, but not limited to, the retention of and the fee arrangements with Professionals and the commencement, continuation, settlement, trial or appeal of claims by or against third parties, will be decided by the Litigation Trust Committee.

### 7.05.05      *Funding of the Litigation Trust*

All fees and costs incurred by the Litigation Trust shall be paid by the Litigation Trust. The Trust Committee shall have the authority to: (a) establish a reserve from time to time not to exceed $100,000, (unless the Litigation Trust Committee agrees to a higher amount by unanimous vote of its members), for the anticipated costs of the Litigation Trust out of any funds recovered by the Litigation Trust and (b) approve any and all disbursements by the Litigation Trustee.

### 7.05.06    *Initial Funding of the Litigation Trust*

Reorganized Moll shall advance an aggregate amount not to exceed $50,000 to the Litigation Trust to pay for the initial costs of prosecuting the Avoidance Actions, if, as and when such fees and expenses are due and payable by the Litigation Trust.  The Litigation Trust shall reimburse to Reorganized Moll the amounts actually advanced to the Litigation Trust pursuant to this Section upon the recovery by the Litigation Trust of $1 million in Avoidance Action Proceeds from the next $50,000 in Avoidance Action Proceeds.

### 7.05.07    *Protection of the Litigation Trustee and the Trust Committee*

Neither the Litigation Trustee nor the Trust Committee members will be liable for their actions or omissions unless such actions constitute gross negligence, willful misconduct or criminal acts.  The Litigation Trust shall be authorized to defend and indemnify the Litigation Trustee and any Trust Committee member to the fullest extent provided by law.  The Litigation Trustee shall reserve for any costs or expenses incurred or to be incurred by the Litigation Trust in defending or indemnifying the Litigation Trustee or the Trust Committee pursuant to this paragraph.  Any such costs or expenses paid out of a reserve or other funds of the Trust shall reduce on a Pro Rata basis the total Allowed Claims in Class 8 remaining to be paid.

## 7.06    Implementation of the Settlement Agreements.

### 7.06.01    *Highland Settlement*

The distributions provided for in the Plan reflect compromises between Highland and the Committee, acting on behalf of the Estate, for the benefit of all other classes of creditors, pursuant to Fed. R. Bankr. P. 9019.  In consideration for Highland's compromise and settlement embodied in this Plan, and sufficient and valuable consideration being received by the Debtor and the Estate, upon the Effective Date, the Debtor shall be deemed to have released Highland, its affiliates, officers, directors, employees, professional advisors and agents from any and all demands, claims and causes of action, whether  known or unknown, which it has or may have arising out of any conduct, transaction or occurrence between Highland or its affiliates and the Debtor.  Within ten days after the Effective Date, the Committee, Highland and Reorganized Moll shall file an agreed stipulation order with the Court dismissing the Highland Litigation with prejudice.

### 7.06.02    *Schiele Settlement*

On the Effective Date, Reorganized Moll shall be authorized to take any and all actions to implement the Schiele Severance Agreement. The Plan incorporates the settlement with Schiele proposed in the Schiele Severance Agreement attached as Exhibit A to the Plan.  The Debtor believes that the Schiele Settlement should be approved pursuant to Fed. R. Bankr. P. 9019 because the Settlement prohibits Schiele from competing with the Debtor and soliciting its employees through December 31, 2003.  Mr. Schiele, the former Chief Executive Officer of the

Debtor, has formed relationships with the Debtor's key customers and its key employees. During the period immediately following the Effective Date, while Reorganized Moll rebuilds its credibility and confidence with both the marketplace and its employees, Mr. Schiele's agreement not to compete and not to solicit employees is valuable.

### 7.07 <u>Treatment of Executory Contracts and Unexpired Leases</u>

#### *7.07.01 Executory Contracts and Leases Not Expressly Assumed are Rejected*

Upon the Effective Date, the Debtor assumes all customer and vendor supply contracts and all intellectual property license agreements in which the Debtor is the licensee and which have not previously been terminated, rejected or expired. All other Executory Contracts which existed as of the Filing Date between the Debtor and any individual or entity, whether such contracts be in writing or oral, which: (i) have not heretofore either been assumed or rejected by Final Order or (ii) are the subject of a separate motion to assume or reject filed under Section 365 of the Bankruptcy Code by the Debtor prior to the Confirmation Date are hereby (a) *rejected, unless listed on Exhibit C* as specifically assumed. Exhibit C may be modified by the Debtor from time to time until the commencement of the confirmation hearing.

#### *7.07.02 Cure of Defaults*

Except to the extent that a different treatment has been agreed to by the non-debtor parties to any Executory Contract or Unexpired Lease to be assumed pursuant to this Article of the Plan, the Debtor shall cure any monetary defaults pursuant to Section 365(b)(1) of the Bankruptcy Code by payment by Reorganized Moll of the Cure Claim in Cash on the Effective Date. In the event of a dispute regarding: (i) the amount of the Cure Claim, (ii) the ability of Reorganized Moll to provide adequate assurance of future performance under the contract or lease to be assumed, or (iii) any other matter pertaining to assumption, the Cure Claim shall be paid by Reorganized Moll following the entry of a Final Order resolving the dispute and approving assumption.

#### *7.07.03 Determination of Cure Claims*

The Debtor shall, pursuant to Section 1123(a)(5)(G) and 1123(b)(2) of the Bankruptcy Code and consistent with Section 365 of the Bankruptcy Code, file and serve a pleading with the Court, within thirty (30) days after the Confirmation Date, listing the Cure Claims of all Executory Contracts or Unexpired Leases to be assumed. The non-debtor parties to such Executory Contracts and Unexpired Leases to be assumed by the Debtor shall have fifteen (15) days from service to object to the proposed Cure Claim identified by the Debtor. The Debtor shall retain its right to reject any of its Executory Contracts and Unexpired Leases, including contracts or leases that are subject to a dispute concerning the amount of the Cure Claim, until five (5) Business Days following the entry of an order resolving an objection to the amount of the Cure Claim.

### 7.07.04    *Pension Plans*

The Debtor currently sponsors two defined benefit retirement plans: the Anchor Advanced Products, Inc. Salaried Pension Plan ("the Salaried Plan"), and the Anchor Advanced Products, Inc. Hourly Pension Plan ("the Hourly Plan "). The two plans (collectively "Pension Plans") are tax-qualified defined benefit pension plans covered by Title IV of the Employee Retirement Income Security Act of 1974 ("ERISA"), *as amended,* 29 U.S.C. §§ 1301-1461.

Title IV of ERISA is administered by the Pension Benefit Guaranty Corporation ("PBGC"), a United States wholly-owned government corporation and agency of the United States. PBGC has the statutory authority to seek involuntary termination of covered pension plans under certain circumstances. With respect to both Pension Plans, PBGC has filed against the Debtor the following claims: (a) unliquidated claims for unfunded benefit liabilities, under 29 U.S.C. § 1362(b); (b) unliquidated claims for minimum funding contributions under 29 U.S.C. § 1362(c), with respect to, and on behalf of the Pension Plans; and (c) unliquidated claims for statutory premiums owed under 29 U.S.C. §§ 1306 and 1307. PBGC's claims for unfunded benefit liabilities and minimum funding contributions are contingent upon termination of the Pension Plans.

On the Effective Date, the Debtor will assume the Pension Plans as ongoing Pension Plans which will survive the bankruptcy reorganization proceeding. Accordingly, Reorganized Moll will, thereby, retain and assume all obligations required of a sponsor of these Pension Plans under applicable law. Should the Pension Plans terminate, PBCG reserves its rights to assert any claims it may hold against the Debtor and to pursue its legal remedies against non-debtors.

### 7.07.05    *Bar Date for Claims Relating to Executory Contracts Rejected Pursuant to the Plan*

Any Person or entity claiming rights under an Executory Contract or Unexpired Lease rejected pursuant to the provisions of this Article shall have thirty (30) days after the Effective Date to file a proof of Claim asserting any Claims arising out of the rejection of such Executory Contract or Unexpired Lease. Failure to timely and properly file a proof of Claim for rejection Claims shall result in the disallowance of such Claims and such Claims shall be deemed discharged as of the Effective Date.

## 7.08    Cancellation of Equity Interests and Issuance of Reorganized Moll Common Stock

On the Effective Date, the certificates that previously evidenced ownership of the existing Equity Interests and the rights of the holders of the existing Equity Interests shall be canceled and shall be null and void. The holders thereof shall have no rights and such certificates shall evidence no rights. Under the Plan, Reorganized Moll will issue 100,0000 shares of $.01 par value common stock (the "Reorganized Moll Common Stock"). Ninety percent (90%) of the Reorganized Moll Common Stock will be distributed to the Class 5 Creditor in partial

satisfaction of its Claims. The balance of the stock shall be reserved for issuance in accordance with the terms of the Reorganized Moll Stock Incentive Plan.

## 7.09    Claims and Causes of Action

### 7.09.01        *Notice to Creditors that All Claims are Preserved*

**ALL CLAIMS OF THE BANKRUPTCY ESTATE ARE BEING PRESERVED AND TRANSFERRED TO REORGANIZED MOLL OR TO THE LITIGATION TRUST UNDER THE PLAN.**

Any and all causes of action which the Debtor may have, including, but not limited to Avoidance Actions and the Votis Claims, or which may be enforceable under any statute, shall be preserved and shall constitute Property of the Estate to be conveyed to Reorganized Moll or to the Litigation Trust as in accordance with the Plan.  The Court shall retain jurisdiction to determine all such causes of action. The Litigation Trust shall have exclusive standing to prosecute, abandon, settle or release Avoidance Actions and the Votis Claims for the benefit of Class 8 Creditors.

**YOU MAY BE SUED IF:**

i)    You were or are a creditor and you received a payment on a prior debt within ninety (90) days before the Petition Date;

ii)    You were an insider of the Debtor and you received a payment on a prior debt within one (1) year before the Petition Date;

iii)    You received any payments or property from the Debtor for goods or services you did not deliver or provide before the Petition Date;

iv)    You received any payments of property from the Debtor without providing reasonably equivalent value;

v)    You received pre-payments, advances or deposits from the Debtor which you did not earn;

vi)    You were an officer or director of the Debtor and you breached your fiduciary duties;

vii)    You were involved in pending litigation with the Debtor at the time of the Petition Date;

viii)   You owe the Debtor any money under a contract or as a result of your breach of contract with the Debtor;

ix)   Potential claims against you or any of your affiliates are described or referred to in this Disclosure Statement; or

x)   The Debtor has any claims against you under state or federal law, whether in contract or in tort, whether known or unknown.

### 7.09.02     *General Description of Significant Claims*

The following is a general discussion of the type and nature of claims and causes of action of the Estate:

NOTE: THE FOLLOWING DISCUSSION IS NOT INTENDED TO BE EXHAUSTIVE AND SHALL NOT LIMIT OR MODIFY ANY CLAIMS OR CAUSES OF ACTION OF THE ESTATE.

Accounts Receivable – As of the Petition Date, the Debtor listed in its Schedules more than $27.5 million in accounts receivable.  During the pendency of this case, most of these accounts have been paid in full and additional accounts have been generated.  The Reorganized Debtor may continue the collection of the accounts receivable.

Breach of Fiduciary Duty – the Debtor is unaware of any facts or circumstances which would give rise to any claims for breach of fiduciary duty on the part of its officers or directors. If the Debtor does not explicitly waive its claims and causes of action against each director or officer, then such claims and causes of action will survive confirmation of the Plan and vest in the Reorganized Debtor on the Effective Date.

Preference Claims – During the ninety (90) day period prior to Petition Date, the Debtor made payments in excess of $38 million to existing creditors.  While many of these payments meet the definition of a preference under the Bankruptcy Code, a substantial portion of those payments are subject to defenses.  In recognition of these defenses and in an effort to avoid disruption to the business prospects of the Reorganized Debtor, the Plan proposes to waive certain claims and causes of action as "Excluded Avoidance Actions".

Based upon the Debtor's review it appears that approximately $6.2 million in Pre-petition payments remain subject to prosecution as Avoidance Actions.  Many of the potential defendants in suits to recover Avoidance Actions may have valid defenses to these claims.  Accordingly, the likely recovery on account of the Avoidance Actions is uncertain, but the Debtor believes it is reasonable to expect a net recovery on such claims in a range of 30% to 33% or $1.5 to $2 million.  A list of potential Avoidance Actions is attached as "Exhibit 4."

# ARTICLE 8.
## CONFIRMATION OF THE PLAN

## 8.01    Feasibility

As a condition to confirmation of a plan, Section 1129 of the Bankruptcy Code requires, among other things, that the Bankruptcy Court determine that confirmation is not likely to be followed by the liquidation or the need for further financial reorganization of the debtor. In an effort to determine the feasibility of the Plan, the Debtor has provided Projections demonstrating the anticipated financial performance of Reorganized Moll for a three (3) year period, commencing on the anticipated Effective Date. The Projections and the associated assumptions which are integral to the Projections are discussed and displayed in Section 3.03 of this Disclosure Statement. Based upon the Projections, the Debtor believes that Reorganized Moll will be able to make all payments required under the Plan and, therefore, that confirmation of the Plan is not likely to be followed by liquidation or the need for further reorganization.

## 8.02    Best Interests Test

In order to confirm the Plan, the Court must find that each holder of an impaired Claim or Equity Interest either (i) accepted the Plan or (ii) received or retained under the plan property of a value, as of the Effective Date, that is not less than the value such holder would receive if the debtor was liquidated under Chapter 7 of the Bankruptcy Code. In a typical Chapter 7 case the debtor ceases operations and a trustee is appointed to conduct an orderly liquidation of the Debtor's assets. The proceeds, net of trustee's fees and other costs and expenses incurred in conducting the liquidation, are distributed to creditors in accordance with their Lien rights and statutorily prescribed priorities of payment.

Since the Debtor would no longer be operating, the ability of the trustee to derive any value for the benefit of creditors from the "going concern value" or "enterprise value" is non-existent. Nevertheless, the Debtor has analyzed the value of the Debtor employing both an enterprise value approach as well as an orderly liquidation approach. The Debtor's valuation conclusions and the associated assumptions which are integral to the valuation conclusions are discussed and displayed in Section 3.04 of this Disclosure Statement.

Based upon the forgoing valuation analysis, Creditors in Classes 7, 8, 9 and 10 would receive no distributions on account of their Claims in a Chapter 7 liquidation. This conclusion is supported whether the value of the Debtors assets were liquidated through an orderly liquidation or whether the higher Enterprise Value was attainable.

**ARTICLE 9.**
**ALTERNATIVES TO THE PLAN**

**9.01     General**

The Debtor believes that the Plan affords the holders of Claims the potential for the greatest realization on the Debtor's assets and, therefore, is in the best interests of such holders. If the Plan is not confirmed, however, the theoretical alternatives include: (a) dismissal of the Chapter 11 Case; (b) an alternative plan of reorganization; or (c) liquidation of the Debtor under Chapter 7 of the Bankruptcy Code. **THE DEBTOR BELIEVES THAT THE CREDITORS' CHOICE IS CLEAR. BASED UPON DEBTOR'S ASSESSMENT, CREDITORS WOULD RECEIVE NO DISTRIBUTIONS IN A CHAPTER 7 CASE OR IN THE EVENT OF DISMISSAL OF THE CASE.**

**9.02     Alternative Plans of Reorganization**

If the Plan is not confirmed, the Debtor or any other party in interest in the case could attempt to formulate and propose a different plan. Alternative plans might provide for the liquidation of the Debtor's assets but it is highly unlikely that any alternate plan could produce a result superior to the result proposed in this Plan. Moreover, the Debtor is skeptical that any other party would expend the energies or resources necessary to propose and confirm a plan in this case. The Debtor further believes that the Plan, as described herein, enables Creditors to realize the greatest possible recovery on their Claims.

**9.03     Liquidation Under Chapter 7**

If no Plan can be confirmed, this Chapter 11 Case may be converted to a case under Chapter 7 of the Bankruptcy Code. In a Chapter 7 case, a trustee would be elected or appointed to liquidate the assets of the Debtor. The proceeds of the liquidation would be distributed to the respective holders of Claims against the Debtor in accordance with the priorities established by the Bankruptcy Code.

Conversion would likely result in a diminution of the value available to pay creditors in a Chapter 11 case. The conversion of the case and the appointment of a trustee would preclude the realization of the going concern value of the Estate. Upon conversion, the Debtor would cease operations, lose valuable contracts and employees, thereby eliminating any good will value or enterprise value which might have been attainable under a Chapter 11 case. Since continued operations are not contemplated in Chapter 7, the ability to repay creditors through future operating income from the Debtor (as provided for in the Plan) would be eliminated. The value of the Debtor would likely be limited to the liquidation value of its tangible assets.

Under Chapter 7, a secured creditor whose claim is fully secured would be entitled to full payment, including interest from the proceeds of the sale of its collateral. Unless its claim is non-recourse, a secured creditor whose collateral is insufficient to pay its claim in full would be

entitled to assert an unsecured claim for its deficiency. Based upon the value of the Debtor's assets, Unsecured Creditors forced to rely on a Chapter 7 liquidation probably would receive no distributions on account of their Claims. Secured Creditors would receive all of the proceeds generated by the liquidation of the Debtor's assets. In the unlikely event that assets remained available after payment of Secured Claims, those assets would undoubtedly be exhausted by payments to Priority Claims.

Claims entitled to priority under the Bankruptcy Code would be paid in full before any distribution to general unsecured creditors. If this case were converted to Chapter 7, the Pension Plans would be rejected by the Chapter 7 trustee. PBGC would assert a priority claim against the Estate for the underfunded obligations of the Pension Plans as of the date of rejection. The Debtor anticipates that PBGC's Priority Claim would be in excess of $2 million. If PBGC's claim were to be Allowed as a Priority Claim, any assets not encumbered by the Liens of Secured Creditors would be distributed to PBGC. It is highly unlikely that Unsecured Creditors would receive any distributions if this case were converted to a Chapter 7 case.

## 9.04    Liquidation Analysis

The Debtor has performed a liquidation analysis of the assets of the Debtor. The results of the analysis are set forth in Section 3.04 of this Disclosure Statement. In summary, the liquidation analysis indicates that the proceeds of a liquidation would be inadequate to provide any recovery to Unsecured Creditors in the event of a liquidation. To the contrary, the liquidation analysis indicates that insufficient sums would be available to pay those creditors holding Secured Claims or those asserting a statutory priority over the Claims of Unsecured Creditors.

Although the liquidation analysis was performed in connection with the preparation of this Disclosure Statement, the Debtor has no reason to believe that the results of such analysis would be materially different if the hypothetical liquidation were to occur on the Confirmation Date.

Based upon the stated assumptions, the Debtor believes that after liquidating all remaining assets and paying Secured Creditors in accordance with their respective Liens, directing any remaining proceeds to the payment of priority and Administrative Claims, the Professionals and payment of Chapter 7 Administrative Expenses, no assets would be available for distribution to Unsecured Creditors.

## 9.05    Dismissal of the Case

If no Plan of Reorganization can be confirmed in this Chapter 11 Case, one alternative would be dismissal of the Debtor's Case. Since substantially all of the Debtor's assets are subject to Liens, dismissal would result in a rush to foreclosure by the various Secured Creditors. Under this scenario, the Unsecured Creditors would receive nothing on account of their Claims.

# ARTICLE 10.
## RISK FACTORS

## 10.01  General

The Plan is subject to a number of material risks, some of which are described below. The primary risk confronting Creditors under the Plan is the same risk that faces all businesses - economic uncertainty. The source of the payments contemplated under the Plan are operating profits generated by the business and post-confirmation financing. If the Debtor is unable to generate operating profits, it may, therefore, be unable to pay Creditors in accordance with the terms of the Plan.

## 10.02  Lack of Recent History of Profitability

The Debtor has not operated profitably for a period of at least the last five (5) fiscal years. No assurances can be made that the Debtor can return to profitability.

## 10.03  Reliance on Major Customers

Approximately 56% of the Debtor's net sales in 2001 were derived from its ten (10) largest customers. Additionally, approximately 29% of the Debtor's net sales in 2001 were derived from Whirlpool Corporation ("Whirlpool") and approximately 5% of the Debtor's net sales in 2001 were derived from Renault. As a consequence of the elimination of certain operations and the loss of certain customers, the Debtor anticipates that Whirlpool alone will account for more than 50% of the Debtor's total sales in fiscal year 2003 and beyond. The Debtor expects that it will continue to be dependent upon a limited number of customers for a significant portion of its sales for future periods.

Although the Debtor has ongoing supply relationships with its principal customers, as is typical in its industry the Debtor does not have any long-term contracts with its customers. Accordingly, there can be no assurance that sales to such customers will continue at the same level or at all, especially in light of the Debtor's current financial situation. As a result of this customer concentration, the Debtor's businesses, operating results and financial condition could be materially adversely affected by the failure of anticipated orders to materialize, deferrals or cancellations of orders, or increases by its largest customers of their in-house production of the Debtor's products or selecting other manufacturers from whom to buy products.

There can be no assurance that in future periods the revenues from these customers will be maintained at historic levels. In addition, certain of the Debtor's agreements to produce parts are tied to specific models or product lines of its customers. Accordingly, the Debtor's business, and estimates for future business, are dependent upon consumer demand for the specific models and product lines that incorporate parts manufactured by the Debtor. If any of these customers were to substantially reduce or discontinue purchases from the Debtor, or if consumer demand for products incorporating plastic parts manufactured by the Debtor were to significantly

decrease, the financial condition and results of operations of the Debtor would be materially adversely affected.

The Debtor's recent financial difficulties have caused certain of the Debtor's large customers to limit their relationship with the Debtor. These limitations have had an adverse effect on the Debtor. If the Debtor is unable to restore relations with their large customers or enter into a sufficient amount of new relationships, the Debtor's financial condition and results would be further materially adversely affected. There can be no assurance that the Debtor will be able to restore or enter into such relationships on acceptable terms or at all.

## 10.04 <u>Competition</u>

The markets in which the Debtor operates are highly competitive. The Debtor competes with a significant number of companies of varying sizes, including divisions or subsidiaries of larger companies, on the basis of price, service, quality and the ability to supply products to customers in a timely manner. Some of these competitors have, and new competitors may have, greater financial and other resources than the Debtor. Competitive pressures or other factors, including the vertical integration by certain of the Debtor's major customers of manufacturing processes traditionally outsourced to the Debtor, could cause the Debtor to lose market share or could result in a significant price erosion with respect to the Debtor's products, either of which could have a material adverse effect on the Debtor's results of operations. Furthermore, the Debtor's customers operate in highly competitive markets. To the extent the Debtor's major customers lose market share in their respective markets, the Debtor's results of operations and financial condition could be materially adversely affected.

## 10.05 <u>Raw Materials</u>

The Debtor's primary raw materials are various plastic resins, nylon and packaging materials. Raw material prices are subject to cyclical price fluctuations, including those arising from supply shortages and as a result of changes in the prices of natural gas, crude oil and other petrochemical intermediates from which resin is derived. Accordingly, the Debtor's financial performance is directly linked to its ability to pass along increased raw material costs to its customers. Although the Debtor has historically been able to pass on increased costs to its customers, there can be no assurance that it will be able to do so in the future or that a significant price increase in raw materials would not have a material adverse effect on the Debtor's financial condition and results of operations. Although most of the raw materials used by the Debtor are available from several suppliers, several of such raw materials are currently obtained from single sources. The Debtor has no reason to believe that there will not be an ample supply of its raw materials at prices commercially acceptable to the Debtor for the reasonably foreseeable future, but the Debtor cannot make any prediction as to the future price of such raw materials. There can be no assurance that the Debtor will have the financial resources necessary to purchase raw materials.

## 10.06  Dependence on Key Personnel

The success of the Debtor depends in large part on the Debtor's senior management and its ability to attract and retain other highly qualified management personnel. The Debtor faces competition for such personnel from other companies and other organizations. There can be no assurance that the Debtor will be successful in hiring or retaining key personnel. The Debtor does not maintain any key person life insurance.

## 10.07  Environmental Matters

Federal, state, local and foreign governments could enact laws or regulations concerning environmental matters that increase the cost of producing, or otherwise adversely affect the demand for, plastic products. The Debtor is aware that certain local governments have adopted ordinances prohibiting or restricting the use or disposal of certain plastic products that are among the types of products produced by the Debtor. If such prohibitions or restrictions were widely adopted, such regulatory and environmental measures or a decline in consumer preference for plastic products due to environmental considerations could have a material adverse effect upon the Debtor. In addition, certain of the Debtor's operations are subject to federal, state, local and foreign environmental laws and regulations that impose limitations on the discharge of pollutants into the air and water and establish standards for the treatment, storage and disposal of solid and hazardous wastes. While the Debtor has not been required historically, and does not currently expect, to make significant capital expenditures in order to comply with applicable environmental laws and regulations, the Debtor cannot predict with any certainty its future capital expenditure requirements because of continually changing compliance standards and environmental technology. The Debtor does not have insurance coverage for environmental liabilities and does not anticipate obtaining such coverage in the future.

## 10.08  Uncertainty in the Financial Projections

The Projections are based on numerous assumptions that are an integral part of the projections. The assumptions and estimates underlying the projections are inherently uncertain and are subject to business, economic and competitive risks and other uncertainties which could materially affect the accuracy of the Projections. Consequently, the Projections contained in this Disclosure Statement are not intended, nor should they be received as representations that the projections will be achieved.

# ARTICLE  11.
# CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

The following is a general summary of certain material federal income tax consequences of the implementation of the Plan to the Debtor, Creditors and shareholders. This summary does not discuss all aspects of federal income taxation that may be relevant to the Debtor, to a particular Creditor or shareholder in light of its individual investment circumstances or to certain Creditors or shareholders subject to special treatment under the federal income tax laws (for example, tax-exempt organizations, financial institutions, broker-dealers, life insurance

companies, foreign corporations or individuals who are not citizens or residents of the United States). This summary also does not discuss any aspects of state, local or foreign taxation.

This summary is based upon the Internal Revenue Code of 1986, as amended ("**IRC**"), the Treasury regulations (including temporary regulations) promulgated thereunder, judicial authorities and current administrative rulings, all as in effect on the date hereof and all of which are subject to change (possibly with retroactive effect) by legislation, administrative action or judicial decision. Moreover, due to a lack of definitive judicial or administrative authority or interpretation, substantial uncertainties exist with respect to various tax consequences of the Plan as discussed herein. The Debtor has not requested a ruling from the Internal Revenue Service ("**IRS**") with respect to these matters and no opinion of counsel has been sought or obtained by the Debtor with respect thereto. There can be no assurance that the IRS will not challenge any or all of the tax consequences of the Plan, or that such a challenge, if asserted, would not be sustained. FOR THE FOREGOING REASONS, CREDITORS AND SHAREHOLDERS ARE URGED TO CONSULT WITH THEIR OWN TAX ADVISORS AS TO THE SPECIFIC TAX CONSEQUENCES (FOREIGN, FEDERAL, STATE AND LOCAL) TO THEM OF THE PLAN. THE DEBTOR IS NOT MAKING ANY REPRESENTATIONS REGARDING THE PARTICULAR TAX CONSEQUENCES OF THE CONFIRMATION AND CONSUMMATION OF THE PLAN AS TO ANY HOLDERS OF CLAIMS OR SHAREHOLDERS, NOR IS THE DEBTOR RENDERING ANY FORM OF LEGAL OPINION AS TO SUCH TAX CONSEQUENCES.

## 11.01   Federal Income Tax Consequences to the Debtor

### 11.01.01        *Cancellation of Indebtedness*

Under general tax principles, the Debtor would realize cancellation of debt ("COD") income to the extent that the Debtor pays a Creditor pursuant to the Plan an amount of consideration in respect of a Claim against the Debtor that is worth less than the amount of such Claim. For this purpose, the amount of consideration paid to a creditor generally would equal the amount of Cash or the fair market value on the Effective Date of any other property paid to such Creditor. Because the Debtor will be in a bankruptcy case at the time the COD income is realized, the Debtor will not be required to include COD income in gross income, but rather will be required to reduce certain of their tax attributes by the amount of COD income so excluded. Under the general rules of IRC Section 108, the required attribute reduction would be applied first to reduce the Debtor's net operating loss carryforwards ("NOLs") to the extent of such NOLs, with any excess excluded COD income applied to reduce certain other tax attributes. The Debtor believes and intends to take the position that any reduction in tax attributes generally occurs on a separate entity basis, even though the Debtor may file a consolidated federal income tax return.

IRC Section 108(b)(5) provides an election pursuant to which the Debtor can elect to apply the required attribute reduction first to reduce the basis of their depreciable property to the extent of such basis, with any excess applied next to reduce their NOLs and then certain other tax attributes.

The Debtor has not yet determined whether it will make the election under IRC Section 108(b)(5).

### *11.01.02        Limitation on Net Operating Losses*

The Debtor will experience an "ownership change" (within the meaning of IRC Section 382) on the Effective Date as a result of the issuance of the Reorganized Moll Common Stock to the Class 5 Creditors. As a result, Reorganized Moll's ability to use any pre-Effective Date NOLs and capital loss carryovers to offset their income in any post-Effective Date taxable year (and in the portion of the taxable year of the ownership change following the Effective Date) to which such a carryover is made generally (subject to various exceptions and adjustments, some of which are described below) will be limited to the sum of (a) a regular annual limitation (prorated for the portion of the taxable year of the ownership change following the Effective Date), (b) the amount of the "recognized built-in gain" for the year which does not exceed the excess of their "net unrealized built-in gain" over previously recognized built-in gains (as the quoted terms are defined in IRC section 382(h)), and (c) any carryforward of unused amounts described in (a) and (b) from prior years. IRC Section 382 may also limit the Reorganized Debtor's ability to use "net unrealized built-in losses," if any, to offset future taxable income. The regular annual limitation will generally be equal to the product of (x) the lesser of: (A) the value of the Reorganized Moll Common Stock immediately after the increase in value of the Debtor resulting from the surrender of Creditors' Claims in the reorganization transactions; or (B) the gross value of the Debtor's assets immediately before the ownership change (with certain adjustments), and (y) the "long-term tax-exempt rate" (as defined in IRC Section 382(f)).  In April 2002, the long-term tax-exempt rate was 4.87%; however, the rate in effect on the Effective Date may be different from the April 2002 rate.  The loss carryovers will be subject to further limitations if Reorganized Moll experiences additional future ownership changes or if it does not continue its business enterprise for at least two (2) years following the Effective Date.

The operation and effect of IRC Section 382 will be materially different from that just described if the Reorganized Debtor is subject to the special rules for corporations in bankruptcy provided in IRC Section 382(l)(5). In that case, the Reorganized Debtor's ability to utilize its pre-Effective Date NOLs would not be limited as described in the preceding paragraph. However, several other limitations would apply to the Reorganized Debtor under IRC Section 382(1)(5), including: (a) the Debtor's NOLs would be calculated without taking into account deductions for interest paid or accrued in the portion of the current tax year ending on the Effective Date and all other tax years ending during the three (3) year period prior to the current tax year with respect to the Claims that are exchanged for Reorganized Moll Common Stock pursuant to the Plan, and (b) if the Reorganized Debtor undergoes another ownership change within two (2) years after the Effective Date, the Debtors' IRC Section 382 limitation with respect to that ownership change will be zero.

As a general matter, the rules of IRC Section 382(1)(5) apply to certain ownership changes occurring in a Chapter 11 bankruptcy case pursuant to a court-ordered transaction or court-approved plan. It is uncertain whether the provisions of IRC Section 382(1)(5) would apply to the ownership change occurring as a result of the confirmation of the Plan. However, under IRC Section 382(l)(5)(H), the Debtor may elect not to have the special rules of IRC Section

382(1)(5) apply (in which case the regular IRC Section 382 rules, described above, will apply. The Debtor has not yet determined whether it would elect to have the regular IRC Section 382 rules apply to the ownership change arising from the consummation of the Plan (assuming Section 382(1)(5) would otherwise apply).

## 11.02    Federal Income Tax Consequences to Holders of Claims and Equity Interests

The federal income tax consequences of the implementation of the Plan to a holder of a Claim will depend upon a number of factors, including whether such holder is deemed to have participated in an exchange for federal income tax purposes, and, if so, whether such exchange transaction constitutes a tax-free recapitalization or a taxable transaction, the type of consideration received by such holder in exchange for its Allowed Claim, and whether such holder reports income on the accrual basis.

### 11.02.01        Holders of Priority Claims and Certain General Unsecured Claims

A holder whose Claim is paid in full or otherwise discharged on the Effective Date will recognize gain or loss for federal income tax purposes in an amount equal to the difference between (i) the fair market value on the Effective Date of any property received by such holder in respect of its Claim (excluding any property received in respect of a Claim for accrued interest that had not been included in income) and (ii) the holder's adjusted tax basis in the Claim (other than any Claim for such accrued interest). A holder's tax basis in property received in exchange for its Claim will generally be equal to the fair market value of such property on the Effective Date. The holding period for any such property will begin on the day after the Effective Date.

Under the Plan, some property may be distributed or deemed distributed to certain holders of Claims with respect to their Claims for accrued interest. Holders of Claims for accrued interest which previously have not included such accrued interest in taxable income will be required to recognize ordinary income equal to the fair market value of the property received with respect to such Claims for accrued interest. Holders of Claims for accrued interest which have included such accrued interest in taxable income generally may take an ordinary deduction to the extent that such Claim is not fully satisfied under the Plan (after allocating the distribution between principal and accrued interest), even if the underlying Claim is held as a capital asset. The tax basis of the property received in exchange for Claims for accrued interest will equal the fair market value of such property on the Effective Date, and the holding period for the property received in exchange for such Claims will begin on the day after the Effective Date. The extent to which consideration distributable under the Plan is allocable to interest is not clear. Claim holders are advised to consult their own tax advisors to determine the amount, if any, of consideration received under the Plan that is allocable to interest.

### 11.02.02        Holders of Equity Interests

Existing shareholders are not expected to recover anything under the Plan, and therefore the Plan should not result in the recognition of any gain by such holders.

# ARTICLE 12.
## REQUEST FOR APPROVAL AND ACCEPTANCE OF PLAN

WHEREFORE, MOLL INDUSTRIES, INC. submits this Disclosure Statement and the information contained therein, in good faith, in accordance with the provisions of Title 11, U.S.C. § 101 et. seq. for consideration by Creditors and other parties in interest, and as the sole source of information furnished by the Debtor, or to be furnished by the Debtor, in solicitation of acceptance of Debtor's Plan of Reorganization.

Dated this 8th day of May, 2003.

MOLL INDUSTRIES, INC.

By */s/ William Teeple*_____
William Teeple, it's Senior Vice President
and Chief Financial Officer

OPPENHEIMER, BLEND
HARRISON & TATE, INC.
711 Navarro, Sixth Floor
San Antonio, TX 78205
(210) 244-2000

By: */s/ Raymond W. Battaglia*_____
RAYMOND W. BATTAGLIA
State Bar No. 01918055

ATTORNEYS FOR DEBTOR, MOLL INDUSTRIES, INC.



**DISCLOSURE STATEMENT**

**EXHIBIT 1**



**DISCLOSURE STATEMENT**

**EXHIBIT 2**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| MOLL INDUSTRIES, INC. | § | CASE NO. 02-54341-K |
| | § | |
| DEBTOR | § | CHAPTER 11 |

## ORDER APPROVING DISCLOSURE STATEMENT BY MOLL INDUSTRIES, INC.; FIXING VOTING DEADLINE AND DEADLINE FOR OBJECTING TO CONFIRMATION; AND FIXING A DATE FOR CONFIRMATION HEARING UPON THE DEBTOR'S AMENDED PLAN OF REORGANIZATION

On May 8, 2003, at San Antonio, Texas came on for hearing the adequacy of the information pursuant to 11 U.S.C. § 1125 of the Disclosure Statement by Moll Industries, Inc. (the "Disclosure Statement"). At the hearing the Court considered the objections filed to the adequacy of the information within the Disclosure Statement, the proposed modifications to the Disclosure Statement as announced on the record by the Debtor, and the arguments and representations by counsel appearing on behalf of the Debtor, the Committee, parties in interest who filed objections, and other significant parties to the case. Based thereon, the Court has determined that the Debtor's Amended

Disclosure Statement contains adequate information as required under 11 U.S.C. § 1125 to enable hypothetical reasonable investors, typical holders of claims and interests of all relevant classes to make informed judgments about the First Amended Plan of Reorganization filed by the Debtor on May 8, 2003 (the "Plan"). The Court also finds and concludes, based upon the Certificates of Service filed in this case that the Debtor has complied with the notice requirements under Bankruptcy Rule 3017(a).

The Court finds that the Debtor (including its agents and professionals) is soliciting acceptances or rejections of the Plan in good faith and in compliance with the acceptable provisions of Title 11 of the United States Code. It is therefore:

ORDERED that the Amended Disclosure Statement filed by Moll Industries, Inc. on May 8, 2003 (the "Disclosure Statement") is approved; and it is further

ORDERED that the Debtor is authorized to have the Disclosure Statement and Plan commercially printed for mailing and to pay the associated costs as an ordinary course expense. It is further

ORDERED that the Debtor may make final edits (consisting of correcting typographical and grammatical errors, stylistic changes, providing updated information, and adding revisions consistent with those announced on the record at the Disclosure Statement hearing and at hearings to consider and approve various settlements coming before the Court prior to mailing of the Disclosure Statement) to the Disclosure Statement prior to solicitation; such revisions shall be filed with the Court and shall be deemed approved by this Order. It is further

ORDERED that the Debtor shall transmit or cause to be transmitted by first class mail or by hand delivery a copy of the Disclosure Statement with the Plan attached as an exhibit, but not

separately sent, together with a conformed copy of this Order and a Ballot conforming to Official Form 14, to each creditor and equity holder of record at their last known addresses on or before May 14, 2003.  It is further

ORDERED that the Creditors Committee and Debtor may include within such package solicitation letters with regard to the Plan.  It is further

ORDERED that the proposed Solicitation Letter filed by the Creditors Committee at the Disclosure Statement hearing is approved.

ORDERED that **May 30, 2003 at 5:00 p.m. Central Time**, is the deadline by which the holders of claims and interests against the Debtor may vote to accept or reject the Plan; any ballot not actually received by the Balloting Agent on or before such date shall not be counted without leave of Court.  It is further

ORDERED that Oppenheimer, Blend, Harrison & Tate, Inc., counsel for the Chapter 11 Debtor ("OBHT") is hereby designated as Balloting Agent with regard to all creditors' ballots; OBHT shall receive the creditors' ballots and tabulate the acceptances and rejections of the Plan as reflected therein and report the results of such tabulation to the Creditors Committee at reasonably requested intervals during the course of such tabulation and to the Court at the hearing on confirmation of the Plan.  It is further

ORDERED that **May 30, 2003 at 5:00 p.m. Central Time** is the last day by which creditors and parties in interest may file objections to the confirmation of the Plan, which objections shall be in writing and filed with the Court together with proof of service in a manner such that the objections are actually received on or before such date by the following:

Raymond W. Battaglia
OPPENHEIMER, BLEND,
HARRISON & TATE, INC.
711 Navarro, Sixth Floor.
San Antonio, TX  78205-1796

-and-

Matthew S. Okin
AKIN GUMP STRAUSS HAUER & FELD LLP
1900 Pennzoil Place - South Tower
711 Louisiana Street
Houston, TX 77002-2720

It is further

ORDERED that any party failing to timely file and serve an objection to the Plan or its confirmation shall be barred from raising any objections at the confirmation hearing.  It is further

ORDERED that a hearing pursuant to 11 U.S.C. § 1128 on the confirmation of the Plan shall commence at **9:00 o'clock a.m., Central Time, on June 5, 2003** in the United States Bankruptcy Court, 615 East Houston Street, San Antonio, Texas.  The hearing may be adjourned from time to time as may be announced on the record at the hearing.  It is further

ORDERED that the objections to the Disclosure Statement are hereby denied.

# # #

SUBMITTED BY/RETURN COPY TO:
RAYMOND W. BATTAGLIA
OPPENHEIMER, BLEND,
HARRISON & TATE, INC.
711 Navarro, Sixth Floor
San Antonio, TX 78205
Telephone: 210/224-2000
Facsimile: 210/224-7540



**DISCLOSURE STATEMENT**

**EXHIBIT 3**

## MOLL INDUSTRIES, INC.

### Summary of Terms and Conditions

### Proposed $[50,000,000] Exit Financing Credit Facility

**The proposed terms and conditions summarized herein represent the conditions pursuant to which Foothill Capital Corporation, in its capacity as Administrative Agent and Lender ("Agent" or "Foothill"), and other Persons as "Lenders" at the discretion of Foothill (such other "Lenders," together with Foothill hereinafter collectively referred to as "Exit Lenders") would be willing to consider entering into a $50,000,000 Credit Facility (the "Exit Facility") with Reorganized Moll Industries, Inc. ("Borrower"). The proposed terms and conditions summarized herein are provided for discussion purposes only and shall not constitute a commitment to provide financing. Capitalized terms used in this Summary of Terms and Conditions but not defined herein are used as such terms are defined in that certain Senior Secured Super-Priority Debtor-in-Possession Credit Facility dated September 19, 2002 (as amended, restated, supplemented or otherwise modified from time to time prior to the date on which the Exit Facility is closed, the "DIP Credit Facility").**

**Notwithstanding anything else contained herein, the Proposed Exit Facility, shall be secured by a first priority security interest in all Borrower's assets subject only to preexisting allowed senior liens, and a second priority security interest on those assets. The repayment terms and the collateral positions contained in this term sheet, including the "Last Out" lender or Term B Lender will be controlled by the waterfall provisions contained in the loan documents and / or an appropriate intercreditor agreement.**

### LOAN STRUCTURE

| Credit Line Structure: | DIP Facility | Proposed Exit Facility |
|---|---|---|
| Total Facility<br>---FCC Share | $50,000,000<br>$7,500,000 (Revolver Only) | $50,000,000<br>$15,000,000 (Rev Only) |
| FCC Credit Position | First Out Basis | Same |
| Revolving Credit Line<br>   Inventory Sub-Line | $17,000,000<br>($7,000,000) | $15,000,000 FCC Only<br>($6,500,000 Total); ($750,000 WIP) |
| Revolver Collateral | Working Capital Assets | 1st Lien on All Assets |
| Participation – Revolver | Highland Entities  $4,500,000<br>Morgan Stanley $5,000,000 | None |
| Term Loan – A<br>Collateral<br>Amortization | See Below for Term Loan Info | $35,000,000 – Highland Only M&E and RE – 2nd Position. Qtly amortization of 1% beginning Yr 2 thru Yr 4($350M/qtr or $1.4MM/yr). 22% qtly in yr 5 ($7.7MM/qtr or $30.8MM/yr).  Excess Cash Flow sweep (on the 90th day after each FYE) of 75% until Total Leverage below 4.0x, and 50% thereafter; provided i) If any event of default then exists or ii) If minimum availability after such payment would be less than $3,000,000; Excess Cash Flow shall be deferred until such conditions can be met.  If ii) occurs borrower shall pay the difference between excess Cash Flow amount due and the $3,000,000 minimum availability.  Excess Cash Flow defined as EBITDA less Capex, Interest paid, Taxes paid, principal payments on borrowed money (other than the Revolving Facility) and Bankruptcy expenses.<br>If revolving line of credit has been reduced to $0 outstanding, excess cash sweeps would be held in escrow and used to pay down the TL on a monthly basis. |

| Tranche B | $33,000,000 - Highland only | None |
|---|---|---|
| Collateral | Real Estate and M&E – 2nd Position | |
| Amortization | None – Balloon at Exit | |
| LC Sub-line | ($2,000,000) | ($3,000,000) |
| Estimated Contract Date | 6/1/00 | 7/1/2003 |
| Contract Maturity Date | 2/28/03 | 7/1/2008 |
| **FCC Pricing:** | **DIP Facility** | **Proposed Exit Facility** |
| Interest Rate-Revolver (Base Rate) | RR + 2.5% | RR + 2.0%<br>No Libor Option |
| Default Rate | <br>2% above fixed rate | <br>Same |
| Interest Rate -Term Loan A | N/A | RR + 3.0%<br>LIBOR + 4.5% |
| Default Rate | <br>N/A | <br>2% above fixed rate |
| Interest Rate – Tranche B | RR + 2.5% | N/A |
| Default Rate | <br>2% above fixed rate | N/A |
| Float | 1 Business Day (agent only) | Same |
| L/C Guaranty Fee | 3.0% Per Annum | 2.0% Per Annum |
| Unused Line Fee | 0.5% | Same |
| Prepayment Fee | None | None |
| Closing Fee – FCC Facility | 1.5% ($750,000) Pro Rata Entire Facility | 1.0% ($150,000 FCC only) |
| Closing Fee – Tranche A | See Above | None |
| Closing Fee – Tranche B | See Above | N/A |
| Monthly Servicing Fee | $10,000 | $10,000 |
| Annual Anniversary Fee | N/A | $100,000 |
| Audit Fee | $750 per day + OOPE | Same |
| Appraisal Fee | Actual Expenses Incurred | Same |
| **Financial Covenants:** | **DIP Facility** | **Proposed Exit Facility** |
| Budgeted i) Revenues and ii) Cash Receipts | 90% of Projections | N/A |
| Budgeted Disbursements | 110% of Projections | N/A |
| EBITDA | None | 80% of projections measured monthly |
| Tangible Net Worth | None | Same |
| Capital Leases | None | Same |
| Capital Expenditures | $3.2MM for term of facility | 105% of proj. Measured monthly<br>$2,858M in yr 1<br>$3,567M in yr 2<br>$2,261M in yr 3<br>Yrs 4 & 5 TBD<br>Borrower can carry-over unused amounts for 1 year; however, the test is not cumulative. |
| Availability Minimum | None | $3MM at closing |

| **Accounts Receivables:** | **DIP Facility** | **Proposed Exit Facility** |
|---|---|---|
| Reporting Frequency | Daily Transactions; Monthly Agings and Non-Primes | Same |
| Advance Rate | 85% | Same |
| Concentration Maximums | None | Same |
| Whirlpool Status | N/A | Company must remain on Whirlpool's new item bid list as a condition precedent. |
| Dilution Maximum | 5% for last 90 days | 5% for last 12 months |
| Asset Coverage Defined as: (Availability generated from AR + Inventory minus (-) LC exposure plus (+) 50% of NOLV of M&E plus (+) 50% of QSV of RE): Outstanding Revolver Amount | Measured Weekly; Minimum 1.25:1.00 | Measured Weekly, Minimum 1.25:1.00; to include 50% of NOLV for M&E and 50% of QSV for RE |
| **Inventory:** | **DIP Facility** | **Proposed Exit Facility** |
| Reporting Frequency | Weekly | Monthly – Non-primes, totals by category and location. |
| Advance Rates<br>---FG & RM<br>---WIP | 50% of RM & FG<br>25% of WIP | The lesser of i) 50% * (RM + FG) + 25% * WIP and ii) 80% of the NOLV of appraised inventory |
| Inventory Appraisals<br>Appraised by DoveBid | Quarterly (lender discretion) | Annual as long as availability is > $7.5MM and no event of default exists. Otherwise, semi-annual. |
| **Term Assets:** | **DIP Facility** | **Proposed Exit Facility** |
| Machinery & Equipment Values | N/A (Appraisals included | NOLV - $8MM – Estimated at 3/7/03 |

| | | |
|---|---|---|
| Appraised by DoveBid Valuations | discontinued/sold assets valued over 12 months prior) | |
| Appraisals – M&E | Quarterly (lender discretion) | Annual (Required) – Last 09/02; Appraisal required upon emergence. |
| Real Estate Values Appraised by Cushman Wakefield | N/A (Appraisals included discontinued/sold assets valued over 12 months prior) | QSV - $13.7MM – Sales in process at 3/7/03 |
| Appraisals – RE | Annual (lender discretion) | Annual (Required) – Last 10/02 |
| M&E and Real Estate Disposition | N/A | Sale proceeds of Discontinued Assets (a defined term including all assets currently targeted for sale) will be applied: First, to any outstanding borrowings on the revolving facility, and Second, to outstanding borrowings on the Term Loan.<br><br>Sale proceeds from Non-Discontinued Assets will be applied 100% to the Term Loan (or first to the Revolving Facility if an event of default then exists or the Current Asset Coverage test is not satisfied). |
| Additional Term Assets | 2nd position on Davie, Florida and Austin, TX facilities obtained. Properties are currently mortgaged. Lending group has 2nd position on equity interest in these properties. FMV $7.5MM with $4.5MM in outstanding mortgages. | Same |

The following is a list of items that need to be addressed or satisfied as conditions precedent to FCC's proposal (in addition to the satisfaction of other conditions which are customary in this type of transaction):

- Entry of a Final Order in the Bankruptcy Case in form and substance acceptable to the Exit Lenders (i) approving a plan of reorganization and (ii) approving the Exit Facility.
- Satisfactory results from FCC audits performed during and just prior to exiting bankruptcy.

Borrower may draw upon the facilities: (i) for payoff of the outstanding DIP Credit Facility in the approximate amount of $47MM; (ii) for the financing of working capital, the issuance of letters of credit, and for capital expenditures; (iii) for the wind down expenses of the sale and liquidation of discontinued assets; (iv) for general corporate purposes, including fees and expenses related to the Facilities.



# DISCLOSURE STATEMENT

# EXHIBIT 4

| Inventory-Raw Materials,etc | ADHESA PLATE | 469.50 |
|---|---|---|
| | AGE INDUSTRIES LTD | 65,473.12 |
| | ALADDIN TEMP-RITE LLC | 5,214.80 |
| | AMERICAN MSI CORP | 41,561.07 |
| | AMERICAN PAPER & TWINE | 41,117.35 |
| | AMERICAN POLYMERS INC | 1,380.95 |
| | APAC PACKAGING & SUPPLY | 18,019.63 |
| | ARM | 66,851.75 |
| | ASHEBORO PAPER | 1,354.58 |
| | ATCOR | 628.48 |
| | AUSTIN FOAM PLASTICS | 2,438.00 |
| | AUSTIN PALLET CO | 22,400.00 |
| | B & B PACKAGING | 1,914.80 |
| | BAMBERGER POLYMERS INC | 27,244.00 |
| | BAYWOOD TECHNOLOGIES | 150.00 |
| | BERGEN INDUSTRIES | 5,900.00 |
| | BERRY & ASSOCIATES | 2,149.76 |
| | BROOKS AUTOMATION | 2,400.00 |
| | C & C PALLETS CO | 14,300.00 |
| | CAROLINA COLOR CORP | 4,314.33 |
| | CHEVRON PHILLIPS CHEMICAL | 47,887.50 |
| | COMPOUNDING SOLUTIONS LLC | 20.90 |
| | CONDOR ELECTRONICS CORP | 107.00 |
| | CRAFTECH INDUSTRIES INC | 6,968.39 |
| | CUSTOM LABELS INC | 3,812.19 |
| | DISTRIBUTION DYNAMICS | 2,920.75 |
| | DRAKE INDUSTRIES INC | 18,495.00 |
| | EASTERN CONTAINER | 2,675.00 |
| | ELLE PACKAGING | 5,458.53 |
| | ELORA PALLET SHOP | 5,280.00 |
| | EVCO PLASTICS | 1,223.48 |
| | FABRICATION SPECIALTIES | 1,603.20 |
| | FOAM PRODUCTS OF | 3,040.00 |
| | FOAMEX | 2,600.00 |
| | HARTFORD BALL CO | 860.00 |
| | HORIZON PACKAGING | 5,014.21 |
| | HORN PLASTICS INC | 1,558.79 |
| | ILS/GATEWAY | 84.60 |
| | INLAND PAPERBOARD | 6,803.50 |
| | JAMAK FABRICATION INC | 1,289.14 |
| | KOCH CONTAINER | 1,135.95 |
| | LOCKWOOD PRODUCTS | 17,079.05 |
| | LONGHORN BOLT & SCREW CO | 8,802.37 |
| | M. HOLLAND CO | 1,846.52 |
| | MASTRO GRAPHIC ARTS INC | 1,583.99 |
| | MATTRIXX GROUP INC | 606.81 |
| | MCGREGOR & SURMOUNT CORP | 583.07 |
| | MICHAEL DAY | 1,801.80 |
| | NATIONAL PLASTICS NETWORK | 8,851.50 |
| | NICE-PAK PRODUCTS INC | 5,850.00 |
| | NYCOM INC | 534.00 |

|  | | |
|---|---|---|
| | OFFICE DEPOT INC | 2,303.08 |
| | ORANGE PRODUCTS INC | 1,652.93 |
| | PACIFIC PACKAGING | 3,572.04 |
| | PARK AVENUE OFFICE | 767.33 |
| | PARREE B.V. | 510.51 |
| | PENTACON AEROSPACE GROU | 255.49 |
| | PHILIPS | 106,305.12 |
| | POLYMER PRODUCTS CO INC | 6,005.90 |
| | PRIME ALLIANCE INC | 11,250.00 |
| | PRODUCT DEVELOPMENT | 1,440.00 |
| | REEDER PALLET CO INC | 7,638.00 |
| | REEDY INTERNATIONAL CORP | 1,070.00 |
| | RGS INDUSTRIES | 634.92 |
| | S.W. ANDERSON CO | 1,146.36 |
| | SEAL-IT | 1,263.90 |
| | SELECT TOUCH CORP | 5,389.00 |
| | SHAMROCK BOLT | 6,561.19 |
| | SIEMENS IPO JAPAN | 1,098.66 |
| | SIERRA PACKAGING INC | 14,368.00 |
| | SIGMA SUPPLY INC | 1,792.80 |
| | SIMKINS INDUSTRIES | 3,762.00 |
| | SPARTECH COLOR - GODDARD | 8,232.00 |
| | SPIROL WEST INC | 5,439.15 |
| | TRIQUEST-PUGET PLASTICS | 2,908.80 |
| | TUV RHEINLAND OF | 14,787.11 |
| | U.S. BEARING | 3,041.58 |
| | UNIFORM COLOR CO | 7,791.36 |
| | UNISOURCE WORLDWIDE INC | 3,625.22 |
| | UNITED PLASTICS GROUP INC | 1,480.21 |
| | UNIVERSAL METAL | 5,907.12 |
| | VALLEY RIVET CO INC | 778.75 | 724,437.89 |

| Supplies | 3D SOLUTIONS INC | 1800 |
|---|---|---|
| | A.J. HALL OIL CO INC | 6000.5 |
| | A-1 COUPLING & HOSE INC | 7.88 |
| | ACTION BOLT & SCREW CORP | 26.2 |
| | ADHERE LABEL | 507.08 |
| | ADVANCED PALLETS INC | 1450 |
| | AIR & HYDRAULIC | 223.61 |
| | AIR DRAULICS | 2067.28 |
| | AJP NORTHWEST INC | 77.2 |
| | ALAMO IRON WORKS INC | 386.42 |
| | ALASKAN COPPER & BRASS CC | 70.73 |
| | ALLIED BEARING | 53.7 |
| | ALLIED ELECTRONICS INC | 814.71 |
| | AMSTERDAM PRINTING | 171.06 |
| | APPLIED INDUSTRIAL | 1139.81 |
| | APW ERIE | 1525.81 |
| | ARBILL INDUSTRIES INC | 2005.87 |
| | ARKANSAS BLUEPRINT CO INC | 124.7 |
| | AUTOLOAD | 1500.89 |
| | AUTOMATED PACKAGING | 580.39 |

| | |
|---|---:|
| A-Z OFFICE RESOURCE INC | 1649.39 |
| BARBER RAZOR BLADE CO | 187.5 |
| BFC ENTERPRISES | 502.12 |
| BIG CHIEF SUPPLY INC | 264.31 |
| BOB NAGEL DISTRIBUTING CO | 442.74 |
| BOC GASES | 2136.68 |
| BOILER SUPPLY CO INC | 5855.28 |
| BRENNTAG SOUTHWEST INC | 535.8 |
| BROWN & SHARPE INC | 5181.84 |
| BRUSKE PRODUCTS | 113.13 |
| BUDGET MOLDERS SUPPLY INC | 435.1 |
| C & H DISTRIBUTORS INC | 1237.22 |
| CAIN'S OLD TIME | 601.95 |
| CINTAS INC | 6908.24 |
| CITY RUBBER STAMP | 162.18 |
| CLAUDE BAMBERGER MOLDING | 825 |
| COMDEC INC | 107.24 |
| CONNEY SAFETY PRODUCTS | 795.8 |
| CORPORATE EXPRESS | 10977.22 |
| COTHERN ELECTRIC MOTOR | 1612.7 |
| CROCKER'S AUTOMOTIVE | 373.97 |
| CROSS SALES | 2109.41 |
| CROSSLIN SUPPLY CO INC | 413.36 |
| CROW-BURLINGAME CO INC | 283.43 |
| CROWN CHEMICAL CO | 3220.51 |
| CRYSTAL SPRINGS WATER CO | 66.64 |
| CURBELL PLASTICS INC | 548.82 |
| CURTIS 1000 INC | 1299.29 |
| CUSTOM EQUIPMENT CO | 1721.74 |
| DANHIL CONTAINERS INC | 362.96 |
| DATAMAN BUSINESS | 1405 |
| DECODE SYSTEMS INC | 6037.39 |
| DELTA ELECTRIC MOTORS | 1807.61 |
| DIRECT SALES CO | 1291.18 |
| DIXIE TOOL CRIB INC | 1031.71 |
| DUBOIS CHEMICALS | 2235.41 |
| DURA MAGNETICS INC | 2247.83 |
| EAST PATTERN & MODEL CORP | 22252.32 |
| EMEDCO CO INC | 519.61 |
| FAMILIAN NORTHWEST INC | 66.6 |
| FE BENNETT | 400 |
| FORKLIFT SYSTEMS INC | 276.7 |
| FRANKLIN PRINTING | 794.58 |
| GARY'S VACUFLO | 50.39 |
| HOIST & CRANE CO | 1440.97 |
| HORIZONS SOLUTIONS CORP | 17355.82 |
| IKON OFFICE SOLUTIONS | 369.52 |
| IMAJE INK JET PRINTING | 2270.91 |
| IMPERIAL SCHRADE CORP | 371.73 |
| IMS CO | 4081.14 |
| INDUSTRIAL SAFETY SOURCE | 591.81 |
| INOTEK TECHNOLOGIES CORP | 172.09 |

| | |
|---|---|
| ITW IMTRAN INC | 133.3 |
| J & L INDUSTRIAL SUPPLY | 768.1 |
| JEMTEC PLASTICS INC | 990.16 |
| JIFFY PRINT | 406.73 |
| JOHN PLANT CO | 402.5 |
| KAR PRODUCTS | 198.47 |
| KONCEPT SAFETY | 160.19 |
| LAB SAFETY SUPPLY INC | 5252.21 |
| LEE PRINTING CO INC | 2835.56 |
| LEGGETT & PLATT INC | 211.72 |
| LIBERTY DATA PRODUCTS INC | 10735.64 |
| LIGHT BULB DEPOT-07 | 41.16 |
| LOFTIS STEEL & ALUMINUM | 66.52 |
| LOGIC COMPUTER PRODUCTS | 293.43 |
| LUMBERMAN'S NEWBURG | 2.49 |
| MACKINNON TOOL | 1802.9 |
| MAGID GLOVE & SAFETY | 570.32 |
| METAL WORKING SUPPLY CO | 217.24 |
| METRO LIFT PROPANE INC | 2423.28 |
| MEYER OF ARKANSAS INC | 2362.61 |
| MIKE HARMS ASSOCIATES INC | 6185.89 |
| MILNER INC | 15.88 |
| MINUTEMAN PRESS | 4972.41 |
| MOBILE PRECISION TOOL | 1597.75 |
| MOLDERS CHOICE INC | 6385.64 |
| MORGAN SUPPLY | 4288.86 |
| MOTION INDUSTRIES INC | 17098.93 |
| MSC INDUSTRIAL SUPPLY CO | 1267.8 |
| MULTIFORM INC | 4658.35 |
| MURFREESBORO ELECTRIC | 258.1 |
| MURPHY INDUSTRIAL | 1114.8 |
| NASHVILLE LIGHT BULB | 213.75 |
| NASHVILLE RUBBER | 89.25 |
| NATIONAL TOOL | 3542.46 |
| NEUTREX INC | 9589.02 |
| NEW PIG | 459 |
| NEWARK ELECTRONICS | 1452.34 |
| NEWBERG ACE HARDWARE | 704.12 |
| NEWBERG AUTO PARTS | 127.43 |
| NICKERSON MACHINERY | 3788.18 |
| NORMED CORP | 255.54 |
| NORTH BROTHERS | 413.33 |
| NORTHERN SUPPLY CO | 643.9 |
| NOVATEC INC | 5396.54 |
| OFFICE COMMUNICATIONS | 630.16 |
| OFFICE MAX INC | 122.31 |
| OFFICE SUPPORT SYSTEMS | 1527.99 |
| OFFICE WAREHOUSE | 1153 |
| PALM ABRASIVE & TOOL CO | 907.28 |
| PARKER HANNIFIN | 5022.83 |
| PATCO INC | 496.07 |
| PITNEYWORKS | 838 |

| | |
|---|---|
| PLASTIC PROCESS | 11429.8 |
| PLATT ELECTRIC SUPPLY INC | 824.55 |
| PLUNKETT OPTICAL INC | 1990.14 |
| PRINT LOGIC INC | 2247.67 |
| PROGRESSIVE COMPONENTS | 3072.1 |
| PROPANE DEPOT | 773 |
| PTX INC | 19678.79 |
| QUILL CORP | 1743.75 |
| RAPID GRANULATOR INC | 833.51 |
| REALIZE INC | 1932.19 |
| RELIZON CO | 727.46 |
| RESEARCH SOLVENTS | 1506.87 |
| ROBBINS & BOHR INC | 1054.85 |
| ROGERS INDUSTRIAL | 29983.36 |
| SAFETY & SUPPLY CO | 819.03 |
| SEARS COMMERCIAL CREDIT | 1111.02 |
| SIDCO LABELING SYSTEMS | 401.26 |
| SIERRA SPRING WATER CO | -80.49 |
| SILICA GEL DESICCANT | 944 |
| SILICON MOUNTAIN | 96.26 |
| SLOAN FLUID | 650.83 |
| SOUTHERN FLUIDPOWER INC | 656.69 |
| STERLING INC | 3117.52 |
| STUART C. IRBY CO | 537.42 |
| SUMMERS SOUTHERN ELECTR | 2138.14 |
| SYSTEM RESOURCES INC | 948.28 |
| SYSTEM SCALE CORP | 1993.01 |
| TARR INC | 1000.29 |
| TENNESSEE DIE | 1259.53 |
| TENNESSEE FILTER | 560.3 |
| TEXAS BARCODE SYSTEMS | 1388.5 |
| TEXAS TYPE | 2461.6 |
| THORESON MCCOSH INC | 594.93 |
| TREKK EQUIPMENT GROUP | 1419 |
| TRIAD FORKLIFT | 70.96 |
| TULCO OILS INC | 8737.39 |
| TURNER SUPPLY CO | 709.17 |
| ULINE INC | 1604.8 |
| UNISOURCE PACKAGING | 2489.41 |
| UNITED SILICONE INC | 5703.07 |
| UNITED STATES PLASTICS | 6182.99 |
| UNIVAR USA INC | 213.28 |
| VACUUM PLATERS | 8234.82 |
| VISION PLASTICS INC | 1496 |
| WEAVER TECHNOLOGIES | 2123.59 |
| WESTERN CUTTING TOOL | 286.13 |
| WESTMARK INDUSTRIES INC | 695.47 |
| WISCONSIN AUTOMATED | 735.69 |
| WISE WHOLESALE | 13505.25 |
| WRICO CORP | 785.82 |
| XE SYSTEMS INC | 160.95 |
| XPECT FIRST AID | 724.14 |

|  |  |  |  |
|---|---|---:|---:|
|  | YUSHIN AMERICA INC | 293.41 | 408,194.67 |
| Repairs & Maintenance | ACE DISCOUNT TOOL | 115.06 | |
|  | AERO HARDWARE | 1180.37 | |
|  | AIRTECH AIR CONDITIONING | 728.74 | |
|  | ALLEN INDUSTRIAL | 37502.78 | |
|  | AUTOMATIC CONTROL | 47.87 | |
|  | AUTOMATION TECH SUPPORT | 3000 | |
|  | BEXAR ELECTRIC CO INC | 3177.23 | |
|  | BOUCHERIE USA | 2194.55 | |
|  | BOWMAN DISTRIBUTION | 4095.54 | |
|  | BOYD METALS | 295.87 | |
|  | BRIGGS EQUIPMENT | 461.99 | |
|  | BRUCE-ROGERS CO | 34.74 | |
|  | BRY-AIR INC | 302.72 | |
|  | BURGER ENGINEERING INC | 525.41 | |
|  | C & D TECHNOLOGIES INC | 2754.48 | |
|  | C.C. DICKSON CO | 1113.21 | |
|  | CAPITOL BEARING SERVICE | 66.52 | |
|  | CHEMSEARCH | 754.37 | |
|  | COLE-PARMER INSTRUMENT C| | 684.92 | |
|  | CRESCENT GAGE | 3019.31 | |
|  | CROSS TECHNOLOGY | 5750 | |
|  | DIVERSIFIED ELECTRIC | 27277.87 | |
|  | DYNAMIC ELECTRIC | 2612.9 | |
|  | EGGELOF INC | 513.77 | |
|  | EQUIPMENT DEPOT INC | 3577.5 | |
|  | FIRST LINE PLUMBING | 31648.85 | |
|  | FLECK BEARING CO | 375.44 | |
|  | FT. SMITH TOOL SERVICE | 139.8 | |
|  | GOLDEN WEST OIL CO | 2787.3 | |
|  | IFM EFECTOR INC | 1563.47 | |
|  | INSPECTION PLUS | 725 | |
|  | J & C GRINDING LLC | 529.75 | |
|  | J.A. KING & CO INC | 2344.5 | |
|  | JANITOR'S WAREHOUSE | 1142.96 | |
|  | JOBCO INC | 4632.55 | |
|  | JOHN BOUCHARD & SONS CO | 2367.52 | |
|  | JOHNSON & SCOTT INC | 1196.55 | |
|  | KEATHLY-PATTERSON | 2010.66 | |
|  | KLINGSPOR ABRASIVES INC | 43.18 | |
|  | MAINTENANCE ENGINEERING | 345.12 | |
|  | MMJ MACHINING | 24770.85 | |
|  | MOLDING AUTOMATION | 3696.96 | |
|  | OVERHEAD DOOR CO | 88 | |
|  | PARKWAY SYSTEMS | 1391.95 | |
|  | ROBINSON ENGINEERING | 66.67 | |
|  | SAFETY KLEEN CORP | 11312.77 | |
|  | SHEPHERD CONTROLS | 2290.93 | |
|  | SIG DOBOY INC | 475.44 | |
|  | SIMCO ELECTRONICS | 2804 | |
|  | SOLID CONTROLS INC | 6026.66 | |

|  | | |
|---|---|---|
| SOUTHERN ARC INC | 185 | |
| STEELCO INC | 235.17 | |
| STERLING INC | 1166.66 | |
| SYNVENTIVE MOLDING | 2198.04 | |
| TOOL & GAGE HOUSE | 3190.08 | |
| VAN ASCHE INDUSTRIAL | 3268.34 | |
| WESTLAND CORP | 4810.83 | 221,618.72 |

| Freight | | |
|---|---|---|
| ABF FREIGHT SYSTEM INC | 1277.2 | |
| AIR CARGO DELIVERY | 164.7 | |
| AIRBORNE EXPRESS | 29.64 | |
| AIRWAYS FREIGHT CORP | 2791.53 | |
| AIT FREIGHT SYSTEM SINC | 237.5 | |
| AVERITT EXPRESS | 158.42 | |
| BAX GLOBAL | 994.6 | |
| CENTRAL FREIGHT LINES INC | 551.96 | |
| CENTRAL TRANSPORT | 2288.85 | |
| CITY SPRINT DELIVERY | 116 | |
| CONSOLIDATED FREIGHTWAYS | 11611.23 | |
| CON-WAY TRANSPORTATION | 10238.01 | |
| DANZAS AEI CUSTOMS | 4164.04 | |
| DATAFLEET DIVISON | 2935.71 | |
| DHL WORLDWIDE EXPRESS | 6770.61 | |
| DOUBLE DIAMOND TRANSPORT | 1850 | |
| EMERY CUSTOMS BROKERS | 177.38 | |
| EMERY WORLDWIDE | 25738.75 | |
| ESTES EXPRESS LINES | 789.74 | |
| EXPRESS MESSENGER | 2253.39 | |
| FAS TEX LOGISTICS INC | 2381.54 | |
| FRITZ CO INC | 27110.05 | |
| FT. LAUDERDALE TRANSFER | 800 | |
| HOT SHOT DELIVERY | 702.45 | |
| JET DELIVERY SERVICE | 116.39 | |
| JET-X CO | 12522.62 | |
| JEVIC | 229.5 | |
| K.N.B.E. INC | 4452 | |
| KUEHNE & NAGEL | 2554.4 | |
| MERCER TRANSPORTATION | 3460.82 | |
| MILAN EXPRESS CO INC | 257.24 | |
| OVERNITE TRANSPORTATION | 3982.63 | |
| OZARK MOTOR LINES INC | 200 | |
| PACK-MARK SHIPPING | 47.52 | |
| PBB USA INC | 37.3 | |
| R & L CARRIERS INC | 14527.28 | |
| RED HOT FREIGHT LLC | 711.36 | |
| RHINO EXPRESS DELIVERY | 257.5 | |
| RIC'S TRANSFER CO INC | 126.18 | |
| ROADWAY EXPRESS INC | 5001.86 | |
| SAIA MOTOR FREIGHT | 63.03 | |
| SOUTHEASTERN FREIGHT | 1971.71 | |
| SPRINT DISTRIBUTION | 432.11 | |
| STERLING COURIER INC | 801.25 | |

| | | | |
|---|---|---|---|
| | TWIN CITY TRANSPORTATION | 18950 | |
| | U.T.I., UNITED STATES INC | 4586.92 | |
| | UNITED PARCEL SERVICE | 76883.69 | |
| | USF DUGAN INC | 195.1 | |
| | USF HOLLAND INC | 5960.81 | |
| | VIKING FREIGHT SYSTEM | 215.43 | |
| | VOLUNTEER EXPRESS INC | 446.01 | |
| | WATKINS MOTOR LINES INC | 4481.98 | |
| | WILSON TRUCKING CORP | 115.11 | |
| | YELLOW FREIGHT SYSTEM INC | 4666.96 | |
| | ZIP TRANSPORT | 67.5 | 274,455.51 |
| Tooling Vendors | ADVANCED MOLD TEXTURING | 935 | |
| | ALLGOOD SERVICES | 60 | |
| | ARC INDUSTRIES | 10866.66 | |
| | ARRK PRODUCT DEVELOPMENT | 9948.5 | |
| | BG & T WELDING | 7440 | |
| | BUTLER & COOK INC | 1622.58 | |
| | CASCADE MOLD & DIE INC | 10987.5 | |
| | CLACKAMAS TOOL WELDING | 1320 | |
| | COLOR COMPS INC | 30 | |
| | COPELAND ENTERPRISES | 3395 | |
| | EDRO SPECIALTY STEEL INC | 2866.46 | |
| | FIVE STAR PLASTICS INC | 754 | |
| | FLEXTEC INC | 36359.22 | |
| | GATE MOLD INC | 3480 | |
| | GREENVILLE TOOL & DIE | 12447 | |
| | H & O DIE SUPPLY INC | 935.6 | |
| | HALLMARK TOOLS | 10256 | |
| | HESS DIE MOLD INC | 325.13 | |
| | JAECO PRECISION INC | 15461.25 | |
| | KENNEDY & BOWDEN | 89471.66 | |
| | MEGA TOOL & MANUFACTURING | 480.1 | |
| | MOLD-TECH | 1200 | |
| | MOLD-TECH/RAWAL | 2045.5 | |
| | MUELLER MACHINE & TOOL | 10596.52 | |
| | N & T MOLD ENGINEERING CO | 6590 | |
| | QUALITY MOLD SHOP INC | 33450 | |
| | S & S MOLD & TOOL | -12166.67 | |
| | SERVICE TOOL & DIE | 21160.42 | |
| | SOUTHERN PRECISION | 6250 | |
| | STAR MOLD | 9200 | |
| | STAR MOLD INC | 280 | |
| | STEEL SAFE TECHNOLOGY INC | 180 | |
| | SUNCOAST HEAT TREAT INC | 970.66 | |
| | SUNRISE TOOL & DIE INC | 11953.64 | |
| | TEMME MOLD & ENGINEERING | 2500 | |
| | TOP GRADE MOLDS LTD | 144 | |
| | WISCONSIN ENGRAVING | 3965 | 317,760.73 |
| Temporary Services | ABLEST STAFFING SERVICES | 51059.04 | |
| | ACCOUNTEMPS | 4885.56 | |

| | | | |
|---|---|---|---|
| | ADECCO EMPLOYMENT | 200386.38 | |
| | BAYVIEW FUNDING | 287932.81 | |
| | CAROLINA PERSONNEL CO | 2112.85 | |
| | CORESTAFF STAFFING | 21474.48 | |
| | EXPRESS PERSONNEL | 24207.29 | |
| | GRIFFIN SERVICES INC | 6180.34 | |
| | MANPOWER | 50713.95 | |
| | REMEDY TEMP INC | 142787.02 | |
| | ROLAN INC | 123881.34 | |
| | TEXAS MANAGEMENT DIVISION | 7731.9 | 923,352.96 |
| | | | |
| Utilities/Communications | AT & T WIRELESS SERVICES | 566.75 | |
| | ATX TELECOMMUNICATIONS | 65.19 | |
| | BELLSOUTH PUBLIC | 160.39 | |
| | BRINKS HOME SECURITY INC | 111.8 | |
| | CHEMCAL INC | 643.5 | |
| | COOK PAGING | 122.98 | |
| | CTC COMMUNICATIONS | 2989.24 | |
| | DELTA WATER LABORATORIES | 2427.18 | |
| | DIDIER COMMUNICATIONS | 74.5 | |
| | HORIZON TELEPHONE | 485.44 | |
| | IGO CORP | 154.94 | |
| | INTRANET COMMUNICATIONS | 443 | |
| | MCI RESIDENTIAL SERVICE | 25.1 | |
| | MESSAGELINK | 125.4 | |
| | METROCALL | 1331.21 | |
| | MONROE COUNTY WATER | 171.56 | |
| | NEXTEL PARTNERS | 159.6 | |
| | PEREGRINE E-MARKETS GROU | 9592.5 | |
| | QWEST | 625.8 | |
| | SPRINT PCS | 1330.43 | |
| | SUNCOM | 1.17 | |
| | TELETOUCH | 195.4 | |
| | TRITEL COMMUNICATIONS INC | 172.52 | |
| | VOICESTREAM WIRELESS | 3322.5 | 25,298.10 |
| | | | |
| Insurance | AIG INSURANCE SERVICE INC | 2300 | |
| | BWC STATE INSURANCE FUND | 46.14 | |
| | POLK & SULLIVAN GROUP | 48574.92 | 50,921.06 |
| | | | |
| Rent-Equipment | AAA RENTALS & SALES | 33.69 | |
| | FLEET CAPITAL CORP | 96606 | |
| | HERTZ EQUIPMENT | 362.06 | |
| | IBM | 989.41 | |
| | NEW YORK STATE | 21.65 | |
| | PITNEY BOWES INC | 430.3 | |
| | PRAXAIR DISTRIBUTION INC | 267.88 | |
| | SARCOM INC | 479.58 | |
| | TRANSPORT INTERNATIONAL | 3834 | 103,024.57 |
| | | | |
| Rent-Building | ABC WAREHOUSING | 816 | |
| | BERGER | 14859.62 | |

|  |  |  |  |
|---|---|---|---|
|  | BILL SPURLING PROPERTIES | 4950 |  |
|  | OLMA REALTY CORP | 90000 |  |
|  | TRUMP 767 FIFTH AVE LLC | 21753.68 | 132,379.30 |
| Computer Equipment | CDW COMPUTER CENTERS INC | 174.32 |  |
|  | CISTECH INC | 4315.13 |  |
|  | COMPUTER ASSOCIATES | 33285 |  |
|  | GLOBAL COMPUTER SUPPLIES | 1795.9 |  |
|  | MIDRANGE SOFTWARE INC | 1541.33 |  |
|  | MODERN ELECTRICAL | 5838.51 | 46,950.19 |
| Benefits | GROUP INSURANCE | 7183 |  |
|  | NATIONAL BENEFIT LIFE | 20 |  |
|  | PRIMACY RELOCATION LLC | 34105.87 |  |
|  | PROVIDENT MUTUAL LIFE | 30705 |  |
|  | RETIREMENT PLAN | 50462 |  |
|  | TRUSTMARK INSURANCE CO | 546.6 |  |
|  | UNITED WAY OF FT. SMITH | 311.5 | 123,333.97 |
| Travel | AMERICAN EXPRESS | 10227.08 |  |
|  | COREY FOTH | 5443.14 |  |
|  | DANIEL GRANZYK | 36 |  |
|  | DAVE CHRISTENSEN | 20.32 |  |
|  | ERNIE VOTIS | 14166.67 |  |
|  | FLY AWAY LLC | 159.1 |  |
|  | GALT INDUSTRIES INC | 28371.99 |  |
|  | GLEN GLENDER | 162.43 |  |
|  | HAMPTON INN | 8249.99 |  |
|  | HERTZ CORP | 7518.43 |  |
|  | HOLIDAY INN | 1492.95 |  |
|  | JEFFERY BABB | 195.81 |  |
|  | JIMMY UNDERHILL | 100 |  |
|  | JOE GENADER | 40 |  |
|  | JOHN BILLS | 109.11 |  |
|  | KHAMMANY RAJAVONG | 100 |  |
|  | LA QUINTA - INGRAM PARK | 626.28 |  |
|  | LIONEL RICKARD | 354.34 |  |
|  | MANNY RODRIGUZ | 117.3 |  |
|  | MARGO WOODELL | 121.24 |  |
|  | MICHAEL BAUER | 25000 |  |
|  | MICHAEL HASHEM | -2133.65 |  |
|  | MICHAEL MCGRATH | 695.81 |  |
|  | MIKE KELLY | 43.58 |  |
|  | NORMA GUERRERO | 20.52 |  |
|  | RANDY LUCAS | 28.64 |  |
|  | RELOCATION COORDINATORS | 1674 |  |
|  | RICHARD FACKLER | 41666.66 |  |
|  | RUSTY JACKSON | 12093.86 |  |
|  | SHILO INN | 111.96 |  |
|  | TIMOTHY MURPHY | 4920 |  |
|  | WALTER HALL | 168.59 | 161,902.15 |

| | | | |
|---|---|--:|--:|
| Employee Hiring & Retention | ARKANSAS DEMOCRAT-GAZET | 66.26 | |
| | CONCENTRA MEDICAL CENTER | 3277 | |
| | COOPER CLINIC P.A. | 4400 | |
| | COURIER-TRIBUNE | 318.82 | |
| | EXECUTIVE CAREERS INC | 8320 | |
| | FIVE POINTS MEDICAL | 588 | |
| | FORTIER SUBSTANCE ABUSE | 200 | |
| | FT. SMITH CHAMBER | 337 | |
| | JOHNSTON'S QUALITY | 231.92 | |
| | MANAGEMENT RECRUITERS | 4726 | |
| | MARLIN CO | 1113.64 | |
| | MIDDLE TENNESSEE | 825 | |
| | NEWS & RECORD | 1281.28 | |
| | RANDOLPH COUNTY MENTAL | 750 | 26,434.92 |
| Professional-Legal | ASI - FOOD SAFETY | 726.5 | |
| | ATER WYNNE LLP | 2190 | |
| | CHOATE,HALL & STEWART | 1253894.8 | |
| | DICKINSON WRIGHT PLLC | 750.68 | |
| | OREGONIAN, THE | 307.52 | |
| | PROTIVITI | 40131.87 | |
| | SOUTHWEST TIMES RECORD | 330.2 | |
| | TENNESSEAN/NASHVILLE | 198.95 | |
| | TRAUGER, NEY & TUKE | 7920.1 | |
| | WRIGHT,LINDSEY | 521.13 | 1,306,971.75 |
| Professional-Audit | ARTHUR ANDERSON LLP | 93750 | 93,750.00 |
| Professional-Other | ACKERMANN | 789.46 | |
| | BULLIVANT,HOUSER,BAILEY | -1340.6 | |
| | CHEM-LAB INC | 216 | |
| | COLLECTIVE NET INC | 20605.84 | |
| | CRAWFORD & ASSOCIATES | 30856.5 | |
| | CT CORP SYSTEM | 3310.75 | |
| | D.F. KING & CO INC | 228.46 | |
| | FIDELITY NATIONAL | 3793.69 | |
| | FRONTIER TRUST | 2115 | |
| | FT. SMITH LAWN SERVICE | 2500 | |
| | GALT MANAGEMENT | 86669 | |
| | GUARD TRONIC INC | 1071.92 | |
| | HUMAN RESOURCE | 75 | |
| | JOSEPH C. SANSONE CO | 2753.54 | |
| | KLEIN & BARENBLAT | 1237.65 | |
| | LLOYD A. ETTER | 20175.89 | |
| | LONDON MANHATTAN CO | 200000 | |
| | MARSHALL CONSULTANTS | 1473 | |
| | NYL EXECUTIVE BENEFITS | 950 | |
| | PRIORITY METRICS | 4900 | |
| | REID & RIEGE P.C. | 7695 | |
| | RICHARD HARLAN | 3695.51 | |
| | ROBERT A. BROWN | 3600 | |
| | STATE STREET BANK | 14172.47 | |

|  |  |  |  |
|---|---|---:|---:|
|  | STEPTOE & JOHNSON LLP | 35262.5 |  |
|  | TECH SALES CO | 5319.93 |  |
|  | TRAVELEX | 240 |  |
|  | UNDERWRITERS LABORATORIE | 651.5 |  |
|  | WOLFGANG KOHLER | 57267.2 | 510,285.21 |
| Imprest | PETTY CASH FUND | 3706.56 | 3,706.56 |
| Other Variable Costs | 3DT LLC | 140.25 |  |
|  | 3T CORPORATION/CLEAN | 6.3 |  |
|  | A-1 PEST CONTROL INC | 150 |  |
|  | A-1 SCALE SERVICE INC | 96.98 |  |
|  | ACACIA NORTH AMERICAN | 400 |  |
|  | ACCENTS WITH LOVE | 481.23 |  |
|  | ACCRO INDUSTRIAL SUPPLY | 197.63 |  |
|  | ADRIAN HALE PEST CONTROL | 1200 |  |
|  | ADT SECURITY SERVICES INC | 5871.41 |  |
|  | AFFIRMED MEDICAL | 372.34 |  |
|  | AIR COMPRESSOR | 353.68 |  |
|  | AIR POWER INC | 63.38 |  |
|  | AIRGAS MID-AMERICA | 65.62 |  |
|  | ALLIANCE GAS SYSTEMS INC | 330 |  |
|  | ALLTEC ENGRAVERS INC | 280 |  |
|  | ALTERNATOR-STARTER | 97 |  |
|  | ALTEX ELECTRONICS INC | 5871.6 |  |
|  | AMERICAN AUTO GLASS INC | 129.23 |  |
|  | AMERICAN QUALITY SYSTEMS | 810 |  |
|  | AMERICAN ROTARY | 152.97 |  |
|  | AMERIPRIDE LINEN | 277.1 |  |
|  | AQUA PURE BOTTLED | 200.97 |  |
|  | ARGOSYS ROBOTICS | 155 |  |
|  | ARROW STAR DISCOUNT | 447.15 |  |
|  | ASHEBORO KEY,LOCK | 429.84 |  |
|  | ASHEBORO/RANDOLPH CHAMB | 867 |  |
|  | AUSTIN BOLT CO | 248.65 |  |
|  | AUSTIN CULLIGAN | 408.84 |  |
|  | AUTOMATION CENTER | 56.83 |  |
|  | AUTOMATION DIRECT.COM | 1200.41 |  |
|  | AVAILABLE CAR SERVICE INC | 292 |  |
|  | AVALON VISION | 846 |  |
|  | BAILEY CO | 170.02 |  |
|  | BARKER AIR & HYDRAULICS | 116.76 |  |
|  | BERENDSEN FLUID POWER | 1011.07 |  |
|  | BEST DELI | 39 |  |
|  | BEYER PRINTING INC | 113.27 |  |
|  | BIJUR LUBRICATING CORP | 579.04 |  |
|  | BOWNE OF ATLANTA INC | 1378.97 |  |
|  | BOY MACHINES INC | 530.85 |  |
|  | BRAID ELECTRIC CO INC | 336.63 |  |
|  | BREWED HOT COFFEE/SIERRA | 1008.56 |  |
|  | BRILES OIL & GAS INC | 11377.91 |  |
|  | BRITE N CLEAN JANITORIAL | 22784.5 |  |

| | |
|---|---:|
| BROWARD COUNTY REVENUE | 45 |
| BROWN & SHARPE | 733.57 |
| BROZELCO INC | 393.4 |
| BUILDING WORKS-USA | 1295.9 |
| BUNCE BUILDINGS | 1059.68 |
| BURGE FLOWER SHOP INC | 358.48 |
| BURNETT PROCESS INC | 0 |
| BUSINESS TECHNOLOGY | 863.29 |
| C. YOUNG & CO INC | 8196 |
| CAD SOUTH | 2215 |
| CAE SERVICES CORP | 1495 |
| CAPITAL HEATER | 923.34 |
| CARE SAFETY LLC | 3017.31 |
| CCL LABEL | 8196.8 |
| CENTERLINE AUTOMATION INC | 2457 |
| CENTRAL WELDING | 2569.62 |
| CHAPMAN PAVING INC | 3159 |
| CHARLIE'S TIN SHOP | 565 |
| CHEMTREAT INC | 3263.94 |
| CHERRY CITY METALS | 4786.66 |
| CHROMALOX | 191.21 |
| CISCO-EAGLE INC | 366.6 |
| CLIMET INSTRUMENTS CO | 1329.1 |
| CMM TECHNOLOGY INC | 910 |
| COMMISSIONER OF PATENTS | 300 |
| COMMUNICATIONS RESOURCE | 7577.5 |
| COMP-AIR SERVICE CO | 439.79 |
| CRM SERVICES | 190.76 |
| CROWN LABEL INC | 75.6 |
| CUMBERLAND ENGINEERING | 424.2 |
| CURWOOD INC | 2435.4 |
| DALTON'S LAWN SERVICE | 485 |
| DAY-TIMERS INC | 129.14 |
| D-BLAZE INC | 843.85 |
| DE LA FLOR GARDENS | 345.36 |
| DEMAG ERGOTECH USA | 1984.5 |
| DIMENSIONAL GAUGE CO | 240 |
| DOALL PIEDMONT | 790.34 |
| DOOR MAN | 36 |
| DRAPER'S SWEEPING SERVICE | 361 |
| DYNAMIC CONVEYOR CORP | 11203.25 |
| EAGLE OFFICE PRODUCTS INC | 1768.79 |
| EAR TECHNOLOGIES INC | 550 |
| ECONOMY PAPER CO INC | 131.26 |
| ENGLISH MOUNTAIN | 149.39 |
| EXPEDITORS INTERNATIONAL | 674.03 |
| FALCON TOOL CO INC | 115.33 |
| FERGUSON ENTERPRISES | 0 |
| FESTO CORP | 26.56 |
| FIRE-TEC | 631.68 |
| FISHMAN CORP | 131.15 |
| FORD TOOL STEELS INC | 131.58 |

| | |
|---|---:|
| FORTUNE PERSONNEL | 740.48 |
| FRANKLIN AUTOMATION | 54.2 |
| FRANKLIN ELECTROFLUID CO | 348.47 |
| FRANKLIN'S COMMERCIAL | 129.4 |
| FRIENDLY RUBBER & SEAL CO | 248.97 |
| G & K SERVICES INC | 8519.89 |
| GEOLOGISTICS AMERICAS INC | 508.7 |
| GLOBAL ENGINEERING | 158.46 |
| GOODWAY TECHNOLOGIES CO | 86.7 |
| GORMLEY PLUMBING | 5915 |
| GOTTRY CORP | 3206.95 |
| GREEN GRASS INC | 948.21 |
| GREENTHUMB NURSERY LLC | 2840 |
| GREG CLARK | 4305 |
| GRETAG MACBETH LLC | 2685.24 |
| GUADALUPE BURCIAGA | 10119.83 |
| GUY M. TURNER INC | 54662.6 |
| HANSON PUBLICATIONS INC | 374.65 |
| HAWKEYE INFORMATION | 500 |
| HELMEL ENGINEERING | 4142.17 |
| HI-TEC INDUSTRIAL | 1038.82 |
| HOLMES ERECTION INC | 500 |
| HOME DEPOT | 719.96 |
| HUNT ELECTRIC SUPPLY CO | 960.59 |
| HYDRA-POWER SYSTEMS INC | 261.78 |
| ICI DULUX PAINT CO | 1302.9 |
| IED INC | 830.16 |
| IMMIGRATION & NATURAL- | 1000 |
| INDUSTRIAL ELECTRONIC | 765.41 |
| INDUSTRIAL OILS UNLIMITED | 207.43 |
| INFO-TECH RESEARCH GROUP | 279 |
| INLAND VACUUM | 1428.71 |
| INSTRUCON INC | 436.33 |
| INTEGRATED INSPECTION | 4640 |
| INTERBIZ | 48270 |
| INTERTECH FILTRATION | 149.78 |
| J.D.W. HYDRAULICS INC | 3000 |
| J.F. APPLIANCE INC | 1003 |
| J.J. ELECTRONICS INC | 340 |
| J.L.B. MEDICAL PRODUCTS | 2878.94 |
| JANI-KING OF NASHVILLE | 1500 |
| JIM FITZGERALD | 3146.16 |
| JOHNSTOWN MANUFACTURING | 2790 |
| J'S RESTAURANT & LOUNGE | 346.05 |
| JUST ADD PLASTIC INC | 5345.16 |
| KILGORE PLUMBING CO INC | 164.85 |
| KIMBALL ELECTRONIC | -88.85 |
| KIPLINGER LETTER | 79 |
| KLINE BROTHERS ELECTRIC | 450 |
| KNOXVILLE NEWS-SENTINEL | 621.76 |
| KROLL LABORATORY | 70 |
| KROY CORP | 155.72 |

| | |
|---|---|
| L.D.R. TECHNOLOGIES LLC | 660 |
| LANDSCAPE SPRAY SERVICE | 469.7 |
| LARRY NEWMAN | 600 |
| LAVELLE INDUSTRIES | 609.66 |
| LAZER QUICK | 47.5 |
| LENSCRAFTERS | 76 |
| LIBERTY LABELS INC | 102.46 |
| LILLY CO | 34.75 |
| LIVINGSTON & HAVEN | 136.2 |
| LOFLINS PAVING | 1985 |
| M & M ENVIRONMENTAL | 1900 |
| MANFRED LOFFLER | 4173.66 |
| MANTEK DIVISION | 1443.29 |
| MARKEM | 256.16 |
| MARSH MICRO SYSTEMS | 6207.8 |
| MASTER GAGE & TOOL CO | 147.44 |
| MASTERMAN'S LLP | 515.57 |
| MASUNE CO | 581.4 |
| MCCLOUD PEST CONTROL | 180 |
| MCLEOD BELTING CO INC | 1293.71 |
| MCPHERSON OIL CO | 247.5 |
| MEMPHIS VALVE | 1579.13 |
| METTLER TOLEDO | 626.69 |
| MEYER OF ARKANSAS INC | 357.23 |
| MICHAEL FENCE CO INC | 858 |
| MICYTE LIMITED | 9661.5 |
| MID SOUTH INDUSTRIAL | 7750 |
| MIDDLE TENNESSEE | 437.35 |
| MIDWEST REFRESHMENT | 532.14 |
| MILWAUKEE CRANE & | 600 |
| MINARIK ELECTRIC CO | 358.55 |
| MOKON | 7398.98 |
| MOLL - PORTUGAL | 75000 |
| MOORE MEDICAL CORP | 263.88 |
| MORRIS COUPLING CO | 253.22 |
| MPKG INC | 1227.27 |
| MR. ROOTER | 503 |
| NATIONWIDE LIFT | 404.1 |
| NDE INC | 200 |
| NELSON MACHINE & GRINDER | 135 |
| NETWORK SERVICES | 117.02 |
| NEW TECHNOLOGY SOLUTIONS | 4799 |
| NEWPORT CORP | 126 |
| NEWPORT SCIENTIFIC INC | 308.34 |
| NISSHA USA INC | 1332 |
| NOLATO SHIELDMATE INC | 6525 |
| NORLIFT | 878.27 |
| OCCUPATIONAL HEALTH | 133 |
| OFFICE DEPOT INC | 8722.66 |
| ORKIN EXTERMINATING | 857.96 |
| OSBORN INDUSTRIES INC | 2122.39 |
| OSCO INC | 1446.51 |

| | |
|---|---|
| OZARK FLUID POWER INC | 683.22 |
| P.E.I. COMMUNICATIONS | 2308.43 |
| PACIFIC INTEGRATED | 4820.59 |
| PAMPERED LAWNS AUSTIN | 1282.22 |
| PARAGON TECHNOLOGIES INC | 703.9 |
| PARK AVENUE OFFICE | 157.05 |
| PEGGY LONG | 729 |
| PENSKE TRUCK LEASING | 2143.76 |
| PHOTOCOPY | 473.91 |
| PIEDMONT ASSOCIATED | 1000 |
| PIEDMONT ELECTRIC MACHINE | 2862.19 |
| PIEDMONT ELECTRIC MOTOR | 1183.72 |
| PITNEY BOWES INC | 2886.78 |
| PORTLAND SAW WORKS | 303 |
| PRIORITY ENGINEERING | 450 |
| PROFESSIONAL | 850 |
| PRO-LINE FIRST AID | 158.65 |
| PRO-PRIDE COMMERCIAL | 500 |
| PURCHASE POWER | 4093.99 |
| Q-CEE'S PRODUCT CORP | 120.42 |
| QUICK & SINCLAIR | 22326.05 |
| R & B VENDING | 2797.2 |
| RCS INC | 3359.95 |
| RED WING MOBILE | 782.1 |
| REED ELECTRIC CO | 562.5 |
| REEVES POWER TOOLS | 527.45 |
| RELIABLE OFFICE SUPPLIES | 218.02 |
| RGA | 1164.58 |
| RJG INC | 398 |
| ROBOHAND INC | 48.6 |
| ROCHESTER INITIATIVE | 695 |
| RON HOLT | 900 |
| ROYAL CUP INC | 173.59 |
| ROYAL OFFICE PRODUCTS INC | 353.49 |
| RUS UNIFORMS | 6254.38 |
| SAFECO INC | 95.37 |
| SAFETY KLEEN CORP | 3039.54 |
| SAFETY NETWORK INC | 843.75 |
| SANDRA NEEDHAM | 8100 |
| SCALEMEN OF FLORIDA INC | 1155.25 |
| SCAMARDO METAL | 160.4 |
| SEAGROVE HARDWARE CO | 147.28 |
| SECURITY SHREDDERS INC | 150 |
| SENTRY SECURITY INC | 190.8 |
| SHARP'S LOCK & ALARM | 43.04 |
| SHOWCASE OF FLOWERS | 48 |
| SIGNART ADVERTISING INC | 239.43 |
| SOLID CONTROLS INC | 797.3 |
| SOLO HORTON BRUSHES INC | 84.6 |
| SPECIALTY PRODUCTS & | 393.5 |
| ST. PETERSBURG STEEL CORP | 572.2 |
| STACK METALLURGICAL | 110 |

| | | | |
|---|---|--:|--:|
| | STAR AUTOMATION INC | 565.68 | |
| | STERICYLE INC | 304.92 | |
| | STERLING INC | 272.2 | |
| | STERLTECH AUTOMATION | 308.46 | |
| | SUBURBAN WEST MAINTENANC | 2466 | |
| | SUMITOMO PLASTICS | 96 | |
| | SUMMERVILLE STEEL CO | 328.82 | |
| | SUNCOAST PRECISION INC | 570 | |
| | SUSAN M. HAMMER | 700 | |
| | SYKES SUPPLY CO | 119.55 | |
| | SYNVENTIVE MOLDING | 1131.59 | |
| | SYSTEM SCALE CORP | 499.74 | |
| | SYSTEM WAREHOUSE INC | 55.4 | |
| | TAYLOR INDUSTRIAL SERVICE | 204.75 | |
| | TAYLOR MADE HOSE | 1206.8 | |
| | TEAM TORGUE INC | 91 | |
| | TECSTAR MANUFACTURING | 135 | |
| | TERMINIX INTERNATIONAL | 1425 | |
| | TEXACO | 128.45 | |
| | TEXAS SCALES INC | 755.76 | |
| | THERMAL CARE | 214.87 | |
| | THREE ARROWS CORP | 305.67 | |
| | TOM'S SUPPLY LLC | 71.18 | |
| | TRI-STATE HOSPITAL | 3844.69 | |
| | TS MARKETING | 5060.45 | |
| | U.S. HEALTHWORKS | 45 | |
| | UNIFIRST CORP | 2954.04 | |
| | UNITEMP | 509.7 | |
| | UNIVERSITY OF ARKANSAS | 1880 | |
| | UPCHURCH ELECTRICAL | 765.58 | |
| | USED OIL SERVICE CO | 120 | |
| | VERNON POOLE & CO INC | 151.9 | |
| | WALMART | 700 | |
| | WASTE MANAGEMENT | 7272.24 | |
| | WHITE GLOVE CLEANING | 2700 | |
| | WMM ASSOCIATES CLEANING | 1063.8 | |
| | WOMACK MACHINE SUPPLY CO | 277.36 | |
| | XE SYSTEMS INC | 28.76 | |
| | X-ERGON | 1108.21 | |
| | YEAGER'S TRUE VALUE | 476.19 | |
| | ZAHORANSKY | 455.5 | 610,590.38 |
| Other Fixed Costs | ARKANSAS GLASS & MIRROR | 215.72 | 215.72 |
| Capital Expenditures | FORTE AUTOMATION | 127276.05 | |
| | OZBURN-HESSEY DEVELOPMEI | 11839 | 139,115.05 |
| | | 6,204,699.41 | 6,204,699.41 |